## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| RANDOLPH FRESHOUR and VINCENZO ALLAN, each individually and on behalf of similarly situated individuals, | ) ) ) | |
| | ) | Case No.: 1:23-cv-02667 |
| Plaintiffs, | ) ) | |
| | ) | Hon. Virginia M. Kendall |
| v. | ) | |
| | ) | Magistrate Judge Hon. M. David Weisman |
| CERENCE INC., a Delaware corporation, | ) ) | |
| Defendant. | ) | |

## DEFENDANT CERENCE INC.'S OPPOSITION TO PLAINTIFFS' MOTION AND MEMORANDUM OF LAW IN SUPPORT OF CLASS CERTIFICATION

Matthew C. Wolfe
Amy Y. Cho
Mehgan E. H. Keeley
Samuel G. Bernstein
Elise N. Malin
**SHOOK, HARDY & BACON LLP**
111 South Wacker Drive, Suite 4700
Chicago, IL 60606
Tel: (312) 704-7700
mwolfe@shb.com
acho@shb.com
mkeeley@shb.com
sbernstein@shb.com
emalin@shb.com

*Counsel for Defendant Cerence Inc.*

i

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................... 1

BACKGROUND ....................................................................................................... 3

I.     The Relevant Voice, Speech, and Cloud Technology. ..................................... 3

II.    Plaintiffs' BIPA Claims and Proposed Class. .................................................. 4

LEGAL STANDARD .................................................................................................. 5

ARGUMENT ............................................................................................................. 6

I.     The Proposed Class Fails the Requirements of Rule 23(b)(3) Because a Class Action Is Not a Superior Method to Fairly and Efficiently Adjudicate Plaintiffs' Claims, and Common Issues Do Not Predominate. ............................................ 6

    A.    Class-wide resolution is not superior. ................................................... 7

        1.    The proposed class definition contains no objective criteria to determine who is a class member. .......................................... 7

            a.    There is no objective way to determine *who* used the technology. .............................................................. 10

            b.    There is no objective way to determine which users' data was sent to the cloud, because that depends on *what* the users said. .......................................................... 13

            c.    There is no objective way to determine *where* users used the technology. ...................................................... 14

            d.    There is no objective way to determine *when* each person used the technology. .................................................. 14

        2.    The absence of an objective method for determining class members leads to a class that would rely entirely on claimants' "because I say so" submissions. ............................................. 15

        3.    A class action is not superior or a fair method of adjudication because potential damages are disproportionate to Plaintiffs' alleged harm. ............................................................................. 16

    B.    Common questions do not predominate over individual issues. ........... 18

1. Individualized inquiries are required to determine if class members used the technology and if their data was ever sent to Cerence from Illinois during the relevant time period...................................................... 19

2. Individualized inquiries are required to determine if class members consented under BIPA 15(b) and (d). ....................................................... 19

3. Individualized inquiries are required to determine whether each class member waived BIPA rights. ............................................................ 20

4. Individualized inquiries are required to prove and calculate damages................................................................................................... 21

II. Plaintiffs also Fail to Meet Their Burden on Adequacy and Typicality. ......................... 22

1. Allan is not a member of the defined class because his data was never transmitted to Cerence. .................................................................... 22

2. Plaintiffs are subject to unique defenses. ..................................................... 23

3. Freshour cannot be the class representative because he is not interested in fulfilling his duties. ............................................................. 24

CONCLUSION................................................................................................................. 25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Al Haj v. Pfizer Inc.*,
2020 WL 1330367 (N.D. Ill. Mar. 23, 2020) ........................................................................21

*Alvarado v. International Laser Products, Inc. et al.*,
No. 18-cv-7756, 2019 WL 337995 (N.D. Ill. June 19, 2019) ......................................................10

*Andrews v. Chevy Chase Bank*,
545 F.3d 570 (7th Cir. 2008) ..................................................................................................7, 21

*Amchem Prods. Inc. v. Windsor*,
521 U.S. 591, 624 (1997) ............................................................................................................18

*Arandell Corp. v. Xcel Energy Inc.*,
149 F.4th 883 (7th Cir. 2025) ....................................................................................................11

*Beaton v. SpeedyPC Software*,
907 F.3d 1018 (7th Cir. 2018) ..................................................................................................23

*Blair v. Equifax Check Servs., Inc.*,
181 F.3d 832 (7th Cir. 1999) ......................................................................................................3

*Briscoe v. Health Care Service Corp.*,
337 F.R.D. 158 (N.D. Ill. 2020) ..................................................................................................9

*CE Design Ltd. v. King Architectural Metals, Inc.*,
637 F.3d 721 (7th Cir. 2011) ..........................................................................................3, 5, 23

*Clark v. Bumbo Int'l Trust*,
2017 WL 3704825 (N.D. Ill. 2017) ..........................................................................................12

*Cothron v. White Castle System, Inc.*,
216 N.E.3d 918 (Ill. 2023) ........................................................................................................17

*Dancel v. Groupon*,
949 F.3d 999 (7th Cir. 2019) ............................................................................................ *passim*

*Duron v. Unifocus*,
No. 18-cv-6479 (N.D. Ill. Dec. 10, 2024) ................................................................................24

*Eddlemon v. Bradley Univ.*,
65 F.4th 335 (7th Cir. 2023) ......................................................................................................21

*Eubank v. Pella Corp.*,
  753 F.3d 718 (7th Cir. 2014) .................................................................................24, 25

*G.T. v. Samsung Elec. Amer., Inc.*,
  742 F. Supp. 3d 788 (N.D. Ill. 2024) ...............................................................................1

*Greene v. Mizuho Bank, Ltd.*,
  327 F.R.D. 190 (N.D. Ill. 2018)......................................................................................22

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014).......................................................................................................5, 6

*Howe v. Speedway, LLC*,
  No. 19-cv-01374, 2024 WL 4346631 (N.D. Ill. Sept. 29, 2024)...........................10

*In re Estate of Ferguson*,
  313 Ill. App. 3d 931 (2d Dist. 2000)..............................................................................20

*In re Facebook Biometric Info. Privacy Litig.*,
  326 F.R.D. 535, 542 (N.D. Cal. 2018).............................................................................10

*In re Rhone-Poulenc Rorer Inc.*,
  51 F.3d 1293 (7th Cir. 1995) .......................................................................................3, 7

*In re Trans Union Corp. Privacy Litig*,
  211 F.R.D. 328 (N.D. Ill. 2002)................................................................................16, 17

*Johnson v. Yahoo! Inc.*,
  2018 WL 835339 (N.D. Ill. Feb. 13, 2018) ...............................................................18

*Johns, et al. v. Paycor, Inc.*
  No. 20-cv-00640, 2025 WL 947914 (S.D. Ill. Mar. 28, 2025)...............................10

*Koos v. First Nat'l Bank of Peoria*,
  496 F. 2d 1162 (7th Cir. 1974) ...................................................................................23

*Lake County Grading Co. of Libertyville, Inc. v. Advance Mechanical*
  *Contractors, Inc.*, 275 Ill. App. 3d 452 (2d Dist. 1995) ........................................20

*Langendorf v. Skinnygirl Cocktails, LLC*,
  306 F.R.D. 574 (N.D. Ill. 2014)...........................................................................8, 9, 21

*Lipton v. Chattem, Inc.*,
  289 F.R.D. 456 (N.D. Ill 2013)......................................................................................21

*McGoveran v. Amazon Web Servs., Inc.*,
  2024 WL 4626253 (D. Del. Oct. 30, 2024) ..............................................................14

*Messner v. Northshore Univ. HealthSystem,*
  669 F.3d 802 (7th Cir. 2012) ...................................................................................6, 7, 18, 19

*Morris v. Wow Bao, LLC,*
  No. 2017-CH-01229 (Cir. Ct. Cook Cnty. Nov. 17, 2021).....................................................10

*Mullins v. Direct Digital LLC,*
  795 F.3d 654 (7th Cir. 2015) ...................................................................................................8

*Murray v. E-Trade Fin. Corp.,*
  240 F.R.D. 392 (N.D. Ill. 2006).............................................................................................25

*Oshana v. Coca-Cola Co.,*
  472 F.3d 506 (7th Cir. 2006) ...................................................................................7, 8, 11, 12

*Palacios v. H&M Hennes & Mauritz, LP,*
  No. 18-CH-16030 (Cir. Ct. Cook Cnty. Mar. 16, 2023).......................................................10

*Patel v. Facebook, Inc.,*
  932 F.3d 1264, 1277 (9th Cir. 2019). .....................................................................................10

*Physicians Healthsource, Inc. v. Allscripts Health Sols., Inc.,*
  254 F. Supp. 3d 1007 (N.D. Ill. 2017) ..............................................................................24, 25

*Pruitt v. Pers. Staffing Grp., LLC,*
  2020 WL 3050330 (N.D. Ill. June 8, 2020) ...........................................................................24

*Randall v. Rolls-Royce Corp.,*
  637 F.3d 818 (7th Cir. 2011) .................................................................................................22

*Rogers v. BNSF Ry. Co.,*
  No. 19-cv-3083, 2022 WL 854348, at *4 (N.D. Ill. Mar. 22, 2022) ......................................10

*Sherwin v. Samsung Elecs. Am., Inc.,*
  2019 WL 10854535 (N.D. Ill. 2019) ......................................................................................23

*Schwartz v. Supply Network, Inc.,*
  2024 WL 4871408 (N.D. Ill. Nov. 22, 2024) .........................................................................17

*Smith-Brown v. Ulta Beauty, Inc.,*
  335 F.R.D. 521 (N.D. Ill. 2020).............................................................................................18

*Strow v. B&G Foods, Inc.,*
  348 F.R.D. 446 (N.D. Ill. 2025)....................................................................................7, 9, 12

*Thompson v. Matcor Metal Fabrication (Illinois) Inc.,*
  No. 2020-CH-00132 (Cir. Ct. Tazewell Cnty. June 28, 2022) ...............................................10

*Tyson Foods, Inc. v. Bouaphakeo*,
 146 S. Ct. 1036 (2016) ..................................................................................7, 19

*Van v. Ford Motor Co.*,
 332 F.R.D. 249 (N.D. Ill. 2019) ......................................................................6, 18

*West v. Carr*,
 337 F.R.D. 181 (W.D. Wis. 2020) ........................................................................9

*Wooley v. Jackson Hewitt, Inc.*,
 2011 WL 1559330 (N.D. Ill. Apr. 25, 2011) .......................................................20

*Zellmer v. Meta Platforms, Inc.*,
 104 F.4th 1117 (9th Cir. 2024) ............................................................................1

**Statutes**

740 ILCS 14/15, *et seq.* ("BIPA") ..................................................................5, 6, 17, 19

**Other Authorities**

Fed. R. Civ. P. 23, *et. seq.* ......................................................................... *passim*

## INTRODUCTION

The proposed class is untenable. Plaintiffs claim that Cerence violated their BIPA rights by collecting data through the "Hey Mercedes" speech-recognition feature, but their class is not tethered to their claims and offers no objective way to identify class members. Standing alone, Plaintiffs' class definition will not identify a single person who had their audio data transmitted to Cerence. Rather, the proposed class will depend entirely on class members' subjective reporting of their use of the "Hey Mercedes" speech-recognition feature. Furthermore, as defined, the class is full of uninjured members and would require a mass of individualized inquiries to determine who has a claim.

Plaintiffs have not proposed an objective or reliable method to determine who is a member of the class. Under Seventh Circuit law, that is fatal to their Motion. *See* Section I.A, *infra*. Moreover, in their efforts to create an expansive class of "Hey Mercedes" users, they concede that Cerence has no way to identify Plaintiffs or any other purported class member – which ultimately will be fatal to their BIPA claims on the merits. *See, e.g., Zellmer v. Meta Platforms, Inc.*, 104 F.4th 1117, 1124 (9th Cir. 2024) ("biometric identifiers must *identify*");[1] *G.T. v. Samsung Elec. Amer., Inc.*, 742 F. Supp. 3d 788, 799-800 (N.D. Ill. 2024) (BIPA only governs the collection of data that *can identify individuals*). Class certification may be common in BIPA cases, but the absence of a class list or database of users' names distinguishes this case from every BIPA case relied upon by Plaintiffs. To try to fill that gap, Plaintiffs argue the class is ascertainable by claiming that they could piece together a class from various third-party sources and a declaration by a purported expert. Those sources do not come close to solving the problem. In fact, at her deposition, Plaintiffs' expert disavowed the points that Plaintiffs cite her report to support.

---

[1]      Emphases added unless otherwise noted.

For these reasons, the proposed class flunks Rule 23's requirements. Plaintiffs ask this Court to certify the class under Rule 23(b)(3), which requires a showing that common questions predominate over individual ones and that a class action is a superior method to fairly and efficiently adjudicate the matter. But a class action is certainly not a superior method when the class: lacks objective criteria to ascertain members; includes unharmed members; and seeks damages that are grossly disproportionate to the alleged harm. *See* Section I.A. Nor can Plaintiffs show that common questions predominate, primarily because their boilerplate "common questions" are overwhelmed by dispositive, user-by-user inquiries, all of which are fundamental building blocks of their claims. To name a few, all putative class members' claims require findings regarding: whether a person even used the technology; how they used it; if they used it in Illinois; and whether they used it during the lengthy carve-out period when Cerence did not even service the Mercedes-Benz U.S. cloud—that is, when no data at all was transmitted from those vehicles to Cerence. *See* Section I.B. More individualized inquiries are involved with determining: whether users consented to the transmission of data; whether users waived BIPA rights; and how to calculate damages. *Id.*

The named Plaintiffs also do not qualify as adequate class representatives with typical claims. FED. R. CIV. P. 23(a)(1), (4). By definition, Plaintiff Allan is not even a member of his own proposed class. Individualized defenses exist as to both Plaintiffs. And Plaintiff Freshour is completely uninterested in being a representative. For each of these independent reasons, the named Plaintiffs are incapable of adequately representing the proposed class. *See* Section II.

In summary, this is the kind of class that that the Seventh Circuit has cautioned courts against allowing. The class is not objectively defined, will require time-consuming, burdensome, and expensive mini-trials on individualized issues, and would be messy, unpredictable, and a

wasteful use of resources. "Certification as a class action can coerce a defendant into settling on highly disadvantageous terms regardless of the merits of the suit." *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 723 (7th Cir. 2011); *Blair v. Equifax Check Servs., Inc.*, 181 F.3d 832 (7th Cir. 1999) (expressing same concerns); *In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293 (7th Cir. 1995) (same). Plaintiffs' ploy for a class action plainly is designed to leverage exactly these sorts of perverse incentives. The motion for class certification should be denied.

## **BACKGROUND**

As is explained below, Cerence is a technology vendor that sells software and services to automobile manufacturers. Cerence provides its customers with a variety of software options to choose from, purchase, and install into their vehicles before they are sold to consumers. Cerence does not sell its software to, or receive personally identifying information, like names or email addresses, from the end users of its technology.

### I.     **The Relevant Voice, Speech, and Cloud Technology.**

The technology now[2] at issue in this case is Cerence's automated speech-recognition ("ASR") technology in the MBUX Voice Assistant. *See* Mot. at 4-5. ASR recognizes spoken words, without any identifying features, and translates those words from speech to text to execute commands (*e.g.*, "turn on the radio"). Ex. 1, Hamerich Dep. Tr. 40:5-11, 117:5-118:6. To use the MBUX speech command service, a user can either press the "push-to-talk" button or say the wakeup word ("Hey Mercedes"). Ex. 1, Hamerich Dep. Tr. 64:25-65:1. Every Cerence witness testified that ASR has no biometric component and does not make it possible for Cerence to

---

[2]     The technology at issue has evolved throughout the life of the case, but Cerence understands Plaintiffs' theory to now exclusively focus on the ASR technology.

identify a user by their voice. *E.g.*, Ex. 1, Hamerich Dep. Tr. 94:5-7.[3] Anyone in the vehicle—like

a one-time passenger, not just the owner or driver—can give a speech command with the ASR

technology. *See* Compl., ECF No. 63, ¶¶ 1, 25, 41 (alleging passengers can interact with ASR);

Ex. 2, Tropp Dep. 137:7-138:22 

Ex. 1, Hamerich Dep. Tr. 40:5-11.

*Id.* at 132:11-21; Ex. 3, Ex. 2 to

Hamerich Dep. Tr. The MBUX Voice Assistant

Ex. 4, Barton Dep. Tr. 45:11-46:8, 123:3-6.

During the statutory period,

Ex. 5,

Tsuboyama Dec. ¶ 9. Before that,

for MBUX in the United States. *Id.* ¶ 6-10.

*Id.* ¶ 11.

## II.    Plaintiffs' BIPA Claims and Proposed Class.

Plaintiffs are Mercedes-Benz owners who allege that Cerence violated BIPA by collecting,

storing, and disclosing their voiceprints when they used MBUX technology. Compl., ECF No. 63,

---

[3]      The parties are currently conducting expert discovery relating to merits issues—namely, whether
the ASR technology captures a "voiceprint."

¶¶ 4-5, 46, 52. Plaintiff Freshour's vehicle is equipped with speech-recognition technology, including the "Hey Mercedes" feature. Ex. 6, Freshour Dep. Tr. 28:21-24. He has used it "constantly" since he bought it in 2022, and he pays $150 annually to renew the services. *Id.* at 29:13-15, 45: 8-15; Ex. 7, MBUSA_0101; Ex. 8, FRESHOUR_000112, Ex. 9, FRESHOUR_000147.

Plaintiff Allan has owned three Mercedes-Benz vehicles that he alleges are relevant here. Ex. 10, Allan Dep. Tr. 35:20-36:6. Allan claims he used the speech-recognition technology across all three vehicles in or around November 2019 through early to mid 2023. *Id.* at 36:18-19, 40:11-20, Ex. 11, MBUSA_0068.

Plaintiffs seek relief under BIPA Sections 15(b) and (d), which impose notice and consent requirements on entities that collect, store, and/or disclose voiceprints. 740 ILCS 14/15(b), (d). Relatedly, they seek to represent a putative class of individuals. Plaintiffs exclude from the class "all individuals whose entire period of ownership, lease, or use of the MBUX Voice Assistant ███ ████████████████████████████████████████████████████████████████████ ████████████████ Mot. at 9. This carve-out excludes Plaintiff Allan from the class, although he requests certification as a class representative. *See* Ex. 11, MBUSA_0068, Allan Dep. Tr. 39:19-20, 40:11-20, 62:4 (used technology from in or around November 2019 through early 2023); Ex. 5, Tsuboyama Dec. ¶ 9 ███████████████████████████████████████████ ██████████████████████████████████; Motion for Summary Judgment as to Plaintiff Allan, also filed today.

## **LEGAL STANDARD**

Plaintiff bears the burden of proving that class certification is appropriate. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014). The Court must conduct a "rigorous analysis" before certifying a class. *CE Design Ltd.*, 637 F.3d at 723 (vacating certification). In

doing so, the Court must find that Plaintiffs have proved by a preponderance of the evidence that the putative class satisfies each of the four requirements of Federal Rule of Civil Procedure 23(a)—numerosity, typicality, commonality, and adequacy of representation—and meets the criteria for one of the three types of class actions set forth in Rule 23(b). *Halliburton Co.*, 573 U.S. at 275 (plaintiff needs to "actually *prove*—not just plead—that the proposed class satisfies each requirement"). Because Plaintiffs seek certification under Rule 23(b)(3), they must also show that "questions of law or fact common to the class members predominate over individualized issues and that a class action is the superior method of adjudicating the case." FED. R. CIV. P. 23(b)(3).

To prove a claim under BIPA Section 15(a), a plaintiff needs to prove that the defendant "collect[ed], capture[d], purchase[d], receive[d] through trade, or otherwise obtain[ed] a person's or a customer's biometric identifier or biometric information" without complying with the statute's notice and consent requirements. 740 ILCS 14/15(b). Relatedly, Section 15(d) requires proof that a defendant was "in possession of biometric identifiers or biometric information" and "disclose[d]" or "disseminate[d]" it without informed consent. *Id*. at 14/15(d). Applied here, that means Plaintiffs and class members will need to prove that Cerence collected and/or disclosed their voiceprints without consent.

## ARGUMENT

**I.       The Proposed Class Fails the Requirements of Rule 23(b)(3) Because a Class Action Is Not a Superior Method to Fairly and Efficiently Adjudicate Plaintiffs' Claims, and Common Issues Do Not Predominate.**

To show that a class action satisfies "predominance" under Rule 23(b)(3), Plaintiffs must show that "common questions represent a significant aspect of [a] case and . . . can be resolved for all members of [a] class in a single adjudication." *Van v. Ford Motor Co.*, 332 F.R.D. 249, 288 (N.D. Ill. 2019), quoting *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012). "If, to make a prima facie showing on a given question, the members of a proposed class

will need to present evidence that varies from member to member, then it is an individual question." *Id.*, quoting *Messner*, 669 F.3d at 815, and *Tyson Foods, Inc. v. Bouaphakeo*, 146 S. Ct. 1036, 1045 (2016). Plaintiffs also need to show that a class action is a superior method to fairly and efficiently adjudicate their claims. FED. R. CIV. P. 23(b)(3). As shown next, Plaintiffs do not meet their burden on either element.

### A. Class-wide resolution is not superior.

In analyzing superiority, the court considers whether a class action or individual trials would be a more fair and efficient method to adjudicate the controversy. FED. R. CIV. P. 23(b)(3). Courts consider "the likely difficulties in managing a class action" and "class members' interests in individually controlling" their own cases. *Id.* "If the class certification only serves to give rise to hundreds or thousands of individual proceedings requiring individually tailored remedies, it is hard to see how common issues predominate or how a class action would be the superior means to adjudicate the claims." *Andrews v. Chevy Chase Bank*, 545 F.3d 570, 577 (7th Cir. 2008) (vacating certification of class that "would not promote the primary purposes of the class-action mechanism: judicial economy and efficiency"); *see also In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d at 1300 (certification risking undue settlement pressure "need not be tolerated when the alternative exists of submitting an issue to multiple juries"). For a number of reasons, Plaintiffs' proposed class action is not a tenable, let alone superior, method for litigating their BIPA claims that Cerence unlawfully collected and disclosed their voiceprints.

### 1. The proposed class definition contains no objective criteria to determine who is a class member.

In the Seventh Circuit, ascertainability is a prerequisite to class certification under the requirements of Rule 23 (most often, it is evaluated under superiority). *Strow v. B&G Foods, Inc.*, 348 F.R.D. 446, 448 (N.D. Ill. 2025); citing *Oshana v. Coca–Cola Co.*, 472 F.3d 506, 513 (7th

Cir. 2006). A class sought under Rule 23(b)(3) must be "defined clearly and based on objective criteria." *See Mullins v. Direct Digital LLC*, 795 F.3d 654, 659 (7th Cir. 2015). "Class definitions have failed this requirement when they were too vague or subjective." *Id.* at 657. "Vagueness is a problem because a court needs to be able to identify who will receive notice, who will share in any recovery, and who will be bound by a judgment." *Id*. at 660.

To avoid these complications, the Seventh Circuit and courts in this district refuse to certify classes that are not clearly defined – especially when the class definition relies upon the subjective say-so of class members, or potentially includes many unharmed class members. The Seventh Circuit's decision in *Oshana* illustrates this principle. *Oshana* was a consumer-fraud case. The plaintiff proposed a class of people who purchased fountain Diet Coke and alleged that they were deceived because the fountain product (which contained saccharin) and the bottled product (which did not) contained different artificial sweeteners. 472 F.3d 506, 513 (7th Cir. 2006). The Seventh Circuit affirmed the denial of class certification, reasoning that basing the class on a purchase was too indefinite: "Some people may have bought fountain Diet Coke *because it contained* saccharin, and some people may have bought fountain Diet Coke *even though* it had saccharin." *Id*. at 514 (emphasis in original). "As such, the proposed class is not sufficiently identifiable or definite." *Id*. at 515.

Since *Oshana*, numerous cases have applied similar reasoning. For instance, a plaintiff in another consumer-fraud action moved to certify a class of persons who purchased the product at issue. *Langendorf v. Skinnygirl Cocktails, LLC*, 306 F.R.D. 574, 578-79 (N.D. Ill. 2014). The court denied certification because the plaintiff "ha[d] not offered any method by which the court could find out who the purchasers were" or any "evidence that *any records exist that show who purchased the offending product*, when, or where." *Id.* at 579. Although "[t]he identities of the

class members need not be known at this stage," the court explained, "there must be some objective criteria by which the identities can be determined." *Id.* at 578. *See also Strow*, 348 F.R.D. at 449-50 (recent decision denying certification for similar reason); *Briscoe v. Health Care Service Corp.*, 337 F.R.D. 158, 164-65 (N.D. Ill. 2020) (same); *West v. Carr*, 337 F.R.D. 181, 187-88 (W.D. Wis. 2020) (class definition "ma[d]e it feasible to identify the larger group of…potential class members, [but] that does not answer the question of whether they *are* members of the class" without "individualized assessments of each potential class member[]").

In this case, Plaintiffs' definition relies upon vehicle lease and purchase information. But that information does not answer the key threshold question in this case, which is: **Did class members use the MBUX speech-recognition technology?** Without answering that question, there is no way to know if someone is in the class. *See Dancel v. Groupon*, 949 F.3d 999, 108 (7th Cir. 2019) ("starting point" of class-certification determination is "the substantive elements of plaintiffs' cause of action"). But Plaintiffs don't even try to answer it. They propose no objective method to identify *who* used the technology, *what* software or features were used (which would determine whether ████████████████████████████) or *when* and *where* class members used the technology. As discussed below, to identify who actually used the supposedly offending technology in a way that implicates BIPA, *each* of these questions *must* be asked. Plaintiffs ask *none* of them and therefore their class definition fails for lack of objectivity and vagueness.

### a. There is no objective way to determine *who* used the technology.

This case is different from every BIPA class-certification decision relied upon by Plaintiffs[4] because there is no established class list of Cerence voice or speech technology users whatsoever. Ex. 12, Peak Dep. Tr. 74:9-13 (Plaintiffs' expert not aware of Cerence "having a list or specific information about what individuals should be class members"). It is undisputed that Cerence does not know who uses its technology. *See* Ex. 1, Hamerich Dep. Tr. 132:15-133:2



); Ex. 15, Cashman Dep. Tr. 206:5-14 (

).

*See* Ex. 4, Barton Dep. Tr. 43:14-44:1. Simply owning or leasing a Mercedes-Benz does not mean that the individual used the "Hey Mercedes" technology, nor does the fact that the person created a Mercedes Me Connect account or that the MBUX Voice Assistant was equipped and active in the vehicle. In fact, people can (and *do*) create an account for, own, or lease a Mercedes-Benz but choose not to use the speech-recognition feature. Plaintiff Allan did exactly that. Ex. 10, Allan Dep. Tr. 39:19-20, 40:11-20. *See also* Ex. 15,

---

[4]     *See* Mot. at 2 n.3, citing *Rogers v. BNSF Ry. Co.*, No. 19-cv-3083, 2022 WL 854348, at *4 (N.D. Ill. Mar. 22, 2022) (certifying class in BIPA case based on fingerprints collected during timekeeping where defendant-employer had list of people who used timeclocks); *Palacios v. H&M Hennes & Mauritz, LP*, No. 18-CH-16030 (Cir. Ct. Cook Cnty. Mar. 16, 2023) (same); *Thompson v. Matcor Metal Fabrication (Illinois) Inc.*, No. 2020-CH-00132 (Cir. Ct. Tazewell Cnty. June 28, 2022) (same); *Johns, et al. v. Paycor, Inc.*, No. 20-cv-00640, 2025 WL 947914 (S.D. Ill. Mar. 28, 2025) (same); *Alvarado v. International Laser Products, Inc. et al.*, No. 18-cv-7756, 2019 WL 337995 (N.D. Ill. June 19, 2019) (same); *Howe v. Speedway, LLC*, No. 19-cv-01374, 2024 WL 4346631 (N.D. Ill. Sept. 29, 2024) (same); *Morris v. Wow Bao, LLC*, No. 2017-CH-01229 (Cir. Ct. Cook Cnty. Nov. 17, 2021) (certifying class in BIPA case based on face geometry and repeat customers); *In re Facebook Biometric Info. Privacy Litig.*, 326 F.R.D. 535, 542 (N.D. Cal. 2018) (certifying class in BIPA case based on face geometry where Facebook has a list of users with Facebook accounts), *aff'd sub nom. Patel v. Facebook, Inc.*, 932 F.3d 1264, 1277 (9th Cir. 2019).

Cashman Dep. Tr. 39:9-22 (does not use the speech-recognition feature in his car); Ex. 12, Peak

Dep. Tr. 43:6-11 (Plaintiffs' expert doesn't either).

Thus, as defined by Plaintiffs, the class will include many people who *never* used the

technology, such as: individuals who owned or leased a vehicle but never used the "Hey Mercedes"

feature; individuals who owned or leased a Mercedes-Benz vehicle but did not personally use the

vehicle (perhaps a family member did instead); and individuals who purchased a Mercedes-Benz

in Illinois but never used the "Hey Mercedes" feature in Illinois (it is not uncommon for purchasers

of vehicles to buy a car in one state but have it delivered to another; both Plaintiffs in this case did

just that). MBUSA_0001 (Freshour purchased vehicles in Missouri), Ex. 13 and MBUSA_0016

(Allan purchased vehicle in Ohio), Ex. 14.

Inversely, a person who does not own, lease, or create a Mercedes Me Connect account for

a vehicle can still use the MBUX Voice Assistant's speech-recognition software while driving or

riding in someone else's vehicle. The Complaint itself contemplates this situation. Compl., ECF

No. 63, ¶¶ 1, 25, 36, 41 (alleging passengers used technology); *see also* Ex. 2, Tropp Dep. Tr.

138:18-22 (███████████████████████████████████████████████████

████). But Plaintiffs propose no way to solve this problem for class-certification purposes, and

their expert never considered it. Ex. 12, Peak Dep. Tr. 91:6-23, 93:4-13.[5]

The Seventh Circuit and courts in this district reject certification of classes that are defined

so broadly that they could include unharmed people without claims. *See, e.g., Oshana*, 472 F.3d

at 509, 514 (denying certification where class was vaguely defined could have included many

---

[5]      Where, as here, the defendant offers admissible evidence that, if credited, would mean individual
questions would predominate over common questions, then the district court must "investigate[ ] the
realism" of the expert evidence "in light of the defendants' counterarguments," and take evidence to that
end. *Arandell Corp. v. Xcel Energy Inc.*, 149 F.4th 883, 894 (7th Cir. 2025). Flaws in Plaintiffs' expert's
opinions and methodology are further discussed in Cerence's Motion to Exclude, also filed today.

people who were not deceived); *Strow*, 348 F.R.D. at 449-50 (denying certification because class included people who suffered no injury); *Clark v. Bumbo Int'l Trust*, 2017 WL 3704825, at *4 (N.D. Ill. 2017) (denying certification because class contained "a great many persons who could not have been harmed by defendant's alleged representations"). In *Oshana*, *Strow*, and *Clark*, the classes broadly covered people who simply purchased or used the product, and the courts held that was too broad and vague. Plaintiffs' proposed class is even less definite: it is not even limited to people who actually *used* the technology, just people who *might have*, and does not contemplate how to reach non-owners of the cars.

Realizing this flaw in their theory, Plaintiffs rely on a declaration by a "class action notice expert" to argue that they could theoretically find class members by piecing together VINs with other data available from third parties. "Accordingly," Plaintiffs claim, citing only their expert's declaration, "the identities of the individual Class members are readily ascertainable, and any individual's status as a Class member can be objectively determined." Mot. 12. That reasoning fell apart when Cerence deposed the Plaintiffs' expert. She testified that she had not "developed a notice plan for this case," and her declaration was limited to what is typically done in automotive cases in which owners or lessors are suing for product defects in their cars. Ex. 12, Peak Dep. Tr. 62:23-63:3; 74:21-25; 87:1-88:23. That's not the case here. *See id*. 75:22-76:11.

Furthermore, Plaintiffs' expert had no idea what kind of information was available to the very third parties she claimed she would rely upon. She has no personal experience working with them, did not know if their data was reliable, and didn't know how to "refine" the data – even though she said in her declaration that doing so would be an important step in the process. *Id*. 68:9-70:25; 73:4-13; 81:18-83:25. Her declaration essentially consisted of a copy-and-paste job from other declarations used in automotive product-defect cases. *Id*. 79:1-13. Unsurprisingly, then,

Plaintiffs' expert made clear that she has "no opinion on ascertainability," nor "any views on that issue," nor any opinion or views on "whether any individual's status as a class member can be objectively determined." *Id.* 42:6-19 (that was "not within the scope of what [she was] doing in this case"). Of course, Plaintiffs rely on her for exactly those points. Mot. 12. Without her, their Motion collapses like a house of cards.

In sum, although Plaintiffs' expert proposed searching VINs in a third-party's database, she ███████████████████████████████ Ex. 12, Peak Dep. Tr. 81:18-83:14. In any event, vehicle ownership does not determine who used the technology. Thus, *who* used the technology can only be reported by claimants themselves.

        **b.**      **There is no objective way to determine which users' data was sent to the cloud, because that depends on *what* the users said.**

The Cerence speech-recognition technology in the MBUX Voice Assistant relies upon an ███████████████████████████████████████████████████. If a user gives a command ███████████████████████████████████████████████████████████████ ███████████████████. Ex. 1, Hamerich Dep. Tr. 39:3-40:11 (████████████████████████ ██████████████████████). On the other hand, ████████████████████████████████ ███████████████████████████████████████████████. *Id.*

For this case, the above is important because it is not enough for a user to say that they used "Hey Mercedes" technology in the relevant Mercedes-Benz vehicles. They also need to confirm *what* they said after activating the technology. If a user only used ████████████████ ███████████████████████████████████████████████████████ Just like with determining *who* the users were, *what* they said can only be reported by the claimants themselves.

c.      **There is no objective way to determine *where* users used the technology.**

BIPA only governs the collection and possession of biometric information within Illinois. *McGoveran v. Amazon Web Servs., Inc*., No. 1:20-cv-01399-SB, 2024 WL 4626253, at *3-4 (D. Del. Oct. 30, 2024) (BIPA does not apply to extraterritorial activities). Cerence's data servers are outside of Illinois. Ex. 15, Cashman Dep. Tr. 46:3-4, 67:19-68:5. And it is likely that many people who purchased vehicles in Illinois used the technology in them outside of Illinois. Both named Plaintiffs, for example, purchased their vehicles in other states. *See* Ex. 10, Allan Dep. Tr. 49:1-2 (Allan purchased vehicle from Ohio dealership); Ex. 7, MBUSA_0101 (Freshour purchased vehicle from Missouri dealership). To fill this gap in figuring out where each person used Cerence's technology, Plaintiffs suggest relying on sales data from MBUSA. But the sales data is ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████ *See* Ex. 4, Barton Dep. Tr. 56:18-57:2. Further, MBUSA's ███████████████████████████████████████████████ ██████████████████████████. *Id.* 68:11-14. Plaintiffs' "class action notice expert" agreed that identifying class members will require determining whether users were in Illinois when their voiceprint was allegedly captured, but she had no opinion on how that should be done. Ex. 12, Peak Dep. Tr. 99:13-101:3. Plaintiffs offer no evidence that they can objectively determine whether people used the technology in Illinois. Again, only the claimants themselves can offer that.

d.      **There is no objective way to determine *when* each person used the technology.**

The class definition carves out a five-and-a-half year period when ██████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████ Mot. at 9; Ex. 5, Tsuboyama Decl. ¶ 10. Because the

carve-out period is longer than the remainder of the statutory period (two years), a significant number of class members should be excluded based on "when" they used the technology. Plaintiffs do not propose an objective or common method for evaluating whether a class member used the technology while Cerence's cloud was connected. As explained above, even if a claimant owned a vehicle during the relevant period, that doesn't mean he used the MBUX technology in Illinois, while giving a command that would have gone to the Cerence cloud, *during that period*. Plaintiffs' class action notice expert offered no way "how to determine if someone meets the timing requirements to be a class member." Ex. 12, Peak Dep. Tr. 102:10-102:19. And there is no objective way to do so.

All four of the above issues (who, what, when, and where) reveal independent flaws in the class definition proposed by Plaintiffs. They make clear that Plaintiffs cannot, as they claim, obtain a "complete putative Class list." *See* Mot. 8. They preclude class certification.

### 2. The absence of an objective method for determining class members leads to a class that would rely entirely on claimants' "because I say so" submissions.

Because there is no class list, and Plaintiffs lack an objective method for defining who used the technology, the best Plaintiffs can propose is as follows: (1) notify owners and lessors of the vehicles; and (2) supplement that with publication notice. Because neither of these methods will determine who actually used the technology, a claims process in which claimants submit affidavits that they used the technology will be needed to figure out who actually did. *See* Mot. at 11-12. One glaring problem with this method is that *anyone* could submit an affidavit claiming to have used the technology, whether as a driver or passenger, and Cerence would have no way to challenge such a claim beyond attacking a witness's credibility. Plaintiffs' expert offered no way to resolve this issue at her deposition. She has "[n]ever been involved in …a method to check whether the claimants are [filing claims] truthfully," and did not know if she could even test that.

15

Ex. 12, Peak Dep. Tr. 98:1-20. Inaccurate affidavits are not unlikely, as is demonstrated by Allan's claim. He sued Cerence and has pursued his case for nearly three years even though he didn't use the technology in a time period where Cerence received MBUX speech data in its cloud. *See* Motion for Summary Judgment, also filed today. Plaintiffs propose no method for testing the accuracy of claim-form affidavits, especially given the complexity of the fact issues in this case, *see* Section I.A.1 *supra*.

Moreover, and importantly, the affidavits would not merely clean up individual questions left over after a predominant common question is decided; they would be needed to acquire individual proof for the same questions. Plaintiffs argue that this can be resolved through common proof. *Dancel* illuminates the problem with Plaintiffs' approach. There, the plaintiff sought to certify a class of Instagram users on the theory that Instagram usernames identified individuals to an "ordinary, reasonable viewer." *Dancel*, 949 F.3d at 1009. The Seventh Circuit held that class certification would not be appropriate because the supposed common questions could only be answered with "individual proof" relating to each user's experience. *Id*. The same analysis applies here.

### 3. A class action is not superior or a fair method of adjudication because potential damages are disproportionate to Plaintiffs' alleged harm.

A class action is not a superior method of adjudicating a controversy when the potential damages are disproportionate to the actual harm alleged. *In re Trans Union Corp. Privacy Litig*, 211 F.R.D. 328, 350–51 (N.D. Ill. 2002) (denying certification). "Although certification should not be denied solely because of the possible financial impact it would have on a defendant, consideration of the financial impact is proper when based on the disproportionality of a damage award that has little relation to the harm actually suffered by the class, and on the due process concerns attended upon such an impact." *Id.* at 351.

Here, Plaintiffs do not allege any physical or financial harm beyond a violation of the statute. Nor do they allege that any entity or person has actually misused their biometric data. Despite this lack of injury, BIPA allows for damages of $1,000 or $5,000 *per violation*. 740 ILCS 14/20. That means plaintiffs can bring individual BIPA cases seeking statutory damages for every use of a biometric technology (the "per-scan" theory of liability) – and they do. *E.g.*, *Schwartz v. Supply Network, Inc.*, 2024 WL 4871408, at *4-5 (N.D. Ill. Nov. 22, 2024).

Plaintiffs' counsel has indicated that they will argue per-scan damages can apply in this class action. *See* Ex. 16, Aug. 6, 2024 Hr'g Tr. 3:17-19 (Plaintiffs' counsel reporting to the Court that "the parties will probably litigate whether the amendment [to the statute eliminating per-scan damages] applies retroactively"). Plaintiffs also predict "tens of thousands" of class members and rely on a ███████████████████████████████████████████████████████

███████████████[6] *See* Mot. at 6-7. Crediting Plaintiffs' theory, assuming 40,000 class members, each of whom used cloud-enabled technology 100 times, times $1,000 per violation, that would lead to damages of $4 billion – all for simple procedural violations of the statute.

In reply, we expect that Plaintiffs will say that BIPA damages are discretionary. *See Cothron v. White Castle System, Inc.*, 216 N.E.3d 918, 929 (Ill. 2023). That's true, but it is no answer. The *in terrorem* effect of $4 billion in BIPA damages is real. It implicates due process concerns and demonstrates that a class action would not be a superior method to adjudicate individuals' claims. *See, e.g., TransUnion*, 211 F.R.D. at 350-51 (denying certification because class action was not superior method where it "could result in statutory minimum damages …

---

[6]    As discussed in Sections I.A.i and I.A.ii, this report does not provide a method for actually identifying class members because it addresses only vehicles (not people who used cloud-enabled speech technology in them). This number is only referenced in this section for calculating the scope of potential damages Plaintiffs will seek in a class action.

grossly disproportionate to any actual damage"). Also considering the feasibility of individual suits and the numerous factual issues with the named plaintiffs here, *see* Section II, *infra*, individual suits are a superior method of adjudicating these novel BIPA claims.

**B.     Common questions do not predominate over individual issues.**

Class certification should be denied for the additional reason that common issues do not predominate over individualized issues. The criteria for satisfying "predominance" under Rule 23(b)(3) is related to the "commonality" requirement, but more demanding. *Van*, 332 F.R.D. at 288, quoting *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 624 (1997).

The question is not just whether there are *more* common questions; it is whether the "common questions represent a significant aspect of [a] case and . . . can be resolved for all members of [a] class in a single adjudication." *Messner*, 669 F.3d at 814. If an issue must be proven through "evidence that varies from member to member…then it is an individual question." *Id.*; *Dancel*, 949 F.3d at 1007 (explaining that such questions cannot "be saved for after certification"); *see also Smith-Brown v. Ulta Beauty, Inc.*, 335 F.R.D. 521, 532-33 (N.D. Ill. 2020) (applying *Dancel*). When "individualized inquiries predominate," the "appropriate step" is "[d]ecertification, not redefinition." *See Johnson v. Yahoo! Inc.*, 2018 WL 835339, at *4 (N.D. Ill. Feb. 13, 2018) (denying certification because individualized inquiries regarding consent overwhelmed common questions).

Like in *Dancel* and its progeny, Plaintiffs' theory of the case is overwhelmed by dispositive, individual issues. They propose a handful of common questions that amount to legal conclusions relating to whether Cerence violated BIPA. Mot. at 14-15. As shown next, that's not good enough.

### 1. Individualized inquiries are required to determine if class members used the technology and if their data was ever sent to Cerence from Illinois during the relevant time period.

To state the obvious, Plaintiffs need to prove that each class member actually used, in Illinois, the technology they allege violated BIPA. They also need to prove that each person used the technology when it was connected to Cerence's cloud. 740 ILCS 14/15(b) (governing entities that "collect" biometric data), (d) (governing entities "in possession" of biometric data).

There is no common evidence to establish whether an individual used the technology. To make that finding, the factfinder will need to determine if each person created a Mercedes Me Connect account, and if so, then will need to determine if he paired the Mercedes Me Connect account to his vehicle. From there, the factfinder will need to conduct user-by-user inquiries to determine who used the technology, what they said, when they said it, and where they said it. *See* Section I.A.1, *supra*. The issue was similar in *Dancel*, where the Seventh Circuit affirmed the denial of certification of a class of social media users because "evidence that varie[d] from member to member" would have been required to identify the proposed class members. 949 F.3d at 1004, 1007, 1010 (quoting *Bouaphakeo*, 136 S. Ct. at 1045, and *Messner*, 669 F.3d at 815).

### 2. Individualized inquiries are required to determine if class members consented under BIPA 15(b) and (d).

Additionally, to prove their BIPA 15(b) and (d) claims, Plaintiffs will need to prove that each class member did not consent to the collection or dissemination of their data. 740 ILCS 15(b); (d). The need for individualized determinations on this element is evident from the Plaintiffs' own, independent productions of the same document demonstrating ███████████████████████

████████████████████████████████████████████████████████████

██████████████████. *See* Ex. 17, FRESHOUR_000011 (████████████████████████

██████████████████████████████████); Ex. 18, ALLAN_000049 at

ALLAN_000050 (same); Ex. 19, Singh Report ¶¶ 3, 67. That document provides that ██████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████ *E.g.,* Ex. 18,

ALLAN_000049 at ALLAN_000050. To determine if Cerence violated the consent provisions in

BIPA 15(b) and (d), the factfinder will need to determine if each class member received, consented

to, and/or withdrew consent from the ███████████████ or any similar document. The consent

defense requires examination of each class member's conduct and documents. It cannot be

resolved on a class-wide basis.

### 3. Individualized inquiries are required to determine whether each class member waived BIPA rights.

Plaintiffs will also need to prove that each class member did not waive their rights to seek

relief from Cerence under BIPA. Statutory rights are waived expressly or impliedly (through

behavior) when the waiver is "knowing, voluntary, and intentional*." In re Estate of Ferguson,*

313 Ill. App. 3d 931, 937 (2d Dist. 2000); *Lake County Grading Co. of Libertyville, Inc. v. Advance*

*Mechanical Contractors, Inc*., 275 Ill. App. 3d 452, 462 (2d Dist. 1995). Courts must consider

potential defenses in determining whether predominance is satisfied at the class certification stage.

*See Wooley v. Jackson Hewitt, Inc.*, 2011 WL 1559330, at *11 (N.D. Ill. Apr. 25, 2011).

Freshour waived his BIPA rights by continuing to use and pay for the Mercedes Me

Connect services, including Cerence's ASR technology, long after filing this lawsuit. Ex. 6,

Freshour Dep. Tr. 29:13-15, 32:21-22 ("constantly" uses MBUX Voice Assistant and pays $150

per year to continue to use it). Determining whether each class member similarly waived their

rights will require a person-by-person analysis about whether each user similarly continued to use

the technology after being put on notice, including what they learned during enrollment, materials

they received from Mercedes-Benz, and this lawsuit. Courts in this district refuse to certify classes

for failure to meet the "predominance" requirement where the named plaintiff was subject to an affirmative defense of waiver after having testified that he continued to purchase or use the product after learning about the alleged wrongdoing. *See, e.g., Al Haj v. Pfizer Inc*., No. 17 C 6730, 2020 WL 1330367, at *3 (N.D. Ill. Mar. 23, 2020); *Lipton v. Chattem, Inc.,* 289 F.R.D. 456, 459-60 (N.D. Ill 2013); *Langendorf*, 306 F.R.D. at 581-84.

Recognizing the importance of this defense, Plaintiffs attempt to distract the Court from the individualized inquiries by arguing that Cerence "cannot make" this argument based on an unrelated state court ruling on the pleadings. Mot. at 15-16. No such order was entered in this case.

### 4. Individualized inquiries are required to prove and calculate damages.

After identifying which class members used and paired the technology, Plaintiffs will need to prove the number of times each class member used the technology in their damages analysis. Individualized inquiries will be necessary in the discretionary damages analysis. Analysis of individualized questions regarding damages is an essential step of the "rigorous analysis" required by Rule 23. *Eddlemon v. Bradley Univ.*, 65 F.4th 335, 340 (7th Cir. 2023) (vacating certification where district court failed to consider individualized questions regarding damages).

This is not the type of case where all class members had a common experience or engaged with the technology under similar circumstances. *See, e.g.,* Section I.A.1, *supra* (explaining why individualized inquiries are needed to determine, who, what, when, and where the technology was used). Additionally, some class members could have used MBUX speech-recognition software many times, only a few times, or not at all. *Compare* Ex. 10, Allan Dep. Tr. 40:11-20 (stopped using MBUX Voice Assistant completely) *with* Ex. 6, Freshour Dep. Tr. 29:13-15 ("constantly" uses MBUX Voice Assistant, even after suing Cerence). These varying circumstances and frequency not only give rise to user-by-user affirmative defenses, *see, supra*, at Section I.B, but also demand user-by-user proof and damages calculations. *See Andrews*, 545 F.3d at 577 ("If the

class certification only serves to give rise to hundreds or thousands of individual proceedings requiring individually tailored remedies, it is hard to see how common issues predominate or how a class action would be the superior means to adjudicate the claims.").

\*   \*   \*

In sum, Plaintiffs propose only a handful of superficial common questions aimed at asking whether Cerence violated BIPA Sections 15(b) and (d). Mot. at 14-15. But resolution of those common questions is only possible by also resolving an abundance of dispositive, individualized issues. *See Dancel*, 949 F.3d at 1007, 1010 (affirming denial of certification where foundational question could only be proven through "evidence that varie[d] from member to member").

## II.    Plaintiffs also Fail to Meet Their Burden on Adequacy and Typicality.

Adequacy and typicality are lacking where the named plaintiffs' "claims . . . are significantly weaker" than other class members' claims due to being "subject to a defense that would not defeat [the claims of] unnamed class members." *Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 824 (7th Cir. 2011) (affirming denial of certification because named plaintiffs' claims were weaker than other class members' claims); *see also Greene v. Mizuho Bank, Ltd.*, 327 F.R.D. 190, 198 (N.D. Ill. 2018) (denying certification because plaintiff was subject to individualized and unique defense). As explained below, Plaintiffs fail to satisfy the adequacy and typicality requirements of Rule 23(a).

### 1.    Allan is not a member of the defined class because his data was never transmitted to Cerence.

Allan cannot be class representative because he is not even a member of his own proposed class. The class definition expressly excludes "all individuals whose entire period of ownership, lease, or use ███████████████████████████████████████████████████████

████████████████████████████████████ Mot. at 9 (emphasis added). As

22

discussed in the accompanying Motion for Summary Judgment also filed today, it is undisputed that Allan *only* used the MBUX speech software during the period that ██████████████ ████████████████████████████████████████████████████. *Compare* Ex. 10, Allan Dep. Tr. 36:18-19, 39:19-40:20 (used technology from November 2019 through early 2023); *with* Ex. 5, Tsuboyama Dec. ¶¶ 8, 10 (████████████████████████ ████████████████████████). Plaintiffs' proposed exclusion makes sense because the proposed class seeks relief for alleged harm flowing from █████████████████████ ████████████████ But it precludes Allan from being a class representative (let alone an "adequate" one) because "a named plaintiff must be a member of the putative class" he claims to represent. *See Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1027 (7th Cir. 2018).

## 2. Plaintiffs are subject to unique defenses.

Typicality also requires that the "claims or defenses of the representatives" be "typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). The "presence of even an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy" typicality "as well as bring into question the adequacy of the named plaintiff's representation." *CE Design*, 637 F.3d at 726 (vacating certification based on potential consent defense). The defense need not be a "slam dunk" to defeat adequacy; "it need only be arguable*." Sherwin v. Samsung Elecs. Am., Inc.*, No. 16 C 7535, 2019 WL 10854535, at *2 (N.D. Ill. 2019) (denying class certification based on arguable statute of limitations defense).

As an initial matter, even if there were a dispute as to whether Allan's use fell outside of the ████████████████████████████—which there isn't—Allan would still need to dedicate significant time and effort "to [his] own problems" at trial, making this case unsuitable for class treatment. *See Koos v. First Nat'l Bank of Peoria*, 496 F. 2d 1162, 1164-65 (7th Cir. 1974). That alone makes him an inadequate class representative.

Additionally, Freshour is subject to a waiver defense and both Plaintiffs are subject to a consent defense. *See* Sections 1.B.2 and 1.B.3, *supra*. These substantial and unique defenses make them atypical and inadequate class representatives.

### 3. Freshour cannot be the class representative because he is not interested in fulfilling his duties.

Freshour is not an adequate class representative because he failed to monitor the case and class counsel. Rule 23(a)(4) requires that the "representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). While class actions are primarily managed by class counsel, "[t]he named plaintiffs are representatives of the class—fiduciaries of its members—and therefore are charged with monitoring the lawyers who prosecute the case on behalf of the class." *Eubank v. Pella Corp.*, 753 F.3d 718, 719 (7th Cir. 2014). Accordingly, an "adequate class representative must have an understanding of the basic facts underlying the claims, some general knowledge of the case, and a willingness and ability to participate in discovery." *Pruitt v. Pers. Staffing Grp.*, *LLC*, No. 16-cv-5079, 2020 WL 3050330, at *4 (N.D. Ill. June 8, 2020). As Judge Pacold recently observed in denying class certification in a BIPA case, "a class representative cannot simply shift its duties to class counsel." ECF No. 197, *Duron v. Unifocus*, No. 18-cv-6479 (N.D. Ill. Dec. 10, 2024) (transcript of telephonic proceedings) at 23. *See also Physicians Healthsource, Inc. v. Allscripts Health Sols., Inc.*, 254 F. Supp. 3d 1007, 1023 (N.D. Ill. 2017) ("Figurehead plaintiffs are not permitted.").

Freshour has demonstrated that he has no interest in fulfilling his duty to unnamed class members. During his deposition, he could not articulate any basis for his Section 15(d) and 15(c) BIPA claims, he testified that he did not know why the Complaint had been amended *three* times, and he admitted that he did not know about the related state court action – in which he is also a named Plaintiff – *at all*. Ex. 6, Freshour Dep. Tr. 42:22-43:10, 51:7-10-52:4. He didn't know

whether his case was "based on the allegation that Cerence is collecting your voiceprint when you say 'Hey Mercedes.'" *Id*. 31:7-11. He also readily admitted that he is not "monitoring the case or following it in any way." *Id*. 56:7-10.

Making matters worse, Freshour doesn't know how class counsel is paid and he doesn't "find it to be any of [his] business" *how* they get paid. Ex. 6, Freshour Dep. Tr. 56:17-22. The duty to monitor includes ensuring "that class counsel does not take an excessive fee award at the expense of the class's monetary award." *Murray v. E-Trade Fin. Corp.*, 240 F.R.D. 392, 399 (N.D. Ill. 2006); *see also*, *e.g.*, *Eubank*, 753 F.3d at 723-24 (discussing the "grave" problems associated with a class representative who does not or will not monitor class counsel). If the class representative does not know what the lawyers are doing, or how they propose to be paid, he cannot fulfill his duties under Rule 23(a)(4).

The reasons for Freshour's lack of engagement are clear. He doesn't really want to be a class representative. He testified at his deposition that he was "not sure" he liked being a class representative and that he was "thrust into the situation" by attorneys. Ex. 6, Freshour Dep. Tr. 54:12-24; 52:15-53:6. But a "class representative cannot simply shift its duties to class counsel." *Physicians Healthsource, Inc.*, 254 F. Supp. 3d at 1023.

## **CONCLUSION**

The Court should deny Plaintiffs' Motion for Class Certification in its entirety.

Dated: December 10, 2025

Respectfully submitted,

CERENCE INC.

By: /s/Mehgan E.H. Keeley
One of Its Attorneys

Matthew C. Wolfe
Amy Y. Cho
Mehgan E. H. Keeley
Samuel G. Bernstein
Elise N. Malin
**SHOOK, HARDY & BACON LLP**
111 South Wacker Drive, Suite 4700
Chicago, IL 60606
Tel: (312) 704-7700
mwolfe@shb.com
acho@shb.com
mkeeley@shb.com
sbernstein@shb.com
emalin@shb.com

# EXHIBIT 1

Randolph Freshour, et al. v. Cerence Inc.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


RANDOLPH FRESHOUR and VINCENZO      )
ALLAN, each individually and on     )
behalf of similarly situated        )
individuals,                        )
                                    )
        Plaintiffs,                 )
                                    )
v.                                  )   No. 1:23-cv-02667
                                    )
CERENCE INC., a Delaware            )
corporation,                        )
                                    )
        Defendant.                  )
_____)


        DEPOSITION OF:  STEFAN HAMERICH, PhD


        TAKEN BY:       PLAINTIFFS


        DATE:           July 15, 2025
                        Commencing at 10:12 a.m.


        PLACE:          SHOOK, HARDY & BACON L.L.P.
                        1 Federal Street, Suite 2620
                        Boston, Massachusetts 02110


        REPORTED BY:    ELIZABETH MCAVOY
                        Notary Public
                        Commonwealth of Massachusetts

Randolph Freshour, et al. v. Cerence Inc.



Page 40

12    MR. GERBIE: Okay. We've been going for about an
13 hour. Why don't we take a quick ten-minute break? I think
14 it's about eleven oh -- why don't we say 11:15 your time?
15    MS. KEELEY: Okay.
16    THE DEPONENT: Yeah.
17    MR. GERBIE: Off the record.
18    THE REPORTER: So with that we are now off the
19 record for a quick break. The time is 11:03 a.m. and we
20 are off the record.
21 [OFF THE RECORD]
22 [ON THE RECORD]
23    THE REPORTER: We're now back on record. The
24 time is 11:20 a.m. You may now proceed.
25

11 (Pages 38 to 41)

Randolph Freshour, et al. v. Cerence Inc.



Randolph Freshour, et al. v. Cerence Inc.



Page 53

1     A   Yeah.

2     Q   What car is it specifically?

3     A   It's a BMW 5 Series.

4     Q   Which one?

5     A   A touring, 530i.

6     Q   Does that car have any Nuance or Cerence

7  technology in it?

8     A   Of course, yes.

9     Q   Do you use the various voice technology in the

10  car?

11     A   Yes.

12     Q   Do you use the voice biometry tool?

13     A   There is none within BMW.

14     Q   Okay.  So which ones do you use?

15     A   I use the ASR.  I use the SSE, ASR dialogue, NLU,

16  TTS.  I use them all.

17     Q   Do you like them?

18     A   Yeah.  I mean, the car is getting old, so -- but

19  yeah, technically, still, I like it, yes.

20     Q   What year is the car?

21     A   2019 I believe, something like that, yeah.

22     Q   Do you know if the car still receives over-air

23  updates for the infotainment system?

24     MR. WOLFE:  Object to the form.

25     THE DEPONENT:  I don't know anyways, so.

14  (Pages 50 to 53)



Randolph Freshour, et al. v. Cerence Inc.

17 (Pages 62 to 65)

Randolph Freshour, et al. v. Cerence Inc.



Page 74

Randolph Freshour, et al. v. Cerence Inc.



Randolph Freshour, et al. v. Cerence Inc.



Boston Court Reporters          (617) 871-6000          July 15, 2025

Randolph Freshour, et al. v. Cerence Inc.



Randolph Freshour, et al. v. Cerence Inc.



Page 118

Page 120

1    THE REPORTER:  All right.  We were just off the
2    record.  The time is 2:14.  Sorry.
3    [OFF THE RECORD]
4    [ON THE RECORD]
5    THE REPORTER:  Now back on the record.  The time
6    is 2:32 p.m.

Page 119

18    Q   Okay.
19    MR. GERBIE:  Okay, why don't we take a quick
20    ten-minute break off the record?  Back at 2:25.
21    MR. WOLFE:  How much longer do you think you
22    have, David?
23    MR. GERBIE:  I probably got at least --
24    [OFF THE RECORD]
25    [ON THE RECORD]

Page 121

Boston Court Reporters      (617) 871-6000      July 15, 2025

Randolph Freshour, et al. v. Cerence Inc.



# EXHIBIT 2

Randolph Freshour, et al. v. Cerence Inc.

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


RANDOLPH FRESHOUR and VINCENZO          )
ALLAN, each individually and on         )
behalf of similarly situated            )
individuals,                            )
                                        )
        Plaintiffs,                     )
                                        )
v.                                      )    No. 1:23-cv-02667
                                        )
CERENCE INC., a Delaware                )
corporation,                            )
                                        )
        Defendant.                      )
_____)


            DEPOSITION OF:  MICHAEL TROPP



        TAKEN BY:        PLAINTIFFS


        DATE:            July 17, 2025
                         Commencing at 10:25 a.m.



        PLACE:           SHOOK, HARDY & BACON L.L.P
                         1 Federal Street, Suite 2620
                         Boston, Massachusetts 02110



        REPORTED BY:     Elizabeth McAvoy
                         Notary Public
                         Commonwealth of Massachusetts

Randolph Freshour, et al. v. Cerence Inc.



Page 26

Boston Court Reporters          (617) 871-6000          July 17, 2025

Randolph Freshour, et al. v. Cerence Inc.



Randolph Freshour, et al. v. Cerence Inc.



Boston Court Reporters          (617) 871-6000          July 17, 2025

Randolph Freshour, et al. v. Cerence Inc.



Page 42

24    MS. KEELEY:  Paul, we've been going for a little
25 over an hour.  Are we close to a good breaking point?

Page 43

1    MR. GESKE:  Can we go for, like, another ten
2 minutes?
3    MS. KEELEY:  Yeah.  Is that good with you?
4    THE DEPONENT:  Fine.

Page 44

11    MR. GESKE:  Okay, now we can take a break.
12    THE REPORTER:  Okay.  So with that, we are taking
13 a quick break.  The time is 11:44 a.m. and we are now off
14 the record.
15 [OFF THE RECORD]
16 [ON THE RECORD]
17    THE REPORTER:  All right, so with that, we are
18 back on record.  The time is 12:03 p.m. and you may now
19 proceed.
20    MR. GESKE:  Thank you.

Randolph Freshour, et al. v. Cerence Inc.



Page 46

Randolph Freshour, et al. v. Cerence Inc.



Page 90

Page 92

Randolph Freshour, et al. v. Cerence Inc.



Page 118

Page 119

Page 120

1  well. I have maybe three or four more exhibits to go
2  through.
3      MS. KEELEY: Okay, let's take a break then.
4      MR. GESKE: Okay.
5      MS. KEELEY: So do you -- what's the -- or sorry.
6  You go ahead. You need to --
7      THE REPORTER: Yeah. We can go off record for a
8  quick break. The time is 4:01 p.m. and we are off the
9  record.
10  [OFF THE RECORD]
11  [ON THE RECORD]
12      THE REPORTER: All right, so we're back on the
13  record. The time is 4:24 p.m. You may proceed.

23      MS. KEELEY: Paul, we've been going for about an
24  hour and a half. Are we at a good breaking point?
25      MR. GESKE: Yes. I'm just looking at the time as

Randolph Freshour, et al. v. Cerence Inc.



Page 134

Boston Court Reporters     (617) 871-6000     July 17, 2025

Randolph Freshour, et al. v. Cerence Inc.



Page 138

Boston Court Reporters          (617) 871-6000          July 17, 2025

# EXHIBIT 3
# CONFIDENTIAL
# FILED UNDER SEAL

# EXHIBIT 4

CONFIDENTIAL

Page 1

1                  UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF ILLINOIS

3                        EASTERN DIVISION

4

5      RANDOLPH FRESHOUR and      )  No. 1:23-cv-02667

       VINCENZO ALLAN, each       )

6      individually and on behalf )

       of similarly situated      )

7      individuals,               )

                                  )

8          Plaintiffs,            )

                                  )

9      v.                         )

                                  )

10     CERENCE INC., a Delaware   )

       corporation,              )

11                                )

            Defendant.            )

12     _____ )

13

14

15

16                    *** CONFIDENTIAL ***

17        VIDEOTAPED DEPOSITION OF CHRISTOPHER ROBERT BARTON

18              30(b)(6) MERCEDES BENZ USA, LLC

19                    Phoenix, Arizona

                   September 18, 2025

20                    10:16 a.m.

21

22

23     REPORTED BY:

       Kate E. Roundy, RPR

24     Arizona Certified Reporter

25     Certificate No. 50582

CONFIDENTIAL

Page 42

1 available?
2          MR. MYERSON: Objection. Beyond the scope.
3          You can answer, if you know.
4          THE WITNESS: I -- I -- I couldn't give you an
5 accurate date. I'm not sure.
6 BY MR. GESKE:
7     Q. Has it been around at least as far as back as
8 2019?
9     A. Now, Mercedes changes the names of their
10 different systems, but a system similar to the MMC may
11 have been called something different, may have been a
12 different acronym. As far as I know was around in 2019.
13    Q. So it may have been a different name, but it
14 performed the same function?
15    A. The -- Yes. The connecting your vehicle to an
16 app function, I believe was around in 2019.
17        (Exhibit 2 was marked for identification.)
18        MR. GESKE: This will be Exhibit 2.
19        For the folks on Zoom, this is MBUSA_0077.
20 BY MR. GESKE:
21    Q. Mr. Barton, I believe this is the list that you
22 were talking about earlier that you reviewed as part of
23 your preparation; is that correct?
24    A. Yes, sir. It looks like the one that I was
25 reviewing.

Page 43

1     Q. Now, I think -- I think you said that the one you
2 looked at was several pages long.
3        Were you looking at a longer version of this?
4     A. This appears to be same. I believe we could
5 check, but I believe I said it was two to four pages.
6 This falls within that range.
7     Q. Did you first see this as part of your
8 preparation or had you seen it before that?
9     A. No. It was part of the preparation.
10 [redacted]
22    Q. I believe in your answer you mentioned Cerence
23 technology.
24        What did -- what did you mean by that?
25    A. The "Hey, Mercedes" function, the voice function

Page 44

1 where you talk to the car.
2     Q. And when you said the team pulled the data of the
3 of vehicles sold in Illinois, which team are you referring
4 to?
5     A. I -- I believe it was requested by Brittany, and
6 then the sales team, Neil, is the one that pulled the
7 reports -- or this report.
8     Q. So did -- did MBUSA need to involve any third
9 parties in getting this data or compiling this list or was
10 it able to do it with its own records?
11    A. This list with its own records.
12        (Exhibit 3 was marked for identification.)
13        MR. GESKE: This is Exhibit 3. We're going to
14 look at this together with the list that we have in front
15 of us.
16        THE WITNESS: Okay.
17        MR. GESKE: For folks on Zoom, this is
18 February 14th, 2025, letter.
19 BY MR. GESKE:
20    Q. You don't have to read this whole thing. We're
21 mainly just going to be looking at the third page. And,
22 specifically, the bottom of the third page.
23        Have you seen this letter before?
24    A. I believe so, yes.
25    Q. When did you first see this letter?

Page 45

1     A. It would have been last week or the week before,
2 when I got the other documents.
3     Q. So I'll represent to you that this is a letter
4 that was sent to me by MBUSA's lawyers.
5     A. Okay.
6     Q. And in this bottom of page 3, there's a paragraph
7 here talking about this list that we've been looking at.
8     A. Okay.
9     Q. And if we look at the -- starting with the second
10 sentence in that bottom paragraph.
11        It says, Subject to and without waiving the
12 foregoing objections, MBUSA pulled sales data related to
13 vehicles that are capable of providing the, quote, "Hey,
14 Mercedes," end quote, feature also referred to as MBUX
15 Voice Assistant, which incorporates Cerence, Inc.'s,
16 technology (f/k/a Nuance Communications.)
17        In the United States the MBUX Voice Assistant was
18 first launched in 2019 in the NTG6 platform in the A Class
19 only. In the following years, the MBUX Voice Assistant
20 was incorporated into other models with the NTG7.0 and
21 Gen 20x head units. The MBUX Voice Assistant is standard
22 on any model with the above-referenced head units for the
23 vehicle's lifetime and does not require renewal. The
24 default is for the feature to be, quote, "on" but the
25 feature can be turned off in the head unit and app setting

12 (Pages 42 - 45)

CONFIDENTIAL



Page 46

1 by the customer -- or, I'm sorry, by the consumer.
2     Did I read that correctly?
3   A.  Sounded -- sounded good to me.
4   Q.  So these -- if I'm understanding this correctly,
5 it's saying that the -- a Mercedes feature is the feature
6 that incorporates the Cerence technology that you talked
7 about earlier; right?
8   A.  As far as I understand it, yes, sir.
9   Q.  And so that feature is present in vehicles that
10 have either the NTG6, NTG7 or Gen 20x platforms; correct?
11   A.  Yes, sir.
12   Q.  And so we have this list here of specific models
13 and years that have one of those platforms; correct?
14   A.  Yes, sir.
15   Q.  So MBUSA is able to determine based on the
16 vehicle's year and model what type of platform it has and
17 whether it's -- it has Cerence technology; correct?
18   A.  Yes, sir.
19   Q.  And it used that -- those criteria in creating
20 this list?
21   A.  Yes, sir.
22   Q.  So this letter also said by default the "Hey,
23 Mercedes" feature is on; correct?
24   A.  That's what it says. Yes, sir.
25   Q.  So does that mean it's -- the "Hey, Mercedes"

Page 47

1 feature, the voice assistant is not a -- it's not an
2 option that a consumer needs to pay extra for. On all
3 these vehicles, it's standard on these vehicles?
4   A.  Yes, sir.
5   Q.  When the letter says that the list was based on
6 sales data showing vehicles sold in Illinois, do you know
7 if it's referring to vehicles that were allocated to
8 Illinois dealerships or are these vehicles that were
9 actually sold to consumers in Illinois?
10   A.  The information that was searched through to find
11 this list, the data gets entered by the dealerships when
12 the sale is complete.
13     So sale's complete, goes into the system, and the
14 database, and that's what was searched.
15     So it was new car sales in the state of Illinois.
16   Q.  So just new car sales.
17     It didn't include used car sales?
18   A.  That is correct.
19

CONFIDENTIAL



Page 54

1  A.  Yes, sir.
2  Q.  For -- for these -- the vehicles on this list,
3  does MBUSA know for each vehicle which dealership it was
4  sent to or sold from?
5      MR. MYERSON:  Objection.  Beyond the scope.
6      You can answer, if you know.
7      THE WITNESS:  Yes.  That information will be on
8  there.
9  BY MR. GESKE:
10  Q.  Are dealers --
11      MR. WOLFE:  Are we approaching a good time for
12  break?
13      MR. MYERSON:  It's 11:45.  Would noon be a good
14  time, you think, or are you near the end of the topic?
15      MR. GESKE:  Yeah, we can -- we can take a break
16  at noon and if we get to a good stopping point before
17  then, then we'll stop.
18  BY MR. GESKE:
19

Page 55

Page 56

Page 57

Veritext Legal Solutions

www.veritext.com                                                      888-391-3376

CONFIDENTIAL



Page 66

1 avenue as well?
2 A. What information are you referring to?
3 Q. So if -- if somebody had an issue with the
4 vehicle and they contacted the -- the CAC team --
5 A. Uh-huh.
6 Q. -- MBUSA would have record of whatever that issue
7 was or that transaction?
8 A. Yes.
9

Page 68

1

22 Q. Who are the people at MBUSA that have the ability
23 to search the MMCR system?
24 MR. MYERSON: Objection. Beyond the scope.
25 You can answer, if you know.

Page 67

1

Page 69

1 THE WITNESS: There's not many. Mercedes-Benz
2 takes customer privacy and just privacy in general very
3 seriously. So there are not many people that have full
4 access to perform the search as I've been describing it.
5 (Exhibit 4 was marked for identification.)
6 MR. GESKE: Turn to our next exhibit, which is 4.
7 For folks on Zoom, this is the document which --
8 which has been Bates-stamped MBUSA_0101-0110.
9 BY MR. GESKE:
10 Q. Mr. Barton, you don't have to look through this
11 whole thing, but you're welcome to -- to skim it, if you
12 would like, but is this something you've seen before?
13 A. Yes. I believe this is the same information that
14 I received with the rest of the documents that I received
15 from my legal team.
16 Q. I'll represent to you that these are documents
17 that MBUSA produced in the case.
18 I see at the top of the first page there is a
19 little MMCR.
20 Do you see that?
21 A. Yes, sir.
22 Q. This was information pulled from the MM- -- MMCR
23 system?
24 A. Yes, sir. I am -- yes.
25 Q. This looks to be a screenshot or a -- a printout

18 (Pages 66 - 69)

CONFIDENTIAL



Veritext Legal Solutions

www.veritext.com                                                      888-391-3376

# EXHIBIT 5
# CONFIDENTIAL
# FILED UNDER SEAL

# EXHIBIT 6

**Page 1**

1           IN THE UNITED STATES DISTRICT COURT
2              NORTHERN DISTRICT OF ILLINOIS
3                    EASTERN DIVISION
4   A.P., a minor, by and through
5   her guardian, CARLOS PENA, CARLOS
6   PENA, RANDOLPH FRESHOUR, and
7   VINCENZO ALLAN, each  individually
8   and on behalf of similarly situated
9   individuals,
10          Plaintiffs,        Case No.
11      vs.                    1:23-cv-02667
12  CERENCE INC., a Delaware
13  corporation,
14          Defendant.
15  _____/
16
17      VIDEOTAPED DEPOSITION OF RANDOLPH FRESHOUR
18               CHICAGO, ILLINOIS
19          WEDNESDAY, JUNE 18TH, 2025
20
21
22  REPORTED BY:
23  DEBORAH HABIAN, RMR, CRR, CLR
24  JOB NO. J13023175

**Page 2**

1
2
3
4
5
6               June 18, 2025
7               10:00 A.M. CDT
8
9
10
11          Videotaped deposition of
12  RANDOLPH FRESHOUR, testifying at the law offices
13  of Shook Hardy & Bacon LLP, 111 South Wacker
14  Drive, Suite 4700, Chicago, Illinois, 60606,
15  USA, pursuant to notice, appearing in person
16  before Deborah Habian, an Illinois Certified
17  Shorthand Reporter, Registered Merit Reporter,
18  Certified Realtime Reporter.
19
20
21
22
23
24

**Page 3**

1            A P P E A R A N C E S
2   ON BEHALF OF THE PLAINTIFFS
3     McGUIRE LAW, PC
4     BY:  PAUL T. GESKE, ESQ.
5          COLIN PRIMO BUSCARINI, ESQ.
6     55 West Wacker Drive, 9th Floor
7     Chicago, Illinois 60601
8     (312) 893-7002
9     pgeske@mcgpc.com
10    cbuscarini@mcgpc.com
11
12  ON BEHALF OF THE DEFENDANT
13    SHOOK HARDY & BACON LLP
14    BY:  MATTHEW C. WOLFE, ESQ.
15         MEAGHAN KEELEY, ESQ.
16    111 South Wacker Drive, Suite 4700
17    Chicago, Illinois 60606
18    (312) 704-7700
19    mwolfe@shb.com
20    mkeeley@shb.com
21
22  ALSO PRESET:
23         Peter VanWinkle videographer
24         Elise Fitzmaurice, SHB summer associate

**Page 4**

1              I N D E X
2   WITNESS:                          PAGE
3   RANDOLPH FRESHOUR
4   Examination by Mr. Wolfe ................   7
5
6   INSTRUCTIONS AND REQUESTS OF COUNSEL
7     By Mr. Geske .........................   62
8     By Mr. Wolfe .........................   73
9     By Mr. Geske .........................   77
10
11
12            INDEX OF EXHIBITS
13  DEFENDANT EXHIBITS RANDOLPH FRESHOUR DEPOSITION
14  NUMBER         DESCRIPTION          PAGE
15  Exhibit 1   Mercedes me connect e-mail   33
16              Bates FRESHOUR_000755
17
18  Exhibit 2   Document re biometric data   39
19
20  Exhibit 3   Corrected Third Amended Class  43
21              Action Complaint
22
23  Exhibit 4   Terms of Use document        63
24              Bates FRESHOUR_000747



RANDOLPH FRESHOUR
A.P. vs CERENCE INC.

June 18, 2025
25–28

Page 25

1    Q. So when you were at the desk with the
2  salesperson, what kind of information was she
3  gathering from you to set up the profile?
4    A. I really don't recall.
5    Q. Okay. And then someone else went to
6  the car and did some things when you weren't
7  there, right?
8    A. Correct.
9    Q. And then you went to the car with the
10  salesperson and did more, right?
11    A. Correct.
12    Q. So what happened in that last step when
13  you were in the car with the salesperson?
14    A. Um... I'm trying to remember here
15  exactly what happened. That's been so long ago.
16  I don't remember everything. I remember some
17  of -- parts of it.
18      It was like a matter of -- a lot of
19  excitement about getting this fantastic vehicle
20  and she's just throwing stuff in the computer
21  and I'm going, Okay, that sounds good. And she
22  goes, What do you want to use for a password?
23  And I said, I'll use this. And says, What's
24  your e-mail? And, I don't know, I gave her my

Page 26

1  e-mail and she put that in there, and then...
2  that's about all I remember.
3    Q. You said you created a password. Do
4  you know what you would use this password for on
5  the vehicle?
6    A. It's for the app. Mainly to get in the
7  app that's on my phone.
8    Q. So if your phone is connected to --
9    A. My phone is connected to the car.
10    Q. -- you need the password in order to do
11  that?
12    A. Right. And a pin.
13    Q. Got it.
14    A. Like I can remote start the car. But
15  if I get completely logged out of the app, then
16  I have to use my e-mail and my password to get
17  back in the app. And then once I'm in the app,
18  I have to have a pin code to do certain
19  functions on it.
20    Q. You can use the app to remote start the
21  car?
22    A. Correct.
23    Q. What else can you do with the app that
24  you can think of?

Page 27

1    A. Oh, you can change all kind of
2  features. I mean, it's -- you can change the
3  ambient lighting in it when you get in it the
4  next time, you can change the radio station when
5  you get in it the next time, you can change the
6  complete layout of the instrument cluster when
7  you get in it the next time.
8    Q. And that's done through the app, which
9  if you're logged out of, you access by password
10  and pin?
11    A. Correct.
12    Q. When you got home and you set up the
13  profile for your wife, what did you all do?
14    A. I don't remember everything. My wife's
15  really computer savvy, and she set -- she did
16  most of it.
17    Q. Do you remember anything about it?
18    A. No. I mean, just her putting her name
19  in it, and that's about it. That's about all I
20  remember. But she was in there for awhile doing
21  different things.
22    Q. Does she ever drive the vehicle with
23  her profile on and you in the passenger seat?
24    A. Yes, occasionally.

Page 28

1    Q. Do -- so are there things that you
2  notice that are different about her setup than
3  are -- than from yours?
4    A. Well, I mean, her seat position, the
5  radio station that she likes, all those things
6  are changed.
7    Q. And she activates that by tapping her
8  name on the screen --
9    A. Correct.
10    Q. -- when she turns the vehicle on?
11    A. (Nodding.)
12      I don't remember everything that went
13  into setting that up the first time. Like
14  I said, when I -- when I was at the dealership,
15  I was pretty excited about getting this vehicle.
16  And pretty much if the salesperson told me,
17  well, you have to do this, you have to do this,
18  I went and I did it, you know. And...
19    Q. Sounds like an amazing vehicle.
20    A. It is.
21    Q. Do you remember saying "Hey Mercedes"
22  multiple times so that the software could learn
23  your voice?
24    A. Yes.



RANDOLPH FRESHOUR
A.P. vs CERENCE INC.

June 18, 2025
29—32

Page 29

1   Q. When did you do this?
2   A. At the dealer.
3   Q. Tell me everything you remember about
4  that.
5   A. Just having to say "Hey Mercedes," and
6  it like wakes up the system.
7   Q. Did the salesperson tell you to do
8  that?
9   A. Yes.
10   Q. And what was her explanation of why you
11  needed to do it?
12   A. No explanation.
13   Q. Do you use the "Hey Mercedes" feature
14  now in the vehicle?
15   A. Constantly.
16   Q. Did you use it on the drive up here?
17   A. Yeah, several times.
18   Q. Okay, give me some examples of what you
19  used it for.
20   A. You say "Hey Mercedes, I need to
21  navigate to 111 East Wacker," and it'll take me
22  right here from anywhere in the United States.
23   Q. Are there other things that the "Hey
24  Mercedes" feature is used for besides

Page 30

1  navigation?
2   A. Turn the temperature up in the cabin,
3  change the radio station.
4   Q. Has anybody else besides you and your
5  wife ever had a personal profile on this
6  vehicle?
7   A. No. I need to put a caveat behind.
8  The people who owned it before me did.
9   Q. And you understand that was deleted by
10  the dealer before you drove it off the lot?
11   A. To my understanding, yes.
12   Q. Do you have to create a profile to
13  drive the car?
14   A. I guess you could use the guest
15  profile.
16   Q. Do you have, since you've had this
17  vehicle, any memory of getting software updates
18  for it?
19   A. All the time.
20   Q. Tell me about how that process works.
21   A. It -- I just get in the car, and it
22  says it had received an over-the-air software
23  update.
24   Q. Do you know what version of the

Page 31

1  software you're currently on in the vehicle?
2   A. Don't have a clue.
3   Q. If you needed to find that out, would
4  you know how to do it?
5   A. I might be able to do it on my app. I
6  don't know.
7   Q. So is your case based on the allegation
8  that Cerence is collecting your voiceprint when
9  you say "Hey Mercedes"?
10   A. I'm not sure exactly what it's based
11  on. It's in the filings that you have.
12   Q. Okay. Do you believe that your voice
13  is being collected all the time every time
14  you're talking in the car or only when you're
15  giving the "Hey Mercedes" voice commands?
16   A. I have no idea.
17   Q. Okay. Are there any other kinds of
18  commands that you give to the car besides "Hey
19  Mercedes, navigate to this place," or "change my
20  temperature," things like this?
21   A. It seems that when you say "Hey
22  Mercedes," it wakes up the system. That's an
23  assumption that I'm making, that -- does the car
24  possibly have the ability to listen to every

Page 32

1  word that's said in that cabin? I would believe
2  yes.
3   Q. When you want to load your personal
4  profile to drive the car, can you activate that
5  by saying "Hey Mercedes, it's Randall"?
6   A. I would imagine you could.
7   Q. Have you ever tried it?
8   A. No.
9   Q. You use the touch screen?
10   A. (Nodding.) That's what I've always
11  used, I mean, from the very start. I -- but I
12  would imagine if I said "Hey Mercedes, it's
13  Randolph," it would go "Okay, thank you," and
14  everything would take off.
15   Q. Are you familiar with something called
16  Mercedes me?
17   A. Yes.
18   Q. What's that?
19   A. That's -- to my understanding, that's
20  the app.
21   Q. Do you pay to use this?
22   A. $150 a year.
23   MR. WOLFE: Okay, I'm going to -- I'm
24  going to show you a few exhibits just sort of to



RANDOLPH FRESHOUR
A.P. vs CERENCE INC.

June 18, 2025
41–44

Page 41

1  BY MR. WOLFE:
2      Q.  You can answer.
3      A.  I have no idea.
4      Q.  Have you ever investigated whether any
5  voice data collected from you could be deleted?
6      A.  No.
7      Q.  You've never asked anybody about that?
8      A.  No.
9      Q.  You've never looked into it on the
10  vehicle like in the settings or anything like
11  that?
12      A.  Once I found through the investigation
13  of my attorneys that there was a problem, I've
14  limited myself to talking to my attorneys about
15  this and not talking to anyone else.
16      So I haven't inquired about it with
17  anybody at Mercedes or anyone else about how to
18  delete this.  I've kept my communication on this
19  case between me and my attorneys.
20      Q.  And you haven't looked into it yourself
21  on the vehicle or the app either, right?
22      A.  No.
23      Q.  Have we discussed all aspects of the
24  voice technology in your car that you think is

Page 42

1  pertinent to your case?
2      A.  To my knowledge.
3      Q.  Have you ever had any problems with the
4  software on your car?
5      A.  I don't believe so.
6      Q.  And by "software," I'm referring
7  specifically to the touch screen User Experience
8  software.
9      A.  (Shaking head.)
10      Q.  No problems with it?
11      A.  No problems.
12      Q.  Have you ever had to get it fixed at
13  the dealer or anything like that?
14      A.  It's been to the dealer mainly for
15  general maintenance, and I had to go one time
16  and they had to change my starter batteries.
17  It's got two different sets of batteries in it
18  for some reason.
19      Q.  Huh.  Okay.
20      A.  And the starter battery was bad, and
21  they had to change it.
22      Q.  Interesting.  Okay, are you alleging
23  that Cerence provided your biometric information
24  to anyone else?

Page 43

1      A.  I don't have any clue what Cerence has
2  done with my information.
3      Q.  Do you know whether you are alleging
4  Cerence sold or profited from your biometric
5  information?
6      A.  I am -- I imagine if they wanted to,
7  they could.
8      Q.  But are you alleging that they actually
9  did?
10      A.  I don't know whether they did or not.
11      Q.  Are you alleging that Cerence failed to
12  obtain your consent before collecting your
13  biometric information?
14      A.  Yes.
15      Q.  Are there any other theorys of
16  liability that you're alleging against Cerence,
17  if you know?
18      MR. GESKE:  Objection, calls for a
19  legal conclusion.
20      But you can answer.
21      THE WITNESS:  Other than what's in the
22  filings, no.
23          (Freshour Exhibit 3 was marked
24          for ID.)

Page 44

1  BY MR. WOLFE:
2      Q.  Mr. Freshour, I've marked a document as
3  Exhibit 3.  Take your time to review it if you
4  want to.
5      A.  (Reviewing document.)
6      Would you ask me questions, sir?  Go
7  ahead, ask.
8      Q.  Okay.  Do you know what this document
9  is?
10      A.  This is the actual case filing.  Isn't
11  it?
12      Q.  Have you seen it before?
13      A.  Yes.
14      Q.  Did you have a part in preparing it?
15      A.  A little, yes.
16      Q.  What was your role in preparing the
17  complaint?
18      A.  Answering the questions that my
19  attorney gave me in order for him to complete
20  the paperwork.
21      Q.  Did you review the complaint before it
22  was filed?
23      A.  Yes, I did.
24      Q.  And did you approve of it before it was



RANDOLPH FRESHOUR
A.P. vs CERENCE INC.

June 18, 2025
45–48

Page 45

1 filed?
2   A. Yes, I did.
3   Q. I want to ask you a few things about
4 some material that starts on page 13. So
5 there's a paragraph 46 towards the top. Do you
6 see that?
7   A. Um-hum.
8   Q. All right. It says "In or about August
9 of 2022, Plaintiff Randolph Freshour purchased a
10 2021 AMG GLC43 model Mercedes-Benz."
11     That's you, right?
12   A. Um-hum.
13   Q. And that's the car we've been talking
14 about today?
15   A. Correct.
16   Q. And it says "Upon arriving to his home
17 in Illinois, Plaintiff Freshour's automobile's
18 operating system prompted him to make a personal
19 profile with the 'MBUX' voice assistant system
20 powered by Cerence Drive."
21     Do you see that?
22   A. Yes, I do.
23   Q. Okay, earlier we talked about that you
24 set up the profile at the dealer, correct?

Page 46

1   A. That's my recollection at this point.
2   Q. Okay.
3   A. I would like to add that I am 71 years
4 old and do have a little bit of a memory
5 problem. I just had a stroke a year and a half
6 ago, so some of my memory is not as good as it
7 used to be.
8   Q. I completely understand that, and I am
9 not trying to trick you. Okay?
10   A. Okay.
11   Q. I just want to make sure I understand
12 everything that's in here.
13     So it says "Upon arriving to his
14 home..." Your memory today is it was actually
15 at the dealer; is that right?
16   A. If this is what I said to my attorney
17 back then, this (indicating to document) is
18 probably more accurate and because it was more
19 fresh in my memory at that point than it is now
20 here we are, what, four years later.
21   Q. Um-hum.
22   A. And, like I said, I did have a stroke
23 in between there and a heart attack also. But
24 who's counting at this point.

Page 47

1   Q. I'm sorry to hear that.
2     Okay, we can go to the next paragraph.
3 In 47, it says, as part of the process, you were
4 required to provide your first and last name and
5 e-mail address?
6   A. Correct.
7   Q. So what do you remember about that?
8   A. Nothing. It's like a blank in my mind.
9 I'm -- I apologize, I --
10   Q. All right, but you believe you would
11 have given this information to your attorney
12 when the complaint was drafted?
13   A. Correct.
14   Q. Okay. But you don't remember anything
15 about it now?
16   A. I --
17   Q. It's okay.
18   A. I apologize. It's like blank. I
19 mean...
20   Q. Now, on 48, it says "During the
21 registration process, Plaintiff Freshour was
22 also prompted to repeatedly say 'Hey Mercedes'
23 to the MBUX voice assistant."
24     Do you see that?

Page 48

1   A. Correct.
2   Q. Do you remember anything about that?
3   A. I do remember that.
4   Q. Okay. And what -- where do you
5 remember doing that?
6   A. I -- at this point in time, I believe I
7 did it at the dealership. I may have done it at
8 home. I don't remember.
9   Q. Okay. And then in the next sentence
10 that starts "Unbeknownst to Plaintiff..."
11   A. Correct.
12   Q. It says that the Cerence Drive software
13 was integrated into the voice assistant and was
14 collecting and so on your voiceprint.
15     Do you see that?
16   A. Correct.
17   Q. Is that based on your attorneys'
18 investigation?
19   A. Correct.
20   Q. And you are relying on the attorneys
21 for that, right?
22   A. I am.
23   Q. All right. And you don't have any
24 additional information about it?



RANDOLPH FRESHOUR
A.P. vs CERENCE INC.

June 18, 2025
49–52

Page 49

1    A.  No.
2    Q.  Then in 49, it says "Following
3  registration with the MBUX voice assistant,
4  every instance in which Plaintiff Freshour said
5  'Hey Mercedes' in his vehicle..."
6        And then it goes on a little bit, and
7  then it says the voice assistant is collecting,
8  capturing and storing and so on.  Do you see
9  that?
10    A.  Correct.
11    Q.  Do -- in this paragraph, do you have
12  any -- personally, do you have any information
13  supporting this paragraph or are you relying
14  entirely on your attorneys' investigation?
15    A.  (Reviewing document.)
16        I believe some of this is information
17  that I provided to my attorneys.
18    Q.  Okay, so what parts did you provide?
19    A.  About where I say "Hey Mercedes," and I
20  told them the same things that I told you
21  earlier in this conversation about what the
22  personal assistant was capable of.  And we had
23  this discussion earlier.
24    Q.  Yes, we did.

Page 50

1    A.  Yeah.
2    Q.  Do you have anything else to add to
3  that discussion?
4    A.  I have nothing to add.
5    Q.  Okay.  Then if you go to the next page,
6  the paragraph 50, it says "...Defendant failed
7  to obtain valid written consent as required by
8  BIPA.  Defendant also failed to provide
9  Plaintiff Freshour with any written disclosures"
10  and so on.
11        Do you have any personal knowledge
12  about this paragraph or are you relying on what
13  your attorneys said?
14    A.  I'm mainly relying on what my attorneys
15  told me, plus the fact that I did never receive
16  anything as far as having any kind of informed
17  consent to this portion of their process.
18    Q.  And then in paragraph 51, it says
19  "Further, on information and belief, Defendant
20  unlawfully disclosed Plaintiff Freshour's and
21  other Class members' biometrics to its
22  third-party cloud and data storage vendors."
23        And do you have any personal
24  information about that paragraph?

Page 51

1    A.  I'm depending on my attorneys on that
2  investigation.
3    Q.  Okay.  Do you know what court this case
4  is pending in?
5    A.  Court of Northern Illinois, Eastern
6  Division.
7    Q.  Did you know that there's also a second
8  case pending in another court?
9    A.  I did not.
10    Q.  This is the Corrected Third Amended
11  Class Action Complaint.  Do you see that?  It's
12  the title of the document.
13    A.  Where's that?
14    Q.  If you go to the very first page, it's
15  right at the start of the document.
16    A.  Okay.  This page here (indicating)?
17    Q.  Yes, sir.  You see the title there
18  Corrected --
19    A.  The third...
20    Q.  -- Third Amended Complaint?
21    A.  Okay.
22    Q.  Do you know why this is the Third
23  Amended Complaint?
24    A.  I have no idea.

Page 52

1    Q.  Do you know what any differences are
2  between this one and previous ones that are
3  filed?
4    A.  I do not.
5    Q.  Who represents you on this case?
6    A.  Colin.
7    Q.  What about the other guy?
8    A.  I met him recently.
9    Q.  Colin has been your primary contact?
10    A.  Colin has been my primary contact.
11        THE WITNESS:  Sorry, Paul.
12        MR. GESKE:  That's all right.  No
13  offense taken.
14  BY MR. WOLFE:
15    Q.  How did you find your lawyers?
16    A.  I was cruising through Facebook back in
17  2023, spring of 2023, and I saw a thing that
18  says "If you owned a Mercedes-Benz vehicle that
19  has this and this and this kind of options, give
20  us a call, there might be a lawsuit."  And I
21  made the call.
22    Q.  Do you still have a copy of that
23  advertisement that you saw?
24    A.  I do not.  I imagine you do.



RANDOLPH FRESHOUR
A.P. vs CERENCE INC.

June 18, 2025
53–56

Page 53

1    Q.  So did you make a phone call to inquire
2  about that or did you send an e-mail?  How did
3  you get in touch with them?
4    A.  I do not remember whether I e-mailed or
5  called, but I know that shortly after that, I
6  spoke with Colin, and it took off from there.
7    Q.  Why did you decide you wanted to file
8  the lawsuit?
9    A.  Well, if you think about it, if -- it's
10  the only way you can get some of these companies
11  to reel in their practices.  They're not doing
12  the right thing.  So if somebody had to file it,
13  why not me.
14    Q.  Was it your idea to file a lawsuit?
15    A.  Colin told me we had grounds for it,
16  so...
17    Q.  Did you talk to any other attorneys or
18  law firms about this case?
19    A.  I did not.
20    Q.  Do you know who Vincenzo Allan is?
21    A.  I do not other than the fact that he's
22  also a named plaintiff.
23    Q.  Do you know if at any time there were
24  other plaintiffs in the case, named plaintiffs?

Page 54

1    A.  I don't know.
2    Q.  You understand this is a proposed class
3  action case?
4    A.  I do.
5    Q.  What does that mean to you?
6    A.  It means that there is a number of
7  people who may have been wronged in this action
8  and that I am just a representative of them, and
9  I'm up here to put the best foot forward and
10  answer the questions to the best of my ability
11  to get action to make them whole.
12    Q.  Is it safe to say that you want to be
13  the class representative?
14    A.  I was kind of thrust into the
15  situation.  I wasn't going, hey, make me the
16  class representative.  I -- you know, I had
17  no -- I have never been in this position in my
18  life.  And not sure I like it to begin with.
19    Q.  What do you mean by you were thrust
20  into the situation?
21    A.  Well, I mean, I guess I was one of the
22  first people to act, and Colin said, Hey, you're
23  a representative of the class.  And I took on
24  the responsibility of doing that.

Page 55

1    Q.  And do you know who's included in the
2  proposed class?
3    A.  I do not.
4    Q.  Are you monitoring or following the
5  case in any way?
6    A.  Am I what?
7    Q.  Are you monitoring the case or
8  following it in any way?
9    A.  Other than occasional conversations
10  with Colin on what's going on, no.
11    Q.  How many conversations have you had
12  with Colin about the case in the two years since
13  it was filed?
14    A.  Maybe nine or ten.  Possibly more.  I
15  have no idea.
16    Q.  Have you participated in developing
17  case strategy?
18    A.  No.
19    Q.  Do you know if anybody besides you has
20  had their deposition taken yet in this case?
21    A.  No.
22    Q.  Have you seen any documents that
23  Cerence turned over in the case?
24    A.  No.

Page 56

1    Q.  You said you reviewed and approved the
2  complaint.  Have you reviewed or approved any
3  other documents that your attorneys submitted in
4  the case?
5    A.  I believe I may have.  And, like I
6  said, since -- since the inception of this, I've
7  been through a lot.  So it's hard for me to say.
8    Q.  Do you remember anything specifically
9  right now --
10    A.  No.
11    Q.  -- that you reviewed and approved?
12    Are you paying your attorneys to
13  represent you in the case?
14    A.  No.
15    Q.  Is there an agreement about fees?
16    A.  No.
17    Q.  What are your expectations for how
18  they're going to get paid?
19    A.  My expectation is that they'll get a
20  percentage of whatever is paid out.  I have no
21  idea what that percentage is and don't find it
22  to be any of my business.
23    Q.  What damages are you seeking in the
24  case, if any?



# EXHIBIT 7
# CONFIDENTIAL
# FILED UNDER SEAL

# EXHIBIT 8

**Your order in the Mercedes me connect Store DS-A-C14255703 of 5/22/24**

📎 1 attachment (34 KB)
MBUS_Refund-Policy_2024-02.pdf;





On Wednesday, May 22, 2024, 12:13 PM, noreply@email.mercedes-benz.com wrote:



FRESHOUR_000112

1/3

# Order confirmation

Order number: DS-A-C14255703
Date of order: 5/22/24

Hi Randolph,

Thank you for your order DS-A-C14255703 on 5/22/24.
Here's all your essential information about activating your Mercedes me connect services.

Your invoice will be sent in a separate email.

**Your next steps**

Please note certain services may require you to log in to the Mercedes me connect Portal to fill in your profile data before you can use the service. Where this is required click on the tile of the service you wish to activate to get started.

If you have purchased an **on-demand feature**, this will be provided immediately and automatically when you turn on your ignition (dependent on vehicle Internet connection). The feature will then be displayed in your multimedia system and will be ready to use.
If you would like to know more about Mercedes-Benz USA's refund policy, please visit https://www.mbusa.com/en/legal-notices/connected-vehicle for more information.

Kind regards,
Mercedes-Benz USA, LLC

Mercedes me
connect Portal

Mercedes me
connect Store

FRESHOUR_000113

**Your order**

---

**Billing address**

Mr.
Randolph Freshour
██████████
██████████████

**Mode of payment**

VISA

---



**Mercedes-Benz Connect**
**(Item number: QEV111AJQG6N)**

- For Mercedes-AMG GLC 43 4MATIC SUV (VIN: W1N0G6EB0MF896840)
- Availability: 12 months

**One-off payment: $150.00**

---

One-off payment (incl. tax)                    **$150.00**

The items are distributed by Mercedes-Benz USA, LLC.

---

Mercedes-Benz USA, LLC

One Mercedes-Benz Drive, Atlanta, Georgia 30328

Telephone: (800) 367-6372
Email: me-connect.usa@cac.mercedes-benz.com

   

This is an automatically generated e-mail. Please do not reply.

© 2024. Mercedes-Benz USA, LLC. All rights reserved (provider).

FRESHOUR_000114

# EXHIBIT 9

## Mercedes-Benz

**Mercedes-Benz USA, LLC**
**A Mercedes-Benz Group AG Company**

**Customer Data**
Mr.
Randolph Freshour
████████████████
USA

**Invoice**

| | |
|---|---|
| Customer Code | 4930593679 |
| Payment method | CREDIT CARD |
| Number | ██████████ |
| Date | 05/22/2024 |
| Purchase order number | DS-A-C14255703 |
| Order date | 05/22/2024 |

Page   1 / 2

Your order

| Item | License and description | Quantity | Unit Price | Taxes | Total Price |
|---|---|---|---|---|---|
| 1 | Mercedes-Benz Connect | 1 | 150.00 USD | 0.00 USD | 150.00 USD |
| | Valet Protect | | | | |
| | Car-to-X Communication | | | | |
| | Geofencing | | | | |
| | Online Map Update | | | | |
| | Stolen Vehicle Assistance | | | | |
| | Remote Vehicle Finder | | | | |
| | Vehicle Locator | | | | |
| | Live Traffic Information | | | | |
| | Vehicle Tracker | | | | |
| | Remote Door Lock & Unlock | | | | |
| | Personalization | | | | |
| | Local Search | | | | |
| | Parking for Navigation | | | | |
| | Global Search | | | | |
| | Weather map | | | | |
| | Theft Notification and Parking Damage Detection | | | | |
| | Weather forecast | | | | |
| | Remote Engine Start | | | | |

W1N0G6EB0MF896840

Product Code   QEV111AJQG6N

This product is valid for one year from the
date of activation

**Mercedes-Benz USA, LLC**
One Mercedes-Benz Drive
Sandy Springs, Georgia 30328

Tel : +1 (800) 367-6372
Email: me-connect.usa@cac.mercedes-benz.com
www.mbusa.com



Mercedes-Benz - are registered trademarks of Mercedes-Benz Group AG, Stuttgart, Germany

FRESHOUR_000147

# Mercedes-Benz

**Mercedes-Benz USA, LLC**
**A Mercedes-Benz Group AG Company**

## Customer Data

Mr.

Randolph Freshour

## Invoice

| | |
|---|---|
| Customer Code | 4930593679 |
| Payment method | CREDIT CARD |
| Number | |
| Date | 05/22/2024 |
| Purchase order number | DS-A-C14255703 |
| Order date | 05/22/2024 |

Page   2 / 2

| | | |
|---|---|---|
| Subtotal | 150.00 | USD |
| Sales Tax | 0.00 | USD |
| Total Price | 150.00 | USD |

**Mercedes-Benz USA, LLC**
One Mercedes-Benz Drive
Sandy Springs, Georgia 30328

Tel : +1 (800) 367-6372
Email: me-connect.usa@cac.mercedes-benz.com
www.mbusa.com


Mercedes-Benz - are registered trademarks of Mercedes-Benz Group AG, Stuttgart, Germany

FRESHOUR_000148

# EXHIBIT 10

**Page 1**

```
 1          IN THE UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF ILLINOIS

 3                   EASTERN DIVISION

 4

 5   RANDOLPH FRESHOUR and        )

 6   VINCENZO ALLAN, each         )

 7   individually and on behalf   )

 8   of similarly situated        )

 9   individuals,                 )

10                   Plaintiffs,  )

11          vs.                   ) No. 1:23-cv-02667

12   CERENCE INC., a Delaware     )

13   corporation,                 )

14                   Defendant.   )

15

16          The videotaped deposition of VINCENZO

17   ALLAN, called as a witness for examination, taken

18   pursuant to the Federal Rules of Civil Procedure of

19   the United States District Courts pertaining to the

20   taking of depositions, taken before VICTORIA C.

21   CHRISTIANSEN, a Certified Shorthand Reporter of the

22   State of Illinois, CSR No. 84-3192, at Suite 4700,

23   111 South Wacker Drive, Chicago, Illinois, on the

24   11th day of July, A.D. 2025, at 10:03 a.m.
```

**Page 2**

```
 1   PRESENT:

 2        McGUIRE LAW, P.C.,
             (55 West Wacker Drive, 9th Floor,
 3           Chicago, Illinois 60601,
             312-893-7002), by:
 4        MR. PAUL T. GESKE,
             pgeske@mcgpc.com, and
 5        MR. COLIN PRIMO BUSCARINI,
             cbuscarini@mcgpc.com,
 6
                  appeared on behalf of the Plaintiffs;
 7

 8
          SHOOK, HARDY & BACON LLP,
 9           (111 South Wacker Drive, Suite 4700,
             Chicago, Illinois 60606,
10           312-704-7700), by:
          MS. MEHGAN E.H. KEELEY,
11           mkeeley@shb.com, and
          MR. MATTHEW C. WOLFE,
12           mwolfe@shb.com,
13           appeared on behalf of the Defendant.
14

15   ALSO PRESENT:
16        MS. KELSEY COOPER, Law Clerk,
             McGuire Law, P.C.
17

18

19

20

21   VIDEOTAPED BY:  PETER VAN WINKLE,
                  Legal Videographer,
22                Esquire Deposition Solutions;
23

24   REPORTED BY:  VICTORIA C. CHRISTIANSEN, RPR, CRR,
                  Illinois CSR No. 84-3192.
```

**Page 3**

1        THE VIDEOGRAPHER:  All right.  We are now on

2   the video record.

3        This is Tape No. 1 to the videotaped

4   deposition of Vincenzo Allan in the matter of

5   Freshour, et al., vs.  Cerence Incorporated, being

6   heard before the U.S. Dist- -- District Court for

7   the Northern District of Illinois, Eastern

8   Division, Case No. 1:23-cv-01667 [sic].

9        This deposition is being held at Shook,

10   Hardy & Bacon LLP on July 11, 2025 at the time of

11   10:03 a.m.

12        My name is Peter Van Winkle.  I'm the

13   videographer.  The court reporter is Vicki

14   Christiansen.

15        Counsel, will you please introduce

16   yourselves and affiliations and the witness will be

17   sworn.

18        MS. KEELEY:  Mehgan Keeley for Defendant

19   Cerence Inc.

20        MR. WOLFE:  Matt Wolfe also for defendant.

21        MR. GESKE:  Paul Geske of McGuire Law for

22   plaintiff.

23        MR. BUSCARINI:  Colin Buscarini of McGuire Law

24   for plaintiff, as well.

**Page 4**

1        MS. COOPER:  Kelsey -- Kelsey Cooper of

2   McGuire Law for the plaintiff.

3        (WHEREUPON, the witness was duly

4        sworn.)

5             VINCENZO ALLAN,

6   called as a witness herein, having been first duly

7   sworn, was examined and testified as follows:

8             EXAMINATION

9   BY MS. KEELEY:

10        Q.   Okay.  Mr. Allan, can you please state

11   your name and address for the record.

12        A.   Vincenzo Allan, 2150 McDonald's Drive,

13   Unit 13- -- 1312, Oak Brook, Illinois 60523.

14        Q.   Okay.  And have you gone by any prior

15   names other than the one you just provided?

16        A.   Correct.

17        Q.   And what was that?

18        A.   M-o-h-a-m-m-a-d.  Same last name.

19        Q.   Okay.  Thanks.  Have you ever been

20   deposed before?

21        A.   No.

22        Q.   Okay.  Have you provided testimony in

23   court before?

24        A.   No.



VINCENZO ALLAN
FRESHOUR and ALLAN vs CERENCE

July 11, 2025
33–36

Page 33

1  received any.
2       Can you --
3    A.  The --
4    Q.  -- clarify your understanding of the
5  difference?
6       MR. GESKE:  Object to the form and lack of
7  foundation.
8       If -- if you want to ask him about a
9  specific one, maybe we could use it as an exhibit.
10  BY MS. KEELEY:
11   Q.   I'm just kind of trying to find out your
12  understanding of the difference between the ones
13  you produced in this case and what -- you said
14  earlier that you didn't receive any, so I'm just
15  trying to understand how you distinguish them.
16      MR. GESKE:  Yeah, same objections.
17      So if you want to ask him about a
18  specific document that was produced, then it would
19  help to -- to show it.
20      MS. KEELEY:  Yeah, I --
21      MR. GESKE:  Yeah, I --
22      MS. KEELEY:  -- I don't have a question about
23  a specific document right now, so are you directing
24  him not to answer the question or --

Page 34

1       MR. GESKE:  No, I'm -- I'm just trying to help
2  you get the testimony that you're looking for.
3       MS. KEELEY:  Okay.
4  BY THE WITNESS:
5    A.   So --
6  BY MS. KEELEY:
7    Q.   We can return to this.
8    A.   So -- so you're asking -- can you re- --
9  so --
10      MR. GESKE:  That's okay.  There isn't -- there
11  isn't a question pending.
12      THE WITNESS:  Okay.
13      MR. GESKE:  Yeah.
14  BY MS. KEELEY:
15   Q.   Okay.  Let's talk about your vehicle
16  history a little bit.
17      How many -- how many cars do you
18  currently own?
19   A.   As of right now, I only own one.
20   Q.   Okay.  And are you leasing any cars
21  right now?
22   A.   No.
23   Q.   Okay.  What type of car do you currently
24  own?

Page 35

1    A.   A Cadillac Escalade.
2    Q.   Okay.  Do you know how many cars you've
3  owned in the last five years?
4    A.   Maybe 10, 15.
5       THE VIDEOGRAPHER:  Sorry.  If you could try
6  not to cover --
7       THE WITNESS:  Oh, sorry, yeah.
8  BY MS. KEELEY:
9    Q.   Okay.  You've owned 10 or 15 cars in the
10  last ten years?
11   A.   Yeah.
12   Q.   And how many of those were Mercedes-Benz
13  vehicles?
14   A.   I believe three or four.
15   Q.   Okay.  Well, do you remember what the
16  first model of a Mercedes-Benz was that you
17  purchased?
18   A.   I believe that was in 2018.  It was a
19  GLS, I don't know, 450, 550, one of those.
20   Q.   And then what are the other three kinds
21  of Mercedes that you've owned?
22   A.   A 2020 C 63 S, a 2022 S 580, a
23  2023 E 63 S.
24   Q.   And of those four Mercedes vehicles,

Page 36

1  which ones are the subject of your -- what you're
2  suing Cerence about?
3    A.   So all -- the -- the last three, the --
4  the recent three.  I don't recall whether or not --
5  I'm sure I've used the Mercedes Me in the 2018, but
6  that was about seven years.
7    Q.   Okay, okay.  Let's -- let's start with
8  the -- the C 63 S.
9    A.   Sure.
10   Q.   Did you -- well, actually, I'll back up
11  and first I'll ask:  Of the -- the three vehicles
12  that you said are at issue in the lawsuit, did you
13  own any of them at the same time?
14   A.   I believe I owned the C 63 and the S 580
15  at the same time.
16   Q.   Okay.  How long did you own both of them
17  for?
18   A.   The C 63, to my best of knowledge, was
19  from November -- around November of '19 to I would
20  say sometime towards the -- you know what?  Towards
21  the middle or beginning of 2022.
22      The next car?  Which other car were you
23  asking you me about?
24   Q.   My question is how long did you own both



VINCENZO ALLAN
FRESHOUR and ALLAN vs CERENCE

July 11, 2025
37—40

Page 37

1 the C 63 S and the S 580 at the same time.
2    A.   The S 5- -- oh, at the same time? Maybe
3 three months.
4    Q.   Okay. For the C 63 S, did you buy that
5 new or used?
6    A.   New.
7    Q.   Okay. Did anybody else drive that car?
8    A.   Just me.
9    Q.   And then how about for the S 580? You
10 mentioned that you owned that around three months
11 at the same time as the prior Mercedes.
12       Do you remember when you purchased and
13 sold that car?
14    A.   I believe I purchased that sometime near
15 the beginning of 2022.
16    Q.   Okay. And when did you sell it?
17    A.   So that car was not sold. That car was
18 involved in a motor vehicle collision and was
19 deemed a total loss.
20    Q.   Okay. When was that?
21    A.   That was in March of '23.
22    Q.   Okay. Do you remember if that was
23 before or after you filed the lawsuit?
24    A.   No, I don't remember whether or not that

Page 38

1 was before or after.
2    Q.   Okay. Did anybody else drive that car?
3    A.   No.
4    Q.   Okay. And then I think the third you
5 said was the E 63 S, right?
6    A.   Uh-huh.
7    Q.   When did you purchase that car?
8    A.   I believe around the same time, like
9 maybe a few weeks later.
10    Q.   A few --
11    A.   A few weeks following the motor vehicle
12 collision of the S 580 I purchased the E 63 S.
13    Q.   Okay. So around March or April of '23?
14    A.   Yeah.
15    Q.   Okay. And you -- did you sell that car?
16    A.   The E 63 S, yes, I ended up selling it.
17    Q.   And when was that?
18    A.   That I don't recall. I have it
19 somewhere in -- I have it somewhere in my
20 documents.
21    Q.   Do you remember what year?
22    A.   I've owned about three or four cars
23 since. I -- I don't know the exact month. I would
24 say it was sometime in 2024.

Page 39

1    Q.   And did anybody else drive that car?
2    A.   No.
3    Q.   Okay. And the Cadillac Escalade that
4 you own today, do you have any voice technology in
5 that vehicle?
6    A.   If there is voice technology in that
7 vehicle, I have not used it.
8    Q.   Okay. Why not?
9    A.   I prefer not to have any company saving
10 my information within their servers, so no, I have
11 not used any voice technology in that vehicle.
12    Q.   Okay. And so are you alleging that you
13 used voice technology in your E 63 S?
14    A.   I used voice tech in my C 63, the S 580
15 and the E 63.
16    Q.   Okay. And when did you decide that you
17 no longer wanted to use voice technology in your
18 vehicles?
19    A.   Sometime -- like a few months into me
20 owning the E 63.
21    Q.   Okay. And what did you do to stop using
22 it at that time?
23    A.   I deleted my user profile out of the
24 vehicle.

Page 40

1       And, now, that car, the E 63 S, I will
2 give you an exact date of purchase because when I
3 purchased that vehicle, I purchased it directly
4 from the dealer with a CO, so my recorded purchase
5 date on that vehicle is when I registered the car,
6 and I hadn't registered the car immediately --
7    Q.   Okay.
8    A.   -- because I had the certificate of
9 origin for the vehicle. I just want to clarify
10 that, as well.
11    Q.   Okay. And so you said that you stopped
12 using voice technology in the E 63 S a few months
13 after you bought it.
14       Did you start using -- when did you
15 start using it?
16    A.   I used it maybe the first few days, and
17 that was it.
18    Q.   The first few days after you purchased
19 it?
20    A.   Yeah. For maybe like a week and a half.
21    Q.   Okay. You mentioned the term "MBUX"
22 earlier.
23       Can you describe your understanding of
24 what that is?



VINCENZO ALLAN
FRESHOUR and ALLAN vs CERENCE

July 11, 2025
49–52

Page 49

1    A.    So the S 580 I bought as a CPO vehicle
2   from an Ohio Mercedes dealer.  Everything was
3   already activated by them for me.
4         So did I activate anything?  No, but my
5   sales advisor told me, "Hey, this car, you can do
6   the same thing as your C 63, just, you know, this
7   one, all you have to -- just 'Hey Mercedes,' and it
8   will do whatever functions you want."
9    Q.    Got it.
10    A.    And let me follow up on that, since --
11   you know, my -- my other reason to believe is --
12   that the car was storing my voice information,
13   since the question was asked so many times, was
14   that, you know, I talk in a very different tone
15   when I'm not in a room like this, so it is very
16   hard to understand me because I talk very quick.
17         Mercedes under- -- the -- the car
18   understood me perfectly fine, which, you know, at
19   the time I didn't think anything of until, you
20   know, I did some Google searches.
21    Q.    Okay.  And when you say the car
22   understood you perfectly fine, are you referring to
23   the words that you were saying, like --
24    A.    Yeah.

Page 50

1    Q.    -- it was able to process those words?
2    A.    Yeah.
3    Q.    Okay.  And is that -- was that the case
4   for all three of the vehicles?
5    A.    I -- I just referenced the S 580.
6    Q.    Okay.  Did you -- did you find that the
7   C 63 S understood you perfectly fine?
8    A.    Yeah, it did.
9    Q.    Okay.  And then how about the E 63 S?
10    A.    The E 63 S, you know, I wouldn't be able
11   to tell you whether or not it completely understood
12   me as I stopped using the service.
13    Q.    Right.  So during the time that you did
14   use the service, did you find that it understood
15   the words that you were saying?
16    A.    I would say it understood the words that
17   I was saying.
18    Q.    Okay, okay.  So going back to the S 580,
19   you said that the sales advisor set that up for
20   you, as well, right?
21    A.    Uh-huh.
22    Q.    And did that advisor ask you for any
23   information when he or she was enrolling you?
24    A.    Once again, they are selling me a

Page 51

1   vehicle.  They have my first name, my last name and
2   my e-mail address.  It was an out-of-state
3   purchase, so yeah, they already had my information.
4   I don't believe they asked me for my information if
5   they already had it.
6    Q.    Okay.  So to your knowledge, did they
7   only input your name -- your first name, your last
8   name and your e-mail address when they enrolled you
9   in the voice technology?
10    A.    To my knowledge, I believe so.
11    Q.    Okay.  When you started using it in the
12   S 580, did you similarly press the button with the
13   face?
14    A.    No.
15    Q.    Okay.
16    A.    "Hey Mercedes."
17    Q.    Okay.  So can you clarify what you mean?
18    A.    Yeah.  "Hey Mercedes," you don't need --
19   I never had to press a button.  The car would even
20   greet you when you walked in.
21    Q.    So backing up a little bit, so you would
22   say, "Hey Mercedes," and you could say the command
23   and the car would execute the command?
24    A.    Sure, okay, so, "Hey Mercedes," input

Page 52

1   command.
2    Q.    Okay.  Got it.  Was there any other
3   phrase that you had to say to activate it?
4    A.    No, just "Hey Mercedes" and follow with
5   a command.
6    Q.    Okay.  Did you ever say something like
7   "Load my personal profile"?
8    A.    Did I ever say "Load my personal
9   profile"?  No.  Why would I -- no.
10    Q.    I'm just trying to understand what your
11   experience was using the technology in the car.
12         Okay.  And then you also said that the
13   car greets you when you -- I don't -- actually,
14   I'll just let you -- can you explain what you meant
15   by the car greets you and what that experience was
16   like?
17    A.    Sure, yeah.  You get in the car, the
18   little iPad screen says "Hello" with your name on
19   it.
20    Q.    And did that happen in -- once you
21   opened the door or when you -- like what -- what
22   happened to trigger that?
23    A.    Yeah, I mean, if your key is with you
24   and you open the door and you sit in the vehicle, I



VINCENZO ALLAN
FRESHOUR and ALLAN vs CERENCE

July 11, 2025
61–64

Page 61

1    A.   Yeah, that's all.
2    Q.   Okay, okay.  I'm going to show you
3  another document we can mark as Exhibit 2.
4          (WHEREUPON, a certain document was
5          marked Allan Deposition Exhibit No.
6          2, for identification.)
7  BY MS. KEELEY:
8    Q.   Do you recognize this document?
9    A.   Yes, I do.
10   Q.   Okay.  Have you seen it before?
11   A.   Yes, I have.
12   Q.   Okay.  Did you have a part in preparing
13  anything in this document?
14   A.   Can you clarify that?
15   Q.   Sure.  I'll back up.
16        So at the top, like it says -- the top
17  heading says, "Corrected Third Amended Class Action
18  Complaint."
19        Do you see that?  About halfway down the
20  page.
21   A.   Yes, I see that.
22   Q.   Did you par-- did you help draft
23  anything in this document?
24   A.   My attorneys drafted this on my behalf

Page 62

1  with information that I provided them.
2    Q.   Okay.  Did you review it before they
3  filed it?
4    A.   Yes, I did.
5    Q.   And did you -- did you give them your
6  approval --
7    A.   Yes.
8    Q.   -- of what's -- of what's in it before
9  it was filed?
10   A.   Yes, ma'am.
11   Q.   Okay, great.  Can you turn to Page 14?
12        Okay.  So I just want to walk you
13  through some of the allegations in the complaint to
14  clarify your understanding of them, so I'll start
15  with -- do you see where it starts with Paragraph
16  No. 52?
17   A.   Yes.
18   Q.   Okay.  So it says, "During the time
19  period relevant to this action, Plaintiff Vincenzo
20  Allan has owned several Mercedes-Benz automobiles
21  integrated with MBUX and voice assistant technology
22  powered by Cerence's voice recognition and SSE
23  capability, including a 2020 Mercedes-Benz AMG
24  C 63 S purchased in or about November of 2019, a

Page 63

1  2022 Mercedes-Benz S 580 purchased in or about
2  March of 2022, and a 2023 Mercedes-Benz E 63 S
3  purchased in or about May 2023."
4          Did I read that correctly?
5    A.   Yes, you did.
6    Q.   Okay.  And those are the three vehicles
7  we were talking about earlier, right?
8    A.   Yes, they are.
9    Q.   So for the next paragraph, 53, it says,
10  "After each of the above-mentioned purchases,
11  Plaintiff Allan returned to his home in Illinois
12  and was prompted by the automobile's operating
13  system to make a personal profile with the MBUX
14  voice assistant system powered by Cerence Drive."
15        Did I read that correctly?
16   A.   Yes, you did.
17   Q.   Okay.  And is -- is that -- is that your
18  understanding of what happened?
19   A.   So -- so here the accounts were made on
20  my behalf by the dealerships.  When I took the cars
21  home, I was prompted to put in my information, as
22  well, into the actual vehicle to hit "sign in."
23   Q.   Oh, okay.  Was that for each -- each of
24  the three vehicles?

Page 64

1    A.   Yeah.
2    Q.   Okay.  So since we didn't --
3    A.   And that's clarification for your
4  previous question.
5    Q.   Okay, great.  That's fine.  So let's
6  back up, then.
7        So -- so after you purchased the C 63 S,
8  you said you went home and prompted -- were
9  prompted to put in your own information.
10        What information were you prompted to
11  put in?
12   A.   The same information that the dealership
13  put in.
14   Q.   Okay.  So the first name, last name,
15  e-mail address?
16   A.   Yes.
17        So, now, when you purchase these cars,
18  you know, the client advisors set up an account for
19  you, and, I mean, it's not just -- almost every
20  automaker does this, Range Rover, Cadillac, all of
21  them.  They ask you for your first name, your last
22  name and your e-mail address.  They set you up an
23  account online.  When the car gets delivered to
24  you, all you have to do is sign in with your -- the



# EXHIBIT 11
# CONFIDENTIAL
# FILED UNDER SEAL

# EXHIBIT 12

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION
    -------------------------------------------------
 3
    RANDOLPH FRESHOUR and
 4  VINCENZO ALLAN, each individually and
    on behalf of similarly situated individuals,
 5
            Plaintiffs,         Case No.
 6                              1:23-cv-02667
       v.
 7
    CERENCE INC., a Delaware corporation,
 8
            Defendant.
 9
    -------------------------------------------------
10
11
            REMOTE VIDEOTAPED DEPOSITION
12
                         OF
13
                   CARLA A. PEAK
14
               NOVEMBER 21, 2025
15
16
17
18
19
20
21
22
23
24  Reported Stenographically By:
    Amy L. Larson, RPR, CSR, CCR
25  Job No. 13787319
```

Page 2

```
 1
 2
 3
 4
                    November 21, 2025
 5
                    11:05 a.m. EST
 6
 7
 8  Remote Videotaped Deposition of CARLA A. PEAK,
 9  taken before Amy L. Larson, a Registered
10  Professional Reporter, Certified Court Reporter in
11  the State of Utah, Notary Public in the State of
12  Minnesota, Notary Public in the State of
13  Wisconsin, Certified Shorthand Reporter in the
14  State of Illinois, Certified Court Reporter in the
15  State of Washington, Certified Shorthand Reporter
16  in the State of Oregon, and Certified Court
17  Reporter in the State of New Mexico.
18
19
20
21
22
23
24
25
```

Page 3

```
 1  A P P E A R A N C E S:
 2  ON BEHALF OF THE PLAINTIFF AND DEPONENT:
 3  MCGUIRE LAW, P.C.
    55 West Wacker Drive, 9th Floor
 4  Chicago, IL 60601
    BY:  PAUL GESKE, ESQ.
 5  email:  pgeske@mcgpc.com
    BY:  ETHAN CONIGLIO, ESQ.
 6  email:  econiglio@mcgpc.com
 7  OBSERVER ON BEHALF OF KROLL, LLC:
 8  KROLL, LLC
    1 World Trade Center, 31st Floor
 9  New York, NY 10007
    BY:  GABRIEL BRUNSWICK, ESQ.
10  email:  gabriel.brunswick@kroll.com
11  ON BEHALF OF THE DEFENDANT:
12  SHOOK, HARDY & BACON L.L.P.
    111 South Wacker Drive, Suite 4700
13  Chicago, IL 60606
    BY:  MATTHEW WOLFE, ESQ.
14  email:  mwolfe@shb.com
    BY:  SAMUEL BERNSTEIN, ESQ.
15  email:  sbernstein@shb.com
16
17  ALSO PRESENT:
18  Mark Von Lanken, Videographer
19
20
21
22
23
24
25
```

Page 4

```
 1  INDEX:
 2  EXAMINATION BY:                          PAGE
 3      Mr. Wolfe                              6
 4      Mr. Geske                            105
 5  EXHIBITS MARKED FOR IDENTIFICATION:
 6      Exhibit 1                             10
        Curriculum Vitae
 7
        Exhibit 2                             52
 8      Supplemental Declaration
 9      Exhibit 3                             55
        Declaration
10
        Exhibit 4                             66
11      Bates MBUSA_0077 - MBUSA_0078
12      Exhibit 5                             89
        Corrected Third Amended Class
13      Action Complaint
14
15
16
17
18
19
20
21
22
23
24
25
```



CARLA A. PEAK
November 21, 2025
RANDOLPH FRESHOUR vs CERENCE INC.
41–44

Page 41

1    offered as a class certification expert by
2    the plaintiffs in this case?
3  A.  No.
4  Q.  What is your role in this case?
5  A.  My role in this case is simply to provide a
6    declaration stating that if a class is
7    certified, this is typically the method of
8    dissemination that is used and that has been
9    approved by other courts.
10  Q.  Do you have an opinion about whether the
11    identities of individual class members in
12    this case are readily ascertainable?
13        MR. GESKE:  Objection to the
14    extent it calls for a legal conclusion.
15        You can answer.
16        THE WITNESS:  I have no opinion on
17    ascertainability.
18  BY MR. WOLFE:
19  Q.  Do you have any views on that issue?
20  A.  I do not.
21        MR. GESKE:  Same objection.
22        Sorry.  Sorry, Carla.
23        Same objection.
24  BY MR. WOLFE:
25  Q.  Do you have any opinion or views on whether

Page 42

1    any individual's status as a class member can
2    be objectively determined?
3        MR. GESKE:  Same objection.
4        THE WITNESS:  Can you rephrase?
5  BY MR. WOLFE:
6  Q.  Do you have any opinion or views on whether
7    any individual's status as a class member can
8    be objectively determined?
9        MR. GESKE:  Same objection.
10        THE WITNESS:  By whom?
11  BY MR. WOLFE:
12  Q.  By a court.
13        MR. GESKE:  Same objection.
14        THE WITNESS:  I don't have an
15    opinion.
16  BY MR. WOLFE:
17  Q.  That's not within the scope of what you are
18    doing in this case?
19  A.  Correct.
20  Q.  Are you offering any opinions on whether the
21    technology at issue in this case involves
22    biometrics?
23        MR. GESKE:  Object to the extent
24    it calls for a legal conclusion.
25        You can answer.

Page 43

1        THE WITNESS:  No, I am not.
2  BY MR. WOLFE:
3  Q.  Do you have any personal firsthand knowledge
4    about this case?
5  A.  No, I do not.
6  Q.  Do you own a car?
7  A.  Yes.
8  Q.  What kind of car is it?
9  A.  A VW.
10  Q.  Does it have speech-command technology?
11  A.  I don't know.  If it does, I don't use it.
12  Q.  Do you use any kind of speech-command
13    technology, like Siri or Global Assist or
14    anything like that?
15  A.  I typically don't, because I don't care to.
16  Q.  Have you ever used speech-command technology
17    in a car?
18  A.  Yes.
19  Q.  Tell me about the circumstances of that.
20  A.  My husband got a new car and we just, like,
21    tested it out.
22  Q.  What kind of car does he have?
23  A.  It's a BMW.
24  Q.  So do you remember what you said to the
25    speech-recognition technology?

Page 44

1  A.  I know it started with, "Hey BMW."
2  Q.  So he was asking you to test out the actual
3    technology that came up on the BMW; is that
4    right?
5  A.  I wouldn't say he was asking me to test it
6    out.  I think he was just saying, "Hey, try
7    this."
8  Q.  Yeah, I got you.
9        Do you -- do you know if you also can
10    pair a phone with the car and use the
11    speech-recognition technology on the phone
12    while you're in your car?
13  A.  I know you can pair a phone with the car,
14    so -- but I've never tried.
15  Q.  Okay.  Have you ever seen people do that?
16  A.  Yes.
17  Q.  Tell me how that works, from your point of
18    view.
19        MR. GESKE:  Objection; foundation,
20    calls for speculation.
21        THE WITNESS:  My husband uses it.
22    He likes that sort of thing.
23  BY MR. WOLFE:
24  Q.  It's not a technical question.  I'm just
25    asking if you observe somebody using, say,



CARLA A. PEAK                                      November 21, 2025
RANDOLPH FRESHOUR vs CERENCE INC.                              61–64

Page 61

1  Q.  In paragraph 7 there's a list of automotive
2      cases.
3          Do you see that?
4  A.  Yes.
5  Q.  Were these also in the classes?
6  A.  No.
7  Q.  Which ones were not settlement classes?
8  A.  I believe Soders vs. General Motors started
9      as a certification class and later settled
10     and became a settlement class.
11         And at least one of the Nissans, that
12     floorboard one.  I'm just -- I can't recall
13     which one it was, but that one also started
14     as a class certification.
15 Q.  Did the cases in paragraph 7 all involve a
16     defect with a car, like a rusty floorboard or
17     some kind of a part that didn't work
18     properly?
19 A.  Not Soders vs. General Motors.
20 Q.  The others all did?
21 A.  I believe so.
22 Q.  What was Soders about?
23 A.  If I recall correctly, I believe it was about
24     the pricing, the sticker on -- there was like
25     a charge that was at issue.

Page 62

1  Q.  So some sort of overpricing or consumer fraud
2      theory about a hidden charge or something
3      like that?
4  A.  Yes, I believe so.
5  Q.  And in the cases in paragraph 7, were the
6      owners of the vehicles the class members?
7  A.  I believe it was -- in most of them it was
8      like current and former owners and current
9      and former lessees.
10 Q.  So in trying to put it in plain English, it
11     would be people whose bought or leased a car
12     and there was something wrong with the car
13     which made the car less usable or less value
14     so they were getting money compensation
15     because there were problems the car?
16 A.  Not -- not necessarily.
17 Q.  Okay.
18 A.  I don't know that they all provided financial
19     compensation, you know, outside of repairs or
20     things.
21 Q.  Okay.  Thank you for that clarification.
22     That's a good clarification.
23         So but each of these cases in
24     paragraph 7 involved owners or lessors of
25     cars and the cars themselves had a problem

Page 63

1      with them; is that fair?
2  A.  Yes, I think that's accurate.  We'll say
3      alleged problem.
4  Q.  I can tell that you have a lot of experience
5      talking to lawyers.
6  A.  There's no liability admitted in a
7      settlement.
8  Q.  Let's go to paragraph 13.
9  A.  Okay.
10 Q.  In paragraph 13 there's a class definition.
11         Do you see that?
12 A.  I do.
13 Q.  How did you get an understanding about what
14     the class definition is?
15 A.  I believe that came from the class action
16     Complaint.
17 Q.  Have you ever seen either of the motions for
18     class certification filed in these cases?
19 A.  I don't recall.
20         MR. WOLFE:  Okay.  Let's take,
21     like, a ten-minute break.
22         THE WITNESS:  Okay.
23         MR. WOLFE:  I maybe have another
24     hour, hour and a half, that should be it.
25         THE VIDEOGRAPHER:  We are off the

Page 64

1      record.  The time is 12:28.
2          (Recess.)
3          THE VIDEOGRAPHER:  We are on the
4      record the time is 12:43.
5          MR. WOLFE:  Ms. Peak, we're going
6      to continue with your declaration in a
7      moment.
8          I just -- I wanted to clarify for the
9      record, I don't think I did a very good job,
10     I previously sent Ms. Peak two exhibits, and
11     the first one is her CV, that will be
12     Exhibit 1.  The second one is her
13     supplemental declaration.  That will be
14     Exhibit 2.  This declaration will be
15     Exhibit 3.  And I'll submit them to Esquire
16     as well after the deposition.
17 BY MR. WOLFE:
18 Q.  Ms. Peak, do you still have your declaration
19     in front of you?
20 A.  Yes.
21 Q.  I want to go to paragraph 15, all right?
22 A.  Yes.
23 Q.  Starting in the first sentence of paragraph
24     15, it says, "I understand from consultation
25     with counsel that Mercedes-Benz USA has

CARLA A. PEAK
RANDOLPH FRESHOUR vs CERENCE INC.

November 21, 2025
73–76

Page 73

1 confirmation for myself. I believed it to be
2 true and wanted that confirmation. And he
3 gave me that confirmation.
4 Q. And did you ask him about a specific vendor
5 that can do it?
6 A. I don't recall if I specifically said
7 IH Market -- IHS Market.
8 Q. Did he give you any specific vendor that can
9 do it?
10 A. I don't recall him responding that he -- with
11 a specific vendor, no.
12 Q. And you've not done this personally, right?
13 A. No.
14 Q. Are you an expert on identifying the people
15 who should receive notice?
16 MR. GESKE: Object to the form and
17 calls for a legal conclusion.
18 You can answer.
19 THE WITNESS: Can you rephrase?
20 BY MR. WOLFE:
21 Q. Are you an expert on figuring out who should
22 get notice of a class action?
23 A. Depending on the method.
24 Q. What do you mean by that?
25 A. Well, what I mean is sometimes the defendant

Page 74

1 has specific information saying this is
2 who -- this is a class member. Based on our
3 records, we know for sure this is a class
4 member. Sometimes there is no information
5 based on who specifically is a class member
6 and so we have to devise a plan to provide
7 notice to potential and/or likely class
8 members.
9 Q. Are you aware of Cerence, the defendant in
10 this case, having a list or specific
11 information about what individuals should be
12 class members?
13 A. No, I'm not.
14 Q. Do you have any reason to think it does?
15 A. I don't have a reason to think one way or the
16 other, no.
17 Q. That isn't something you'd want to know when
18 you're making recommendations about how to
19 make a notice plan?
20 A. It is, but I'm not making a notice plan.
21 Q. This declaration is not meant to explain how
22 notice could be achieved in this case?
23 A. This declaration is how notice is typically
24 achieved in other cases, but it is not
25 100 percent specific to this case.

Page 75

1 Q. You cite a number of cases in this
2 declaration. Which ones do you think are
3 most analogous to this case?
4 MR. GESKE: Object to the form.
5 You can answer if you understand the
6 question.
7 THE WITNESS: Based on the
8 information available to me at this point in
9 time, not knowing one way or another whether
10 Cerence has information about actually who is
11 in the class and who is not, this is
12 typically how cases -- how notice is provided
13 in automotive situations where the numbers
14 are available and, therefore, I think it
15 would be very similar, based on the
16 information available at this time, to the
17 cases that I list in number 7 with the
18 exception perhaps of Soders --
19 Soders vs. General Motors, which is slightly
20 different.
21 BY MR. WOLFE:
22 Q. Is it your understanding that the allegation
23 in this case is that the speech recognition
24 software didn't work the way it was supposed
25 to?

Page 76

1 A. No, it is not.
2 Q. What's your understanding of what the
3 plaintiffs allege Cerence did wrong?
4 A. My understanding is alleged violation of
5 BIPA.
6 Q. Is it your understanding that the plaintiffs
7 said Cerence collected, possessed, maybe did
8 other things with their biometric data
9 without obtaining consent or making proper
10 disclosures under BIPA?
11 A. Yes.
12 Q. If a person owned a Mercedes vehicle and
13 never used the voice technology on the
14 vehicle, would they have a claim against
15 Cerence?
16 MR. GESKE: Objection; foundation,
17 calls for speculation, calls for a legal
18 conclusion.
19 You can answer if you understand the
20 question.
21 THE WITNESS: I mean, I don't have
22 an opinion on that. That's not what the
23 class -- it's my understanding that is not
24 specifically what the class certification --
25 a motion for class certification would be



CARLA A. PEAK
November 21, 2025
RANDOLPH FRESHOUR vs CERENCE INC.
81–84

Page 81
1    vehicles, as well as the addresses the
2    current/former owners and lessees.
3  Q. And your understanding is if a third-party
4    vendor could give it to you, they won't do it
5    with a court order?
6  A. Yes.
7  Q. Do you know why?
8  A. Specifically?
9  Q. Yeah.
10 A. I don't know specifically why, but I
11   understand the logic behind it.
12 Q. What's your understanding?
13 A. Well, I mean, some information is not
14   publicly available, and my understanding is
15   this information is not publicly available
16   and, therefore, a court would need to order
17   it to be provided to us.
18 Q. Do you know if IHS Market can supply VINs of
19   the model, year and make at issue?
20 A. My understanding is, is they can do something
21   like that. Specifically this make and model,
22   I have not confirmed, no.
23 Q. And your understanding isn't based on
24   personal experience, it's based on general
25   understanding from working on other cases

Page 82
1    where other people did the work?
2  A. Yes.
3  Q. Do you know if IHS Market can supply data
4    showing which vehicles were registered in
5    Illinois?
6  A. My understanding is that they can.
7  Q. And is that also based on other -- other
8    people doing that in cases that you've worked
9    on?
10 A. Yes.
11 Q. Do you think IHS Market can supply mailing
12   address data for the relevant vehicle owners
13   and lessors?
14 A. That is my understanding, yes.
15 Q. And that's also not based on your personal
16   experience, it's based on other people doing
17   the work and you being aware of it?
18 A. Correct.
19 Q. Do you know where IHS Market gets this data?
20 A. Not specifically.
21 Q. Do you know whether the data is reliable?
22 A. No, not specifically.
23 Q. At the end of the paragraph 17 you say, "The
24   information would be refined to individuals
25   in Illinois who owned or leased one of the

Page 83
1    vehicles at issue in this litigation during
2    the class period."
3       Do you see that?
4  A. I do.
5  Q. How would you do that?
6  A. I would not specifically do that.
7  Q. Who would?
8  A. Our data team.
9  Q. Do you know how the data team would do it?
10 A. Not specifically.
11 Q. Do you have any idea of how they do it?
12 A. I would say based on the information
13   available to them, but I don't know the
14   specific procedure for doing so.
15 Q. In paragraph 18 you say, "Should the matter
16   proceed to the class notice phase upon
17   completion of the above-referenced look-up
18   processes, the notice phase would be analyzed
19   for completeness."
20       Do you see that?
21 A. I do.
22 Q. How would you do that?
23 A. I would not specifically do that.
24 Q. Who would do it?
25 A. Our data team.

Page 84
1  Q. Do you know how they would do it?
2  A. I know generally what they look for.
3  Q. What do they look for?
4  A. They would look to ensure that there were
5    mailing addresses and city was listed, state
6    was listed, ZIP code was listed, to make sure
7    that those addresses were complete and
8    mailable.
9  Q. That's what you mean by completeness, making
10   sure that the addresses appear to be
11   complete?
12 A. They would also look to see which VIN numbers
13   do not have any names and addresses
14   associated with them.
15 Q. In paragraph 19 you talk about additional
16   notification methods.
17       Do you see that?
18 A. I do.
19 Q. How did Kroll determine whether additional
20   notification methods are needed?
21 A. When the notice list is analyzed, it was
22   looked for completeness, so it would tell
23   us -- we would have an understanding of how
24   many VIN numbers do not have any names and
25   addresses associated with them and,



CARLA A. PEAK
RANDOLPH FRESHOUR vs CERENCE INC.

November 21, 2025
85–88

Page 85

1　therefore, would not be getting any type of
2　notice about the litigation.
3　　　　We would also be looking at, when we
4　mail, how many are coming back as
5　undeliverable, if any, and how many re-mails
6　are available.
7　　　　So we would use this information
8　based off of the class size, and then if it
9　falls below 70 percent, which is the FJC
10　recommended standard, then we would add other
11　methods of notification to ensure that that
12　threshold was met.
13　Q.　What other methods of notification would you
14　use?
15　A.　Typically, we would employ media notice.
16　Q.　What do you mean by that?
17　A.　So we would use the advertising software that
18　we have available to us to analyze the type
19　of individual, any type of information we can
20　about the individuals who likely owned one of
21　these vehicles.  It's the same information
22　that marketers use when they are trying to
23　sell products to people and reach the right
24　people so they're not wasting any ad spend.
25　　　　And so we would analyze that and say,

Page 86

1　Okay, who is likely purchaser of a Mercedes,
2　and if we can get down as far as this
3　particular make and model, we would go -- you
4　know, we would delve that deep, if possible,
5　and create the proxy audience, which is more
6　or less a sample audience or a likely
7　audience of people who likely purchased one
8　of these vehicles.
9　　　　And then we would devise an
10　advertising campaign to reach them.  That
11　advertising campaign might consist of digital
12　notices, social media notices, press release,
13　publications, whatever fits this particular
14　demographic, and usage consumption habits.
15　Q.　Is there anything about the class proposed in
16　this case that would inform your media notice
17　methodology?
18　A.　In this particular instance, we would look
19　for people who likely purchased the vehicles
20　that possibly had this software installed on
21　them or this -- forgive me if I'm not using
22　the right term as software, but voice
23　software.
24　Q.　I think voice software is fair.
25　A.　Okay.

Page 87

1　Q.　Have you done any testing of your notice plan
2　for this case?
3　A.　We haven't developed a notice plan for this
4　case yet.
5　Q.　Have you done any testing of your notice plan
6　that you describe in this declaration?
7　A.　Can you elaborate on what you mean by
8　"testing," please?
9　Q.　Let me back up.
10　　　　Before you roll out notice plans in
11　class actions, do you ever test them with
12　subsets or focus groups or do anything to
13　understand their reach before you roll them
14　out?
15　A.　No, not typically.
16　Q.　Have you ever done that?
17　A.　I believe we did do it -- it wasn't a class
18　action case, but a government case back in
19　the day.
20　Q.　Is it fair to say that a proposal in your
21　declaration is dependent on IHS Market being
22　able to provide you with the data referenced
23　in paragraph 17?
24　A.　The notice plan in the declaration is just a
25　sample.  The notice plan that any

Page 88

1　administrator would devise for this case if
2　it's certified would be subject to a lot of
3　different information.
4　Q.　My question is a little bit different.
5　A.　Okay.
6　Q.　My question is -- I'll try to ask it a
7　different way.
8　　　　If IHS Market can't give you the
9　VINs, registration data, mailing, address
10　data and other information in paragraph 17,
11　is your notice plan achievable?
12　A.　So a notice plan hasn't been developed yet.
13　Q.　So you don't have a notice plan for this
14　case?
15　A.　No, it hasn't been developed yet, because a
16　class has not been certified.
17　Q.　So your declaration is limited to what is
18　typically done in automotive cases; is that
19　fair?
20　A.　Yes.
21　Q.　There are no BIPA cases identified in this
22　declaration, right?
23　A.　No, not that I'm aware of.
24　Q.　Paragraphs 18 to 30 of your declaration, are
25　those -- is that material material that you



CARLA A. PEAK                                      November 21, 2025
RANDOLPH FRESHOUR vs CERENCE INC.                          89–92

Page 89

1    reuse in many declarations?
2    A. Yes.
3    Q. Is there anything unique to this case in
4       those paragraphs?
5    A. No.
6             MR. WOLFE: Let's take a
7       ten-minute break. I'm almost done, but I
8       think I need to get another exhibit and then
9       there will be maybe 20 more minutes.
10            THE WITNESS: Okay.
11            THE VIDEOGRAPHER: We are off the
12      record. The time is 1:19.
13            (Recess.)
14            THE VIDEOGRAPHER: We are on the
15      record. The time is 1:31.
16   BY MR. WOLFE:
17   Q. Ms. Peak, I think you told me earlier that
18      you have reviewed the Complaint in this case;
19      is that right?
20   A. I believe so, yes.
21   Q. Okay. We're going to send you another
22      exhibit.
23            MR. WOLFE: Sam, can you send it.
24            (Exhibit 5 marked.)
25            MR. BERNSTEIN: Just sent.

Page 90

1             THE WITNESS: Okay, opening it up.
2             MR. WOLFE: This will be
3       Exhibit 5.
4             THE WITNESS: Okay.
5    BY MR. WOLFE:
6    Q. Ms. Peak, have you seen this document before?
7    A. I would have to compare it to the one I did
8       see. I'm not sure if I saw the corrected or
9       Amended Class Action Complaint.
10   Q. Okay. I'll represent to you this is the
11      operative Complaint in the federal case.
12   A. Okay.
13   Q. Can you take a look at paragraph 1 for me?
14      At the very end of the first page, going on
15      to the second, it says, "Defendant's products
16      use biometric-enabled systems to listen to
17      drivers' and passengers' voices."
18            Do you see that?
19   A. I do.
20   Q. Can you go to page 11, please?
21   A. Paragraph 11 or page 11?
22   Q. Page 11, paragraph 41.
23   A. Great. Thanks. Okay.
24   Q. And there it says in the second line,
25      "Cerence does not clearly inform or notify

Page 91

1       the drivers and passengers of those vehicles
2       that it is collecting, capturing, storing and
3       disseminating their voiceprint biometrics."
4             Do you see that?
5    A. I do.
6    Q. Are drivers and passengers the same things as
7       owners and lessors necessarily?
8    A. No, not into my opinion.
9    Q. Have you considered notice methods for
10      drivers and passengers of vehicles as part of
11      your work on this?
12   A. So with this initial -- with this
13      information, this to me would say that we
14      would need to include an additional layer to
15      reach those passengers of those vehicles.
16   Q. Have you ever thought about that before today
17      in connection with --
18   A. Well, I haven't developed a notice plan, so
19      no.
20   Q. You did not consider that in connection with
21      this case before today?
22   A. No, because I was not developing a notice
23      plan for this case.
24   Q. What do you mean by an additional layer?
25      What would you do?

Page 92

1    A. So whenever we develop a media plan, we take
2       into account all of the information available
3       to us. So if we can provide direct notice,
4       that is the preferred method under Rule 23.
5       If we cannot provide direct notice, then we
6       would have to supplement with other methods
7       of notice, such as a media campaign.
8    Q. So if you wanted to reach passengers in these
9       Mercedes vehicles whose voice biometrics
10      allegedly were captured by Cerence, you would
11      do that through media notice?
12   A. If these individuals were part of the class
13      definition.
14   Q. And the media notice would be effectively
15      publication notice; is that right?
16   A. Typically, it's digital-type notice.
17   Q. Sure. Digital notice is the modern version
18      of publication notice; is that fair?
19   A. Yes.
20   Q. And what would it say?
21   A. I -- that's not something I can decide or
22      determine at this time, because a class has
23      not been certified. I'm not creating a
24      notice yet. I don't have all of the
25      information available to me. It would be

CARLA A. PEAK
RANDOLPH FRESHOUR vs CERENCE INC.

November 21, 2025
93–96

Page 93

1   decided at the time when someone, at any
2   point if the class is certified, creates a
3   notification.
4   Q.  As a class action notice expert, if you
5     wanted to get the attention of someone who,
6     as a nonowner of a Mercedes vehicle used this
7     technology, what would you do?
8   A.  I'd have to do my research first before I
9     make a decision.
10  Q.  As you sit here today, you can't tell me what
11    you'd do?
12  A.  No, I'd have to research -- I'd have to do
13    research first.
14  Q.  In a media notice situation where you are
15    trying to reach consumers and there's no
16    class list, how do you check to make sure
17    that claimants really are entitled to make a
18    claim, that they're not just making it up?
19  A.  How do I tell if someone is -- can actually
20    make a qualified claim?
21  Q.  Yeah.
22  A.  I don't.
23  Q.  Does anybody do that?
24  A.  Typically, the settlement agreement sets
25    forth what needs to be done by the

Page 94

1   administrator to collect what information is
2   needed to collect for somebody to file a
3   claim, what sort of proof is required, you
4   know, if there's a deficiency process, and it
5   fully explains how to do that.
6       But -- but Kroll does not identify
7   class members, and I do not identify class
8   members.
9   Q.  The parties work that out in the settlement
10    agreement and there's a process set out in
11    the settlement agreement?
12  A.  The parties work out a process to determine
13    who gets paid.
14  Q.  What if there's no settlement?
15  A.  Then there's no money to pay anyone.
16  Q.  What if there's a judgment?
17  A.  Then a judge dictates that information.
18  Q.  So let's -- in a consumer class action
19    scenario where you provide media notice and
20    people submit a claim, there's a claim form;
21    is that fair to say?
22  A.  Typically, yes.
23  Q.  And is information required on the claim form
24    to verify that somebody has a claim?
25  A.  It depends what is required by the settlement

Page 95

1   agreement.
2   Q.  In this case, what would you want to see on
3     the claim form to verify that somebody has a
4     claim?
5   A.  It would be determined by what the settlement
6     agreement says, if this case were to settle,
7     or what a judgment by the court says.
8   Q.  But you have no opinion on that?
9   A.  I do not decide what gets put on the claim
10    form, no.  I do not decide requirements for
11    proof of claim.
12  Q.  Do you agree that a claim form would be
13    necessary in this case?
14  A.  I have no opinion.  There's no -- there's no
15    settlement, so there is no reason for a claim
16    form.
17  Q.  If passengers are in the class, how do you
18    identify them without a claim form?
19  A.  I don't --
20        MR. GESKE:  Objection; calls --
21    sorry.  Sorry, Carla.
22        Objection; calls for speculation,
23    lacks foundation.
24        THE WITNESS:  Can you repeat the
25    question?

Page 96

1   BY MR. WOLFE:
2   Q.  If passengers are in the class, how do you
3     identify them without a claim form?
4         MR. GESKE:  Same objections.
5         THE WITNESS:  I don't identify
6     class members.
7   BY MR. WOLFE:
8   Q.  How would you handle an owner or lessor of a
9     Mercedes like you who wouldn't use the on-car
10    speech technology?
11  A.  Can you --
12        MR. GESKE:  Object to form.
13    You can answer.
14        THE WITNESS:  Handle in what
15    regard?
16  BY MR. WOLFE:
17  Q.  Would you want to see a claim form from them
18    to ensure that -- whether they used the
19    technology or not?
20  A.  Again, I don't decide what proof needs to be
21    placed in a claim form and I don't decide who
22    gets paid.
23  Q.  Are you ever involved in the design of claim
24    forms?
25  A.  Yes.



CARLA A. PEAK
RANDOLPH FRESHOUR vs CERENCE INC.

November 21, 2025
97–100

Page 97

1   Q.  In what way?
2   A.  Reviewing settlement agreements and putting
3       the requirements that the parties have
4       stipulated into the claim form so we know
5       what information is to be collected, as well
6       as collecting the information that we as the
7       administrator need to receive to facilitate
8       payments.
9   Q.  What's some typical information that you put
10      on the claim form?
11  A.  Name, address, phone number, email address,
12      selection of payment method, signature.
13  Q.  How about confirmation that you used or
14      bought or had an account or whatever the
15      issue is of the case?
16          MR. GESKE:  Object to the form,
17      compound.
18          You can answer.
19          MR. WOLFE:  Bad question.  I'll
20      withdraw it.  That was a terrible question.
21  BY MR. WOLFE:
22  Q.  Have you ever seen claim forms that required
23      a claimant to say something like, I bought
24      this product during this time period?
25  A.  Yes.

Page 98

1   Q.  Have you ever seen claim forms that required
2       a claimant to say something like, I spent
3       time to remedy this harm during this time
4       period and I would like to get money back for
5       remedying that harm?
6   A.  Yes.
7   Q.  And those claims are dependent on the
8       claimants truthfully filling them out and
9       signing them, right?
10  A.  Yes.  I don't know if I can attest to whether
11      they're doing it truthfully, but it is
12      required of them to fill out the claim form
13      and submit it and check all the boxes that
14      say they're doing it truthfully.
15  Q.  Have you ever been involved in a process
16      where there's a method to check whether the
17      claimants are doing it truthfully, like a
18      challenge process to the claim forms or
19      something like that?
20  A.  Personally, no.
21  Q.  Is it your experience that that would be
22      relatively atypical in a settlement
23      situation?
24  A.  I don't know.
25  Q.  Can we go back to your declaration that was

Page 99

1       Exhibit 3, the full declaration?
2   A.  Okay.
3   Q.  Turn to paragraph 13.
4   A.  Yes.
5   Q.  Do you see the proposed class definition
6       there?
7   A.  Uh-huh.
8   Q.  In the first line it says, "Within Illinois."
9           Do you have an understanding of why
10      the class definition says, "Within Illinois"?
11  A.  I think that's for legal reasons because of
12      the BIPA statute.
13  Q.  Is it fair to say that based on this
14      definition, to be a member of the class you
15      would have had to have done one of these
16      things in Illinois?
17          MR. GESKE:  Objection; calls for a
18      legal conclusion.  The document speaks for
19      itself.
20          You can answer.
21          THE WITNESS:  I think -- yeah, I
22      think that you would have to have been in --
23      within Illinois during the class period and
24      created -- and all three of those things --
25  BY MR. WOLFE:

Page 100

1   Q.  Have you ever --
2           THE WITNESS:  -- would have had to
3       have been true.
4   BY MR. WOLFE:
5   Q.  I'm sorry, I stepped on your answer a little.
6       Were you finished?
7   A.  You would have had to be within Illinois at
8       some point during the class period and all
9       three of those would have had to be true.
10  Q.  Thank you for the clarification.
11          Have you --
12  A.  That's my understanding.  But, of course, you
13      know, any time you draft notices and things,
14      the parties will correct us if we are wrong,
15      because I am not a lawyer.  So if I interpret
16      something incorrectly, the attorneys would
17      correct me.
18  Q.  Have you ever been involved in designing a
19      notice plan that requires class members to
20      have been within a certain state in order to
21      have a claim?
22  A.  Yes.
23  Q.  Do you have any specific opinion in this case
24      about how that should be done?
25  A.  How what should be done?



CARLA A. PEAK
RANDOLPH FRESHOUR vs CERENCE INC.

November 21, 2025
101–104

Page 101

1  Q.  Figuring out whether somebody was in Illinois
2      when all three of those things happened.
3  A.  No, I do not.
4  Q.  In other cases you've worked on, how have you
5      handled that issue, determining whether
6      someone was in a certain state when they did
7      whatever it was that led to a claim?
8  A.  So I don't determine that.  I determine the
9      best way to provide them with notice and help
10     with the notice content, but I don't decide
11     how to determine whether or not they were in
12     that specific state when something occurred.
13 Q.  Do you agree that based on this class
14     definition, there would have to be a
15     determination made here that somebody was in
16     Illinois when they did these three things?
17 A.  I don't think that that is something for me
18     personally to determine.
19 Q.  Would notifying owners or lessors of vehicles
20     registered in Illinois necessarily solve that
21     problem?
22 A.  Solve the problem of?
23 Q.  Figuring out if they used the technology
24     while they were in Illinois.
25 A.  No, we would not -- I don't believe we would

Page 102

1      know if they used the technology when they
2      were in Illinois.  But, again, I wouldn't be
3      able to tell, because it's not my job to
4      identify class members.
5  Q.  And then later in the class definition, I
6      think you pointed this out also, it says,
7      "During the class period."  So there's a
8      timing element here too; is that fair?
9  A.  Yes.
10 Q.  Is that something you've seen before, that
11     there's a timing element for someone to be a
12     class member?
13 A.  Yes.
14 Q.  It's pretty typical, right?
15 A.  Yes.
16 Q.  Do you have any specific opinion in this case
17     about how to determine if someone meets the
18     timing requirements to be a class member?
19 A.  I do not.
20 Q.  In other cases how have you handled this
21     timing issue, requirement issue?
22 A.  I do not.  It's stipulated by the parties or
23     the court.
24 Q.  Do you agree that, based on this class
25     definition, there would have to be a

Page 103

1      determination made that someone did these
2      things during the time period defined?
3          MR. GESKE:  Objection; calls for a
4      legal conclusion.
5          You can answer.
6          THE WITNESS:  I would say it's not
7      up to me to determine any of those things.
8  BY MR. WOLFE:
9  Q.  I'm just asking you as an experienced class
10     action notice person.
11         When you see -- during the class
12     period, do you think, Oh, we have to have
13     something in the notice design to handle
14     that?
15 A.  Saying all of that?
16 Q.  No, just identifying to people, You might
17     have a claim if you did this at this time.
18     Is the "at this time" thing something you'd
19     expect to see in the notice plan?
20 A.  Yes.
21 Q.  And then the claimants would need to do
22     something to verify, yes, I did that during
23     the relevant time period, right?
24 A.  If that's what the parties agreed to.
25 Q.  Or if it was contested if that's what the

Page 104

1      court ordered, right?
2  A.  Correct.
3  Q.  In this declaration there are a few places
4      where you identify information that was
5      provided to you by counsel; is that fair?
6  A.  Yes.
7  Q.  Is there any other assumptions, facts or data
8      supplied to you by counsel that's not
9      disclosed in this declaration?
10 A.  I don't believe so.
11         MR. WOLFE:  I think I'm probably
12     done.  Let me have three minutes to talk to
13     Mr. Bernstein.
14         THE VIDEOGRAPHER:  Shall we go off
15     the record?
16         MR. WOLFE:  Yeah, I think we might
17     as well.
18         THE VIDEOGRAPHER:  We are off the
19     record.  The time is 1:50.
20         (Recess.)
21         THE VIDEOGRAPHER:  We are on the
22     record.  The time is 1:54.
23 BY MR. WOLFE:
24 Q.  Ms. Peak, have you answered all my questions
25     to the best of your ability today?



# EXHIBIT 13
# CONFIDENTIAL
# FILED UNDER SEAL

# EXHIBIT 14
# CONFIDENTIAL
# FILED UNDER SEAL

# EXHIBIT 15

CONFIDENTIAL

1          UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF ILLINOIS
2                 EASTERN DIVISION

3

4

5    RANDOLPH FRESHOUR and        )
     VINCENZO ALLAN, each         )
6    individually and on behalf   )
     of similarly situated        )
7    individuals,                 )
                                  )
8      Plaintiffs,                )
                                  )
9    vs.                          ) No. 1:23-CV-02667
                                  )
10   CERENCE, INC., a Delaware    )
     corporation,                 )
11                                )
       Defendant.                 )
12

13

14

15          The video deposition of JOHN CASHMAN before
16   Richard Derrick Ehrlich, Registered Merit Reporter,
17   Certified Realtime Reporter, taken pursuant to the
18   Federal Rules of Civil Procedure, at McGuire Law
19   Offices, 55 W Wacker Drive, Chicago, Illinois,
20   commencing at 10:00 a.m., on the 20th day of August,
21   2025.

22

23

24

25

CONFIDENTIAL

Page 22

1  there was another -- there was another exchange
2  you had with him -- I'm sorry -- you said about
3  a week ago?
4  A  Yeah.  Last week, I had an exchange with him,
5  and this morning I just had a quick follow-up
6  question.
7  Q  And the one about a week ago, was that by email,
8  or was that a call?
9  A  That was a call.
10 ███████████████████████████████
11 A  No.
12 Q  Okay.  Were there any others that you spoke with
13 about the case generally?
14 A  I'm trying to think if there was anybody else.
15 No.
16 Q  When did you first learn about the lawsuit?
17 A  I think it's been two years.
18 Q  Two years since you learned about it?
19 A  Yeah.  There was the need for -- I mean, it just
20 got circulated on my team for review, and I
21 looked at the -- I believe it was the Freshour,
22 and there was a -- other case.  Pena case,
23 involving VW.  I remember looking through those
24 cases, yeah.
25 Q  You said something was circulated.  Do you

Page 23

1  remember what it was?
2  A  I think it was the complaints.  Again, if I'm
3  using the right terminology.  I apologize if I'm
4  not using the right legalese.  But the initial
5  complaints or the initial cases that were filed.
6  Q  And what was -- what were you being asked to do
7  when it was circulated to you?
8  A  I don't -- I don't recall.  I just know that I
9  wanted to read them to understand what the issue
10 was at hand.
11 Q  Why did you want to read them?
12 A  I think I knew that there was probably -- they
13 were frivolous, to be honest with you.
14 Q  Why did you think that?
15 ███████████████████████████████

22 Q  So you heard about -- you heard that there was a
23 lawsuit, and you asked somebody to send you the
24 complaint?
25 A  No.  I think someone sent it to me.

Page 24

1  Q  Someone sent it to you?
2  A  Yeah.  I didn't ask about it.  Because it's not
3  like I knew about it ahead of time.  Someone
4  sent it to me, yeah.
5  Q  And they were asking you what?
6  A  I don't remember.  I don't remember exactly why
7  they sent it to me.  I just know that I read
8  them, and I provided my feedback.
9  Q  Have you reviewed any other lawsuits against
10 Cerence in your time there?
11 A  It's possible.  I just don't recall.
12 Q  What about in your prior roles before working
13 for Cerence, would you review lawsuits against
14 your employer?
15 A  Most likely not.
16 Q  Have you spoken with anybody at Daimler or
17 Mercedes-Benz about this deposition?
18 A  No.
19 Q  Have you spoken with anybody at Daimler or
20 Mercedes-Benz about this lawsuit generally?
21 A  No.
22 ███████████████████████████████
███████████████████████████████
███████████████████████████████

Page 25

1      MR. WOLFE:  Object to form.
2      MR. GESKE:  Yeah.  Please let me finish
3  the question before you make the objection.
4  Thanks.
5      MR. WOLFE:  Object to form.
6  BY MR. GESKE:
7  Q  Was there anybody else at Cerence, besides
8  ███████████████████████████████
9  about this lawsuit generally?
10     MR. WOLFE:  Object to the form.  Already
11 asked.
12     THE DEPONENT:  No.
13 BY MR. GESKE:
14 Q  Have you spoken with any lawyers for Daimler or
15 Mercedes-Benz about this case?
16 A  No.
17 Q  Have you spoken with anybody at Mercedes-Benz,
18 USA, LLC, about this case or about this
19 deposition?
20 A  No.
21 Q  Have you spoken with anybody at Nuance about
22 this case or about this deposition?
23 A  No.
24 Q  Earlier, we were talking about documents you
25 reviewed.  As part of your preparation, you

7 (Pages 22 - 25)

CONFIDENTIAL

Page 38



24 Q   What kind of car do you drive?
25 A   The newest car I have is a Toyota Highlander.

Page 40

1  A   We have three cars.  My wife and I have three
2      cars.
3  Q   What are the other two?
4  A   A 2013 Mazda and a 2014 Toyota Camry, which my
5      wife wants me to get rid of both.
6  Q   Do either of the -- other two cars, the
7      older ones, do they have any Cerence voice or
8      speech technology?
9  A   They don't have any speech technology in either
10     of them.
11 Q   Have you owned a Mercedes in the last six years?
12 A   No.
13 Q   Have you leased a Mercedes or rented a Mercedes
14     in the last six years?
15 A   I don't believe I've ever driven a Mercedes
16     vehicle in my life.



Page 39

1      It's a 2023, I believe.
2  Q   Is Toyota a Cerence customer?
3  A   Yes.
4  Q   What Cerence technology, if any, is in your car?
5  A   I don't know if we have Cerence technology in my
6      car, but I use Apple CarPlay.  And I feel
7      terrible about it as we're talking about it
8      right now.
9  Q   Do you know if there's any voice or speech
10     recognition capability in your --
11 A   I think there is, yes.
12 Q   Do you use it?
13 A   No.
14 Q   Why don't you use it?
15 A   Because it's pretty easy to have the system, the
16     infotainment system, pair my phone, and I think
17     it's -- I think it's cumbersome to set up, and I
18     think that the sales guy that showed us the car
19     just said, Okay.  Just plug your phone in, and
20     you're good to go.
21         So that's all my wife and I have been
22     doing since.
23 Q   Do you have more than one car?
24 A   Yes.
25 Q   How many cars do you have?

Page 41



11 (Pages 38 - 41)

CONFIDENTIAL



Veritext Legal Solutions

www.veritext.com                                                                    888-391-3376

CONFIDENTIAL



Veritext Legal Solutions

CONFIDENTIAL



Veritext Legal Solutions

www.veritext.com                                                          888-391-3376

CONFIDENTIAL



Veritext Legal Solutions

www.veritext.com                                                           888-391-3376

CONFIDENTIAL

Page 194



25    MR. GESKE: Okay. Now would be a good

Page 196

1    So, no, there wasn't any real -- from what
2    I recall, any real discussion around anything
3    and certainly no discussion around what he was
4    going to say or anticipating any questions along
5    those lines. But we certainly knew he was doing
6    a deposition the next day.
7 Q   Did you talk about the case more generally or
8    your views of the case?
9 A   You know, I don't remember if we did. I mean,
10    if we did, it would have been a very small part
11    of the conversation. You know, it was mostly
12    about let's go out to dinner and have a nice
13    time.
14 Q   Do you remember anything that you guys talked
15    about with respect to the case?
16 A   No, I don't really remember anything. So that
17    makes me think we didn't really talk about the
18    case at all.
19 Q   Did you guys talk about your upcoming
20    deposition?
21 A   Yeah. Just some stuff in passing, like, Oh, I'm
22    going to be doing it in Chicago; that I'm the
23    corporate rep. You know, that I'll be probably
24    answering more questions outside of data
25    privacy, but nothing -- again, nothing specific.

Page 195

1    time for a break.
2    VIDEOGRAPHER: This is the end of media
3    four. We are going off the record. The time is
4    4:51 p.m.
5    (Break.)
6    VIDEOGRAPHER: We are back on the record.
7    This is the beginning of media five. The time
8    is 5:11 p.m.
9    Please proceed.
10 BY MR. GESKE:
11 Q   Thank you for bearing with us, Mr. Cashman. I
12    only have a few other questions.
13    I think you mentioned earlier that you had
14    dinner with Mr. Tropp when he was in Boston?
15 A   Yes.
16 Q   Was that before or after his deposition?
17 A   Before.
18 Q   Did you guys talk about the deposition?
19 A   It certainly wasn't a primary part of the
20    conversation. Mostly we just talked personal.
21    Michael coming into Boston. Was he nervous
22    about the deposition. But nothing -- nothing
23    like strategy or what he was going to talk
24    about. I think he felt comfortable. I'm sure
25    he was properly prepared by counsel.

Page 197

1    None of the specifics or anything like that.



50 (Pages 194 - 197)

CONFIDENTIAL



Page 206

25    MR. WOLFE:  I don't have anything else.

Page 207

1    MR. GESKE:  Okay.
2    VIDEOGRAPHER:  Is there a signature?
3    MR. WOLFE:  Yeah.
4    VIDEOGRAPHER:  We are off the record at
5  5:27 p.m., and this concludes today's testimony
6  given by John Cashman.
7    The total number of media units used was
8  five and will be retained by Veritext.
9    (Signature reserved.)
10    (Video deposition concluded.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 208

1    CERTIFICATE
2
3    I, Richard D. Ehrlich, a Certified Shorthand
4  Reporter of the State of Illinois, do hereby certify
5  that I stenographically reported the proceedings had,
6  and that the foregoing transcript is a true and
7  accurate record of the proceedings had therein.
8    IN WITNESS WHEREOF, I do set my hand this
9  21st day of Au ust  2025.
10
11
    Richard D. Ehrlien
12    Certified Shorthand Reporter
    License No. 084.2019
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 209

1    Veritext Legal Solutions
    1100 Superior Ave
2    Suite 1820
    Cleveland, Ohio 44114
3    Phone: 216-523-1313
4
5  August 21, 2025
6  To: Matt Wolfe
7  Case Name: Freshour, Randolph Et Al.  v. Cerence Inc.
   Veritext Reference Number: 7533291
8  Witness:  John Cashman      Deposition Date:  8/20/2025
9
10  Dear Sir/Madam:
11    Enclosed please find a deposition transcript.  Please have the witness
12    review the transcript and note any changes or corrections on the
13    included errata sheet, indicating the page, line number, change, and
14    the reason for the change.  Have the witness' signature notarized and
15    forward the completed page(s) back to us at the Production address
16  shown
17  above, or email to production-midwest@veritext.com.
18    If the errata is not returned within thirty days of your receipt of
19    this letter, the reading and signing will be deemed waived.
20
21  Sincerely,
22  Production Department
23
24
25  NO NOTARY REQUIRED IN CA

Veritext Legal Solutions

www.veritext.com                                                                    888-391-3376

# EXHIBIT 16

```
 1                  IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3    RANDOLPH FRESHOUR, and        )  Case No. 23 C 02667
      VINCENZO ALLAN, each          )
 4    individually and on behalf of )
      similarly situated individuals,)
 5                                   )
                      Plaintiffs,    )
 6                                   )
               v.                    )
 7                                   )
      CERENCE INC., a Delaware       )
 8    corporation,                   )
                                     )  Chicago, Illinois
 9                                   )  August 6, 2024
                      Defendant.     )  9:37 a.m.
10

11                 TRANSCRIPT OF PROCEEDINGS - STATUS
                 BEFORE THE HONORABLE VIRGINIA M. KENDALL
12
      APPEARANCES:
13
      For the Plaintiffs:     McGUIRE LAW PC
14                            BY:  MR. PAUL T. GESKE
                                   MR. COLIN P. BUSCARINI
15                            55 W. Wacker Drive, 9th Floor
                              Chicago, Illinois 60601
16

17    For the Defendant:      SHOOK HARDY & BACON LLP
                              BY:  MR. MATTHEW C. WOLFE
18                                 MS. MEHGAN KEELEY
                              111 S. Wacker Drive, Suite 4700
19                            Chicago, Illinois 60606

20
      Court Reporter:         GAYLE A. McGUIGAN, CSR, RMR, CRR
21                            Official Court Reporter
                              219 S. Dearborn Street, Room 2524A
22                            Chicago, Illinois 60604
                              312.435.6047
23                            gayle_mcguigan@ilnd.uscourts.gov

24                            *  *  *  *  *

25               PROCEEDINGS REPORTED BY STENOTYPE
          TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION
```

1          (Proceedings heard in open court:)

2                THE CLERK:  23 C 2667, Pena versus Cerence.

3                THE COURT:  Good morning, everyone.

4                MR. GESKE:  Good morning, your Honor.  Paul Geske for

5      plaintiffs.

6                MR. BUSCARINI:  Good morning, your Honor.  Colin

7      Buscarini also for the plaintiffs.

8                THE COURT:  Good morning.

9                MS. KEELEY:  Good morning.  Mehgan Keeley for

10     defendant Cerence.

11               THE COURT:  Good morning.

12               MR. WOLFE:  Good morning, your Honor.  Matt Wolfe,

13     W-O-L-F-E, for Cerence.

14               THE COURT:  Good morning.

15               Tell me a bit about your case and what you intend to

16     prove.

17               MR. GESKE:  Sure.  Well, your Honor, this case was

18     reassigned --

19               THE COURT:  Right.

20               MR. GESKE:  -- from Judge Maldonado.  This is our

21     first time appearing before your Honor.  But this is a putative

22     class action involving claims under the Illinois Biometric

23     Information Privacy Act.  There's also a counterpart to this

24     case with claims proceeding in state court due to lack of

25     Article III subject matter jurisdiction over those claims.

1              The parties just recently wrapped up pleading motions.

2    And I'm pleased to report we were able to reach an agreement on

3    those motions which resulted in us filing an amended complaint

4    and defendant just recently answering.

5              We've also been working cooperatively with defense

6    counsel.  We worked out an agreed proposed discovery schedule,

7    which we submitted on July 22nd.

8              THE COURT:  Does the new law impact you at all, the

9    new biometric law in Illinois?

10             MR. GESKE:  If I understand the question, is that the

11   law that limits recovery of damages to essentially one

12   violation?

13             Well, I don't have it in front of me, but I think

14   there's some dispute as to whether it applies retroactively.

15   So given that our case was filed before that went into effect

16   and the violations are alleged to occur under the prior version

17   of the statute, I can't say today whether it will.  I'm sure

18   that the parties will probably litigate whether the amendment

19   applies retroactively.

20             THE COURT:  Okay.  What's your position?

21             MS. KEELEY:  Our position is that the revised law

22   would apply to limit damages here.

23             THE COURT:  I think it said that when I read that.  I

24   mean, I only read the article.  I didn't read the statute.

25             So what's your position?

1       MS. KEELEY:  On the case as a whole?  Our position is

2  that the -- as counsel mentioned, we agreed on the amended

3  complaint, and it narrowed the number of products and the types

4  of technology at issue significantly.

5       The type of technology that's still at issue in this

6  case, our position is that it is embedded in the vehicles.

7  Our -- Cerence is a technology company that sells the software

8  to manufacturers like Mercedes, which are the vehicles that the

9  plaintiffs here allege to have owned.  And the technology is

10  embedded in the vehicles and not sent back to Cerence.  So our

11  position is that if the plaintiffs' voices were indeed somehow

12  saved in the car's technology, it's embedded in that vehicle

13  after it leaves Cerence's hands.

14       So that's our position and what we intend to prove in

15  discovery.

16       THE COURT:  Okay.  I will adopt your schedule that you

17  proposed to me.

18       Lynn, you can put it in the docket entry for me.

19       And then I would like to see you again before you dig

20  into all of your expert disclosures to see if we can get a

21  status on you.

22       So that would be -- my goodness.  Let's say -- I'm

23  looking at your -- let's say May of 2025.

24       THE CLERK:  Okay.

25       THE COURT:  This schedule is really, really generous,

1    in my book, so make sure that you comply with it because I

2    don't expect that I should need any extensions of time when

3    it's this generous, okay?

4             All right.  Thanks very much.

5             MULTIPLE SPEAKERS:  Thank you.

6             THE CLERK:  Your Honor, did you want to set a status

7    for May 5th at 9:30?

8             THE COURT:  That's fine.

9             THE CLERK:  Okay.

10        (Concluded at 9:41 a.m.)

11                              *  *  *  *  *

12        I certify that the foregoing is a correct transcript of the

13    record of proceedings in the above-entitled matter.

14

15    /s/ GAYLE A. McGUIGAN_____          May 28, 2025
      GAYLE A. McGUIGAN, CSR, RMR, CRR
16    Official Court Reporter

17

18

19

20

21

22

23

24

25

# EXHIBIT 17

Declaration of Consent under the Data Protection Act

## Contribution to Improving Voice Control

Version 902.53.002.A.23-23

Mercedes-Benz AG, Mercedesstr. 120, 70372 Stuttgart, Germany ("Mercedes-Benz") is constantly working on further developing its products and services, improving their quality and adapting them to customer requirements. For these purposes Mercedes-Benz would like to evaluate data from the vehicle and/or data from other services activated by the customer jointly with the language provider Cerence GmbH, Jülicher Straße 376, 52070 Aachen, Germany ("Cerence"). This data can either be transmitted directly from the vehicle and/or forwarded to Mercedes-Benz by Mercedes-Benz USA, LLC ("MBUSA"), 1 Mercedes-Benz Drive, Atlanta, GA 30328 ("controller") as data controller of the Mercedes me connect and smart control services. Mercedes-Benz and Cerence are jointly responsible as data controllers for the data processing within the scope of this consent.

The activation of the "LINGUATRONIC Online Voice Control" or "MBUX Voice Assistant" service by the customer is a required prerequisite for the data processing carried out for the purpose of improving voice control. If the service is deactivated, no data will be processed, even if the customer has given consent.

**What categories of data are processed for improvements of voice control?**

The following categories of personal data will be processed for the purpose of improving the voice control function, depending on the vehicle equipment:
- Audio data
- Data on the use of the voice control function: e.g. text recognized from the voice request (in particular through automatic transcription) and information about the request (e.g. recognized topic, time and place requested in the weather topic)
- possibly the approximate geoposition of the vehicle at the time of the voice request, if applicable
- technical data of the request (e.g. technical status or data size of the voice request, response time)
- Vehicle and system data (e.g. model series, language set in the infotainment system, current software version)

**How will the data be used?**

The data collected from the vehicle will be supplemented in the Backend with stored data on the vehicle equipment (e.g. model series). This extended information helps to classify the transmitted data of a vehicle in terms of its quality characteristics (e.g. the microphone functionality).

To optimize the automatic transcription, a maximum of 0.5% of all voice requests are randomly selected and transcribed by humans. In doing this, the voice requests are acoustically distorted, among other things, in order to prevent any attribution to a specific person. At the same time, appropriate measures for secure data processing have been implemented.

The "Messaging" and "Dictation" features do not involve the processing of any personal data for the improvement of voice recognition.

FRESHOUR_000011

For the use of the "LINGUATRONIC Online Voice Control" or "MBUX Voice Assistant" service, the data is transmitted from the vehicle with each voice request. In rare cases, spoken words can be misunderstood as "Hey Mercedes", with the result that the voice control is activated by mistake. The customer recognizes the activation of the voice control on the basis of a system response (e.g. "Yes, please?") or a display on the screen of the head unit. The customer can activate or deactivate the service at any time in the user account. The customer or the driver can also control the transmission of voice data directly in the vehicle.

The processing, storage and use of data for the improvement of voice control is based on an identifier, which is created from several parameters, but does not permit any inferences regarding the vehicle identification number ('VIN'). The pseudonymous data is processed or stored for up to 24 months for the purpose of developing and improving speech recognition and voice control.

**The customer agrees that for the aforementioned purposes and in the above-described manner, the above data categories, in particular the vehicle's approximate geoposition, will be transmitted from the vehicle to Mercedes-Benz and Cerence, and/or forwarded by the data controller to Mercedes-Benz, and will be processed by Mercedes-Benz and Cerence as explained above. The processing of the personal data will take place for the aforementioned purposes on the basis of this consent. The consent is given on a voluntary basis. The consent or lack thereof does not have any effect on the provision of the Mercedes me connect and smart control services.**

**What rights can the customer assert?**

The customer can withdraw consent at any time in their user account in the overview of the Terms of Use. From the time of the revocation, no further vehicle data will be transmitted, stored or used for the aforementioned purposes. Revoking consent will not affect the legitimacy of the data processing or other lawful processing that had taken place until the said revocation. In accordance with the legal requirements, the customer has the right to receive information about their personal data, to have the data amended or deleted, to limit the scope of or object to the processing of this data, to exercise their right to data portability and to send a complaint to the data controller, to Mercedes-Benz, Cerence or to a supervisory authority. Mercedes-Benz and Cerence do not store the Customer's personal data for longer than is necessary for the achievement of the aforementioned purposes, unless longer storage is required due to legal retention requirements.

If the Customer allows the vehicle to be used by another driver, the Customer is obligated to inform the other driver about the data processing before the start of the journey.

**How can the customer exercise their rights?**

To exercise their rights or in the event of questions concerning the processing of customer data within the scope of contributing to the improvement of voice control, the customer can make contact at any time using the following contact details:

- Data controller of the market and Mercedes-Benz as respectively independent data controller:

  Mercedes-Benz, Customer Assistance Center Maastricht N.V (CAC), P.O. Box 1456, 6201 BL Maastricht, The Netherlands; email: mercedes_me_connect@cac.mercedes-benz.com; Tel.: 00800 9 7777777 (Toll- free from a landline. Cell phone charges may vary).

  Mercedes-Benz USA, LLC

FRESHOUR_000012

Tel.: (800) 367-6372
Email: connect.usa@cac.mercedes-benz.com

The appointed Data Protection Officer is, respectively: Mercedes-Benz Group AG Chief Officer for Corporate Data Protection, HPC E600, 70546 Stuttgart, Germany.

email: data.protection@mercedes-benz.com.

The customer will find further information concerning data processing and data protection by the data controller and Mercedes-Benz in the Privacy Statement for the Mercedes me connect and smart control services.

- Voice provider as data controller:

Cerence GmbH, Jülicher Straße 376, 52070 Aachen, Germany
The Data Protection Officer appointed by Cerence is: Cerence Data Protection Officer, Jülicher Straße 376, 52070 Aachen, Germany, privacy@cerence.com.

FRESHOUR_000013

# EXHIBIT 18

Declaration of Consent under the Data Protection Act

**Contribution to Improving Voice Control**

Version 902.53.002.A.23-23

Mercedes-Benz AG, Mercedesstr. 120, 70372 Stuttgart, Germany ("Mercedes-Benz") is constantly working on further developing its products and services, improving their quality and adapting them to customer requirements. For these purposes Mercedes-Benz would like to evaluate data from the vehicle and/or data from other services activated by the customer jointly with the language provider Cerence GmbH, Jülicher Straße 376, 52070 Aachen, Germany ("Cerence"). This data can either be transmitted directly from the vehicle and/or forwarded to Mercedes-Benz by Mercedes-Benz USA, LLC ("MBUSA"), 1 Mercedes-Benz Drive, Atlanta, GA 30328 ("controller") as data controller of the Mercedes me connect and smart control services. Mercedes-Benz and Cerence are jointly responsible as data controllers for the data processing within the scope of this consent.

The activation of the "LINGUATRONIC Online Voice Control" or "MBUX Voice Assistant" service by the customer is a required prerequisite for the data processing carried out for the purpose of improving voice control. If the service is deactivated, no data will be processed, even if the customer has given consent.

**What categories of data are processed for improvements of voice control?**

The following categories of personal data will be processed for the purpose of improving the voice control function, depending on the vehicle equipment:
- Audio data
- Data on the use of the voice control function: e.g. text recognized from the voice request (in particular through automatic transcription) and information about the request (e.g. recognized topic, time and place requested in the weather topic)
- possibly the approximate geoposition of the vehicle at the time of the voice request, if applicable
- technical data of the request (e.g. technical status or data size of the voice request, response time)
- Vehicle and system data (e.g. model series, language set in the infotainment system, current software version)

**How will the data be used?**

The data collected from the vehicle will be supplemented in the Backend with stored data on the vehicle equipment (e.g. model series). This extended information helps to classify the transmitted data of a vehicle in terms of its quality characteristics (e.g. the microphone functionality).

To optimize the automatic transcription, a maximum of 0.5% of all voice requests are randomly selected and transcribed by humans. In doing this, the voice requests are acoustically distorted, among other things, in order to prevent any attribution to a specific person. At the same time, appropriate measures for secure data processing have been implemented.

The "Messaging" and "Dictation" features do not involve the processing of any personal data for the improvement of voice recognition.

For the use of the "LINGUATRONIC Online Voice Control" or "MBUX Voice Assistant" service, the data is transmitted from the vehicle with each voice request. In rare cases, spoken words can be misunderstood as "Hey Mercedes", with the result that the voice control is activated by mistake. The customer recognizes the activation of the voice control on the basis of a system response (e.g. "Yes, please?") or a display on the screen of the head unit. The customer can activate or deactivate the service at any time in the user account. The customer or the driver can also control the transmission of voice data directly in the vehicle.

The processing, storage and use of data for the improvement of voice control is based on an identifier, which is created from several parameters, but does not permit any inferences regarding the vehicle identification number ('VIN'). The pseudonymous data is processed or stored for up to 24 months for the purpose of developing and improving speech recognition and voice control.

**The customer agrees that for the aforementioned purposes and in the above-described manner, the above data categories, in particular the vehicle's approximate geoposition, will be transmitted from the vehicle to Mercedes-Benz and Cerence, and/or forwarded by the data controller to Mercedes-Benz, and will be processed by Mercedes-Benz and Cerence as explained above. The processing of the personal data will take place for the aforementioned purposes on the basis of this consent. The consent is given on a voluntary basis. The consent or lack thereof does not have any effect on the provision of the Mercedes me connect and smart control services.**

**What rights can the customer assert?**

The customer can withdraw consent at any time in their user account in the overview of the Terms of Use. From the time of the revocation, no further vehicle data will be transmitted, stored or used for the aforementioned purposes. Revoking consent will not affect the legitimacy of the data processing or other lawful processing that had taken place until the said revocation. In accordance with the legal requirements, the customer has the right to receive information about their personal data, to have the data amended or deleted, to limit the scope of or object to the processing of this data, to exercise their right to data portability and to send a complaint to the data controller, to Mercedes-Benz, Cerence or to a supervisory authority. Mercedes-Benz and Cerence do not store the Customer's personal data for longer than is necessary for the achievement of the aforementioned purposes, unless longer storage is required due to legal retention requirements.

If the Customer allows the vehicle to be used by another driver, the Customer is obligated to inform the other driver about the data processing before the start of the journey.

**How can the customer exercise their rights?**

To exercise their rights or in the event of questions concerning the processing of customer data within the scope of contributing to the improvement of voice control, the customer can make contact at any time using the following contact details:

- Data controller of the market and Mercedes-Benz as respectively independent data controller:

Mercedes-Benz, Customer Assistance Center Maastricht N.V (CAC), P.O. Box 1456, 6201 BL Maastricht, The Netherlands; email: mercedes_me_connect@cac.mercedes-benz.com; Tel.: 00800 9 7777777 (Toll- free from a landline. Cell phone charges may vary).

Mercedes-Benz USA, LLC

ALLAN_000050

Tel.: (800) 367-6372
Email: connect.usa@cac.mercedes-benz.com

The appointed Data Protection Officer is, respectively: Mercedes-Benz Group AG Chief Officer for Corporate Data Protection, HPC E600, 70546 Stuttgart, Germany.

email: data.protection@mercedes-benz.com.

The customer will find further information concerning data processing and data protection by the data controller and Mercedes-Benz in the Privacy Statement for the Mercedes me connect and smart control services.

- Voice provider as data controller:

Cerence GmbH, Jülicher Straße 376, 52070 Aachen, Germany
The Data Protection Officer appointed by Cerence is: Cerence Data Protection Officer, Jülicher Straße 376, 52070 Aachen, Germany, privacy@cerence.com.

ALLAN_000051

# EXHIBIT 19 CONFIDENTIAL FILED UNDER SEAL