# EXHIBIT 1

1

```
 1                  IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                           EASTERN DIVISION

 3   RANDOLPH FRESHOUR and VINCENZO      )   No. 23 C 2667
     ALLAN, each individually and on     )
 4   behalf of similarly situated        )
     individuals,                        )
 5                                       )
                         Plaintiffs,     )
 6                                       )
                vs.                      )
 7                                       )
     CERENCE, INC., a Delaware           )
 8   corporation,                        )   Chicago, Illinois
                                         )   June 16, 2025
 9                       Defendant.      )   2:47 p.m.

10                       TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE M. DAVID WEISMAN, MAGISTRATE JUDGE
11
     APPEARANCES:
12

13   for the Plaintiffs:   MCGUIRE LAW, P.C.
                             BY:  MR. PAUL T. GESKE
14                               MR. DAVID L. GERBIE
                             55 West Wacker Drive, 9th Floor,
15                           Chicago, Illinois  60601

16
     For the Defendant:    SHOOK, HARDY & BACON, LLP
17                           BY:  MS. MEHGAN E. H. KEELEY
                             111 South Wacker Drive, Suite 4700,
18                           Chicago, Illinois 60606

19

20

21                       PATRICK J. MULLEN
                       Retired Official Court Reporter
22                   United States District Courthouse
                        219 South Dearborn Street
23                      Chicago, Illinois  60604

24
                       *   *   *   *   *
25
        TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION
```

1   (Proceedings in open court.)

2       THE CLERK:  23 CV 2667, Pena versus Cerence,

3  Incorporated.

4       MR. GERBIE:  Good morning -- or good afternoon, Your

5  Honor.  David Gerbie on behalf of the plaintiffs.

6       THE COURT:  Good afternoon.

7       MR. GESKE:  Good afternoon, Your Honor.  Paul Geske

8  for plaintiffs.

9       THE COURT:  Good afternoon.

10       For defendant?

11       MS. KEELEY:  Mehgan Keeley for defendant.

12       THE COURT:  Good afternoon.

13       Thank you for your status report.  I've got a couple

14  of questions I want to talk to you all about.  Let's start with

15  the depositions.  So from defendant's standpoint, I hear what

16  you're saying about this.  In addition to Mr. Cashman,

17  Mr. Hamerich, and Mr. Tropp, all of whom you will be bringing

18  here to the States, there's a 30(b)(6) deposition referenced.

19  Would that deposition occur here or in Germany?

20       MS. KEELEY:  We think it would be productive to try to

21  do it in line with the depositions that are already scheduled.

22  We're just waiting.  It's hard to form our position without

23  knowing what the topics will be like and which witnesses will

24  testify to them.

25       THE COURT:  Yes, and we'll get to the timing of that.

```
1    So I'm talking at a little bit higher level.  Then there's a
2    series of additional people, Mr. Steiger, Mr. Tsuboyama,
3    Mr. Haiber -- I think that's a mister -- Mr. Kwast, and
4    Mr. Hardegger, all individuals that plaintiff wants or
5    plaintiffs want to depose, but your client is saying:  We don't
6    think we need to bring them over here, and at best we would
7    like to let these other depositions go forward and then see on
8    these others.
9            Is that correct?
10           MS. KEELEY:  High level, but I'll make a -- there's a
11   few distinctions between them.
12           THE COURT:  Tell me.
13           MS. KEELEY:  Three of them live in Germany, so for
14   those three, yeah, we did some digging into them.  We aren't
15   agreeing right now to fly them all the way over here until we
16   go through some of the depositions that we already are flying
17   people here for that we think will be better sources of
18   knowledge --
19           THE COURT:  Okay.
20           MS. KEELEY:  -- objectively.  I'll also add that I
21   think plaintiffs kind of mischaracterized our position in their
22   status report.  We're not downright refusing to produce them at
23   this time.  They're welcome to go through the procedures
24   required to depose those people if they want to.  I just don't
25   think that that issue is even ripe yet because they haven't
```

1    initiated any of those procedures.  These are just based on

2    emails.  So if they choose to do that, we would probably still

3    need to evaluate if we would seek a protective order or

4    something like that, but that's our position as to those three.

5          Mr. Tsuboyama lives in Canada.  Our position as to

6    him, I don't know as extensively what the procedures are that

7    plaintiffs would need to research for deposing a witness in

8    Canada.  But I interviewed him personally last week and talked

9    to him about what he does, what he knows about the issues in

10   the case.  He knows absolutely nothing about the voice

11   biometric product, which is why we didn't connect with him in

12   the first place.

13         Again, if plaintiffs want to take the deposition

14   anyway so he can tell them that, you know, they're welcome to.

15   They just haven't done any of the procedures.  At that time,

16   again, we would need to evaluate if we would pursue a

17   protective -- a motion for a protective order.  But for that

18   reason, too, that's also why for now we suggest they start with

19   the three depositions and the 30(b)(6) that go directly to the

20   issues that we understand from their written discovery requests

21   they're looking for.

22         Mr. Haiber, I'm not -- I don't really understand the

23   legal basis of plaintiffs' comment that we refused them after

24   our communications last week because we explained that he's a

25   former employee so we don't have any control over him.  We're

1    not in contact with him, so we don't have the ability to

2    require him to sit for a deposition.

3              THE COURT:  I think you're misspeaking.  I think it's

4    Mr. Kwast who's a former employee.

5              MR. GERBIE:  That was our understanding as well, Your

6    Honor.

7              THE COURT:  I'm just looking at page 3 of the status

8    report.  It says:

9              "Mr. Haiber is not willing to fly" -- I'm sorry --

10   "Cerence is not willing to fly Mr. Haiber from Germany and does

11   not think it's appropriate to set a date at this time for

12   Mr. Kwast, who's at number 4.  Cerence does not plan to produce

13   Mr. Kwast.  Mr. Kwast is a former employee."

14             MS. KEELEY:  That's correct.  I just switched the

15   names.

16             THE COURT:  That's fine.

17             MS. KEELEY:  I misspoke, yeah.

18             THE COURT:  Yes, yes, I just want to make sure.

19             All right.  So you're speaking at the level I want to

20   to kind of get this stuff sorted out at.  So I did not -- I

21   agree with you I did not understand your status report to say

22   you were refusing to produce these people.  So I think you're

23   in agreement with that.  You're not taking that position now,

24   correct?

25             MS. KEELEY:  Correct.

1      THE COURT:  Then the next question I have is this.  If

2  plaintiffs' counsel flew to Germany to do the depositions,

3  would you be -- would you require them to go through the

4  procedures they need to, letters rogatory, et cetera, to do

5  those depositions, or are you just saying:  We're not going to

6  fly our people here.  If you want to do the depositions, you

7  can go to Germany and do them there.  You know, we'll meet you

8  there and do them, but we're not going to fly our people here.

9      MS. KEELEY:  So it's correct that we're at this time

10  not willing to fly them here.  I'm not sure, but just from my

11  high level research, I think they might be required to go

12  through special procedures even if they go to Germany.  I think

13  Germany is particularly strict.

14      THE COURT:  Okay.

15      MS. KEELEY:  I think that until the depositions in

16  July happen, I don't think the issue is ripe enough for us to

17  take a position on where -- I mean, again, we've been saying

18  since the beginning of these hearings with you that we're

19  willing to revisit all of these issues after those go forward.

20  It's just -- I think we're just concerned that these are just

21  efforts to slow things down without any articulations of why

22  they're needed.

23      THE COURT:  Yes, I guess what -- I think that things

24  are on the slow roll since it's been in front of me, and it's

25  not -- I don't like that.  I think we have a date and we should

1   be working towards it, and I think, you know, I think perhaps

2   now for both sides to find compromise, they're saying they're

3   not -- you are saying:  We're not deciding now.  Let's do these

4   depositions and see what they look like.

5          This is okay, but that seems to me to invite a further

6   slow roll of the resolution of the issue, which is should there

7   be more time to do any of this, because I don't see how you get

8   any of this done.  Like if you needed -- if plaintiffs needed

9   to issue letters rogatory or follow whatever procedure German

10  law requires, I don't think you'd be able to get that done

11  unless -- I know the Germans are known for efficiency, but I

12  can't imagine that they're going to get this done in 45 days.

13         MR. GERBIE:  May I be heard?

14         THE COURT:  Yes, tell me what you're thinking about

15  that.

16         MR. GERBIE:  Well, Your Honor, we have flagged this

17  issue well in advance of today's hearing, and candidly

18  defendant is presenting a bit of a moving target as to whether

19  or not they are cooperating or not.  Originally their position

20  was:  We're not going to bring anyone to the United States.  Go

21  to the Hague for all of them.

22         They've walked that back and now they're producing two

23  people and saying:  Well, we'll decide later based on whether

24  we believe that you've uncovered enough relevant testimony or

25  documents as to whether or not we will further cooperate.

1    Even sitting here today, defendant is again refusing
2  to say one way or the other if they will cooperate and produce
3  these people or if we need to go to the Hague immediately.  We
4  are at the point where we think it is ripe but, again, our
5  perspective is shared with what I sort of understood the
6  Court's comments were, which is, you know, we still don't know
7  if the defendant is going to cooperate or is not going to
8  cooperate.
9    We can get into the custodial issues as well which
10  relate to some of these individuals and the timeline, but as a
11  general matter, you know, these people are relevant, we're
12  allowed to take depositions, and they're only agreeing to
13  produce three witnesses in a complex biometrics case.
14    THE COURT:  You keep saying that, Mr. Gerbie, and
15  that's not what they're saying.  They're saying:  We're willing
16  to bring -- we're willing on our tab to fly over three or
17  possibly four or more individuals to do discovery here.  We're
18  going to fly them over.  We're going to put them up at maybe
19  not nice hotels, maybe Motel 6 or something like that.
20    I don't know what they're going to do, but they're
21  saying:  We are willing to do all of that.
22    Now, as people familiar with the litigation process,
23  we all might say, well, there's a benefit to Cerence to do it
24  that way.  They've got to have their defense counsel prepare
25  their witnesses.  There's lots of logistical benefits to doing

1        it that way.

2                MR. GERBIE:  But we --

3                THE COURT:  What's happened here is discovery has been

4        ignored effectively.  Cerence has, you know, has proceeded with

5        discovery.  They've asked, and they have not heard back.  Then

6        here they come and they're like:  We're near the end of the

7        date of a date that the chief district judge in the court said

8        don't expect extensions, that you're getting a healthy

9        discovery time.

10               And like all judges who say that, you know, Judge

11       Kendall doesn't mean that in stone.  So if you were looking for

12       30 days to do more stuff, fine, but that's not where -- the

13       flavor of this since it's been before me is you saying that

14       they're not willing to cooperate.  They're actually doing a lot

15       of cooperation, and instead of just saying you dropped the ball

16       on discovery, which if you don't want to say it you don't want

17       to say it, but that's what it looks like.

18               So here we are.  I agree with you on one point.  We

19       need clarity on the issue of depositions.  Unless there's some

20       rule or case that I'm not familiar with, if they're saying "you

21       want to depose our people in Germany, have at it, go through

22       the proper procedure," I don't know why that's not within their

23       rights.  Is there something the matter with that approach?

24               MR. GERBIE:  Well, we can get into whether or not --

25               THE COURT:  No, we are going to now.  That's why I'm

1    asking.

2         MR. GERBIE:  Oh, I understand.  Our perspective as to

3    that issue specifically is that they're demonstrating that they

4    have control over these people.  First they weren't going to

5    produce anybody in the United States, and now they've decided

6    to produce two.  I'm sure you're not surprised to hear that

7    they're selecting the two that will be the most beneficial to

8    their case and potentially the least beneficial to our case.

9         THE COURT:  I actually disagree with that because what

10   counsel has done effectively has said:  Here are the people you

11   wanted to depose, and we've done searches and there aren't a

12   lot of documents.

13        MR. GERBIE:  Well, if we can talk about that, they've

14   only --

15        THE COURT:  No, we're talking about the depositions.

16   So are you telling me that since these people are in their

17   control, they have to fly them here?

18        MR. GERBIE:  No, not necessarily --

19        THE COURT:  Okay.

20        MR. GERBIE:  -- to that extent, but there may be some

21   caselaw that supports that.  So if we're at the point of

22   needing to brief a motion to compel on --

23        THE COURT:  There's no motion to compel.  I'm telling

24   you that you aren't getting more time for depositions.  So you

25   can do what you want to do and see what you get done, but this

1  has got to -- this facade that they have done something wrong

2  or that they have not cooperated has got to end.  That's not

3  what's happened, and they continue to -- you continue to say

4  they're saying they won't when they're saying they might, and

5  I, quite frankly, am saying I don't care if they might or might

6  not because if they -- I think we all know this.  If they say

7  "we might," I think your point is well-taken.  It then lies on

8  defendant to decide whether or not they're going to cooperate

9  and bring someone over.  And if they decide not to, then you're

10 going to come back and yell foul and say:  We waited.  Ms.

11 Keeley lulled me into waiting.

12         I don't think she's done anything of the sort because

13 I think it's been very clear if you've been in the hearings

14 that this is not a done deal.  So I don't want that to happen.

15 Start doing what you need to do to take depositions in Germany.

16         MR. GERBIE:  Understood, Your Honor.  Thank you.

17         THE COURT:  Okay.

18         MR. GERBIE:  And that was our perspective.

19         THE COURT:  Or Canada.  Just so I'm clear, or Canada,

20 and I don't know where Mr. Kwast lives.

21         MR. GERBIE:  Tsuboyama.

22         MS. KEELEY:  Mr. Kwast, we understand, is likely in

23 Belgium.

24         THE COURT:  Okay.

25         MS. KEELEY:  Since he's a former employee, that's what

1  we've pieced together.

2  THE COURT: Okay. So I have no idea what Belgium law

3  requires. Mr. Tsuboyama is in Canada. I have had some touches

4  with that, but do whatever you need to do.

5  MR. GERBIE: And, Your Honor, may I be heard a little

6  bit --

7  THE COURT: Yes.

8  MR. GERBIE: -- a little bit more on this issue? So,

9  you know, the reason we brought the motion for extension was in

10  order that we may complete oral discovery and so that we

11  weren't before Your Honor a month from now saying: Well, here

12  we are. We've taken these three, and we need more time to

13  complete these four. We think that they are required.

14  Then defendant says: There's been plenty of time to

15  work this out.

16  And our perspective is yes, they've been slow rolling

17  this issue for several weeks or months now.

18  THE COURT: Mr. Gerbie, just on the point of slow

19  rolling and why you shouldn't be saying that, in this status

20  report you say: We'll file a motion to compel in a couple of

21  weeks.

22  That's what you wrote. It's June 16th. Discovery

23  ends July 29th. You file a motion. Just so we're all clear,

24  this is on page 4 of the status report. This is a paragraph

25  dealing with plaintiffs' position:

1          "Plaintiffs will draft and file in the coming weeks,

2    as necessary, to the extent that additional good faith efforts

3    fail to resolve these disputes."

4          That's slow rolling a case, so stop using "slow

5    rolling."

6          MR. GERBIE:  Yes, Your Honor.

7          THE COURT:  They've been clear on their position.

8    This case has languished on the plaintiffs' side.  That's where

9    we're at.

10          So anyway, on the deposition point, do what you need

11   to do.  The idea as to the number of depositions, you're not

12   near the limit so the rule is not at play on that.  You know,

13   Rule 26 does talk about other factors, but do what you need to

14   do.

15          MR. GERBIE:  Understood, Your Honor.

16          THE COURT:  I'm unlikely to get in the way of you

17   going to Germany to take depositions unless defendant has a

18   really, really good reason to say that there's nothing you

19   could possibly get from it.  If it's a little bit duplicative,

20   so be it.  You know, if you have a good faith reason and you

21   can explain it to me, I'm not going to get in the way of doing

22   that.

23          MR. GERBIE:  Understood, Your Honor.  As to one

24   individual in particular, Mr. Steiger, defendant identified

25   this person specifically in their Rule 26 disclosures as

```
 1   somebody who has relevant knowledge, but they're not willing to
 2   produce him in the United States for testimony.
 3         THE COURT:  Is there a rule that says they have to?
 4   You brought this suit.  Is there?  I have not done enough
 5   international --
 6         MR. GERBIE:  Your point is well-taken, Your Honor.
 7         THE COURT:  Okay.  They are -- in their sense of
 8   cooperation, they're saying:  We're not paying.  We're not
 9   footing the bill.
10         MR. GERBIE:  Well, but they're also not saying if we
11   fly there they will produce them subject to U.S. law.
12         THE COURT:  Well, I don't know that they have to,
13   either.
14         MR. GERBIE:  Understood, Your Honor.
15         THE COURT:  Again, those are two areas that I'm
16   flagging for you.  If I've got them wrong, I'm happy to look
17   and tell you I have them wrong.
18         MR. GERBIE:  Yes, Your Honor.
19         THE COURT:  I certainly don't think the first one I
20   have wrong, and the second one I'm not as clear on.
21         MR. GERBIE:  Understood, Your Honor.  I do want to
22   apologize to the Court to the extent it appears as though we
23   are slow rolling this.  As we identified in our motion, I've
24   been out on paternity leave for a length of time.  My
25   co-counsel has been out on his honeymoon for the last three
```

1    weeks.

2           THE COURT:  Which is why if you were asking for 30

3    days I'd be like no problem.

4           MR. GERBIE:  Understood, Your Honor.

5           THE COURT:  I'd be telling Ms. Keeley:  You know, does

6    that really have -- do you want to conduct yourself there?

7           But she's not done that.  She's been like:  We're

8    probably okay with you, you know.

9           But you're saying:  I've had these life events which

10   are joyous and things we should do as people.

11          I agree.  Then you're saying:  But I want ESI.  I want

12   them to fly people over to Germany.

13          You're creating all these things, but really what

14   you're saying is:  We've had these good things happening in our

15   lives.  We're a little bit behind.  Can we get 30 days more?

16          You'd have 30 days more, probably 45, without the bat

17   of an eyelash from me.

18          MR. GERBIE:  Understood, Your Honor.

19          THE COURT:  But that's not what's happening.  So we've

20   got to get past that.  It's not being slow rolled.

21          MR. GERBIE:  Understood.  Understood, Your Honor.

22          THE COURT:  Okay.  That's where we are on the

23   depositions, except the 30(b)(6).  I know there's other things

24   you want to talk about.  I don't want to lose track of the

25   30(b)(6) deposition.  When are you going to get that notice

```
 1  out?
 2            MR. GERBIE:  This week, Your Honor.
 3            THE COURT:  Okay.  I like that idea.  The 30(b)(6)
 4  notice has to be sent out by June 20th.
 5            Ms. Keeley, what does next week look like for you?
 6            MS. KEELEY:  Judge, do you mind if I grab my phone
 7  back there?
 8            THE COURT:  Go ahead.
 9            MS. KEELEY:  Sorry about that.
10     (Brief pause.)
11            MS. KEELEY:  Are you looking for a hearing or for a
12  response?
13            THE COURT:  A response.
14            MS. KEELEY:  Okay.
15            THE COURT:  I just want to get this set up --
16            MS. KEELEY:  Sure.
17            THE COURT:  -- so it can get done in July.
18            MS. KEELEY:  If we can have a week to respond.
19            THE COURT:  Okay, June 27th, any objections to the
20  scope and notice of the 30(b)(6).  Then I want all
21  meet-and-confers to be done -- and so the July 4th holiday
22  weekend is there -- by close of business July 8th.  Then file
23  a -- we'll have a status report probably July 9th-ish.  We'll
24  see, but we'll just get a status report with any of the
25  lingering discovery issues.  So right now all meet-and-confers
```

1    on the 30(b)(6) have to be done by the 8th.

2           MS. KEELEY:  Judge, if it's -- and I'm open to talking

3    through this, you know, with opposing counsel, too.  Their

4    deposition of John Cashman, who's one of our witnesses who

5    could possibly be a 30(b)(6), is on the 9th.

6           THE COURT:  Oh.

7           MS. KEELEY:  So if it's feasible for anyone -- and,

8    you know, speak up, too -- if we could maybe try to wrap up

9    meet-and-confers sooner, it could be productive for us to try

10   to prepare him if he ends up being a witness, you know, for

11   both at the same time.

12          THE COURT:  That would be great.

13          Mr. Gerbie, Ms. Keeley has till June 27th, and you get

14   your notice out the 20th.  Can you get your notice out sooner

15   than the 20th?

16          MR. GERBIE:  Your Honor, I'm not sure that we can this

17   week.

18          THE COURT:  That's fine.

19          MR. GERBIE:  That's the end of the week.  We've got a

20   holiday between now and then, and counsel is still getting back

21   up to speed.

22          THE COURT:  That's fine.  Okay.  So the 20th, the

23   27th.  Can we get meet-and-confers finished by noon on July

24   3rd?

25          MS. KEELEY:  I think that could work for us.

1          MR. GERBIE:  Yes, Your Honor.

2          THE COURT:  Okay.

3          MS. KEELEY:  And if we can, depending on the number of

4   topics and stuff, you know, we'll try to be diligent.  If we

5   can get a response out sooner, too, we'll try to do that.

6          THE COURT:  Okay.  Then you said that deposition that

7   might work well is the 9th, is that right?

8          MS. KEELEY:  Yeah.  Well, I'm not -- so the three

9   folks that are scheduled right now of the Cerence witnesses are

10  the 9th, the 15th, and the 17th.

11         THE COURT:  Okay.

12         MS. KEELEY:  Then any combination of those three, you

13  know, depending on what the topics are, could potentially be

14  30(b)(6) witnesses.  But the 9th is just the first one that's

15  up.  He's a -- I'm blanking on his formal title, but he's the

16  director of privacy of sorts at Cerence.  So he's the first one

17  that's up, so I think -- I was just thinking in the event that

18  we could figure it out by then, it might be more productive for

19  all of us.

20         THE COURT:  Okay.  Yes, I'm not going to -- I'm going

21  to put those dates in place.  I was going to have you do a

22  status report on whether that's been worked out or not.  But if

23  you can get it done, great.  I am going to get a status report

24  and have you back before me, but I'm not going to try to sync

25  all that up.

```
 1              MS. KEELEY:  Okay.

 2              THE COURT:  I'll get it definitely -- I'll definitely

 3     have you all back here before the 15th and 17th.  So we'll

 4     somehow get that figured out.

 5              MS. KEELEY:  Okay.  That is the week of the Boston

 6     witnesses.

 7              THE COURT:  Okay.

 8              MS. KEELEY:  So a status hearing on -- we'll be in

 9     Boston the 14th through the 17th with those witnesses.

10              THE COURT:  Okay.  I think Ms. Owens is telling me the

11     7th is probably going to be when we're going to get back

12     together.

13        (Discussion off the record.)

14              THE COURT:  Okay.  Sorry.  We have a couple --

15        (Discussion off the record.)

16              THE COURT:  Put July 7th at 9:15 for our next status

17     hearing here.  All right.  So depositions in general we're good

18     on.  The 30(b)(6) notice, the meet-and-confer on that we're

19     good on.

20              Then, Mr. Gerbie, I think you were going to talk about

21     ESI, which is the next thing I have on my list.  But if you

22     were going to talk about something else, tell me that.

23              MR. GERBIE:  Yes, that is where we were going to go.

24              THE COURT:  Okay.  So tell me what you're thinking

25     about that, and tell me if I'm right or wrong because I'm
```

1    looking at plaintiffs' position after defendant's summary. I'd

2    give you a page number, but it's not numbered.

3          MR. GERBIE: Page 9.

4          THE COURT: Page 9, yes. Is that where you're at, or

5    are you on their work, on defendant's?

6          MR. GERBIE: Well, six of one, half-dozen of the

7    other.

8          THE COURT: Tell me where you want to go.

9          MR. GERBIE: So, I mean, I guess we can start with

10    defendant's, you know, custodians and hit reports. Our

11    perspective is that we've identified individuals that clearly

12    should have been included as full file custodians for the

13    search terms that they did run, and candidly they only ran four

14    individuals as full file custodians in a case like this where

15    candidly the product has clearly been worked on by many, many

16    individuals.

17          We can prevent -- present those witnesses or those

18    individuals to Your Honor along with an explanation of why they

19    should have been included as full file custodians even just

20    against the search terms that defendant has run, and then in

21    accordance with Your Honor's wishes, we really did put our

22    heads together and try and present as narrow of additional

23    search terms as we could to supplement defendant's search which

24    the Court spoke to last week.

25          THE COURT: All right. So let's start with this

1  notion that ESI is even -- renewed ESI or supplemental ESI is

2  even justified.  I'm looking at page 8 of the status report

3  where Ms. Keeley and her colleagues have put together a

4  custodian and hit report for Cashman, Tropp, Hamerich, and

5  Steiger.

6          I haven't done the math, but if you use the most cold

7  and reviewed amount of data that defendants identify -- and

8  this is the third column over -- "documents remaining left for

9  review after email threading, removal of junk files, running

10  unique search term hits, applying date ranges, and keeping

11  families together," for Mr. Cashman, it's 17,000-plus, for

12  Mr. Tropp 20,000-plus, for Mr. Hamerich 46,000-plus, for

13  Mr. Steiger 23,000-plus.

14          They then conduct a manual review.  As I understand

15  that, Ms. Keeley, you use real people to look at the documents

16  and it's supervised.  Whether you use contract attorneys to do

17  it, it's supervised by someone in your firm, correct?

18          MS. KEELEY:  Yes.  We have a team of contract

19  attorneys that did the first round of review one at a time, and

20  then myself and another team member personally did a quality

21  check review of each document.

22          THE COURT:  Okay.  So from those 17,000 with

23  Mr. Cashman, we get 38 relevant documents.  From Mr. Tropp's

24  20,000, we get 132 relevant documents.  Mr. Hamerich's 46,000,

25  we get 574 relevant documents.  Mr. Steiger's 23,000, we get

1    25.

2        So that confirms my suspicion which I had last time

3    and I think I put on the record, which is, I don't think this

4    is an ESI-heavy case because I don't think that German

5    companies are talking a lot about BIPA in their back-and-forth.

6    You know, quite frankly, Illinois law on BIPA, to say it's an

7    outlier is probably not doing justice to outlying statutes, but

8    it's not something that most people are out there worrying

9    about because it's not data privacy as we understand it or

10   something like that.  It's a very specific statute, and it does

11   not surprise me in the least that it's not -- you're not

12   getting a lot of ESI documents.

13       Why would we be talking about doing more ESI when Rule

14   26 tells me I have to look at the proportional needs of the

15   case?

16       MR. GERBIE:  Your Honor, the needs of this case relate

17   to specific products that are developed and deployed by

18   defendant.  So the documents we're looking for are from

19   individuals who were intimately involved in the design and

20   deployment of those products with defendant's customers.

21       There are certain people -- and I can go through

22   them -- you know, directors of software engineering, product

23   managers, vice-president of research and development, all which

24   relate to this product, and none of their files were searched.

25   Certain ones had "go get" documents produced.  Mr. Hardegger

1    had four produced.  You know, he's the one, but he's someone

2    along with at least a few others who candidly should have just

3    been included in defendant's own, as Your Honor put it,

4    reasonable search for records on these products.

5         So we're not, we're not on a fishing expedition

6    looking for questions about, you know, necessarily documents

7    that say "BIPA" or "BIPA liability," but documents which

8    describe voice biometrics, where the samples that are taken

9    from the vehicles go, how they're stored, where they're stored.

10   You know, the people that are responsible for designing and

11   deploying those products have relevant testimony, and their

12   files should have been searched.  So we believe this is very,

13   you know --

14        THE COURT:  You're still not answering the question I

15   have, which is that Rule 26 tells me that discovery needs to be

16   proportional, and for proportionality, you know, when I'm

17   forcing another side -- go ahead.

18        MR. GERBIE:  Go ahead.

19        MR. GESKE:  Sorry, Your Honor.  So I understand the

20   point about proportionality.  On a number of these individuals,

21   we're not necessarily saying you need to conduct a full ESI

22   search and then go through the same process that you did for

23   these first four.  For some of them, we're saying let's just

24   see a hit report so that then we can determine is this somebody

25   that warrants further attention or is this somebody where a

1    manual review would even be required.

2           But on a number of these, like, for example, the

3    individuals who we included as people -- I'm sorry --

4    individuals that Cerence included as individuals who were asked

5    to provide "go get" documents, we said:  Okay.  Well, what

6    would -- can you provide a hit report for them if you applied

7    those same set of terms?

8           And if the hit report comes back and, you know,

9    there's very little, then we can say:  All right.  Let's rule

10   that person out.

11          Or, you know, are there so many documents that a

12   manual review would be extremely burdensome, such that it's,

13   you know, it's too late to address that at this point.  But for

14   some of these, all we've asked is let's see what a hit report

15   would look like.

16          Then on the additional terms that we've provided, you

17   know, we were very conservative with these.  We just provided

18   five terms.  They're largely in line with Cerence's own terms,

19   but they're designed to address several holes or gaps that were

20   left by how they drafted their terms.  But, you know, again,

21   these specifically incorporate some of the terminology and the

22   product names that Cerence uses.

23          And to Your Honor's question about, well, is this

24   really an ESI-heavy case, you know, oftentimes what we've seen

25   in reviewing the documents is that, you know, these employees

1  are -- among themselves and with Mercedes, they're very candid

2  in how they describe the technology, what it is and what it

3  does.  Whereas, you know, a lawyer might say:  Well, that's not

4  really a voiceprint or that's not really biometrics within the

5  meaning of BIPA.

6        And then, you know, you'll have an email from an

7  employee that says:  Oh, yeah, this is the voiceprint.  This

8  technology uses voiceprints.

9        Then, you know, when we try to get to the bottom of

10  that, you know, we hear:  Well, there's actually a more

11  specific biometric product, you know, and that "voiceprint"

12  doesn't really mean "voiceprint" as it's used in BIPA.

13        You know, it's much easier if we're just looking at

14  trying to get to the bottom of how the technology works, what

15  it does factually, what data is collected and then stored in

16  the cloud or obtained by Cerence, it's much easier to do that

17  if we actually have the words from the employees themselves

18  rather than just, you know, some lawyer's interpretation of

19  those words.

20        THE COURT:  But that's what depositions are for,

21  right?

22        MR. GESKE:  Right, and, you know, this was proposed in

23  conjunction with some of the individuals who we intend to

24  depose.

25        THE COURT:  Yes, but it was proposed to you in

1    December of 2024.

2         MR. GESKE:  Yes, that's a fair point.  I believe we

3    approached Cerence about running an ESI protocol in February.

4    I recognize there was two months of time between December and

5    February and, you know, it should have been done sooner.  But,

6    you know, I think realistically if you look at the timeline of

7    Cerence's productions, we got very substantial productions in

8    February and March.  I think during that period we got more

9    documents than we had gotten during the entire previous

10   lifespan of this case.  So we got a huge document --

11        THE COURT:  But do you know why that is?

12        MR. GESKE:  Well, I can speculate, but we got a

13   huge --

14        THE COURT:  Well, I can tell you why it is.  In

15   December, they sent you their custodians and their search terms

16   and they said:  Let me know if this is going to work.

17        Then someone was probably hearing The First Noel in

18   the background and then New Year's Eve celebrations, and then

19   after that people got back to work, but nothing, and then it

20   was just crickets.  No more Christmas carols, it was just

21   crickets and crickets and crickets.

22        Then in February I guess there's some contact.  Then

23   March is when -- I thought it's in March.  Is that when you

24   first end up in state court on this issue?

25        MR. GESKE:  We were in state court, I believe, earlier

```
 1    in February.

 2              THE COURT:  Okay.

 3              MS. KEELEY:  Yes, this was the first time on that

 4    issue, yeah.

 5              THE COURT:  Okay.  So that's why you got a lot of

 6    stuff.  It's because while the Christmas carols were playing

 7    and you weren't calling them, they started working.  Then they

 8    started producing stuff and then, yes, you got stuff because

 9    you never said anything.

10              As we just heard from Ms. Keeley, she and her firm and

11    her client paid a lot of money to have contract attorneys

12    review stuff.  That takes time, and then to do quality control

13    the right way you need to -- you can't kind of just do it.

14    You've got to do it and make sure you're doing it right, and

15    that takes some time.  Then they start producing.

16              In my experience -- and I don't know if this is the

17    experience in this case -- you start to get a production that

18    starts to looks like this and speeds up, because once they get

19    things going then they start sending stuff out.  So I don't

20    disagree with any of that.  That's not defendant's fault.

21              MR. GESKE:  Right, and I'm not saying it is

22    defendant's fault.  I'm not --

23              THE COURT:  It would be their money.  It would be

24    their time.  It would be all of that.

25              MR. GESKE:  Right, and I'm not trying to put blame on
```

```
 1    anybody.  I'm just saying that this is -- this is the timeline
 2    of when we received the documents, and then shortly after we
 3    received the documents in February and March we said:  Here's a
 4    list of people we'd like to depose.
 5            You know, after weeks of going back and forth on that,
 6    you know, we got to the point where we were told, well, go to
 7    Germany and, you know, that's the point at which we said --
 8            THE COURT:  They didn't say that.  They said --
 9            MR. GESKE:  Well, with the exception of two people.
10            THE COURT:  Well, three -- no, three plus a 30(b)(6).
11            MR. GESKE:  I think it's just two.
12            MR. GERBIE:  One of them is already in the United
13    States, Your Honor.
14            THE COURT:  Okay.
15            MR. GESKE:  Yeah, Mr. Cashman is U.S.-based.
16            THE COURT:  Okay.
17            MR. GESKE:  So they're saying:  With the exception of
18    these two who we've chosen, the rest you can go to Germany.
19            So at that point we said:  Okay.  Let's --
20            THE COURT:  They're saying maybe.
21            MR. GESKE:  Well --
22            THE COURT:  They're still saying -- I'm the one who's
23    saying forget it.  I'm saying forget "maybe" and pretend you're
24    going to have to go to Germany because I don't want you to be
25    saying:  While Ms. Keeley was being gracious, she lulled us
```

```
 1    into thinking we didn't need to do anything.

 2              I'm done with this.

 3              MR. GESKE:  No, that's not what I'm saying.  I'm just

 4    trying to provide context here.

 5              THE COURT:  I have a ton of context.

 6              MR. GESKE:  Sure.

 7              THE COURT:  You don't have to do any of that.  I'm

 8    really up on this case.

 9              MR. GESKE:  Okay.  Fair enough.

10              THE COURT:  So that's not going to work.  What I would

11    like context on is the inference I'm drawing from the numbers

12    that Ms. Keeley has provided is not suggestive of a case that

13    ESI is really all that important.  When you were using your

14    example of a voiceprint, I thought before you finished what

15    happened, what people are saying, which is:  Well, when we say

16    voiceprint, it's not what the Illinois Biometric Information

17    Privacy Act means.  It's just voiceprint.  That's just our

18    short -- you know, our in-the-know language that we use.

19              When you were telling that story, I was like they're

20    going to say that's not what -- we're not talking about an

21    Illinois BIPA voiceprint.  We're just talking about voiceprint.

22    That's what we talk about.

23              So that further tells me that using search terms and

24    having defendant incur additional costs doesn't make a whole

25    lot of sense.  What am I missing?
```

 1          MR. GESKE:  Well, I think when we're seeing

 2   individuals use the term "voiceprint," they're talking about

 3   identifying a person based on the unique characteristics of

 4   their voice, which our position is that that is -- that falls

 5   squarely within BIPA.  But BIPA doesn't define the term

 6   "voiceprint," so it's something that is ultimately open to

 7   argument.  If there's going to be an argument from defendant

 8   that this isn't really a voiceprint within the meaning of BIPA

 9   then, you know, that's undeniably relevant to us making the

10   counterargument that it is within the meaning of BIPA.

11          THE COURT:  Tell me what the emails -- how that would

12   change any of this.

13          MR. GESKE:  Well, there is, you know, a reckless

14   versus negligent component which speaks to mindset.  So

15   defendant's understanding of its own product is something that,

16   you know, I'm sure defendant would argue we have to prove that

17   the information that they were collecting, they were collecting

18   it in a knowing manner, not necessarily knowing that it was

19   violating BIPA, but knowing that it was being collected and

20   what the information was.

21          THE COURT:  Well, I think Ms. Keeley has said they

22   don't even collect it.

23          Isn't that your client's view?

24          MS. KEELEY:  Yeah, our client's cloud servers don't

25   have any connection to the product.

```
 1                THE COURT:  Okay.

 2                MS. KEELEY:  May I just add something as well?

 3                THE COURT:  In a second.

 4           But explain to me, though, why the emails are

 5   necessary.  I understand what you're interested in.  Why do you

 6   need emails to ask people about that concept?

 7                MR. GESKE:  Well, in part potentially to impeach them

 8   to the extent that they are saying that's untrue:

 9           I notice, you know, Mr. Hardegger, that you described

10   this as a voiceprint in your email.  What did you mean by that?

11   Okay.  Let's talk about it.  What is that?  Do you mean that in

12   a way that it -- is it used to identify a person?  Okay.  How

13   is that done?  Is it done by taking that sample, storing it in

14   XYZ way, taking data points from that sample, and then later

15   comparing that to future samples?  Okay.  Tell me about that

16   process.

17           Then we can take that testimony in accordance with the

18   documents, with whatever other documents we have, provide it to

19   an expert, and say:  Okay.  Is it a biometric, or is it not?

20   Is it subject to the statute, or is it not?

21           We believe that it is, and the way that engineers

22   describe the product is very relevant to their testimony and

23   their credibility as witnesses.  So we think it's extremely

24   relevant.

25                THE COURT:  Well, that wasn't -- I didn't ask about
```

1   relevance.  I asked why do you need the emails, and you told me

2   you needed it for a particular reason which I'm still not

3   tracking.  Do you remember the reason you said you needed it?

4           MR. GERBIE:  The way that engineers discuss the

5   product and its deployment is, I think as my colleague said,

6   often more suggestive of how the product actually functions

7   than necessarily the technical documentation.  So the way in

8   which they describe the product is relevant.  Oftentimes, as

9   we've seen with the emails that they have produced, they are

10  talking about how the product works and its capabilities

11  candidly with each other.

12          So we think that, you know, search terms aside,

13  certain of these individuals, which we didn't know they had

14  relevant documents until we received productions in March,

15  would have relevant documents for production here.

16          THE COURT:  But you received their relevant documents

17  in March.

18          MR. GESKE:  No, we received relevant documents from

19  these four individuals who they've identified as custodians in

20  March.  Upon review of those documents the last couple of

21  months, we've identified that there are other individuals who

22  we're not -- who we don't have hit reports for and who we

23  don't -- who they didn't pull files for even on their own

24  search terms that are likely to have relevant documents.

25          THE COURT:  Yes, I'm still -- you said you needed the

```
 1    emails for impeachment.  That doesn't make sense to me much.
 2            MR. GERBIE:  We don't know if we need them for
 3    impeachment.
 4            THE COURT:  Well, that's what you said.  That's not
 5    what I offered.
 6            MR. GERBIE:  It was a hypothetical, Your Honor.  I
 7    apologize.
 8            THE COURT:  Well, I asked you what you needed them
 9    for, why you couldn't ask these questions in a deposition
10    without the emails.  These are things you're trying to find
11    out:
12            When you say voiceprint, what does that mean?  Here's
13    a colleague of yours discussing a voiceprint of a voice.  What
14    does that mean to you all within your team?
15            This is what it means.
16            What do you do with it?
17            Whatever it is, you've got emails to prompt you to
18    understand what to ask.  I understand, of course, it's always
19    better to have the emails of people you're deposing, but again
20    when the Christmas carols were playing in December, if someone
21    had reached out to Ms. Keeley and said:  I don't like these
22    custodians, and we'd like these custodians as well --
23            MR. GERBIE:  I'm not sure if we were provided with the
24    custodians in December.
25            THE COURT:  That's -- I think you are right about
```

1     that, actually.

2          MR. GERBIE:  And that was the issue.  Your Honor's

3     comments last week were well taken that, you know, bringing

4     additional search terms this late in the ballgame is likely not

5     to be, you know, looked upon kindly and asked that we -- that

6     custodians is a different matter.  So we really have endeavored

7     to identify those additional custodians that we wouldn't have

8     had any reason to know about until these late productions in

9     March.

10          THE COURT:  Yes, I forgot about that.  That's a fair

11    point.

12          Go ahead, Ms. Keeley.

13    MS. KEELEY:  Thanks, Judge.  Just starting at the top

14    and kind of redirecting, I just wanted to clarify because I

15    know depositions came up again.  Is that issue still open?  Do

16    I need to respond to that?

17          THE COURT:  No.

18    MS. KEELEY:  Okay.  There were two -- on the ESI

19    issue, there were two open issues that you asked us to come

20    here with at the last hearing.  The first is our reporting

21    about our procedures, the hit reports we ran of the custodians

22    to plaintiffs and to you, and the second was for plaintiffs to

23    articulate good cause and particular reasons why a certain

24    person was particularly important, why not getting their ESI is

25    prejudicial to their clients, and so far the only reason

1   they've had in terms of either custodians -- well, I'll start

2   with search terms, that there's certain emails about engineers

3   talking about biometrics.  I don't know if they haven't

4   reviewed all of them yet, but we've produced a lot of emails

5   saying exactly what they're looking for.

6           Directing you to page 8 of the report, our search

7   terms have a lot of different synonyms for "voice" that we

8   pulled from technical documents, the exact words that are used

9   in them.  So I'm not really following the argument that they

10  aren't receiving the documents that they think are relevant,

11  one, because they do have them and they might just not have

12  reviewed them yet and, two, because -- because these terms

13  include all the different kinds of variations of words that

14  they're looking for.  And the terms proposed, even if they were

15  timely, for example, we've produced documents explaining that

16  the Gen20 -- I'm on page 10.

17          THE COURT:  Yes.

18          MS. KEELEY:  The last one, Gen20-X, that's a head unit

19  in certain Mercedes vehicles.  We've produced many documents

20  explaining that Mercedes did not purchase the voice biometric

21  products to use in that head unit.  The same thing for the

22  cloud, we've produced documents explaining -- like I mentioned

23  with Mr. Tsuboyama who was identified for a deposition, we've

24  produced documents explaining that the voice biometric product

25  is incapable of connecting to the cloud.  So I think this is

```
 1    not only untimely but far from good cause.

 2              THE COURT:  So what do you make of the idea that you

 3    didn't provide custodians in December?  I don't know that that

 4    would have changed anything, but on page 9 it reads:

 5              "To this end, plaintiffs have requested that defendant

 6    run all search terms for the custodial files of Khaled Anani,

 7    Christophe" -- and I think that should be Christopher --

 8    "Couvreur, Jochen Hardegger, and hit reports for the following

 9    custodians:  Mike Chachich" -- I may be butchering that --

10    "Jorge Tsuboyama" -- who we've talked about -- "Udo Haiber, and

11    Holger Kwast."

12              So, Mr. Gerbie, when you said that plaintiffs have

13    also requested hit reports for the following custodians, what

14    is the difference between those four and the three right above

15    them?

16              MR. GERBIE:  The three right above them we believe or

17    we're quite confident have -- relevant documents have been

18    produced.  You know, certain "go get" documents were produced

19    for them.  So we think there's at least some acknowledgment

20    that they may have relevant documents, and we're asking that

21    defendant pull the full files and run a custodial search.  Then

22    for the subsequent ones --

23              THE COURT:  Oh, okay.

24              MR. GERBIE:  Go ahead, Paul.

25              MR. GESKE:  So the difference, Your Honor, is that the
```

1  top three were ones for which Cerence did the "go get"

2  production.  The bottom three were not included as custodians

3  either for the full search terms or for the "go get" process.

4      THE COURT:  Okay.  So you would expect Cerence to

5  go -- for Anani, Couvreur, and Hardegger, you would expect them

6  to go through the same process they did for the four who are

7  covered on page 8, right?

8      MR. GESKE:  Well, I think to start with it would be

9  helpful to get a hit report for them.

10      THE COURT:  But that's what I'm wondering.  It doesn't

11  say that.

12      MR. GESKE:  Well, I think we asked that they run the

13  search terms.

14      THE COURT:  That's why I was asking you the difference

15  between those two --

16      MR. GESKE:  Yeah.

17      THE COURT:  -- and I thought what you just told me was

18  you think with those three, they should do what they have done.

19  I thought you were saying you don't want hit reports.  You want

20  them to go run the search terms on those three custodians.

21      MR. GESKE:  So the difference between the two lists,

22  the top list are individuals who Cerence included in their "go

23  get" production.  The bottom three were not included.

24      THE COURT:  I get that.  The relief, what is the

25  relief you're asking for?

```
 1              MR. GESKE:  So, I mean, to start with, I think it
 2   would be helpful to have a hit report for all six of these
 3   individuals.
 4              THE COURT:  All seven.
 5              MR. GERBIE:  Yeah, there's one more.
 6              MR. GESKE:  Oh, I'm sorry.  Yeah, there's one on the
 7   last page.  So it would be helpful to have a hit report for
 8   them, and then we can discuss, you know, whether there --
 9              THE COURT:  We're not doing that.
10              MR. GERBIE:  May I be heard briefly, please?
11              THE COURT:  Sure.
12              MR. GERBIE:  So just by way of example, if Your Honor
13   may, I've got a copy of a document I'd like to provide to the
14   Court and counsel.
15              THE COURT:  Sure.
16     (Brief pause.)
17              THE COURT:  Thanks.
18              MR. GERBIE:  So as Your Honor can see from the first
19   page, which is Bates 74 --
20              THE COURT:  I don't mean to interrupt.  It's just
21   marked "attorneys' eyes only," so I'm just reminding all of us,
22   if we're going to talk about it, we've got to be mindful that
23   it's marked "attorneys' eyes only."
24              MS. KEELEY:  Thank you.
25              THE COURT:  Go ahead, Mr. Gerbie.
```

```
1          MR. GERBIE:  Yes, Your Honor.  Your Honor can note the
2    author of the document is one of the individuals we've
3    identified here as somebody who should have been a full file
4    custodian, and this document describes rather explicitly the
5    sorts of technology at issue.  If you look at page 76, within
6    the box there's a couple of things, and I'm mindful of the
7    protective -- I'm trying to be mindful of the protective order.
8          THE COURT:  Yes.
9          MR. GERBIE:  You know, I can pass up a highlighted
10   copy if that would be a little bit easier for Your Honor.  But
11   certainly 76, 77, and then I'd also direct Your Honor
12   specifically to 83, the fourth dash at the bottom of 83 --
13   sorry -- the fourth dash from the first bullet in 83.  So this
14   individual who wrote this is the principal product manager for
15   one of the products at issue in this case.
16         THE COURT:  Okay.
17         MR. GERBIE:  So this is an individual who -- based on
18   this document, we believe he very obviously has knowledge about
19   the facts at issue in this case.  That's why we're looking to
20   depose him and to get the search terms defendant has already
21   run against the others run against his file as well.
22         So, you know, we're happy to provide the Court with
23   these sorts of documents for other individuals as well, but I
24   did just want to put some additional color -- excuse me -- on
25   the types of documents that are at issue in this case that go
```

1    beyond emails.

2              THE COURT:  Yes, okay.  So I appreciate that.  That

3    doesn't change what I think is the most appropriate way to

4    resolve this issue, and that is to have defendant do a "go get"

5    for --

6              As long as I'm tracking this, if I'm wrong, tell me,

7    Ms. Keeley.  Mr. Anani, Mr. Couvreur, and Mr. Hardegger you

8    have done "go gets" on, is that correct?

9              MS. KEELEY:  Correct.

10             THE COURT:  If based on any of the proposed search

11   terms that are appearing on page 10 of the joint status report

12   you think further review for "go get" documents for those three

13   people, understanding your obligation under Rule 26 to do a

14   reasonable search, that there are additional documents, I'd

15   order you or I'm ordering you to supplement that based on what

16   you are seeing from plaintiffs' sense of what may be relevant

17   here, and then I'm going to order you to do a "go get" review

18   for the four individuals who are on pages 9 and 10.

19             I'm not asking you to do a full ESI dump and search.

20   So you can go into their files and see if they have them.  I

21   know one of these individuals is no longer with the company.

22   So I am not going to order a full ESI download and search.

23   This is way too late in the game.

24             I think, Mr. Gerbie, I see your point on -- well, I

25   think it's 83 where the terms "biometry" and "biometrics" is

 1   included.  I understand why that's of interest to you, but that

 2   still reinforces my view, which is, considering the amount of

 3   time and money that went into going through hundreds of

 4   thousands of documents to get to a few hundred, we need to look

 5   at proportionality.  You have a document right here for this

 6   individual with a nice bullet point that you've identified that

 7   you can ask him all sorts of questions about.

 8            MR. GERBIE:  Well, Your Honor --

 9            THE COURT:  Way back when, before there were emails

10   and Slack and whatever the next generation is going to produce,

11   attorneys just asked questions.  They didn't have the emails

12   for supposed impeachment.  They didn't spend hundreds of

13   thousands of dollars looking at what people send back and forth

14   about where they're going for lunch and all the other things

15   that come from all of this.  You know what you're looking for.

16   You've got documents.

17            Defendant gave you an opportunity in December,

18   January, and finally in February someone woke up, and they've

19   started their production.  I don't see -- and you have not come

20   to me and said:  Here's obvious things we're missing.

21            These are all things you think might be out there.  I

22   am convinced based on the numbers that have been presented that

23   this is not an ESI-driven case.  Unlike others where sometimes

24   there is a reason ESI has to be front and center, that does not

25   seem to be this case.

1          Additionally, Ms. Keeley has repeatedly said that she

2     does not think her client is involved in the maintaining of

3     biometric information to begin with, that they're a software

4     designer and their cloud doesn't even store the information.  I

5     have yet to hear you tell me that that's wrong.

6          And as anyone who works in the area of BIPA knows,

7     unrestrained, plaintiff's attorneys can come up with lots of

8     different theories as to why things may or may not be relevant,

9     but I have yet to hear plaintiff say:  We don't think that's

10    true.  Here's good reason why we think our case is different

11    from the way Ms. Keeley is describing it.

12         So I do not see under Rule 26 proportionality based on

13    the needs of the case cause that full ESI discovery is

14    appropriate, but I will order defendants to supplement any "go

15    get" discovery for the three identified people on page 9 and to

16    do "go get" discovery on the four that are identified on pages

17    9 and 10.

18         MR. GERBIE:  Is Your Honor willing to order defendant

19    to produce a hit report?

20         THE COURT:  No.

21         MR. GERBIE:  Thank you, Your Honor.

22         THE COURT:  No, and the reason I'm not ordering a hit

23    report is because it's too late in the game.  So if Ms. Keeley

24    produced another hit report similar to the one we just saw for

25    the others, where would that lead us -- leave us?

1          MR. GERBIE:  Well, Your Honor, in that case, if they

2   were to produce a hit report, again, this is a -- you know,

3   we're trying to be very targeted with the specific individual

4   who was the principal product manager of the product that we

5   believe is at issue in the case.  This is not somebody who's

6   tangentially worked on the product at some point.  This is

7   somebody who we believe should have been included and who we

8   didn't know wasn't included, again, until we got these

9   documents in March and started reviewing them.

10          You know, we've been before Your Honor for a couple of

11  weeks now.  We've been trying to meet and confer.  I hear Your

12  Honor telling us that we can go get testimony, but it sounds

13  like we might be having to go to Germany to get testimony from

14  them, which we'll do and which is fine.  We'll have to do that.

15  But Your Honor's order last week did ask us to tell them which

16  additional custodians you'd want to get hit reports for and

17  potentially full file custodians and ordered defendant to

18  identify to us --

19          THE COURT:  That's --

20          MR. GERBIE:  So this is the first time, you know, and

21  we are trying to --

22          THE COURT:  That's fair.  That's fair.

23          So, Ms. Keeley, I did think I was going to get hit

24  reports, so tell me what happened there.

25          MS. KEELEY:  So you're referring to the "go get"

```
 1   custodians, right?

 2           THE COURT:  Yes.

 3           MS. KEELEY:  Yeah.  So our client doesn't have the

 4   capability to run search terms on like files in their internal

 5   system.  So to run search terms and to run a hit report, that's

 6   what we -- how the full file collect worked.  We did like a PST

 7   collection through our client's IT department.  They have to

 8   send it to our e-discovery vendor.  We do a full upload, which

 9   I understand that you understand is very expensive storage

10   costs and uploading costs, and we pay vendors hourly to go

11   through them and then we run the search terms on everything.

12           So in order to do a hit report on anyone that we

13   haven't done a full file collection from would require another

14   initiation of an e-discovery process, and that's why when we

15   realized that these "go get" people only had a few documents

16   that they sent us and said we think these sound relevant to how

17   their in-house counsel described the case and found the ones

18   from that that were responsive, that's why, again,

19   proportionality didn't seem -- or we concluded it wouldn't have

20   been productive, especially with the full file collect

21   custodians we had, as you explained, the small percentage that

22   even ended up being responsive.

23           THE COURT:  Okay.  Well, that does explain why it

24   didn't happen.  You know, I didn't know that when I ordered it

25   for certain.  I think that kind of relief that I was ordering
```

1  back then, though I presumed incorrectly, was just a matter of

2  a vendor doing a couple runs and not -- I didn't realize what

3  the collection protocol looked like, that it was more limited.

4  That does make sense because you have to pay for all that stuff

5  to be stored.

6          So you have the answer to that, Mr. Gerbie, and it's a

7  fair question to be asking.  Hearing that answer, though, I

8  don't think you're entitled to further relief.  Nothing has

9  changed.  I guess the better way to say it is nothing has

10  changed in the way I'm seeing this.

11          MR. GERBIE:  We understand, Your Honor, but our

12  perspective is that even if we had had a disagreement or raised

13  the search terms question on December 21st, 2024, that wouldn't

14  have changed that the defendant's selected from our

15  perspective, you know, convenient individuals for a search.  We

16  weren't able to identify these people until today -- until

17  relatively recently, and we believe we're bringing those

18  individuals to the Court promptly.

19          MS. KEELEY:  Judge, we understand this isn't a game.

20  We're not picking and choosing.  This keeps coming up that they

21  weren't given custodians in December.  They didn't ask for them

22  until they were here before you.  I think this is just getting

23  a little out of control.

24          THE COURT:  I mean, I am confident if on December

25  21st, again, with Christmas carols playing in the background,

1    you had called Ms. Keeley and said, "look, we don't even know

2    who these custodians -- what custodians you are talking about,"

3    we would have a whole different background here.

4            MR. GERBIE:  Understood, Your Honor.

5            THE COURT:  And I don't think it would -- you know, we

6    wouldn't be here.  You know, if Ms. Keeley or her colleagues

7    were like "we're not going to tell you the custodians," they

8    would have been laughed out of the court, whether here or down

9    at the Daley Center, you know.

10           MR. GERBIE:  Understood, Your Honor.  Candidly, this

11   is -- you know, we are complying with -- we had this discussion

12   last week.

13           THE COURT:  Yes, you're right.

14           MR. GERBIE:  And Your Honor asked us -- thought it was

15   a reasonable perspective to say we didn't know who the

16   custodians were until -- we still didn't.  As of last week, we

17   didn't know who the custodians were.  So that was provided to

18   us in response to --

19           THE COURT:  Did you not ask?

20           MS. KEELEY:  Not until we were before Your Honor, no,

21   they didn't.

22           THE COURT:  I mean --

23           MR. GERBIE:  Your Honor, I can't speak to what

24   happened before I appeared before Your Honor.  We handled this

25   at least in some detail last week, and Your Honor knew that we

```
 1    did not know who the custodians were even last week.
 2          THE COURT:  You are 100 percent right that I didn't.
 3    What I did not know is in December the custodians weren't
 4    identified.  I don't know when I -- I don't know if I knew.
 5    Maybe it's in the transcript, and I'll stand corrected.  I
 6    don't know when I knew that you didn't know the custodians
 7    until very recently.  But again, did someone ask and Ms. Keeley
 8    say:  I'm not telling you, it's my secret?
 9          MR. GESKE:  Well, Your Honor, in February when we
10    provided them with a proposed ESI protocol, it had here's how
11    many search terms we would be limited to and here's how many
12    custodians we would be limited to.
13          Then the response that we got from them was:  We're
14    not even going to talk to you about an ESI protocol because we
15    already did our own search.
16          THE COURT:  Yes.
17          MR. GESKE:  So that was the response that we got at
18    that time.
19          THE COURT:  Right.
20          MS. KEELEY:  And that does not identify custodians,
21    either.  I remember there being a vague number in the ESI --
22    this boilerplate protocol that they drafted of custodians they
23    would like.  But even at that time, no, they did not ask for
24    names and they did not give us names that they wanted to be
25    custodians.
```

```
 1              THE COURT:  Yes, I remember looking at that earlier
 2    when I first got the case because it was -- and I don't mean
 3    this in a negative way -- it was a general boilerplate ESI
 4    protocol, correct?
 5              MR. GESKE:  Well, it was a --
 6              THE COURT:  It wasn't -- let me put it this way.  I
 7    know the answer, but sometimes I'll see ESI protocols where the
 8    hit reports have been exchanged, custodians, search terms, and
 9    it says:  These are the custodians, these are the search terms,
10    and this is what we're going to produce.
11              Then I sign those because both sides are saying this
12    will satisfy our Rule 26 obligation from a producing party's
13    standpoint, and the discovery-requesting party is saying we
14    believe that meets our obligation to diligently pursue our
15    case, or vice versa, depending on how you're looking at it.
16    But the one I looked at didn't have that.  It was more like
17    here's how ESI is going to work.
18              MR. GESKE:  Yeah, I think that's correct.  It didn't
19    -- the ESI protocol itself did not list who the custodians were
20    or what the search terms would be.  I think it was prepared
21    based on a template from the Northern District of Illinois.
22    But again, the response that we got was:  We're not going to
23    discuss this with you.  We're not going to meet and confer
24    about it.  We think that what we did on our own is all that we
25    needed to do.
```

1          THE COURT:  Right, and you understood.  Like there is

2     a difference when the court order says that this is the ESI

3     protocol versus a party saying:  I'm meeting my Rule 26

4     obligations, and this is how I have done it.

5          MR. GESKE:  Yes.

6          THE COURT:  Okay.  So it is not uncommon in my

7     experience for a party to say:  We're not entering an

8     agreement, and we don't want you to sign an order, Judge,

9     saying that this meets Rule 26.  We're just going to do it, and

10    we can duke it out on the fringes, which is what's happened

11    here, whether by default or by design, I don't know.

12         MR. GESKE:  Right, and I think that that's similar to

13    what we've endeavored to do here.  These very limited

14    custodians and these very limited search terms are, as Your

15    Honor said, the fringes of the --

16         THE COURT:  And that's why you're getting the relief

17    that you're getting, which is that I'm ordering the defendant

18    to do "go get" searches for those individuals and supplement

19    the three that already were "go getted."  Excuse the verbiage.

20         I mean, you have a date at the end of July.  You're

21    trying to get depositions done, and now you're asking them to

22    spend I don't know how much time going through potential ESI

23    searches.  It's not happening, and that is for all the reasons

24    I've said.  On top of which the stuff that has been produced,

25    the numbers absolutely confirm my belief, which is that this is

1    not an ESI-heavy case.  It's a lot of money and time going into

2    looking through emails to produce very few, and there's a way

3    that people for years, decades, hundreds of years, conducted

4    depositions without having emails.  I trust that you're able to

5    do that.

6              MR. GESKE:  Yes.  I don't know if hundreds of years

7    ago they had biometric technology but, yes, we can do our best.

8              THE COURT:  No, but they had -- if someone built a

9    Ford motor car that didn't work right, someone figured out what

10   questions to ask to prove that true.

11             All right.  So I've covered the ESI.  I've covered the

12   30(b)(6).  I've covered the depositions.  I am going to set a

13   status date, but before I get there, anything else from

14   plaintiffs that you want to talk about?

15     (Discussion off the record.)

16             MR. GERBIE:  Yes, Your Honor.  We'd like a short

17   accommodation to the deadline to move to compel all third party

18   compliance with our issued subpoenas, a seven-or-14-day

19   extension, if Your Honor will permit it, from I believe the

20   27th to a week or two beyond that.

21             THE COURT:  Do you know where on the docket we have

22   that date?

23             MR. GERBIE:  I think it was last week's order.

24             MS. KEELEY:  Yeah, that's what I'm seeing, 96.

25             THE COURT:  96?  Give me a second.

1     (Discussion off the record.)

2          THE COURT:  And, Mr. Gerbie, you're asking for, you

3     said, two weeks?

4          MR. GERBIE:  Yes, Your Honor.

5          THE COURT:  So July 13th.

6     (Discussion off the record.)

7          THE COURT:  Oh, sorry.  I'm looking at June.  Sorry.

8     July 11th.  Any objection, Ms. Keeley?

9          MS. KEELEY:  No.

10          THE COURT:  That motion will be granted.

11          MR. GERBIE:  Thank you, Your Honor.

12          THE COURT:  Anything else like that or other things, I

13     should say, in general?

14          MR. GERBIE:  No, Your Honor.  I just -- we're going to

15     go about going to the Hague, so we'll keep you posted.

16          THE COURT:  Yes.  I don't --

17          MR. GERBIE:  Understood, Your Honor.

18          THE COURT:  If you need -- I know sometimes you need

19     stuff from here.  We're happy to do that, and we'll get that

20     turned around.  Okay.  You're good?

21          MR. GERBIE:  Yes, sir.

22          THE COURT:  Okay.  From defendant?

23          MS. KEELEY:  Nothing further.

24          THE COURT:  All right.  So we've got July 7th for our

25     status.

1      (Discussion off the record.)

2           THE COURT:  Okay.  Can you do 10:00 o'clock on the

3      7th?  I've got a settlement conference at 10:00, but

4      otherwise -- or 10:30, but otherwise you're going to be sitting

5      through a 9:15 call, which isn't going to be good for you.

6           MS. KEELEY:  Thank you.  10:00 o'clock works for me if

7      it works for plaintiffs.

8      (Discussion off the record.)

9           MR. GERBIE:  Yes, Your Honor.

10          THE COURT:  It does work for you?

11          MR. GERBIE:  July 7th at 10:15 or 10:00?

12          THE COURT:  10:00.

13          MR. GERBIE:  Yes, Your Honor.

14          THE COURT:  Okay.  And then please file a status

15     report by noon on --

16     (Discussion off the record.)

17          THE COURT:  You can just -- if you want to file a

18     status report the morning of the 7th, you can do that or you

19     can tell me where things are.  I don't want to ruin your

20     weekend, so I'm not going to make you do something on the 3rd,

21     you know.

22          MR. GERBIE:  Thank you, Your Honor.

23     (Discussion off the record.)

24          THE COURT:  Yes, you do need to do the meet-and-confer

25     and have all that done by the 3rd.

1          MR. GERBIE:  Understood, Your Honor.

2          THE COURT:  But you can -- even if you file something

3    real short saying these are some points you'd like to cover on

4    the 7th, great.  Otherwise, I can do it on the fly.

5          All right.  Thank you all very much.

6          MR. GERBIE:  Thank you, Your Honor.

7          MS. KEELEY:  Thank you, Judge.

8          THE COURT:  Thanks.  Mr. Gerbie, don't forget this.

9          MR. GERBIE:  Yes, Your Honor.

10         THE COURT:  Thanks a lot.

11      (Proceedings concluded at 3:54 p.m.)

12                    C E R T I F I C A T E

13      I certify that the foregoing is an accurate transcript

14    produced from an audio recording of the proceedings in the

15    above-entitled matter.

16    /s/Patrick J. Mullen          June 20, 2025

17    _____           _____
      Patrick J. Mullen
      Retired Official Court Reporter

18

19

20

21

22

23

24

25

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RANDOLPH FRESHOUR and VINCENZO ALLAN, each individually and on behalf of similarly situated individuals, | ) ) ) ) | |
| | ) | No. 1:23-cv-02667 |
| *Plaintiffs*, | ) ) | Hon. Virginia M. Kendall |
| v. | ) ) | Magistrate Judge M. David Weisman |
| CERENCE INC., a Delaware corporation, | ) ) ) | |
| *Defendant.* | ) ) | |

## AMENDED NOTICE OF RULE 30(b)(6) DEPOSITION OF CERENCE INC.

YOU ARE HEREBY NOTIFIED THAT pursuant to Rules 26 and 30(b)(6) of the Federal Rules of Civil Procedure and all applicable local rules, Plaintiffs Randolph Freshour and Vincenzo Allan, through counsel, will take the deposition of Cerence Inc.'s (hereinafter "You" or "Cerence") corporate designee or designees who are the most knowledgeable on the topics listed below, on oral examination before a notary public or any other duly authorized officer, beginning at 10:00 a.m. on August 20, 2025, at the office of McGuire Law, P.C., 55 W. Wacker Dr., 9th Fl., Chicago, IL 60601, or at such other place and time as is agreed upon, and continuing day to day until completed or otherwise agreed to by the Parties. The deposition will be recorded stenographically and by audio and visual means.

PLEASE TAKE FURTHER NOTICE THAT, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Cerence must designate one or more officers, directors, managing agents, or other persons to testify on its behalf, with the persons so designated to testify as to matters known or reasonably available to Cerence as to the following topics on which examination is

1

requested. The deposition will be taken in accordance with and for all purposes permissible under the Federal Rules of Civil Procedure.

**Definitions**

1.  "APPROXIMATE LOCATION" means or refers to a geo-location data point derived from an original user location input (e.g. CERENCEINC–00002167, CERENCEINC–00006896).

2.  "BIPA" means or refers to the Illinois Biometric Information Privacy Act, 740 ILCS 14/1, *et seq*.

3.  "BIOMETRIC(S)" and/or "BIOMETRIC DATA" means or refers, collectively, to Biometric Identifiers and/or Biometric Information—as those terms are defined and used in BIPA, including the "unique characteristics and/or patterns of [an individual's] voice" that are unique to an individual or that otherwise could be utilized to identify, authenticate, or verify a speaker, as well as any data or information based on, extracted from, or derived from the foregoing used "for identification and verification purposes." Corrected Third Amended Complaint ¶ 2.

4.  "CERENCE VOICE TECHNOLOGY" means or refers to any and all voice recognition software, hardware, technology, or related products and services that You sell, license, or otherwise provide to automotive manufacturers and that You use or have used to collect, capture, purchase, receive through trade, or otherwise obtain Biometric Data. For purposes of these Topics, "CERENCE VOICE TECHNOLOGY" includes, but is not limited to: Nuance Voice Security Library (NVSL) and biometric recognition components of the following: Input AI Technologies with Biometrics; Cerence Drive and the Cerence Drive Framework (e.g. CERENCEINC-00000059); Dragon Drive and the Dragon Drive Framework (e.g. CERENCEINC-00006839); VoCon; Speech Signal Enhancement ("SSE"); Passive Identification

2

with Voice Biometrics; Implicit Enrollment with Voice Biometrics; Passive Authentication with Voice Biometrics; Deep Neural Network ("DNN") Technology (e.g. CERENCEINC-00000309); Multi-Seat Intelligence (e.g. CERENCEINC-00006817); Just Talk; and all software, hardware, and technology in Mercedes-Benz vehicles that utilizes or is powered by the foregoing "that, when combined with other technology on the automobile, is capable of implementing voice commands and Identifying, within certain parameters, a speaker in an automobile." (Answer at 7). "CERENCE VOICE TECHNOLOGY" shall also include any former or alternate versions of these products or services that may have been previously marketed or provided under different names by Nuance, as well as any iterations, predecessors, or rebranded technologies now incorporated under Cerence. Notwithstanding the foregoing, expressly excluded from "CERENCE VOICE TECHNOLOGY" are any technologies that were not deployed in Mercedes-Benz vehicles sold in the U.S. during the Relevant Time Period.

5.      "COMPLAINT" means or refers to Plaintiffs' Corrected Third Amended Class Action Complaint filed in the above-captioned matter on June 18, 2024.

6.      "DEVICEID," "DEVICE_ID," or "DEVICE ID," means or refers to the unique identifier assigned to a specific hardware device, embedded module, or software instance that has deployed or integrated from Cerence Voice Technology in Mercedes-Benz automobiles sold in the U.S. DEVICEID includes, but is not limited to, any pseudonymized, hashed, static, or structured value used by Cerence to Identify a discrete voice-enabled device across Cerence's runtime, research, or product improvement infrastructure as well as any value logged alongside a UserID and other metadata for purposes of consent filtering, audit control, or data governance enforcement.

7.      "MERCEDES-BENZ END USER" means or refers to any individual who used

3

Cerence Voice Technology as deployed in Mercedes-Benz vehicles in the U.S. during the Relevant Time Period.

8. "NUANCE COMMUNICATIONS, INC.," or "NUANCE" means or refers to Nuance Communications, Inc. as well as any of its divisions or subsidiaries. For purposes of these Topics, "NUANCE" expressly includes Nuance Communications Ireland Limited, Nuance Communications UK Limited, and Nuance Communications Deutschland GmbH.

9. "PLAINTIFFS" means or refers to Plaintiffs Randolph Freshour and Vincenzo Allan.

10. "RECORDS" means all documents as defined under the Federal Rules, files, and information in any form or medium, including but not limited to: papers, writings, drawings, graphs, charts, photographs, sound recordings, images, electronically stored information (ESI), emails, text messages, instant messages, voicemails, databases, spreadsheets, logs, source code, object code, algorithms, metadata, backup files, archived files, cache files, temporary files, system files, configuration files, audit trails, access logs, handwritten notes, memoranda, reports, analyses, contracts, agreements, communications, correspondence, and any other data or data compilations stored in any medium from which information can be obtained, translated if necessary, into reasonably usable form, whether in Cerence's direct possession, custody, or control, or in the possession, custody, or control of its agents, representatives, affiliates, or third parties acting on its behalf.

11. "RELEVANT TIME PERIOD," means the time period between March 24, 2018 and the present. Unless stated otherwise, the following topics pertain to the Relevant Time Period.

12. "SOURCE CODE" shall mean coding or computer coding for voiceprint creation, speaker identification, wake word detection, natural language understanding, and related

functions, whether authored by Cerence or integrated from Nuance.

13. "VOICE DATA" means any and all information derived from, related to, or associated with Mercedes-Benz End User voice inputs, including but not limited to: raw voice recordings, utterances, processed audio files, voiceprints, voice templates, user acoustic profiles, acoustic features, spectral characteristics, voice models, speaker embeddings, or voice commands that are unique to an individual or that otherwise could be utilized to identify, authenticate, or verify a speaker, as well as any data or information based on, extracted from, or derived from the foregoing used "for identification and verification purposes." Corrected Third Amended Complaint ¶ 2.

### Topics For Deposition Pursuant to Federal Rule 30(b)(6)

1. Your contracts or agreements with Daimler AG relating to Your provision of Cerence Voice Technology for Mercedes-Benz vehicles sold in the U.S. during the Relevant Time Period.

2. The Cerence Voice Technology and related services that You sell, license, or otherwise provide for use or integration in Mercedes-Benz automobiles sold in the U.S.

3. The user identification functionalities of Cerence Voice Technology in Mercedes-Benz vehicles sold in the U.S., including Your knowledge of the use cases and how Mercedes-Benz End Users use their voice to interact with such Cerence Voice Technology.

4. Your use of cloud storage or cloud computing services for data storage or data processing of Mercedes-Benz End User Voice Data or Biometric Data for Cerence Voice Technology in Mercedes-Benz vehicles during the Relevant Time Period.

5. Your knowledge regarding the software, Source Code, engines, or services, that You license, purchase, or otherwise receive from Nuance for integration in Mercedes-Benz

vehicles sold in the U.S. during the Relevant Time Period, as well as any contracts or agreements for the same.

6.      Your knowledge concerning the functionalities and voice recognition use cases of the NTG6, NTG7, MBUX, and Gen20x products or platforms in Mercedes-Benz automobiles when integrated with Cerence Voice Technology.

7.      Your collection or receipt of Voice Data or Biometric Data from Mercedes-Benz End Users who interact with Cerence Voice Technology, as well as how that data is collected, stored, processed, transmitted, and/or disseminated to You or by You.

8.      Your publicly available policies regarding the retention, destruction, or storage of Voice Data or Biometric Data collected or obtained from Mercedes-Benz End Users who interact with Cerence Voice Technology.

9.      Your use, storage, and processing of Mercedes-Benz End User Voice Data and Biometric Data, including but not limited to such data stored within Your Runtime Environment and GRID Server.

10.     Your use of Mercedes-Benz End User Voice Data and Biometric Data to improve Your products and services including Cerence Voice Technology.

11.     Your transmission or dissemination of Mercedes-Benz End User Voice Data, Biometric Data, and/or data derived therefrom, to any third parties.

12.     Your collection or receipt of any personally identifying information, including Approximate Locations, associated with Voice Data or Biometric Data of Mercedes-Benz End Users who made a voice command with Cerence Voice Technology during the Relevant Time Period.

13.     Your practices, policies, and procedures relating to any spectral analysis or

processing of acoustic features unique to individuals from Mercedes-Benz End User voice recording(s), Voice Data, or Biometric Data gathered from vehicles integrated with Cerence Voice Technology that can be used to identify Mercedes-Benz End Users by their voices.

14.     Any consents or permissions obtained from Mercedes-Benz End Users to collect, store, process, or use Voice Data or Biometric Data.

15.     The profit or revenue You receive from the sale, licensing, or provision of Cerence Voice Technology for use in Mercedes-Benz automobiles.

# EXHIBIT 3

| | |
|---|---|
| **From:** | Paul Geske <pgeske@mcgpc.com> |
| **Sent:** | Friday, January 9, 2026 4:58 PM |
| **To:** | Keeley, Mehgan E. H. (SHB) |
| **Cc:** | David Gerbie; Brendan Duffner; Wolfe, Matthew (SHB); Cho, Amy (SHB); Malin, Elise N. (SHB); Bernstein, Sam (SHB) |
| **Subject:** | Re: Freshour v. Cerence |

**<span style="color:red">EXTERNAL</span>**

Hi Mehgan,

We are not willing to withdraw the motion to strike, and your proposed compromise does not cure the issues we raised in the motion.

On Fri, Jan 2, 2026 at 11:06 AM Keeley, Mehgan E. H. (SHB) <mkeeley@shb.com> wrote:

> Paul,
>
> I'm following up on our email below.
>
> Thanks,
>
> Mehgan
>
> **Mehgan E. Keeley**
> *Associate*
> Shook, Hardy & Bacon L.L.P.
>
> 312-704-7712 | mkeeley@shb.com
>
> 

---

**From:** Keeley, Mehgan E. H. (SHB) <mkeeley@shb.com>
**Sent:** Sunday, December 21, 2025 10:44 AM
**To:** Paul Geske <pgeske@mcgpc.com>; David Gerbie <dgerbie@mcgpc.com>; Brendan Duffner <bduffner@mcgpc.com>
**Cc:** Wolfe, Matthew (SHB) <MWOLFE@shb.com>; Cho, Amy (SHB) <ACHO@shb.com>; Malin, Elise N. (SHB) <emalin@shb.com>; Bernstein, Sam (SHB) <sbernstein@shb.com>
**Subject:** Freshour v. Cerence

Paul,

We are emailing about the Motion to Strike filed on Friday. We disagree with your characterization of the discovery period, but as a compromise, we are willing to produce Jorge Tsuboyama for a 3-hour deposition on the statements set forth in his declaration. Please let us know your thoughts and if you will withdraw the motion.

Mehgan

**Mehgan E. Keeley**
*Associate*
Shook, Hardy & Bacon L.L.P.

312-704-7712 | mkeeley@shb.com



CONFIDENTIALITY NOTICE: This e-mail message including attachments, if any, is intended for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. Thank you.

--
# Paul T. Geske
## McGUIRE LAW, P.C.
55 W. Wacker Dr., 9th Fl.
Chicago, Illinois 60601
pgeske@mcgpc.com
T: (312) 893-7002 ext. 4
D: (312) 820-9005
F: (312) 275-7895
www.mcgpc.com

CONFIDENTIALITY NOTE:
This e-mail is intended only for the individual or entity to which it is addressed and may contain information that is privileged or confidential under applicable law. If the reader of this e-mail message is not the intended recipient, or the employee or agent responsible for delivery of the message to the intended recipient, you are hereby notified that any dissemination,

distribution, or copying of this communication is prohibited. If you have received this e-mail in error, please notify us immediately by telephone at (312) 893-7002 and indicate the sender's name. Thank you.

# EXHIBIT 4

```
 1                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3
     RANDOLPH FRESHOUR and VINCENZO      )  No. 23 C 2667
 4   ALLAN, each individually and on     )
     behalf of similarly situated        )
 5   individuals,                        )
                                         )
 6                    Plaintiffs,        )
                                         )
 7             vs.                       )
                                         )
 8   CERENCE, INC., a Delaware           )
     corporation,                        )  Chicago, Illinois
 9                                       )  August 13, 2025
                      Defendant.         )  11:13 a.m.
10

11                     TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE M. DAVID WEISMAN, MAGISTRATE JUDGE
12

13   APPEARANCES:

14   for the Plaintiffs:   MCGUIRE LAW, P.C.
                           BY:  MR. PAUL T. GESKE
15                              MR. DAVID L. GERBIE
                           55 West Wacker Drive, 9th Floor,
16                         Chicago, Illinois  60601

17
     for the Defendant:    SHOOK, HARDY & BACON, LLP
18                         BY:  MS. MEHGAN E. H. KEELEY
                           111 South Wacker Drive, Suite 4700,
19                         Chicago, Illinois  60606

20

21                          PATRICK J. MULLEN
                         Retired Official Court Reporter
22                        United States District Court
                           219 South Dearborn Street
23                         Chicago, Illinois  60604
                              (708) 935-1931
24
                         *   *   *   *   *
25
            TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION
```

2

```
 1    APPEARANCES:   (Continued.)

 2    For Subpoena
      Respondent MBUSA:        LEWIS, BRISBOIS, BISGAARD & SMITH LLP
 3                             BY:  MR. DANIEL W. MYERSON
                               550 West Adams Street, Suite 300,
 4                             Chicago, Illinois  60661

 5    For Subpoena
      Respondent Nuance:       JENNER & BLOCK LLP
 6                             BY:  MR. DAVID C. LAYDEN
                               353 North Clark Street,
 7                             Chicago, Illinois  60654

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1    (Proceedings in open court.)

 2         THE CLERK:  23 CV 2667, Pena versus Cerence,

 3    Incorporated.

 4         THE COURT:  All right.  Good morning.  For plaintiffs?

 5         MR. GERBIE:  Good morning, Your Honor.  David Gerbie

 6    on behalf of plaintiffs.

 7         MR. GESKE:  Good morning, Your Honor.  Paul Geske for

 8    plaintiffs.

 9         THE COURT:  Good morning to both of you.

10         For defendant?

11         MS. KEELEY:  Mehgan Keeley for defendant.

12         THE COURT:  Good morning, Ms. Keeley.

13         And for MBUSA?

14         MR. MYERSON:  Good morning, Your Honor.  Daniel

15    Myerson for Mercedes-Benz USA.

16         THE COURT:  Good morning.

17         MR. LAYDEN:  And good morning, Your Honor.  David

18    Layden for Nuance.

19         THE COURT:  Good morning.  All right.  Give me one

20    second.  So I looked at the status report, and I want to

21    discuss the MBUSA issue.  Give me a minute.

22    (Pause.)

23         THE COURT:  All right.  I'm a little bit confused, to

24    be candid.

25         So, Mr. Gerbie, it sounds like you tried to set up an

4

```
1    agreement with MBUSA to get a declaration as opposed to the
2    need to conduct a 30(b)(6) deposition, correct?
3            MR. GERBIE:  Yes, Your Honor.  It was something we
4    discussed at the last hearing in our trying to be flexible.
5    Their position was that they're a neutral third party and that
6    this is burdensome, so we -- as mentioned at the hearing.  They
7    reached out to us after the hearing, and we said:  Great.
8    We're happy to do that, but we have two conditions.
9            And as you saw from the attached correspondence, we
10   were not able to reach agreement.
11           THE COURT:  And so one of the conditions was a
12   confirmation that -- and I'm reading from your version:
13           "Plaintiffs asked MBUSA to confirm whether it has a
14   joint defense agreement or similar arrangement with Cerence."
15           And then the limited confidentiality:
16           "Plaintiffs requested that communications about draft
17   declarations and the drafts themselves remain confidential to
18   protect plaintiffs' work product and litigation strategy."
19           Putting aside the joint defense agreement or similar
20   arrangement, I'm confused on the limited confidentiality issue.
21   So you wanted MBUSA to agree, and I envisioned this through
22   email, but it could be through phone calls, too, I suppose,
23   where you're talking with Mr. Myerson and saying:  Hey, here
24   are the questions we're interested in.  This is the information
25   we're interested in, and this is what we're looking for.
```

1           Then you did not want Mr. Myerson -- you wanted

2    Mr. Myerson to agree that he would not share that exchange

3    with Ms. Keeley or her colleagues on behalf of Cerence.

4           MR. GERBIE:  Yes, Your Honor.

5           THE COURT:  Okay.  So I can understand that thought

6    process, certainly, if you and Mr. Geske were saying what about

7    this and we should be asking about that, how that's comfortably

8    within work product.  So your emails back and forth within the

9    firm about the declaration, I would and I think most people

10   would acknowledge that as work product.  It informs your

11   strategy as to the deposition or the declaration, however you

12   go about getting the information.

13          Your thought was that if you shared that with

14   Mr. Myerson, you wanted him to keep it confidential as well.

15          MR. GERBIE:  Yes, Your Honor.

16          THE COURT:  Okay.  So tell me this.  When Ms. Keeley

17   sends the subpoena to Mr. Myerson and says she wants the emails

18   between you and him, why wouldn't he have to produce those,

19   because the only way I think that works is if you have an

20   agreement, a signed agreement, which happens where you have

21   joint defense or joint prosecution agreements with

22   Mr. Myerson.  Whether it's written or oral, that's what you'd

23   be saying you'd want.

24          MR. GERBIE:  Well, Your Honor --

25          THE COURT:  Hold on.  Because that would be the only

6

```
 1    way that Ms. Keeley -- Mr. Myerson could come in here and say:

 2    Judge, I'm not producing these.

 3            MR. GERBIE:  I appreciate that, Your Honor.  Again, we

 4    were seeking to reach an agreement with that.

 5            THE COURT:  But do you understand, if you appreciate

 6    that, that's the same thing you're all bent out of shape over

 7    with Mr. Myerson and Ms. Keeley?

 8            MR. GERBIE:  Your Honor, if the communications

 9    regarding --

10            THE COURT:  Well, wait.  What am I missing?

11            MR. GERBIE:  What I'm saying is that we would like

12    to -- our perspective is we want to take a deposition.  We've

13    noticed topics that are well within the scope of what we

14    believe is permissible and discoverable information.  We sought

15    that deposition four months ago.  We're here now, having done

16    numerous meet-and-confers on the topics, and we're trying to be

17    flexible in agreeing to entirely eliminate the need for a

18    deposition and instead, you know, replace that with sworn

19    testimony through a declaration.  So, you know --

20            THE COURT:  Right.  So we can have a hard stop there

21    and say that didn't happen.  We couldn't get there.

22            MR. GERBIE:  Well, we haven't gotten there yet.

23            THE COURT:  Okay.  But you're -- that part I'm fine

24    with.  So we need to have the deposition.  I'm completely

25    perplexed by your position that somehow MBUSA has done
```

7

```
 1   something sanctionable, that they've done something wrong,
 2   because honestly what I just walked through with you is exactly
 3   why what they're doing is totally fine.  Because if you set
 4   that deal up and Mr. Myerson had, I would say, probably the bad
 5   judgment to accept it, Ms. Keeley, when she sends the subpoena
 6   over, is going to get those communications.
 7            MR. GERBIE:  Your Honor, again, that may be
 8   discoverable.
 9            THE COURT:  But that's what you're complaining about
10   that they've done.
11            MR. GERBIE:  Your Honor, if the parties are able to
12   reach a declaration or were able to reach a declaration --
13            THE COURT:  They're not parties.  It's not parties.
14            MR. GERBIE:  I'm sorry.  I apologize, Your Honor.  If
15   plaintiffs and MBUSA were able to reach a declaration, we
16   wouldn't have a problem, even without conferring with
17   co-counsel, with the substance of the communications being
18   discoverable information.
19            THE COURT:  Substance?  The communications.
20            MR. GERBIE:  That's what I'm -- yes, Your Honor.
21            THE COURT:  Yes.
22            MR. GESKE:  So we're only --
23            THE COURT:  But you're complaining because they
24   wouldn't agree to it.  You're telling me:  Oh, we would be okay
25   with that.
```

8

```
 1           But you spend four pages in the status report telling
 2    me:  They wouldn't agree to this, and look how unreasonable
 3    they are.
 4           MR. GERBIE:  Your Honor, our perspective is that the
 5    information ultimately coming into Cerence's possession is
 6    different than it happening while the parties are preparing to
 7    conduct finally a 30(b)(6) deposition of Cerence, you know, a
 8    week before that or two weeks before that, a deposition of
 9    MBUSA, and potentially a deposition of Nuance.
10           THE COURT:  Is that anywhere in your status report, by
11    the way?
12           MR. GERBIE:  Well, I think, I think we're colorably
13    explaining why we believe that we want our work product
14    protected.  So, you know --
15           THE COURT:  But, look, you're going to get your
16    deposition.  You have the uncanny ability to find issues that
17    simply don't exist and make no sense.  You are literally asking
18    MBUSA to do the exact same thing you find so offensive that
19    they may be doing for good reason, I might add, with Cerence.
20    You know this.  Across corporate America, companies that do
21    business together, their attorneys often get on the phone and
22    talk to each other.
23           MR. GERBIE:  Yes, Your Honor.
24           THE COURT:  That is not sanctionable.  That's not
25    unethical.  There's nothing about that that is wrong.
```

```
 1              MR. GERBIE:  And you're right.  You're right.  That's

 2    totally fine, and that's why our position --

 3              THE COURT:  I'm glad because it's happening.  It's

 4    probably happening right now somewhere.

 5              MR. GERBIE:  Well, that's why our position is if

 6    that's the case, we just want to know and that's fine.  So then

 7    we don't want to have in-depth, you know, litigation strategy

 8    conversations with you if that is the state of affairs.  So if

 9    it's -- to the extent it's not --

10              THE COURT:  Then why didn't you just write that?  Why

11    didn't you just say:  We tried to talk through this, and

12    practically it's really not going to work so we need to do the

13    deposition.

14              MR. GERBIE:  I apologize if Your Honor feels that I

15    overstepped in using the language in the status report, but

16    that is our position.  We believe that there's been a

17    representation that MBUSA has been a completely neutral third

18    party, and this has been going on for a number of months.  So

19    if there's a joint defense agreement at issue --

20              THE COURT:  I don't even know where -- I have to

21    respectfully disagree with that.  I don't know where it even

22    came from that they're a neutral third party.  They are

23    certainly not a party to this litigation, but I've got to be --

24    maybe they said that.

25              Did you?  Did you that say, Mr. Myerson, that you're a
```

1    neutral third party?

2         MR. MYERSON:  Not to my knowledge, ever.

3         THE COURT:  Okay.  Maybe they have and he doesn't

4    remember.  I don't remember, but I have to tell you it shocks

5    me to think that two companies that have built a car

6    together -- and I know that Ms. Keeley's client has played a

7    smaller role in that part, but they have an ongoing or did have

8    an ongoing business relationship.  They worked together to

9    design a product that people spend a lot of money for.  So they

10   are -- they have a business relationship.  They still may have

11   a business relationship.

12        I didn't think that they were neutral in that regard,

13   and because of that I certainly didn't think it would be odd

14   for Mr. Myerson to call up Ms. Keeley and say "can you tell me

15   what you're thinking about this because I'm confused about

16   that" when they were talking.

17        MR. GERBIE:  That's a totally fair position, and

18   ultimately that's why we said we don't think this is workable.

19        THE COURT:  That's good.

20        MR. GERBIE:  If you can't agree, we don't think it's

21   workable.  So we'll proceed with the deposition.

22        THE COURT:  I don't know.

23        MR. GERBIE:  And that's where we are.

24        THE COURT:  I mean, I read three pages, including the

25   proposed path forward and potential sanctions, and I'm

1    confused.  You know, like I don't understand this.  There is so

2    much conflict in our world today, and when you have an attorney

3    who has come in and said we're trying to work through this or

4    you're trying to work through this and it didn't work out,

5    fine.

6              MR. GERBIE:  Understood, Your Honor.

7              THE COURT:  And the things that didn't work out are

8    not things that shocked me.  It's shocking to me that you find

9    them shocking.  That's shocking to me.  But the fact that

10   they're not going to say whether or not they have a joint

11   defense agreement, they may or they may not.  They may have

12   some other kind of agreement.  That's all fine.  It happens

13   every day.

14             MR. GERBIE:  I understand.  Your Honor, again, you

15   know, we wanted testimony through a deposition.  We were trying

16   to be flexible in this.  You know, due to their request, they

17   preferred to have a declaration, and we said:  Okay.  If you

18   prefer to have a declaration, we can do that.  We just don't

19   want to share with you, you know, our specific list of

20   questions.

21             And, you know, I've been in a situation before where

22   you enter into negotiations and drafts are exchanged and

23   ultimately there is no execution of that, and that can be

24   shared.  We believe that's work product, and it shouldn't be

25   shared, particularly with a party.  I think Your Honor

1  understands that.  So I apologize for the suggestion.

2          THE COURT:  But, Mr. Gerbie, when you share your work

3  product with someone else, it's no longer privileged by

4  definition.

5          MR. GERBIE:  Well, absent an agreement.

6          THE COURT:  Absent an agreement, which is exactly what

7  you think MBUSA and Cerence have done, and you think that's

8  wrong.

9          MR. GERBIE:  I don't think that's wrong.  I just want

10  to know if that's the case --

11          THE COURT:  That's fair.

12          MR. GERBIE:  -- before I share my work product with

13  them.

14          THE COURT:  That's fair.  That's fair.

15          MR. GERBIE:  It's not wrong.  Of course, that happens

16  all the time.

17          THE COURT:  Yes, and that is fair.

18          MR. GERBIE:  Thank you, Your Honor.

19          THE COURT:  Anyway, you're going to get your

20  deposition, but it's going to be after Cerence's.

21          Ms. Keeley, where does the Cerence deposition stand?

22          MS. KEELEY:  Location?  Is that "where"?

23          THE COURT:  And when.

24          MS. KEELEY:  Oh, when.  I'm sorry.  August 20th in

25  Chicago.

1      THE COURT:  Okay.  Then, Mr. Myerson, you're going to

2   need to have someone teed up soon thereafter.  Where are we on

3   the 30(b)(6) issues, the notice and the issues?

4      MR. MYERSON:  So what Your Honor had said last time is

5   that after Cerence's 30(b)(6) is completed, then plaintiffs

6   will give us a copy --

7      THE COURT:  That's right.

8      MR. MYERSON:  -- and we'll figure out what else is

9   needed, and we may possibly bifurcate the class certification

10  issues from the substantive issues as well.

11     THE COURT:  Okay.

12     MR. MYERSON:  But all that was to be decided after the

13  Cerence deposition.

14     I will say, you know, just as one last, you know,

15  thing to try to see if this declaration can be done, we had

16  actually made an offer back to plaintiffs just to say very

17  specifically:  If you want to give us a list of questions, we

18  actually would agree to consider that as your work product.

19     Then if Cerence wants to come and subpoena or request

20  it, we won't voluntarily give it unless you, Your Honor, says

21  it has to be produced.  That was the offer we made to them, you

22  know, in an attempt to try to get this done.  So we did make

23  that offer.  You know, if that's something that, you know, Your

24  Honor thinks is reasonable to try to finish this with a

25  declaration instead of a deposition, that is our preference

1    because a 30(b)(6) is very burdensome.  But that's where we

2    were.

3              THE COURT:  So here is where I am on that issue.  If

4    Mr. Gerbie or Mr. Geske sends over questions and Ms. Keeley

5    subpoenas the email with the questions, I would be, like, I

6    don't know why she couldn't get that email as I understand

7    things now.  There may be something that I don't know or

8    something that has happened, you know, since or whatever that

9    may say, oh, she shouldn't get it.  An agreement might be a way

10   to do that if it's an agreement that would cover that.

11             That said, on a practical level, I don't understand

12   the issue about the questions, because if I'm understanding

13   this Mr. Gerbie would say here are the questions and then the

14   declaration would be saying information that responds to the

15   questions.  So are the questions important?  I guess, but the

16   answers are really the important thing.  So I don't --

17             MR. GERBIE:  That's exactly right, Your Honor.

18             THE COURT:  I don't understand why Ms. Keeley getting

19   the questions would matter much at all.  What I did

20   understand -- and maybe I'm misreading the status report -- was

21   the back-and-forth in getting to the questions because that may

22   be or I think I could imagine Mr. Gerbie saying:  Well, this

23   issue is important.  We need to have someone explain this part,

24   and this is why it matters.

25             That's all his thought process which, you know, we

```
1    call work product, and that's the -- you know, that type of
2    email, I could see why Ms. Keeley would be interested in it.
3    Unless there's an agreement, I don't know why it wouldn't be
4    that you wouldn't have to produce it.  But that goes back to if
5    MBUSA has that kind of agreement with Cerence.  No one -- I
6    mean, that's how the world works here.  It's not sanctionable.
7    It's not inappropriate.  It's just how things get done or don't
8    get done, I suppose.
9           All right.  So let's set a date after the deposition.
10   It's the 20th, so we should --
11      (Discussion off the record.)
12          THE COURT:  I want to get you all in here soon
13   thereafter, so I'm looking at -- before I get down this rabbit
14   hole, I'm looking at the week of the 25th.  Is everyone here?
15          MS. KEELEY:  Yes.
16          THE CLERK:  Do you know how long it's going?
17          THE COURT:  Probably a half-hour.
18          MR. MYERSON:  Yes, Your Honor.
19          THE COURT:  Mr. Gerbie?
20          MR. GERBIE:  I'm unavailable Friday.
21          THE COURT:  On the 29th.
22          MR. GERBIE:  Correct.
23          MS. KEELEY:  Judge, I'm in town.  I have a deposition
24   on the 28th --
25          THE COURT:  Okay.
```

```
 1            MS. KEELEY:  -- so I will be unavailable that day.

 2            THE COURT:  Ms. Owens is throwing out the 26th at

 3   10:00 o'clock.  Yes, I could do that.

 4            MS. KEELEY:  That works for defendant.

 5            MR. GERBIE:  That works for plaintiff, Your Honor.

 6            MR. MYERSON:  That works for MBUSA.  Thank you.

 7            THE COURT:  All right.  And is it Mr. Layden?

 8            MR. LAYDEN:  Your Honor, yes.  I wasn't sure you were

 9   including me in this.  I'm actually going to be out of town

10   that week, so I'm sorry about that.

11            THE COURT:  Okay.  Do you have someone who can cover

12   for you?  Do you want to be at the --

13            MR. LAYDEN:  Well, I suppose it will depend, but it

14   might be better to do it, if it's possible, the week after.

15            THE COURT:  Can you appear by phone that day?

16            MR. LAYDEN:  I can, Your Honor, yes.

17            THE COURT:  Are you on a family vacation or what?

18            MR. LAYDEN:  I am on a vacation, but I'll be working.

19   So I'm happy to appear by phone, not a problem.

20            THE COURT:  Okay.  We'll have you appear by phone.

21            MR. LAYDEN:  Okay.  Thank you, Your Honor.

22            THE COURT:  Is there anything you wanted to add?  I

23   have not engaged you on any of this yet.

24            MR. LAYDEN:  No, Your Honor.  I'm happy to address it,

25   but I showed up, frankly, because I was invited in your last
```

1    minute order.  I'm happy to address any questions the Court

2    has.  I think plaintiffs' counsel has laid out where we are in

3    terms of our discussions, and I think it also will depend upon,

4    you know, what questions are asked at the Cerence deposition

5    and what answers are given in terms of the scope there.

6         You know, we're continuing to talk about the one

7    issue, which is MBSL, which is I think the only area where I

8    think we have any unique knowledge.  I'm not sure of the

9    relevance of that, frankly, because I think my understanding is

10   that the facts are showing that that's only on vehicle tech.

11   So it's never going to be in the possession of Cerence, but

12   that's not something that I just understand from reading the

13   docket, certainly my client's understanding of it.

14        But I haven't been part of this case, so I certainly

15   don't want to start arguing about the scope of discovery.  I

16   don't know what Your Honor has said about that in the past, but

17   that's I think the only thing that is potentially uniquely in

18   the possession of Nuance and what I've been discussing with

19   Mr. Geske.

20        THE COURT:  We'll see how this one plays out, and then

21   you can -- we'll see where things are on the 26th.  Then I just

22   want to make sure, Mr. Myerson, because we are dealing with

23   dates that may or may not -- that I can't change on my own, I

24   can tell you that.  So I just want to make sure you are getting

25   someone teed up for a 30(b)(6) deposition.  I'm not saying it

1   will happen or it won't happen, but what I don't want is for

2   you to tell me you need two weeks to find people.

3          MR. MYERSON:  Understood, Your Honor.

4          THE COURT:  So please engage with Mr. Gerbie and

5   Mr. Geske as to topics.  I mean, you've got the topics.  I

6   presume you'd need to cover all of that, and then hopefully --

7   I'm not saying "hopefully," but, you know, it may get whittled

8   down.  I'm just giving you a forewarning that I'm not going to

9   look kindly on you saying:  I need two weeks to find someone

10   and another two weeks to prepare someone.

11          MR. MYERSON:  Yeah.  Then just, you know, as a note on

12   that front about the topics, Your Honor --

13          THE CLERK:  Can you get near the microphone?

14          MR. MYERSON:  Oh, I'm sorry.

15          THE COURT:  Thank you, Alyssia.

16          MR. MYERSON:  Yeah, a note about the topics.  When we

17   last appeared, that was the issue that we were going back and

18   forth on, and that didn't actually get decided.  The idea was

19   to come back after.  We will make sure that we have somebody.

20   We understand in broad strokes what's really the key stuff.

21   The specific language of the topics is not settled, but I just

22   wanted to remind Your Honor about that.

23          THE COURT:  Yes, I do remember that, and I think the

24   whole point of getting the Cerence deposition done first was to

25   see whether or not either side needs all of the topics.  I

```
 1    don't know until we see what Cerence is saying or what the
 2    30(b)(6) deposition produces.
 3              All right.  Anything further from plaintiff?
 4              MR. GERBIE:  No, Your Honor.
 5              MR. GESKE:  Your Honor, very briefly, a housekeeping
 6    matter.  Obviously Your Honor is taking a close look at the
 7    schedule and the deadlines as extended by the district court
 8    judge.  When we sought that extension, candidly I think we had
 9    a motion to compel already pending as to MBUSA.  So I think we
10    would have sought a little bit more time if we thought it was
11    going to be entered and continued for another effectively six
12    weeks beyond that.  So we might go back to Judge Kendall if we
13    think that we need some more time, but we're hoping to get
14    everything, you know, ironed out shortly after the 26th, take
15    the deposition hopefully in the next two weeks thereafter, and
16    then be in good shape for our current deadlines.
17              THE COURT:  Yes, I appreciate that situation.  You
18    know, Judge Kendall, she does manage her docket very tightly.
19    I think she will see what's going on, you know.
20              MR. GESKE:  Yes, Your Honor.
21              THE COURT:  If you want to file something sooner
22    rather than later so we know if we have wiggle room, I'm not
23    offended in the least.  If we find out we don't have any, you
24    know, that will help inform me on dates, certainly.  So do what
25    you need to do.  I know that you -- I know you're in -- when I
```

1    was in your situation, I knew it's challenging, right?  You're

2    dealing with one judge who's doing the work and another judge

3    who's setting the dates, so that's not ideal sometimes.  So

4    whatever you think is appropriate, it will not offend me in the

5    least --

6              MR. GESKE:  Yes, Your Honor.  Thank you.

7              THE COURT:  -- to take those steps.

8              Okay.  Anything else?

9              MR. GESKE:  Not from plaintiff, Your Honor.

10             THE COURT:  Great.

11             Anything, Ms. Keeley?

12             MS. KEELEY:  No.  That's all, Judge.

13             THE COURT:  All right.  Thank you all very much.

14             MR. GESKE:  Thank you, Your Honor.

15             THE COURT:  We'll see will you in a couple weeks.

16             MS. KEELEY:  Thank you.

17             MR. MYERSON:  Thank you, Your Honor.

18      (Proceedings concluded at 11:33 a.m.)

19                        C E R T I F I C A T E

20         I certify that the foregoing is an accurate transcript

21    produced from an audio recording of the proceedings in the

22    above-entitled matter.

23    /s/Patrick J. Mullen                January 16, 2026

24    Patrick J. Mullen
      Retired Official Court Reporter

25