**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RANDOLPH FRESHOUR and VINCENZO ALLAN, each individually and on behalf of similarly situated individuals, | ) ) ) | |
| | ) | Case No.: 1:23-cv-02667 |
| Plaintiffs, | ) | |
| | ) | Hon. Virginia M. Kendall |
| v. | ) | |
| | ) | Magistrate Judge Hon. M. David Weisman |
| CERENCE INC., a Delaware corporation, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT CERENCE INC.'S RESPONSE IN OPPOSITION TO PLAINTIFFS'
MOTION TO STAY PURSUANT TO THE *COLORADO RIVER* DOCTRINE**

Matthew C. Wolfe
Amy Y. Cho
Mehgan E. H. Keeley
Samuel G. Bernstein
Elise N. Malin
**SHOOK, HARDY & BACON LLP**
111 South Wacker Drive, Suite 4700
Chicago, IL 60606
Tel: (312) 704-7700
mwolfe@shb.com
acho@shb.com
mkeeley@shb.com
sbernstein@shb.com
emalin@shb.com

*Attorneys for Defendant Cerence Inc.*

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 2

LEGAL STANDARD........................................................................................................ 3

ARGUMENT..................................................................................................................... 4

I. Plaintiffs waived this argument by their extreme delay in raising it and strategic decision to drive the proceedings in federal court until now .................. 5

II. The state and federal cases are not "parallel" because the state court will not resolve the federal court claims ...................................................................... 6

    A. The state court case cannot resolve plaintiff's federal claims because the cases involve substantively different claims under BIPA that will require different proof and evidence ............................. 7

    B. *Rivera* is not instructive because it involved claims that were virtually identical in the state and federal matters .................................. 9

III. The Court should deny Plaintiffs' motion to stay because there are no exceptional circumstances warranting abstention.................................................. 10

    A. Four of the *Colorado River* factors favor retaining jurisdiction........... 11

        1. Factors three and seven weigh against abstention because both proceedings have made substantial progress and a stay would not avoid piecemeal litigation........................................... 11

        2. Factor nine likewise favors retaining jurisdiction........................ 13

        3. Factor ten does not support abstention, and Plaintiffs' argument has nothing to do with the law ..................................... 13

    B. The remaining factors are neutral or irrelevant and therefore weigh against abstention. ..................................................................... 14

CONCLUSION.................................................................................................................. 15

## INTRODUCTION

Until now, Plaintiffs' litigation strategy was for the federal court to manage their disputes and generally drive the course of both the federal and state court proceedings, despite the differences between the claims brought in them. Apparently dissatisfied with how that has gone so far, Plaintiffs now attempt to sidestep this Court's jurisdiction by asking the Court to "stay" this mature case pursuant to *Colorado River*. But given the "virtually unflagging obligation" of federal district courts to "exercise the jurisdiction given them," abstention under *Colorado River* is reserved only for "exceptional circumstances." *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 14-15 (1983) (declining to abstain under *Colorado River*) (quoting *Colorado River Water Conservation Dist. v. U.S.*, 424 U.S. 800, 813, 817 (1976)). Indeed, only the "clearest of justifications" suffice to justify the "surrender" of a federal court's jurisdiction. *Moses H. Cone*, 460 U.S. at 25-26. None are present here, and in any event, Plaintiffs waived their right to raise this issue long ago.

"[A] stay is as much a refusal to exercise federal jurisdiction as a dismissal," and a district court should not stay under *Colorado River* unless it "concludes that the parallel state-court litigation will be an adequate vehicle for the ***complete*** and prompt resolution of the issues between the parties." *Moses H. Cone*, 460 U.S. at 28.[1] That is certainly not the case here, where the state and federal suits involve different claims with different elements that will require different proof. Even in cases where, unlike here, the state-court action *can* resolve all of the issues between the parties, courts still refuse to enter stays under *Colorado River* except in "exceptional circumstances."

---

[1]     Emphases added unless otherwise noted.

Critically, "[i]f there is any substantial doubt" that the federal court "will have nothing further to do in resolving any substantive part of the case, whether it stays or dismisses," it would be a "serious abuse of discretion to grant the stay or dismissal at all." *Id.* That's the case here. The Court should deny Plaintiffs' Motion and maintain its proper exercise of jurisdiction in this action.

## **BACKGROUND**

On March 24, 2023, Plaintiffs filed claims under BIPA Sections 15(a) – (d) in the Chancery Division of the Circuit Court of Cook County. Dkt. No. 4-1. On April 28, 2023, Cerence removed the complaint to federal court under the Class Action Fairness Act ("CAFA"). Dkt. No. 4. The parties stipulated to remand Plaintiffs' Section 15(a) and (c) claims, Dkt. Nos. 12, 15, and the Court remanded those claims to state court on June 1, 2023. Dkt. No. 16. As is explained further in the Argument below, since then two cases have proceeded, with Plaintiffs' Section 15(a) and (c) claims in state court and Plaintiffs' Section 15(b) and (d) claims in federal court. The parties stipulated to avoid duplicative discovery across both matters, and Plaintiffs elected to raise their numerous discovery disputes in federal court, with Cerence agreeing that documents and information produced in the federal case could be used in the state case. *See* Ex. 1, May 29, 2025 Hr'g Tr. at 3:5-19 (stipulation); *see also, e.g.,* Dkt. Nos. 79 (Plaintiffs' motion to refer discovery matters to magistrate judge); 85, 89, 95, 99, 102, 109, 119, 120, 126, 127, 128, 142, 161 (motions and status reports wherein Plaintiffs raised disputes related to extensions of time, custodians, document search terms, deposition witnesses, 30(b)(6) topics, and subpoena compliance); 93, 96, 100, 110, 123, 125, 130, 135, 137, 138, 156, 159, 162, 173 (hearings held before and corresponding orders entered by Magistrate Judge Weisman on discovery disputes); Ex. 2, Docket, No. 23-CH-2886 (Cir. Ct. Cook Cnty.) (state court docket showing absence of such filings by Plaintiffs).

After the close of fact discovery and moving for class certification, Plaintiffs filed a motion to stay, or in the alternative, to stay ruling on class certification and extend the expert discovery

schedule. Dkt. Nos. 167, 170. Plaintiffs did not raise *Colorado River* in that motion. *See generally id.* This Court effectively denied Plaintiffs' motion on November 10, 2025, when it granted the alternative relief requested by Plaintiffs—extension of the expert discovery schedule—and continued to exercise jurisdiction over this case. Dkt. No. 174.

As relevant here, the parties filed four sets of similar motions across both matters, with slightly more progression in the federal action:

1. The parties have fully briefed Plaintiffs' motions for class certification in both matters. No class has been certified in either case.

2. The parties have fully briefed Cerence's motions to exclude the testimony of Plaintiffs' putative class certification expert, Carla Peak, filed in connection with its response to Plaintiffs' motions for class certification. Dkt. Nos. 194-195, 204. Neither court has ruled.

3. Cerence filed motions for summary judgment as to Plaintiff Allan because Cerence's cloud did not service the technology that he allegedly used. Dkt. No. 196. Both courts have stayed briefing pending resolution of other motions.

4. Plaintiffs filed a motion to strike a declaration used in support of Cerence's motions for summary judgment in federal court on December 19, 2025, Dkt. No. 222, and three weeks later, filed the same motion in state court. Judge Weisman denied the motion and this Court is reviewing Plaintiffs' objections to his order. Dkt. No. 259. The motion is pending in state court.

## **LEGAL STANDARD**

"Abstention from the exercise of federal jurisdiction is the exception, not the rule." *Moses H. Cone*, 460 U.S. at 14 (quoting *Colorado River*, 424 U.S. at 813). "The doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is

an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." *Id.* Relatedly, because it is a "prudential rule, not a jurisdictional," doctrine, a party may waive the right to invoke *Colorado River* abstention where they fail to timely raise it. *Thomas-Wise v. Nat'l City Mortgage Co.*, No. 14 C 3460, 2015 WL 641770, at *2 (N.D. Ill. Feb. 13, 2015); *see also Barichello v. McDonald*, 98 F.3d 948, 955 (7th Cir. 1996).

The *Colorado River* test consists of two steps. First, the question is "whether the concurrent state and federal actions are actually parallel," which is only true if there "is a substantial likelihood that the state litigation will dispose of all claims presented in the federal case." *AAR Int'l, Inc. v. Nimelias Enters. S.A.*, 250 F.3d 510, 518 (7th Cir. 2001) (reversing order of abstention); *Herron v. Gold Standard Baking, Inc.*, No. 20 C 7469, 2023 WL 8621959, at *2 (N.D. Ill. Dec. 13, 2023) (denying motion to stay). If they are, the court next determines "whether the necessary exceptional circumstances exist to support abstention" based on a series of factors, including the desirability of avoiding piecemeal litigation; the adequacy of the state-court action to protect the plaintiff's rights in the federal case; and the relative progress of both proceedings. *Herron*, 2023 WL 8621959, at *2 (quoting *DePuy Synthes Sales, Inc. v. OrthoLA, Inc.*, 953 F.3d 469, 477 (7th Cir. 2020)); *Wildberry Condominium Ass'n. v. Travelers Indemnity Co. of America*, 522 F. Supp. 3d 432, 442 (N.D. Ill. 2021) (denying motion to stay).

## **ARGUMENT**

For three independent reasons, the Court must continue to fulfill its duty to "adjudicate [the] controversy properly before it." *Moses H. Cone*, 460 U.S. at 14. *First*, Plaintiffs waived their right to raise *Colorado River* abstention. *Second*, the cases at issue here are not parallel, so *Colorado River* abstention is not warranted. *Third*, no exceptional circumstances exist to warrant abstention. In determining whether to abstain, a court's task "is not to find some substantial reason for *exercise* of federal jurisdiction by the district court; rather, the task is to ascertain whether there

4

exist 'exceptional' circumstances, the 'clearest of justifications,' that can suffice under *Colorado River* to justify the *surrender* of that jurisdiction." *Id.* at 25. None exist here.

## I. Plaintiffs waived this argument by their extreme delay in raising it and strategic decision to drive the proceedings in federal court until now.

As an initial matter, the Court should deny Plaintiffs' motion because it is waived by their extreme delay in raising it. The Seventh Circuit and courts in this District have acknowledged that the *Colorado River* doctrine is non-jurisdictional and therefore can be waived, specifically when a party urges the federal court to decide key issues and later seeks abstention. *See Barichello*, 98 F.3d at 955; *Allian v. Allian*, No. 18 C 3825, 2018 WL 6591422, at *4 (N.D. Ill. Dec. 14, 2018) (exercising discretion to "look past" *Colorado River* argument); *Thomas-Wise*, 2015 WL 641770, at *2 (passing on *Colorado River* issue and proceeding to merits); *Smart Mortgage Centers, Inc. v. Noe*, No. 21-cv-3606, 2022 WL 832663, at *n.3 (N.D. Ill. Mar. 21, 2022) (declining to decide *Colorado River* argument); *Houston v. AIMCO*, No. 18 C 2635, 2019 WL 1077125, at *2 (N.D. Ill. Mar. 7, 2019) (party waived *Colorado River* argument by omitting it from pleading-stage briefing).

Plaintiffs waived their right to invoke *Colorado River* by strategically litigating their claims in this court for nearly three years and choosing the federal court to drive their (numerous) discovery disputes. *See* Background, *supra*, at 2 (citing federal and state court dockets). Plaintiffs also filed a motion to stay in November and never raised a *Colorado River* argument until shortly after receiving an unfavorable ruling on their motion to strike.

By "expressly urging the federal court to address" key issues for years, Plaintiffs used it as a "dress rehearsal" to see how things played out before picking a court to decide the merits. *See Barichello*, 98 F.3d at 955 (party may waive *Colorado River* argument by "expressly urging the federal court" to address big-picture issues); *see also Marietti v. Santacana*, 111 F. Supp. 3d

5

129, 134 (D.P.R. 2015) (holding that party waived *Colorado River* argument by failing to raise it earlier and rejecting party's "attempt to use the magistrate system as a dress rehearsal"). Plaintiffs' instant Motion may have been inspired by Judge Weisman's recent denial of their Motion to Strike, Dkt. No. 259; Plaintiffs' concerns about achieving class certification or winning on the merits on their federal claims; or Judge Weisman's criticism that Plaintiffs improperly threatened sanctions against third parties, let the case "languish" and "ignored" discovery while "Cerence proceeded," then picked disputes near the end of fact discovery, and baselessly accused Cerence of "lying" during that process. Ex. 3, Aug. 13, 2025 Hr'g Tr. at 8, 11-12 (seeking sanctions); Ex. 4, June 5, 2025 Hr'g Tr. at 24 (letting case "languish"); Ex. 5, June 16, 2025 Hr'g Tr. at 9-11, 13, 27, 41, 45-46 (ignoring discovery, letting it "languish on the plaintiffs' side," and creating "façade" that Cerence has not cooperated); Ex. 6, Oct. 15, 2025 Hr'g. Tr. at 13 (accusations of "lying"). In all events, "it would be fundamentally unfair to permit [Plaintiffs] to set [their] case in motion before the magistrate, wait to see which way the wind was blowing, and—having received an unfavorable recommendation—shift gears before the district judge." *Marietti*, 111 F. Supp. 3d at 134 (quoting *Paterson–Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 991 (1st Cir. 1988)).

Plaintiffs waived their right to raise this issue long ago. The *Colorado River* doctrine is intended for narrow circumstances—not for parties to "test run" the courts. *See Colorado River*, 424 U.S. at 818 ("only the clearest of justifications will warrant dismissal"). Their Motion should be denied for this reason alone.

## II. The state and federal cases are not "parallel" because the state court will not resolve the federal court claims.

Regardless of waiver, this case is not a candidate for a *Colorado River* stay because the state and federal actions are not "parallel" within the meaning of the doctrine. Under *Colorado River*, the key question is whether there "is a substantial likelihood that the state litigation will

6

dispose of *all claims* presented in the federal case." *Adkins v. VIM Recycling, Inc.*, 644 F.3d 483, 499 (7th Cir. 2011) (reversing abstention order). Put differently, abstention "necessarily contemplates that the federal court will have *nothing further to do* in resolving any substantive part of the case." *Moses H. Cone*, 460 U.S. at 28. "[A]ny doubt regarding the parallel nature of the foreign suit should be resolved in favor of exercising jurisdiction." *AAR Int'l*, 250 F.3d at 520 (reversing abstention order).

> **A.** **The state court case cannot resolve plaintiff's federal claims because the cases involve substantively different claims under BIPA that will require different proof and evidence.**

As Plaintiffs' earlier filings in this case show, it is certain that the state court case will not resolve Plaintiffs' federal claims. Plaintiffs' federal claims are under Section 15(b) and 15(d), each of which involve the "substantive and personal nature" of the information allegedly collected by Cerence and the opportunity for Plaintiffs to "make informed choices about to whom and for what purpose they will relinquish control of that information." *Bryant v. Compass Group USA, Inc.*, 958 F.3d 617, 626 (7th Cir. 2020). In other words, Plaintiffs allege that Cerence "withheld substantive information to which [they] were entitled and thereby deprived [them] of the ability" to give informed consent to the collection and possession of their biometric information. *Id.*; *Cothron v. White Castle Sys., Inc.*, 20 F.4th 1156, 1161 (7th Cir. 2021) (applying *Bryant* analysis to Section 15(d) claim). There is Article III standing over these claims, and Plaintiffs have never challenged that this Court has jurisdiction over them. And importantly here, Cerence's alleged collection and disclosure of biometric information, and the nature of any consent given by Plaintiffs to collection and disclosure, are central to Plaintiffs' federal claims.

In contrast, the 15(a) and 15(c) claims are in state court because they involve general regulatory violations of BIPA, without particularized injury to the Plaintiffs. Plaintiffs know this; they drafted their Complaint intentionally to try to keep these claims in state court, and moved to

7

sever and remand ***only the Section 15(a) and 15(c) claims*** shortly after Cerence removed the Complaint.[2] Dkt. No. 12. Plaintiffs' Section 15(a) claim is limited to the allegation that Cerence did not develop or make public a written retention schedule and guidelines for permanently destroying biometric identifiers and biometric information. This claim is exactly like the *Bryant* plaintiff's claim, which the Seventh Circuit held did not satisfy Article III. *Bryant*, 958 F.3d at 626; *see also* Dkt. No. 12 at 5-6 (Plaintiffs' motion to sever and remand, making this exact argument). Similarly, Plaintiffs' Section 15(c) claim is "based solely on a violation of Section 15(c)'s prohibition against profiting from biometrics." Dkt. No. 12 at 7-9.  Plaintiffs allege no particularized injury resulting from Cerence's "profit" from biometrics. Their Section 15(c) claim thus pursues a statutory remedy for violation of the "same kind of general regulation as the duty to create and publish a retention and destruction schedule found in section 15(a)." *Thornley v. Clearview AI*, 984 F.3d 1241, 1247 (7th Cir. 2021). In other words, Plaintiffs' injuries and own conduct are less relevant to their state-court claims, which are focused more on Cerence's publication of a retention schedule and profit from biometrics.

Simply put, although there is some overlap because Cerence denies that the data it collects is biometric at all, the cases involve different claims requiring different elements of proof. Plaintiffs' 15(a) and 15(c) claims in state court seek to impose duties owed to the public generally in publishing policies and profiting from data, whereas the 15(b) and 15(d) claims in federal court require proof that Cerence actively collected, captured, and/or disclosed the named Plaintiffs' biometric information without Plaintiffs' informed consent. 740 ILCS 14/15. Even after a state court trial, issues such as whether Cerence collected or disclosed biometric information, and

---

[2] Cerence removed the entire Complaint because 28 U.S.C. § 1441 permits only the removal of a "civil action," not individual "claims."

whether Plaintiffs consented to collection or disclosure, would not be decided. At that point, the federal court would need to resolve those issues.

Under these circumstances, courts in this District consistently deny motions to stay. *See, e.g., Baz v. Patterson,* 689 F. Supp. 3d 602, 608 (cases not parallel where state and federal cases involved different claims); *Eclipse Gaming Sys., LLC v. Antonucci*, No. 17 C 196, 2017 WL 3071258, at *5 (N.D. Ill. July 18, 2017) (Kendall, J.) (same); *Weston v. DB Private Wealth Mortgage, Ltd.*, 2023 WL 4864995, at *4 (N.D. Ill. Jul. 31, 2023) (same); *USWAY Corp. v. Wardzala*, 2012 WL 138605, at *3 (N.D. Ill. Jan. 18, 2012) (same); *Fofi Hotel Co., Inc. v. Davfra Corp.*, 846 F. Supp. 1345, 1351-52 (N.D. Ill. 1994) (same).

### B. Rivera is not instructive because it involved claims that were virtually identical in the state and federal matters.

Plaintiffs rely on *Rivera v. Google* because it is another BIPA case that was filed in both state and federal court. Motion at 2, 5, 8-11. In doing so, they oversimplify the procedural posture of *Rivera*, and they ignore the material differences explaining why the *Rivera* state court could resolve the federal court claims: both actions involved "virtually identical" claims under sections 15(a) and 15(b). *Rivera v. Google*, *Inc.*, No. 16-cv-02714, 2021 WL 3857792, at *1 (N.D. Ill. Aug. 30, 2021). Thus, *Rivera* is not instructive for this case, where the claims pending in the parallel proceedings aren't identical. Indeed, Plaintiffs do not cite a single BIPA case that has been stayed under the *Colorado River* doctrine under these circumstances. *See* Mot. 7, 9-12, citing *Avila v. JDD Investment Co.*, No. 21 C 1917, 2021 WL 5905627, at *4, 7 (N.D. Ill. Dec. 13, 2021) (both cases involved 15(b) claims); *Stinson v. LCS Community Employment LLC*, No. 20-cv-04603, 2021 WL 4978450, at *2 (N.D. Ill. May 3, 2021) (both cases involved 15(a), (b) and (d) claims); *Hirmer v. ESO Solutions*, Inc., No. 1:22-cv-01018, Dkt. No. 28 at 7; 32 (N.D. Ill. July 13, 2022) (both cases involved 15(a) and (b) claims); *Mata v. Deslauriers*, Inc., No. 21-cv-3976, 2023 WL

6065478, at *3 (N.D. Ill. Sept. 18, 2023) (declining to exercise supplemental jurisdiction because ADA claim and BIPA claim did not share common nucleus of operative fact and separately noting potential *Colorado River* implications where cases both involved 15(a) and 15(b) claims).

Finally, Plaintiffs try to distract the Court from the variances in their claims by arguing all claims require proof that Cerence received voiceprints. Mot. at 6. The fact that the two cases may present "some duplication," however, is "not enough to justify a stay of this federal action." *Glassie v. Doucette*, 55 F.4th 58, 64 (1st Cir. 2022) (cases not parallel, notwithstanding that "[t]his federal lawsuit clearly covers much ground in common with these ongoing state court proceedings"). Because Plaintiffs bear the burden of proof on issues in federal court that are not present in state court, "the state-court litigation [will] not dispose of all the claims presented in this suit," and *Colorado River* abstention is improper. *Moses H. Cone*, 460 U.S. at 28.

There is *certainty*—more than the required "substantial doubt"—that the state court case will not resolve all of the parties' issues. *See Moses H. Cone*, 460 U.S. at 28. It would therefore be "a serious abuse of discretion to grant the stay or dismissal at all." *Id.*

### III. The Court should deny Plaintiffs' motion to stay because there are no exceptional circumstances warranting abstention.

Plaintiffs spend most of their brief mechanistically walking through the *Colorado River* factors. That is the wrong analysis. Because the cases are not parallel, the Court need not consider whether the factors favor a stay. *See TruServ Corp. v. Flegles, Inc.*, 419 F.3d 584, 593 (7th Cir. 2005) ("Because the cases are not parallel, we need not balance the *Colorado River* factors."); *Herron*, 2023 WL 8621959, at *3 ("Because the Court finds that *Colorado River* abstention is not warranted at the first step, the Court need not reach the second step.").

Even if the Court proceeds with analyzing the factors, there are no exceptional circumstances justifying abstention. Plaintiffs' argument that eight factors favor a stay exaggerates

10

the circumstances, which are far from "exceptional." *See* Mot. at 7; *Colorado River*, 424 U.S. at 814 (requiring "exceptional circumstances"). At best, four factors favor retaining jurisdiction, and the rest are neutral—which tilts the decision in favor of retaining jurisdiction. *See Huon*, 657 F.3d at 641 ("because of the presumption against abstention, absent or neutral factors weigh in favor of exercising jurisdiction").

      **A.**      **Four of the *Colorado River* factors favor retaining jurisdiction.**

            **1.**      **Factors three and seven weigh against abstention because both proceedings have made substantial progress and a stay would not avoid piecemeal litigation.**

The analyses for ***factors three*** (avoidance of piecemeal litigation) and ***seven*** (the relative progress of the proceedings) overlap. To start, abstention would not avoid piecemeal litigation because, as discussed in Section II, resolution of Plaintiffs' Section 15(a) and (c) claims in state court will not necessarily dispose of their Section 15(b) and (d) claims in federal court. Additionally, "[t]his factor [three] requires that courts avoid duplicative discovery whenever possible," but the parties here already stipulated to avoid duplicative discovery, fact discovery closed months ago, and there is "different evidence that the parties would need to produce in this case to prove their claims in each court." *See Eclipse Gaming*, 2017 WL 3071258, at \*5 (citing *Day v. Union Mines Inc.*, 862 F.2d 652 (7th Cir. 1988)'s holding that "the federal district court should have abstained from exercising jurisdiction given that both courts needed to oversee substantially similar discovery").

Plaintiffs make a speculative argument that there is a risk of inconsistent rulings and conflicting factual records which, they argue, could manifest if (and only if) the state court grants their pending motion to strike. Mot. 7-9. But the state court has not ruled on that motion, and up to this point, there have been no conflicting factual findings. Speculation about a state court outcome is not sufficient to justify relinquishing jurisdiction. *See Huon*, 657 F.3d at 649 (vacating

*Colorado River* stay and explaining that "court's anticipation of the outcome in the state appellate court is not enough to justify abstention").

Plaintiffs also urge the Court to follow *Rivera* on this factor, even though that case involved a completely different procedural history and posture. Unlike here, where the parties litigated different claims in each court from the outset, the *Rivera* plaintiffs filed 15(a) and 15(b) claims in federal court, appealed a dismissal for lack of standing and, while the federal appeal was pending, filed "virtually identical" 15(a) and 15(b) claims in state court. *Rivera*, 2021 WL 3857792 at *1. The parties later agreed to dismiss the appeal, and shortly thereafter, the plaintiffs moved to stay the federal case pursuant to the *Colorado River* doctrine. *Id.* In granting the stay, the court unsurprisingly found a risk of "piecemeal litigation" because, unlike here, the two lawsuits were "virtually identical." *Id.* at *3. In this case, Plaintiffs' litigation strategy makes *Rivera* inapposite. Plaintiffs stipulated to litigate claims requiring different proof in separate proceedings, litigated as such for nearly *three years*, and asked the federal court to handle most issues. No court in this District has surrendered its jurisdiction under these circumstances.[3]

Plaintiffs' litigation strategy also negates their argument that abstention would "save judicial resources." Mot. at 2. Here, the courts are far past that point. The state and federal cases have proceeded on nearly identical tracks, and both have made substantial progress. *See id.* (outlining status of class certification and motion practice); *cf. Colorado River*, 424 U.S. at 820 (explaining that "absence of any substantial progress in the federal-court litigation" "tended to support dismissal"). This Court's "interests in the time and money it has spent in this federal

---

[3]     Plaintiffs rely on the *Rivera* court's dicta about a hypothetical scenario with claims split between cases, and the resulting potential for piecemeal litigation. Mot. at 8. This is a red herring. That issue was not before the court, and the *Rivera* court's hypothetical discussion was based on the huge variance in discovery patterns and schedules in the state and federal cases, which is not present here. *See Rivera*, 2021 WL 3857792, at *3-4 (explaining that the court bifurcated discovery, class certification discovery had not begun, and "significant discovery" took place in federal court while "state court action never got off the ground").

12

litigation weigh against the stay." *Great American Ins. Co.*, 2026 WL 395103, at *5. Plus, concerns about judicial resources "exist *whenever* there is a lawsuit in both state and federal court. The need to avoid duplicative litigation [alone] is not enough to support abstention – otherwise, it would turn the presumption on its head." *Wildberry*, 522 F.3d at 444 (denying abstention).

### 2. Factor nine likewise favors retaining jurisdiction.

Abstention is not appropriate based on ***factor nine*** (availability of removal) for the simple reason that, after Cerence removed the case, Plaintiffs waived this argument by stipulating to split the cases between state and federal court and then litigating both cases as such for years. *See Thomas-Wise*, 2015 WL 641770 at *2 (a "party may waive Colorado River abstention by expressly urging the federal court to address the merits"). Even if the Court viewed this factor as neutral, "neutral factors weigh in favor of exercising jurisdiction." *Huon*, 657 F.3d at 641.

### 3. Factor ten does not support abstention, and Plaintiffs' argument has nothing to do with the law.

As for ***factor ten*** (the vexatious or contrived nature of the federal claim), there is nothing of the sort. Plaintiffs' argument that Cerence had a vexations motive is completely baseless. The federal court's jurisdiction was obtained through proper removal processes under CAFA. Dkt. No. 4. Plaintiffs have never challenged the propriety of the removal, because they have no basis to do so. They cite no authority connecting the circumstances of this case to those involving "contrived" or "vexatious" claims, because there is none.

\*\*\*

In arguing that these factors are neutral or favor abstention, Plaintiffs misleadingly cite cases where the state and federal court proceedings involved the same claims. In none of those cases did the movant, like Plaintiffs, primarily litigate in the federal court before belatedly moving for abstention. *See* Motion at 7-12, citing *Clark v. Lacy*, 376 F.3d 682, 684, 687 (7th Cir. 2004)

13

(both cases alleged breach of fiduciary duty and movant sought abstention during pleading stage); *Avila*, 2021 WL 5905627, at *4, 7 (both cases involved 15(b) claims); *Rivera*, 2021 WL 3857792, at *1 (both cases involved 15(a) and 15(b) claims); *Stinson*, 2021 WL 4978450, at *2 (both cases involved 15(a), 15(b), and 15(d) claims); *Hirmer*, Dkt. No. 28 at 7; 32 (both cases involved 15(a) and 15(b) claims). Accordingly, these cases are not instructive.

**B.     The remaining factors are neutral or irrelevant and therefore weigh against abstention.**

All other factors are neutral or irrelevant, which favors retaining jurisdiction. When a "federal court could hear this dispute, and so could a state court," "[t]he tie goes to staying put in federal court." *Wildberry*, 522 F.Supp.3d at 443-44 ("[t]he deck is stacked in favor of keeping the case in federal court, so neutral factors weigh against abstention"); *Huon*, 657 F.3d at 648 ("because of the presumption against abstention, absent or neutral factors weigh in favor of exercising jurisdiction").

***Factor one*** (assumed jurisdiction of property) is irrelevant because no property is at issue. ***Factor two*** (convenience of the federal forum) is "not a factor" because "[b]oth courts are located in Chicago and are convenient to the parties." *Eclipse Gaming,* 2017 WL 3071258, at *5.

***Factor four*** (the order in which jurisdiction was obtained) is likewise neutral. Cerence removed the case to federal court 30 days after it was filed in state court. After the partial remand, the cases have proceeded on the same schedules. *See Clark,* 376 F.3d at 688 (finding factor neutral when state court case began a few weeks before federal case); *Eclipse Gaming*, 2017 WL 3071258, at *5 ("the mere fact that this Court is the second court to hear a case involving the same parties is insufficient to justify this Court's abstention" when other factors favor retaining jurisdiction); *Wildberry*, 522 F.Supp.3d at 443 ("[t]he order matters somewhat, but it is not a race, either….the Seventh Circuit does not put much stock in the 'first to file' rule").

14

***Factors five*** (the source of governing law), ***six*** (adequacy of the state court forum), and ***eight*** (concurrent jurisdiction) are also neutral. Although BIPA is an Illinois law, "[t]he mere fact that the outcome of the case is governed by state law does not warrant dismissal—to hold otherwise would undermine the purpose of federal diversity jurisdiction." *Huck*, 1993 WL 239048 at *4 (citing *Gonzalez v. Cruz*, 26 F.2d 1, 5 (1st Cir. 1991).[4] "[F]ederal courts are well-versed in resolving cases under state law, too." *Wildberry*, 522 F.3d at 443 (denying abstention even though claims in federal court raised issues of state law).

## CONCLUSION

Plaintiffs' request for a stay under the *Colorado River* doctrine must be denied. Plaintiffs waived the argument by their extreme delay in raising it, the state court proceedings will not dispose of their federal claims, and there are no circumstances making this an "exceptional" case. Accordingly, Cerence respectfully requests this Court to deny Plaintiffs' Motion to Stay.

Dated: March 18, 2026
                            Respectfully submitted,

                            CERENCE INC.

                            By: /s/Mehgan E.H. Keeley
                               One of Its Attorneys

Matthew C. Wolfe
Amy Y. Cho
Mehgan E. H. Keeley
Samuel G. Bernstein
Elise N. Malin
**SHOOK, HARDY & BACON LLP**
111 South Wacker Drive, Suite 4700
Chicago, IL 60606
Tel: (312) 704-7700
mwolfe@shb.com
acho@shb.com
mkeeley@shb.com
sbernstein@shb.com
emalin@shb.com

---

[4] Plaintiffs rely on *Avila* in support of factor five, but again, the state and federal cases in *Avila* both involved 15(b) claims. *See, supra*, Section II at 9, 13.

# EXHIBIT 1

1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RANDOLPH FRESHOUR, *et al*.,  )  Case No. 23 C 02667
             )
   Plaintiffs,     )
             )
   v.          )
             )
CERENCE, INC.,      )  Chicago, Illinois
             )  May 29, 2025
   Defendant.     )  9:21 a.m.

TRANSCRIPT OF PROCEEDINGS - STATUS/MOTION
BEFORE THE HONORABLE M. DAVID WEISMAN, MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiffs:    McGUIRE LAW PC
           BY:  MR. DAVID L. GERBIE
           55 W. Wacker Drive, 9th Floor
           Chicago, Illinois 60601

For the Defendant:    SHOOK HARDY & BACON LLP
           BY:  MS. MEHGAN E.H. KEELEY
           111 S. Wacker Drive, Suite 4700
           Chicago, Illinois 60606

FAILURE TO SPEAK DIRECTLY INTO MICROPHONE
RESULTS IN INAUDIBLE PROCEEDINGS AS NOTED.

Transcriber:      KRISTEN J. CARANNANTE, RPR, RMR, FCRR
           Court Reporter
           10 Montgomery Place, #1D
           Brooklyn, New York 11215
           848.459.3124
           kjcarannante@gmail.com

* * * * *

PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court:)

THE DEPUTY CLERK: 23CV2667, Peña v. Cerence, Incorporated.

MR. GERBIE: Good morning, your Honor. David Gerbie on behalf of the plaintiffs.

THE COURT: Good morning. For defendant?

MS. KEELEY: Good morning. Mehgan Keeley for defendant Cerence, and I have with me Elise Fitzmaurice. She is a summer associate observing in court this morning.

THE COURT: Great.

MS. FITZMAURICE: Thank you.

THE COURT: Welcome.

All right. So we have got a contested motion to extend discovery. I talked to Judge~Kendall to make sure she wanted me to address the issue, which she has asked me to take care of. So we are in a position to do that.

I know there is an objection. Tell me the objection.

And this is the first time we have been together, so I want to -- I think I have to orientate myself to how we had discovery set up. It's a little bit different than how I normally do it in these kind of cases, which is fine, but I am trying to work through that, coupled with the time.

So tell me, from defendant's perspective, what you were thinking.

MS. KEELEY: Sure. Would it be helpful if I kind of

gave a background first or --

THE COURT:   Yes, for sure.

MS. KEELEY:   -- a timeline first?

THE COURT:   Yes.

MS. KEELEY:   So as you might have seen, this case is in two parallel proceedings in state and federal court. We have removed and then we stipulated to take two of the four BIPA claims back to state court based on a jurisdictional issue.

So we are in parallel proceedings in state court. The state court judge has set the same fact discovery cutoff, and the parties have agreed not to duplicate discovery in either case or require, you know, a second round of a deposition or --

THE COURT:   And do you have an agreement that depositions -- I'm sorry for interrupting, but depositions in one case works in the other cases?

MR. GERBIE:   Yes, your Honor.

THE COURT:   Okay. Keep going.

MS. KEELEY:   Yes.

So when Judge~Kendall set the discovery schedule last summer, she set the fact discovery cutoff of July 22. She was -- you might have seen our objection. She really emphasized how generous the discovery schedule was and really discouraged extensions of time, and I think we have had a productive discovery since then. We didn't have any stays on

4

the written discovery during early motion practice or anything, so we have exchanged written discovery in both the state case and the federal case.

Cerence has completed its document production. We have produced several rounds of documents, substantially completed that last several months ago, I think it was in March, maybe just right after the last state court status hearing. And last week, we produced our privilege log and we have a very small -- 29 or 30 documents that were just downgraded from the privilege log.

So that's kind of an overview of that. Would it -- can I fill in any gaps before I go into our production, or is there --

THE COURT: One question I have, which relates to discovery, is the ESI approach.

So as I understand ESI, it was done -- you did it without basing your search term decision-making as opposed to a collaborative process. I don't know if that is an issue or if I am misunderstanding how ESI was done here.

MS. KEELEY: Yes. So I actually think plaintiffs mischaracterized that in their motion. We -- last December, we had a meet-and-confer -- a couple of rounds of letters and a meet-and-confer over the phone on both issues that both parties raised with discovery. And one of their questions was about search terms and time periods and stuff.

So after that, we sent them a list of all of the search terms we were using, which are really broad terms, and I understand that -- you know, that's our position, but we sent them the time period we were using, all of that, and didn't hear back from them for several months.

And then right before the state court status hearing, a few months later, they asked us to just enter into a boilerplate ESI protocol after we were nearly finished with reviewing and producing tons of documents. So at that point, we didn't think that was very productive or proportional to where discovery was at or the needs of the case.

So when we were at the state court status hearing, plaintiffs filed a motion to -- I think it was to order us to enter into one or order us to confer about entering into one, and the judge denied the request because -- a few reasons.

The first was that the process that we described to plaintiffs and to the judge he found to be thorough.

He found that we put plaintiffs sufficiently on notice and didn't hear from them for several months.

And then the third reason, which is still true now, is that they haven't articulated exactly what they think we did wrong with ESI.

And after that ruling, we haven't heard a word about ESI until receiving the status report draft yesterday. So we still don't know what the challenge is.

So kind of tying it back together with our objection to the motion for extension of time, I just don't think that that represents a diligent reason to extend time based on that purpose.

And then, on that note, I will also add that we don't -- you know, we understand one of the bases is personal conflicts for a bunch of members of the team. We are understanding of that. Our request for you to deny the motion isn't because we don't think that those are good reasons to need more time, it's just because we think it is premature.

We also think that -- you know, we are trying to schedule dates for depositions right now. We nearly have them on both sides. We are just finalizing them for this summer, including for July, after the conflicts are over. So we would ask you to deny it without prejudice because it is premature and because we think that it would be more appropriate for both sides to try to make a stronger effort to get dates on the schedule, finish discovery on the generous cutoff date that was already set, and then revisit if an extension is actually proportional to what the case needs.

THE COURT: So from a case management approach, what I hear you saying as far as depositions is, if we keep this tighter date, and we are working towards working around people's conflicts, we can get most of it done. Maybe we don't get them all done. And then you are saying "deny without

prejudice," so if someone comes back in mid July and says, We have got two more depositions we can't get done by the end of the month, we need another 30 days for those two depositions, if I gave you -- I won't say *carte blanche*, but I gave you 60, 90 days, that emphasis to get it done sooner will evaporate.

MS. KEELEY:    We think so.

THE COURT:    Okay.  That makes sense in some way.

Let me ask another question.  Then, Mr. Gerbie, I will hear from you.

The way discovery was set up is, as I read Judge~Kendall's order, fact discovery closed at the end of July, yet there was still -- expert discovery followed, makes all the sense in the world.  But then there was still an opening for class-related discovery, and I am just confused on that.  I don't usually manage my discovery that way, and then just -- my impression is that Judge~Kendall was following your all's lead, so I am trying to figure out what you all thought about that and why you wanted that.

I am looking at 69 on the docket.  So it says, "Completion of merits fact discovery due by July 22, 2025; class certification motion shall be filed no later than August 22, 2025."  This is the date I am a little confused on, "Completion of any outstanding class discovery due 60 days after ruling on plaintiff's class certification motion."

What were you all contemplating?  I am just -- I don't

8

normally do that, so I am trying to understand what that --
what the plan was there.  What is that?

MS. KEELEY:    Yes.  I think in our view, our sense was
that if there is discovery, trying to, like, find class members
and stuff like that --

THE COURT:    Oh.

MS. KEELEY:    -- that would be an issue after resolving
if there's actually -- you know, merits to the case or if the
class should even be certified in the first place.

So I think, from our point, we thought it would be a
more productive use of everyone's resources that way.  But I'm
not sure if plaintiffs had a different view.

THE COURT:    Okay.

MS. KEELEY:    But we did agree on the schedule --

THE COURT:    Yes.  I think she was tracking from
something you all submitted.

So, from your view, it is like discovery in the sense
of finding people, not substantive discovery on some class
issue after class certification has been ruled on.  That is
what I was confused about.

MS. KEELEY:    I think it would also include numbers,
you know, of the size and stuff, although I say that with --

THE COURT:    But you --

MS. KEELEY:    -- the caveat that we have exchanged some
of that information already.  So I think it's just we wanted to

reserve anything that would have been moot if class would be -- if the class cert. would be denied. So I think it is just identifying that information.

THE COURT: Okay.

MS. KEELEY: That's my understanding.

THE COURT: All right. But I think, at least from the defendant's perspective, it was not this time period to do some more substantive discovery of some nature. It was cleanup --

MS. KEELEY: Oh.

THE COURT: -- of some sort.

MS. KEELEY: Oh, yeah, no.

THE COURT: Okay.

MS. KEELEY: I mean, we expect -- or we have been planning and have been completing all of the substantive discovery --

THE COURT: Okay.

MS. KEELEY: -- within the fact time period.

THE COURT: Okay.

So, Mr. Gerbie, thank you for your patience. So let's start on that point, just so I am making sure --

MR. GERBIE: I appreciate that.

THE COURT: -- everybody is on the same page.

MR. GERBIE: With respect -- with respect to that point, to the extent defendant is not reporting what we believe is discovery relevant to the elements of class certification,

we understand, and presumably have agreed, that the specific identification of class members could potentially wait until after class certification but, again, only to the extent it is not used to withhold discovery relevant to the elements we need to --

THE COURT: Okay. Because numerosity -- you are talking about the number, but numerosity is usually -- you know, that's one of the four things you have to look at. So I am assuming that kind of data has been exchanged. That's part of what is going on now.

MS. KEELEY: Yes. Yes, we provided --

THE COURT: Okay.

MS. KEELEY: -- an estimated class size.

THE COURT: It may be class members, addresses, things like that. Okay.

MS. KEELEY: Yes.

THE COURT: Okay. So thanks for that. So I think we are on agreement there. That's fine.

So tell me, from defense perspective, it seems like a good way to manage discovery to me, so you are a little bit behind the eight ball a bit. Because having a date in place, being thoughtful of other people's schedules, that is important to the Court. And then saying, if we can't get it all done, they are not opposed to getting a brief extension, sounds good to me so far. And the idea that if we have a deadline, since

we were all little kids, our teachers gave us deadlines to get things done, and if we needed an extra day or two, the nice ones gave it to you, so that all makes sense to me.

MR. GERBIE:   Yes, so --

THE COURT:   What am I missing from your perspective?

MR. GERBIE:   Well, so there are a few things --

THE COURT:   Okay.

MR. GERBIE:   -- and at the outset of litigation, we don't always know exactly how long something is going to take. This case has become more complex than I think all of the parties originally anticipated, more moving pieces with respect to third parties.

And this is also not a situation in which I hear anything close, candidly, from complete cooperation from defendant agreeing we will do everything we can to produce the witnesses you have identified in the United States or even, if not in the United States, in Germany subject to the rule -- Federal Rules of Civil Procedure; rather it is, no, go domesticate, you know, this discovery in Europe and take discovery there.  We are maybe going to cooperate on a couple of witnesses that we believe are the most relevant, but if you think others are relevant we are not going to cooperate.

So what I expect is going to happen is they are going to say, We gave you two witnesses, we believe discovery is done, and it is done by July 22.  We don't believe an extension

is necessary.  That's -- I can -- I'm not going to guarantee it, but I'm reasonably confident that's what's going to occur.

So I agree theoretically and, you know, if I wasn't out on paternity leave, we have another partner out on a honeymoon, that the next eight weeks would theoretically offer enough time to do -- I mean, it would still be a heavy lift, it would still be eight to ten deps easily, but I just don't expect that that is how it is going to go, and we prefer not to come in the week of the deadline to your Honor and say, Now we need the extension.

So we are trying to foresee these issues, ask for what extension we believe is appropriate and will reasonably allow the parties to not just get the discovery done, but to hash things out before your Honor if necessary, which is part of the reason that we asked for the referral to your Honor in the first place.

THE COURT:   Yes.  I saw that.  I was wondering what animated that.  I hadn't seen a motion like that in a bit.

All right.  So are you worried about the stress of not knowing that you will get more time if you need it?

MR. GERBIE:    Oh, not the stress of not knowing but, you know, from our perspective, the relevant question is "have we completed discovery?"  And we have no depositions formally on the schedule yet.  So while the parties are working cooperatively, we haven't gotten dates for any depositions yet.

THE COURT:   Okay.

MR. GERBIE:   We haven't been told that, you know -- this is going to be a big issue if they are only going to produce two, and we think that there is some insufficient -- there is insufficient testimony, then maybe we will meet before your Honor or in some other court.

So we want to get the discovery done.  We would love to get it done in the next ten weeks.  We think a 90-day extension is appropriate.  It is the first time the parties -- or, rather, plaintiff -- or anyone has asked for an extension and there have been none granted thus far.  So we think, in a complex case such as this, with a few more moving pieces, that it is appropriate under the circumstances now.

Of course we would like to, you know, schedule regular statuses with your Honor to keep the parties sort of on task as a part of that extension.  And candidly, that's what we expected in seeking a referral.

THE COURT:   Okay.  Well, you will definitely get that because I am going to set a status for next week, and the goal of that status is to have you all give me a schedule of depositions.  So I will give you a week.  I am looking at Thursday, the 5th, in the afternoon.  I am looking at 2:00, maybe.

MS. KEELEY:   That works for us.

THE COURT:   Okay.

MR. GERBIE: Just checking.

THE COURT: Thanks.

MS. KEELEY: Judge, after we schedule this, just for the record, can I clarify a few things?

THE COURT: Yes.

MR. GERBIE: That works.

THE COURT: Okay. And I have a couple of questions for Mr. Gerbie.

Okay. 2:00 on the 5th. File a status report by noon on the 4th. Tell me your deposition schedule that you have nailed down, those that you are still -- you know, if you are still trying to confirm, these are ones confirmed, and if you are having trouble, in particular, what I am worried about are these foreign depositions.

So, I understand what you are saying. Quite frankly, I don't know when those conversations started, and I can hear all that out next week if I need to. But that may -- there may be a select few depositions set because of part of the reason we are going to have to kick further out. And if we have to go through the Hague Convention to get that done, I know you are not going to get that done by July 22, or whatever that date is.

So what I want, I think we have to understand that. We have to understand what is being made available, if your client is willing to bring people over here to have the

depositions done. You can tell your client, you know, there is a judge on the case who is handling discovery who intends to try and get this done by the end of July, certainly by, you know, World Series time. So they need to start thinking about those things and making those decisions. It is certainly a lot easier for everyone if people just come over. You know, there is a cost involved, and we can talk about that if that's an issue.

So that will be next week. We will figure that out.

But, Mr. Gerbie, I hear what you are saying. I am trying to understand. I don't hear a prejudice right now to your client. I do hear the stress of people's lives, more important things than this case, that have to get -- should be done and trying to work that in. So that's why I go back to what are you worried about if --

MR. GERBIE: Well, candidly, your Honor, I am supposed to be on paternity leave for the next four weeks.

THE COURT: Yes. That's much more important than this case, so that's fine.

MR. GERBIE: And, you know, that was not planned at the outset of discovery necessarily in terms of timing. And we do have another partner who is out of the country, another senior associate who is also out of the country currently. But even still, we can start scheduling depositions. I don't see any issue.

And from our perspective, we have offered dates for our plaintiffs to be deposed, so we are waiting on dates for any of the defendant's witnesses entirely. So I think they have a little bit more work to do in that respect prior to next week. I hope that we are able to see some progress and can better assess the reasonableness of getting everything done by the current deadline, I guess, at that point.

But, again, we think that it is likely that an extension will be required, especially -- and I didn't get a chance to address this previously. We do disagree with the way the ESI -- alleged ESI protocol was conducted and not getting to participate in any sort of material way, sign off on it, identify custodians or add custodians.

We are not saying that defendants haven't produced any relevant documents. Far from it. But that is not also how the rules typically operate in terms of agreeing to scope of discovery and who are relevant witnesses whose mailboxes should be searched, which potentially is relevant deposition testimony.

So we do think that that is an issue that will maybe not —— you know, I would prefer to have another opportunity to meet and confer with defendants on it, and then bring it before your Honor if we think it is necessary, but --

THE COURT: Let me ask you this: First of all, remind me, when does your paternity leave start.

MR. GERBIE: It -- I guess it started on April——I need to know this——29th.

THE COURT: Okay. Yes, you should remember that. So you are on paternity leave now.

MR. GERBIE: Yes. I came in this morning just for this hearing, your Honor.

THE COURT: I'm sorry. Okay.

MR. GERBIE: That's not your fault. I am covering for another lawyer who is out of the country, so --

THE COURT: Well, okay. All right. So congratulations.

MR. GERBIE: Thank you.

THE COURT: So June will come, although paternity leave made it easier, trust me, after going through three kids just now people expect you to work and be at home doing other stuff, but we can take up that later.

Okay. So here is what I am thinking. That is what the scheduling is about. Defendant has a summer associate who has nothing better to do, I am sure, than to look at people's calendars and figure that stuff out, but that's why I want a report next week. So I want to know where we are on that.

The ESI issue is a little bit different, and I will -- I am not deciding anything, but I will tell you my impression.

So when I manage cases from the get-go, ESI is -- we spend a lot of time on -- when ESI is important, we spend a lot

of time on it at the beginning because of the issue that I see coming, which I don't like, and I am just forewarning everyone. You are saying: We didn't have an opportunity. I don't know if that is true or not. I think defendant has a different take on that.

But if we start to spend too much time on ESI now, undoubtedly things may change, because you will say: Well, now we need to depose this person and we didn't know this then and I would have asked these questions in my June deposition, but I am getting it now at the end of June and the deposition's already happened. That is why I don't -- I would like to get all of that stuff cleaned up at the front end.

And again, not deciding anything, this sounds like, at least to some extent, a judge down the street looked at this and said: This is where I am on the issue. I don't know if comity would bind me to that judge's ruling. I don't think it would. But from the case management --

MR. GERBIE: It would not, your Honor.

THE COURT: I'm sorry?

MR. GERBIE: It would not, your Honor.

THE COURT: I don't think it would. But from a case management standpoint, completely different, right? I am just looking and saying this --

MR. GERBIE: I understand. We are not trying to open a hornet's nest --

THE COURT: Yes.

MR. GERBIE: -- you know, towards the end of discovery.

THE COURT: Okay.

MR. GERBIE: So we appreciate that. But -- and maybe there is a compromise to be reached, again, which is why I would like an opportunity to confer with defendant before fully ripening the issue with your Honor, but I did want to flag it in our filings.

THE COURT: Totally fine.

So with that said, in the status report that you file for next week, include a section on the ESI issues. And everyone's heard what I just said, so if there are discrete issues that have a really good reason why ESI may need to be tweaked a bit, I will be open -- I will be open to anything, but that seems to be a bit more aligned with getting this where we are in the case and getting it done versus wide requests that seem to just kind of blow up a schedule. Because Judge~Kendall does keep a very tight schedule. So I have got to manage three different entities——you all, the schedule, and Judge~Kendall. So we've got to keep in mind that we are not -- you know, she moves her docket along. That's why people like appearing before her, because --

MR. GERBIE: Yes, your Honor.

THE COURT: -- the case gets traction.

All right. So include that in there. We will see where we are.

I know, counsel, you said you wanted to add some comments, so go ahead.

MS. KEELEY: Yes. Thank you, Judge.

I just wanted to clarify a few things, mostly just to clarify the conversation, in part, because there is a colleague who is out, and so I just wanted to clarify a few things for the record. We had been discussing dates for both sides, but we are just finalizing them. So we --

THE COURT: Okay.

MS. KEELEY: -- have both agreed to bring a few of our witnesses to the U.S. for -- to make it easier for them so they don't have to travel to Germany. We have provided tentative dates that we are finalizing with those witnesses. So I don't think there should be a problem getting them on the status report next week.

THE COURT: Can I interrupt you? I just want to understand. Are these identified witnesses or are these 30(b)(6) witnesses that you all have identified?

MS. KEELEY: No, they are witnesses that plaintiffs have identified.

THE COURT: Okay. Keep going.

MS. KEELEY: And they initially identified seven, and a few weeks later, a few more. And I think the point that

Mr. Gerbie might have been referencing, that we suggested starting with a few of them because of the expense on our client, the burden on the witnesses to come over here, and because we are not forcing them to fly over there for those, so we did a ton of investigation way earlier in the case. That's, like, really the key information about what's at issue, and those are the ones that we suggested starting with, and then revisiting if there are --

THE COURT: Okay.

MS. KEELEY: -- relevant questions that are still at issue after those are finished in July.

So I just wanted to clarify that we have been having productive conversations about those and making progress. And we will clarify more concrete examples of this in the status report next week, but I just do want to clarify that we have tried to meet and confer --

THE COURT: Yes.

MS. KEELEY: -- with ESI six months ago, so -- and we will provide more --

THE COURT: Yes.

MS. KEELEY: -- examples of that in the status report, but appreciate your Honor considering it.

THE COURT: Okay.

Last question, or maybe last topic, for the status report. Are there 30(b)(6) deposition notices out?

Mr. Gerbie, is that something you will --

MR. GERBIE:    We can speak to that in the status report.

THE COURT:    Okay.

MR. GERBIE:    I don't believe that they are out yet, but we are going to need a 30(b)(6).

THE COURT:    Okay.  So I'm not going to put this on there just because you are coming back from paternity leave, but -- no, I'm serious.

You know what I was going to say, get that notice out so we can start to look at that.  But if you could at least have conversations with plaintiff's counsel next week when you come back, I want to get that cleaned up.  We can have routine statuses like every week or two, but that seems to me we've got to get that cleaned up or identified and cleared up if there are any issues with it.

You don't have it, so you wouldn't know.

And Mr. Gerbie, you will -- in the status report, if you can just book a quick section saying, "we are talking about this" or "we have sent the notice over" and, defendant, if you don't have time to respond to it yet, that's fine, but I wanted to make sure we don't lose track of that issue either.

MR. GERBIE:    Yes, your Honor.

THE COURT:    Are there any other discovery issues that I am missing, because I am just going from -- I don't know your

23

case. I am going from experience.

MR. GERBIE: There are some third parties that are potentially relevant where we are having -- we are continuing to meet and confer with them to see to the extent to which they are going to comply with subpoenas.

THE COURT: So you have served subpoenas on them?

MR. GERBIE: We have served several.

THE COURT: Okay.

MR. GERBIE: Yes, your Honor.

THE COURT: Include that in the status report, as well --

MR. GERBIE: Yes, your Honor.

THE COURT: -- and just where things stand.

MR. GERBIE: And that's one of the issues that we believe is going to necessitate more time ultimately. You know, considering they are a third party, their obligations aren't the same as a party obviously. We, again, would like to -- we would like to avoid hauling them before your Honor to hash something out, and so we are making every effort to do that --

THE COURT: Okay.

MR. GERBIE: -- before doing that.

THE COURT: Yes. And if we have to, that will probably be -- next week we will talk about a date to get any motions to compel against third parties.

MR. GERBIE:   Yes, your Honor.

THE COURT:   All right.  Any other issues like that?
Those are the kind of things I am looking for.  No?

MS. KEELEY:   Nothing from us.

THE COURT:   Okay.  Anything further from plaintiff?

MR. GERBIE:   Not off the top of my head, your Honor.

THE COURT:   Anything further from defendant?

MS. KEELEY:   No, Judge.

THE COURT:   All right.  Welcome to the Court.  Thanks
so much.  We will see you next week.

MR. GERBIE:   Thank you, your Honor.

MS. KEELEY:   Thank you, your Honor.

MS. FITZMAURICE:   Thank you.

(Concluded at 10:07 a.m.)

* * * * *

I certify that the foregoing is a correct transcript of the

digital recording of proceedings in the above-entitled matter

to the best of my ability, given the limitations of using a

digital recording system.


*/s/ Kristen J. Carannante*
*May 30, 2025*
Kristen J. Carannante, RPR, RMR, FCRR
Court Reporter/Transcriber

# EXHIBIT 2

District 1

# Case Summary

## Case No. 2023CH02866

| | | | |
|---|---|---|---|
| **A P,Carlos Pena,Vincenzo** | § | Location: | **District 1** |
| **Allan,Randolph Freshour-vs-Cerence Inc.** | § | Judicial Officer: | **Calendar, 2** |
| | § | Filed on: | **03/24/2023** |
| | § | Cook County Attorney Number: | **56618** |
| | § | Cook County Attorney Number: | **58950** |

---

## Case Information

Case Type: Class Actions
Case Status: **03/24/2023** **Pending**

---

## Assignment Information

**Current Case Assignment**
Case Number     2023CH02866
Court              District 1
Date Assigned   03/24/2023
Judicial Officer  Calendar, 2

---

## Party Information

*Lead Attorneys*

**Plaintiff**     **Allan, Vincenzo**     **Buscarini, Colin Primo**
*Retained*
312-893-7002(W)
55 West Wacker DR
FL 9th
Chicago, IL 60601

**Freshour, Randolph**   **Buscarini, Colin Primo**

***Retained***
312-893-7002(W)
55 West Wacker DR
FL 9th
Chicago, IL 60601

**P, A**   **Geske, Paul T.**
***Retained***


**Pena, Carlos**   **Geske, Paul T.**
***Retained***


**Defendant** **Cerence Inc.**   **Wolfe, Matthew Charles**
***Retained***
312-704-7700(H)
111 South Wacker DR
STE 4700
Chicago, IL 60606

---

## Events and Orders of the Court

02/23/2026
Answer/Response/Reply
   *UNDER SEAL Defendant Cerence Inc. Reply in Support of Its Motion to Exclude Testimony of Plaintiffs' Expert Carla A. Peak*
   Party:   Defendant Cerence Inc.
   *UNDER SEAL Defendant Cerence Inc. Reply in Support of Its Motion to Exclude Testimony of Plaintiffs' Expert Carla A. Peak*


02/19/2026
            Agreed Order Entered   (Judicial Officer: Chupack, Joel)
               Party:   Defendant Cerence Inc.;
                        Plaintiff Allan, Vincenzo;
                        Plaintiff Freshour, Randolph;
                        Plaintiff P, A;
                        Plaintiff Pena, Carlos
               Party 2:   Attorney Buscarini, Colin Primo;
                        Attorney Geske, Paul T.;
                        Attorney Wolfe, Matthew Charles

02/19/2026

Order Defendant Leave To File Petition    (Judicial Officer: Chupack, Joel)
   Party:   Defendant Cerence Inc.
   Party 2:   Attorney Wolfe, Matthew Charles

02/19/2026

Order Plaintiff Leave To File Petition    (Judicial Officer: Chupack, Joel)
   Party:   Plaintiff Allan, Vincenzo;
         Plaintiff Freshour, Randolph;
         Plaintiff P, A;
         Plaintiff Pena, Carlos
   Party 2:   Attorney Buscarini, Colin Primo;
         Attorney Geske, Paul T.

02/19/2026

Motion To - Allowed -    (Judicial Officer: Chupack, Joel)
   Party:   Defendant Cerence Inc.
   Party 2:   Attorney Wolfe, Matthew Charles

02/19/2026

Order To Seal -Allowed    (Judicial Officer: Chupack, Joel)
   *REPLY IN SUPPORT*
   Party:   Defendant Cerence Inc.
   Party 2:   Attorney Wolfe, Matthew Charles
   *REPLY IN SUPPORT*

02/19/2026

Motion To - Allowed -    (Judicial Officer: Chupack, Joel)
   Party:   Plaintiff Allan, Vincenzo;
         Plaintiff Freshour, Randolph;
         Plaintiff P, A;
         Plaintiff Pena, Carlos
   Party 2:   Attorney Buscarini, Colin Primo;
         Attorney Geske, Paul T.

02/19/2026

Order To Seal -Allowed    (Judicial Officer: Chupack, Joel)
   Party:   Plaintiff Allan, Vincenzo;
         Plaintiff Freshour, Randolph;
         Plaintiff P, A;
         Plaintiff Pena, Carlos

02/19/2026

Case Assigned to Zoom Hearing - Allowed
   *930AM*

02/19/2026



Courts Motion This Case Is Taken Under Advisement     (Judicial Officer: Chupack, Joel)
   Party:  Plaintiff Allan, Vincenzo;
          Plaintiff Freshour, Randolph;
          Plaintiff P, A;
          Plaintiff Pena, Carlos
   Party 2:  Attorney Buscarini, Colin Primo;
          Attorney Geske, Paul T.

02/19/2026   **Open Call**  (9:30 AM)  (Judicial Officer: Chupack, Joel)
        Resource: Location CH2601 Court Room 2601
        Resource: Location D1 Richard J Daley Center

02/17/2026   

        Agreed Order Entered    (Judicial Officer: Chupack, Joel)
          Party:  Defendant Cerence Inc.;
              Plaintiff Allan, Vincenzo;
              Plaintiff Freshour, Randolph;
              Plaintiff P, A;
              Plaintiff Pena, Carlos
         Party 2:  Attorney Buscarini, Colin Primo;
              Attorney Geske, Paul T.;
              Attorney Wolfe, Matthew Charles

02/17/2026   

        Order Plaintiff Leave To File Petition    (Judicial Officer: Chupack, Joel)
        *REPLY BRIEF UP TO 15 PAGES*
          Party:  Plaintiff Allan, Vincenzo;
              Plaintiff Freshour, Randolph;
              Plaintiff P, A;
              Plaintiff Pena, Carlos
        *REPLY BRIEF UP TO 15 PAGES*

02/17/2026   

        Answer/Reply/Response - Allowed
          Party:  Plaintiff Allan, Vincenzo;
              Plaintiff Freshour, Randolph;
              Plaintiff P, A;
              Plaintiff Pena, Carlos
         Party 2:  Attorney Buscarini, Colin Primo;
              Attorney Geske, Paul T.

02/17/2026

Answer/Response/Reply
  Party:  Plaintiff Freshour, Randolph

02/17/2026

Exhibits Filed
  Party:  Plaintiff Freshour, Randolph

02/17/2026

Notice Of Motion Filed
  Party:  Plaintiff Freshour, Randolph

02/17/2026

Notice Of Motion Filed
  Party:  Plaintiff Freshour, Randolph

02/17/2026

Motion Filed
  Party:  Plaintiff Freshour, Randolph

02/13/2026

Answer/Response/Reply
  *Defendant Cerence Inc. Reply in Support of Its Motion to Exclude Testimony of Plaintiffs Expert Carla A. Peak*
  Party:  Defendant Cerence Inc.
  *Defendant Cerence Inc. Reply in Support of Its Motion to Exclude Testimony of Plaintiffs Expert Carla A. Peak*

02/13/2026

Motion Filed
  *Defendant Cerence Inc. Motion for Leave to File Reply Under Seal*
  Party:  Defendant Cerence Inc.
  *Defendant Cerence Inc. Motion for Leave to File Reply Under Seal*

02/13/2026

Notice Of Motion Filed
  *Notice of Motion for Defendant Cerence Motion for Leave to File Reply Under Seal*
  Party:  Defendant Cerence Inc.
  *Notice of Motion for Defendant Cerence Motion for Leave to File Reply Under Seal*

02/11/2026
Filed Under Seal
*[UNDER SEAL] Cerence Inc. Response to Plaintiffs Motion to Strike and Exclude Declaration of Jorge Tsuboyama*
    Party:   Defendant Cerence Inc.
*[UNDER SEAL] Cerence Inc. Response to Plaintiffs Motion to Strike and Exclude Declaration of Jorge Tsuboyama*


02/11/2026
Exhibits Filed
*[UNDER SEAL] Exs. 6 and 10 to Cerence Inc. Response to Plaintiffs Motion to Strike and Exclude Declaration of Jorge Tsuboyama*
    Party:   Defendant Cerence Inc.
*[UNDER SEAL] Exs. 6 and 10 to Cerence Inc. Response to Plaintiffs Motion to Strike and Exclude Declaration of Jorge Tsuboyama*


02/11/2026
Exhibits Filed
    *(2023CH02866) Order Granting Cerence Motion to Seal*
    Party:   Defendant Cerence Inc.
    *(2023CH02866) Order Granting Cerence Motion to Seal*

02/09/2026
Agreed Order Entered     (Judicial Officer: Chupack, Joel)
    Party:   Defendant Cerence Inc.;
            Plaintiff Allan, Vincenzo;
            Plaintiff Freshour, Randolph;
            Plaintiff P, A;
            Plaintiff Pena, Carlos
    Party 2:   Attorney Buscarini, Colin Primo;
            Attorney Geske, Paul T.;
            Attorney Wolfe, Matthew Charles

02/09/2026
Motion To - Allowed -     (Judicial Officer: Chupack, Joel)
    Party:   Defendant Cerence Inc.
    Party 2:   Attorney Wolfe, Matthew Charles

02/09/2026
Order To Seal -Allowed     (Judicial Officer: Chupack, Joel)
    Party:   Defendant Cerence Inc.
    Party 2:   Attorney Wolfe, Matthew Charles

02/09/2026 **General Chancery Hearing** (10:15 AM) (Judicial Officer: Chupack, Joel)
        Resource: Location CH2601 Court Room 2601
        Resource: Location D1 Richard J Daley Center
        **MINUTES - 02/09/2026**



    Motion To - Allowed - (Judicial Officer: Chupack, Joel)
      Party: Defendant Cerence Inc.
      Party 2: Attorney Wolfe, Matthew Charles



    Order To Seal -Allowed (Judicial Officer: Chupack, Joel)
      Party: Defendant Cerence Inc.
      Party 2: Attorney Wolfe, Matthew Charles



    Agreed Order Entered (Judicial Officer: Chupack, Joel)
      Party: Defendant Cerence Inc.;
           Plaintiff Allan, Vincenzo;
           Plaintiff Freshour, Randolph;
           Plaintiff P, A;
           Plaintiff Pena, Carlos
      Party 2: Attorney Buscarini, Colin Primo;
           Attorney Geske, Paul T.;
           Attorney Wolfe, Matthew Charles

    Allowed;

02/04/2026
    Notice Of Motion Filed
      *Notice of Motion of Cerence Inc. Motion for Leave to File Under Seal*
      Party: Defendant Cerence Inc.
      *Notice of Motion of Cerence Inc. Motion for Leave to File Under Seal*

02/03/2026
Answer/Response/Reply
  *Defendant Cerence Inc. Sur-Reply in Opposition to Plaintiffs' Motion for Class Certification*
  *[UNDER SEAL FILING]*
  Party: Defendant Cerence Inc.
  *Defendant Cerence Inc. Sur-Reply in Opposition to Plaintiffs' Motion for Class Certification*
  *[UNDER SEAL FILING]*

02/03/2026



Answer/Response/Reply

*[PUBLIC VERSION] Cerence Response to Plaintiffs Motion to Strike and Exclude Declaration of Jorge Tsuboyama*

Party:   Defendant Cerence Inc.

*[PUBLIC VERSION] Cerence Response to Plaintiffs Motion to Strike and Exclude Declaration of Jorge Tsuboyama*

02/03/2026



Exhibits Filed

*[PUBLIC VERSION] Exs. 1-11 to Cerence Response to Plaintiffs Motion to Strike and Exclude Declaration of Jorge Tsuboyama*

Party:   Defendant Cerence Inc.

*[PUBLIC VERSION] Exs. 1-11 to Cerence Response to Plaintiffs Motion to Strike and Exclude Declaration of Jorge Tsuboyama*

02/03/2026

Motion Filed

*(2023CH02866) Cerence Inc. Motion for Leave to File Under Seal*

Party:   Defendant Cerence Inc.

*(2023CH02866) Cerence Inc. Motion for Leave to File Under Seal*

02/03/2026



Notice Of Motion Filed

*(2023CH02866) Notice of Motion of Cerence Inc. Motion for Leave to File Under Seal*

Party:   Defendant Cerence Inc.

*(2023CH02866) Notice of Motion of Cerence Inc. Motion for Leave to File Under Seal*

02/02/2026

Order To Seal -Allowed

Party:   Defendant Cerence Inc.

02/02/2026



File Amendment Or Additional Or Amended Pleadings-Allowed      (Judicial Officer: Chupack, Joel)

Party:   Defendant Cerence Inc.

02/02/2026 **General Chancery Hearing**  (10:15 AM)  (Judicial Officer: Chupack, Joel)
　　　　　　　Resource: Location CH2601 Court Room 2601
　　　　　　　Resource: Location D1 Richard J Daley Center
　　　　　　　**MINUTES - 02/02/2026**



　　　　　　　File Amendment Or Additional Or Amended Pleadings-Allowed
　　　　　　　　(Judicial Officer: Chupack, Joel)
　　　　　　　　Party:　Defendant Cerence Inc.

　　　　　　　Allowed;

01/21/2026


Notice Of Motion Filed
　*Notice of Motion for Cerence Inc. Motion for Leave to File Sur-Reply in Opposition to Plaintiffs*
　*Motion for Class Certification*
　Party:　Defendant Cerence Inc.
　*Notice of Motion for Cerence Inc. Motion for Leave to File Sur-Reply in Opposition to Plaintiffs*
　*Motion for Class Certification*

01/21/2026


Motion Filed
　*Cerence Inc. Motion for Leave to File Sur-Reply in Opposition to Plaintiffs' Motion for Class*
　*Certification and, If Granted, Motion to File Sur-Reply Under Seal*
　Party:　Defendant Cerence Inc.
　*Cerence Inc. Motion for Leave to File Sur-Reply in Opposition to Plaintiffs' Motion for Class*
　*Certification and, If Granted, Motion to File Sur-Reply Under Seal*

01/21/2026　
　　　　　　　Filed Under Seal
　　　　　　　　*Seal Order*
　　　　　　　　Party:　Plaintiff Allan, Vincenzo
　　　　　　　　*Seal Order*

01/21/2026　Answer/Response/Reply
　　　　　　　　*Answer/Response/Reply*
　　　　　　　　Party:　Plaintiff Allan, Vincenzo
　　　　　　　　*Answer/Response/Reply*

01/21/2026　Exhibits Filed
　　　　　　　　*Exhibits Filed*
　　　　　　　　Party:　Plaintiff Allan, Vincenzo
　　　　　　　　*Exhibits Filed*

01/21/2026    Exhibits Filed
        *Exhibits Filed*
        Party:   Plaintiff Allan, Vincenzo
        *Exhibits Filed*

01/21/2026    Exhibits Filed
        *Exhibits Filed*
        Party:   Plaintiff Allan, Vincenzo
        *Exhibits Filed*

01/21/2026    Exhibits Filed
        *Exhibits Filed*
        Party:   Plaintiff Allan, Vincenzo
        *Exhibits Filed*

01/21/2026
        Filed Under Seal
        *Seal Order*
        Party:   Plaintiff Allan, Vincenzo
        *Seal Order*

01/21/2026    Answer/Response/Reply
        *Answer/Response/Reply*
        Party:   Plaintiff Allan, Vincenzo
        *Answer/Response/Reply*

01/21/2026    Exhibits Filed
        *Exhibits Filed*
        Party:   Plaintiff Allan, Vincenzo
        *Exhibits Filed*

01/21/2026    Exhibits Filed
        *Exhibits Filed*
        Party:   Plaintiff Allan, Vincenzo
        *Exhibits Filed*

01/21/2026    Exhibits Filed
        *Exhibits Filed*
        Party:   Plaintiff Allan, Vincenzo
        *Exhibits Filed*

01/21/2026    Exhibits Filed
        *Exhibits Filed*
        Party:   Plaintiff Allan, Vincenzo
        *Exhibits Filed*

01/20/2026
        Continuance - Allowed -    (Judicial Officer: Chupack, Joel)
        Party:   Plaintiff Allan, Vincenzo

01/20/2026    **Open Call**   (9:30 AM)   (Judicial Officer: Chupack, Joel)
     Resource: Location CH2601 Court Room 2601
     Resource: Location D1 Richard J Daley Center
     **MINUTES - 01/20/2026**

     Continuance - Allowed -     (Judicial Officer: Chupack, Joel)
       Party:   Plaintiff Allan, Vincenzo

     Allowed;

01/20/2026
     Motion Filed
       Party:   Plaintiff Allan, Vincenzo

01/16/2026
     Answer/Response/Reply
       Party:   Plaintiff Allan, Vincenzo

01/16/2026
     Exhibits Filed
       Party:   Plaintiff Allan, Vincenzo

01/16/2026
     Memorandum Of Law Filed
       Party:   Plaintiff Allan, Vincenzo

01/16/2026
     Exhibits Filed
       Party:   Plaintiff Allan, Vincenzo

01/16/2026
     Exhibits Filed
       Party:   Plaintiff Allan, Vincenzo

01/16/2026
     Exhibits Filed
       Party:   Plaintiff Allan, Vincenzo

01/16/2026
     Exhibits Filed
       Party:   Plaintiff Allan, Vincenzo

01/14/2026
     Motion Filed
       *Motion for Leave to File Documents Under Seal*
       Party:   Plaintiff Allan, Vincenzo
       *Motion for Leave to File Documents Under Seal*

01/12/2026
     Case Assigned to Zoom Hearing - Allowed

01/12/2026

Continuance - Allowed -     (Judicial Officer: Chupack, Joel)
  *930AM*
  Party:   Defendant Cerence Inc.;
                Plaintiff Allan, Vincenzo;
                Plaintiff Freshour, Randolph;
                Plaintiff P, A;
                Plaintiff Pena, Carlos
  Party 2:   Attorney Buscarini, Colin Primo;
                Attorney Geske, Paul T.;
                Attorney Wolfe, Matthew Charles
  *930AM*

01/12/2026

Agreed Order Entered     (Judicial Officer: Chupack, Joel)
  Party:   Defendant Cerence Inc.;
                Plaintiff Allan, Vincenzo;
                Plaintiff Freshour, Randolph;
                Plaintiff Pena, Carlos
  Party 2:   Attorney Buscarini, Colin Primo;
                Attorney Geske, Paul T.;
                Attorney Wolfe, Matthew Charles

01/12/2026

Answer/Reply/Response - Allowed
  *ON OR BEFORE*
  Party:   Plaintiff Allan, Vincenzo;
                Plaintiff Freshour, Randolph;
                Plaintiff P, A;
                Plaintiff Pena, Carlos
  Party 2:   Attorney Buscarini, Colin Primo;
                Attorney Geske, Paul T.
  *ON OR BEFORE*

01/12/2026    **General Chancery Hearing**   (10:15 AM)   (Judicial Officer: Chupack, Joel)

Resource: Location CH2601 Court Room 2601
Resource: Location D1 Richard J Daley Center
**MINUTES - 01/12/2026**

Agreed Order Entered     (Judicial Officer: Chupack, Joel)
Party:   Defendant Cerence Inc.;
Plaintiff Allan, Vincenzo;
Plaintiff Freshour, Randolph;
Plaintiff Pena, Carlos
Party 2:   Attorney Buscarini, Colin Primo;
Attorney Geske, Paul T.;
Attorney Wolfe, Matthew Charles

Answer/Reply/Response - Allowed
*ON OR BEFORE*
Party:   Plaintiff Allan, Vincenzo;
Plaintiff Freshour, Randolph;
Plaintiff P, A;
Plaintiff Pena, Carlos
Party 2:   Attorney Buscarini, Colin Primo;
Attorney Geske, Paul T.
*ON OR BEFORE*

Case Assigned to Zoom Hearing - Allowed

Continuance - Allowed -     (Judicial Officer: Chupack, Joel)
*930AM*
Party:   Defendant Cerence Inc.;
Plaintiff Allan, Vincenzo;
Plaintiff Freshour, Randolph;
Plaintiff P, A;
Plaintiff Pena, Carlos
Party 2:   Attorney Buscarini, Colin Primo;
Attorney Geske, Paul T.;
Attorney Wolfe, Matthew Charles
*930AM*

Continued;

01/09/2026



Motion Filed

*Defendant Cerence Inc. Motion to Stay Briefing and a Ruling on Motion to Strike Declaration of Jorge Tsuboyama*
Party: Defendant Cerence Inc.
*Defendant Cerence Inc. Motion to Stay Briefing and a Ruling on Motion to Strike Declaration of Jorge Tsuboyama*

01/09/2026



Notice Of Motion Filed

*Notice of Motion of Defendant Cerence Inc. Motion to Stay Briefing and a Ruling on Motion to Strike Declaration of Jorge Tsuboyama*
Party: Defendant Cerence Inc.
*Notice of Motion of Defendant Cerence Inc. Motion to Stay Briefing and a Ruling on Motion to Strike Declaration of Jorge Tsuboyama*

01/09/2026

Filed Under Seal

*[UNDER SEAL] Cerence Inc. Response in Opposition to Plaintiffs Motion and Memorandum of Law in Support of Class Certification*
Party: Defendant Cerence Inc.
*[UNDER SEAL] Cerence Inc. Response in Opposition to Plaintiffs Motion and Memorandum of Law in Support of Class Certification*

01/09/2026

Exhibits Filed

*[UNDER SEAL] Exhibits 1, 2, 4, 5, 6 to Cerence Inc. Response in Opposition to Plaintiffs Motion and Memorandum of Law in Support of Class Certification*
Party: Defendant Cerence Inc.
*[UNDER SEAL] Exhibits 1, 2, 4, 5, 6 to Cerence Inc. Response in Opposition to Plaintiffs Motion and Memorandum of Law in Support of Class Certification*

01/09/2026

Exhibits Filed

*[UNDER SEAL] Exhibits 8, 9, 12, 14, 15, and 16 to Cerence Inc. Response in Opposition to Plaintiffs Motion and Memorandum of Law in Support of Class Certification*
Party: Defendant Cerence Inc.
*[UNDER SEAL] Exhibits 8, 9, 12, 14, 15, and 16 to Cerence Inc. Response in Opposition to Plaintiffs Motion and Memorandum of Law in Support of Class Certification*

01/09/2026

    Notice Of Motion Filed
      Party: Plaintiff Allan, Vincenzo

01/08/2026 *CANCELED* **Open Call** (9:30 AM) (Judicial Officer: Chupack, Joel)
    Resource: Location CH2601 Court Room 2601
    Resource: Location D1 Richard J Daley Center
    *Stricken*

01/08/2026
Filed Under Seal
    *[UNDER SEAL] Cerence Inc. Motion for Summary Judgment as to Plaintiff Vincenzo Allan*
    Party: Defendant Cerence Inc.
    *[UNDER SEAL] Cerence Inc. Motion for Summary Judgment as to Plaintiff Vincenzo Allan*

01/08/2026
Exhibits Filed
    *[UNDER SEAL] Exhibits 3, 4, 5, 7 to Cerence Inc. Motion for Summary Judgment as to Plaintiff Vincenzo Allan*
    Party: Defendant Cerence Inc.
    *[UNDER SEAL] Exhibits 3, 4, 5, 7 to Cerence Inc. Motion for Summary Judgment as to Plaintiff Vincenzo Allan*

01/08/2026
Filed Under Seal
    *[UNDER SEAL] Cerence Inc. Motion to Exclude Testimony of Plaintiffs Expert Carla A. Peak*
    Party: Defendant Cerence Inc.
    *[UNDER SEAL] Cerence Inc. Motion to Exclude Testimony of Plaintiffs Expert Carla A. Peak*

01/08/2026
Exhibits Filed
    *[UNDER SEAL] Exhibit 2 to Cerence Inc. Motion to Exclude Testimony of Plaintiffs Expert Carla Peak*
    Party: Defendant Cerence Inc.
    *[UNDER SEAL] Exhibit 2 to Cerence Inc. Motion to Exclude Testimony of Plaintiffs Expert Carla Peak*

01/07/2026

Agreed Order Entered      (Judicial Officer: Chupack, Joel)
     Party:    Defendant Cerence Inc.;
               Plaintiff Allan, Vincenzo;
               Plaintiff Freshour, Randolph;
               Plaintiff P, A;
               Plaintiff Pena, Carlos
     Party 2:    Attorney Buscarini, Colin Primo;
                 Attorney Geske, Paul T.;
                 Attorney Wolfe, Matthew Charles

01/07/2026

Motion Filed
     Party:    Plaintiff Allan, Vincenzo

01/07/2026

Exhibits Filed
     *Exhibit 1*
     Party:    Plaintiff Allan, Vincenzo
     *Exhibit 1*

01/07/2026

Exhibits Filed
     *Exhibit 2*
     Party:    Plaintiff Allan, Vincenzo
     *Exhibit 2*

01/07/2026

Exhibits Filed
     *Exhibit 3*
     Party:    Plaintiff Allan, Vincenzo
     *Exhibit 3*

01/07/2026

Exhibits Filed
     *Exhibit 4*
     Party:    Plaintiff Allan, Vincenzo
     *Exhibit 4*

01/07/2026

Exhibits Filed
     *Exhibit 5*
     Party:    Plaintiff Allan, Vincenzo
     *Exhibit 5*

01/07/2026

Exhibits Filed
*Exhibit 6*
Party:   Plaintiff Allan, Vincenzo
*Exhibit 6*

01/06/2026

Clerk Status     (Judicial Officer: Chupack, Joel)
*930AM*
Party:   Defendant Cerence Inc.
Party 2:   Attorney Wolfe, Matthew Charles
*930AM*

01/06/2026

Clerk Status     (Judicial Officer: Chupack, Joel)
*930AM*
Party:   Defendant Cerence Inc.;
            Plaintiff Allan, Vincenzo;
            Plaintiff Freshour, Randolph;
            Plaintiff P, A;
            Plaintiff Pena, Carlos
Party 2:   Attorney Buscarini, Colin Primo;
            Attorney Geske, Paul T.;
            Attorney Wolfe, Matthew Charles
*930AM*

01/06/2026

Strike From The Call - Allowed -     (Judicial Officer: Chupack, Joel)
*1/8/26 STRICKEN*
Party:   Defendant Cerence Inc.;
            Plaintiff Allan, Vincenzo;
            Plaintiff Freshour, Randolph;
            Plaintiff P, A;
            Plaintiff Pena, Carlos
*1/8/26 STRICKEN*

01/06/2026

Execute Or Perform - Allowed -     (Judicial Officer: Chupack, Joel)
*MEET & CONFER*
Party:   Defendant Cerence Inc.;
            Plaintiff Allan, Vincenzo;
            Plaintiff Freshour, Randolph;
            Plaintiff P, A;
            Plaintiff Pena, Carlos
*MEET & CONFER*

01/06/2026

Answer/Reply/Response - Allowed
*IN SUPPORT*
Party: Plaintiff Allan, Vincenzo;
Plaintiff Freshour, Randolph;
Plaintiff P, A;
Plaintiff Pena, Carlos
Party 2: Attorney Buscarini, Colin Primo;
Attorney Geske, Paul T.
*IN SUPPORT*

01/06/2026

Extend Time - Allowed -     (Judicial Officer: Chupack, Joel)
Party: Plaintiff Allan, Vincenzo;
Plaintiff Freshour, Randolph;
Plaintiff P, A;
Plaintiff Pena, Carlos

01/06/2026

Set Briefing Schedule - Allowed -     (Judicial Officer: Chupack, Joel)
Party: Defendant Cerence Inc.;
Plaintiff Allan, Vincenzo;
Plaintiff Freshour, Randolph;
Plaintiff P, A;
Plaintiff Pena, Carlos
Party 2: Attorney Buscarini, Colin Primo;
Attorney Geske, Paul T.;
Attorney Wolfe, Matthew Charles

01/06/2026

Answer/Reply/Response - Allowed
*ON OR BEFORE*
Party: Plaintiff Allan, Vincenzo;
Plaintiff Freshour, Randolph;
Plaintiff P, A;
Plaintiff Pena, Carlos
*ON OR BEFORE*

01/06/2026

Answer/Reply/Response - Allowed
*ON OR BEFORE*
Party: Defendant Cerence Inc.
Party 2: Attorney Wolfe, Matthew Charles
*ON OR BEFORE*

01/06/2026    📄

     Motion To - Allowed -     (Judicial Officer: Chupack, Joel)
       Party:   Defendant Cerence Inc.
       Party 2:   Attorney Wolfe, Matthew Charles

01/06/2026    📄

     Order To Seal -Allowed     (Judicial Officer: Chupack, Joel)
       Party:   Defendant Cerence Inc.
       Party 2:   Attorney Wolfe, Matthew Charles

01/06/2026    📄

     Agreed Order Entered     (Judicial Officer: Chupack, Joel)
       Party:   Defendant Cerence Inc.;
           Plaintiff Allan, Vincenzo;
           Plaintiff Freshour, Randolph;
           Plaintiff P, A;
           Plaintiff Pena, Carlos
       Party 2:   Attorney Buscarini, Colin Primo;
           Attorney Geske, Paul T.;
           Attorney Wolfe, Matthew Charles

01/05/2026   **Progress Hearing**   (10:00 AM)   (Judicial Officer: Chupack, Joel)
       Resource: Location CH2601 Court Room 2601
       Resource: Location D1 Richard J Daley Center

12/22/2025   *CANCELED* **General Chancery Hearing**   (10:15 AM)   (Judicial Officer: Chupack, Joel)
       Resource: Location CH2601 Court Room 2601
       Resource: Location D1 Richard J Daley Center
       *Stricken*

12/19/2025    📄

     Advance Or Reset On Call     (Judicial Officer: Chupack, Joel)
       Party:   Plaintiff Allan, Vincenzo

12/19/2025    📄

     Agreed Order Entered     (Judicial Officer: Chupack, Joel)
       Party:   Attorney Buscarini, Colin Primo;
           Attorney Geske, Paul T.;
           Attorney Wolfe, Matthew Charles;
           Defendant Cerence Inc.;
           Plaintiff Allan, Vincenzo;
           Plaintiff Freshour, Randolph;
           Plaintiff P, A;
           Plaintiff Pena, Carlos

12/19/2025

Strike From The Call - Allowed -     (Judicial Officer: Chupack, Joel)
Party:   Plaintiff Allan, Vincenzo

12/15/2025



Exhibits Filed

*(2023 CH 02866) Corrected Exhibit 1 to Cerence Inc. Opposition to Plaintiffs Motion and Memorandum of Law in Support of Class Certification*
Party:   Defendant Cerence Inc.
*(2023 CH 02866) Corrected Exhibit 1 to Cerence Inc. Opposition to Plaintiffs Motion and Memorandum of Law in Support of Class Certification*

12/15/2025



Exhibits Filed

*(2023 CH 02866) Corrected Exhibit 4 to Cerence Inc. Motion for Summary Judgment as to Plaintiff Vincenzo Allan*
Party:   Defendant Cerence Inc.
*(2023 CH 02866) Corrected Exhibit 4 to Cerence Inc. Motion for Summary Judgment as to Plaintiff Vincenzo Allan*

12/15/2025



Motion Filed

*(2023 CH 02866) Defendant Cerence Inc. Corrected Motion for Leave to File Under Seal*
Party:   Defendant Cerence Inc.
*(2023 CH 02866) Defendant Cerence Inc. Corrected Motion for Leave to File Under Seal*

12/15/2025



Notice Of Motion Filed

*(2023 CH 02866) Notice of Motion of Cerence Inc. Corrected Motion for Leave to File Under Seal*
Party:   Defendant Cerence Inc.
*(2023 CH 02866) Notice of Motion of Cerence Inc. Corrected Motion for Leave to File Under Seal*

12/15/2025



Exhibits Filed

*(2023 CH 02866) Corrected Exhibit 13 to Defendant Cerence Inc. Opposition to Plaintiffs Motion and Memorandum of Law in Support of Class Certification*
Party:   Defendant Cerence Inc.
*(2023 CH 02866) Corrected Exhibit 13 to Defendant Cerence Inc. Opposition to Plaintiffs Motion and Memorandum of Law in Support of Class Certification*

12/10/2025



Notice Of Motion Filed

*Notice of Motions for Cerence Motion to Exclude Testimony of Plaintiffs Expert Carla A. Peak and Cerence Motion for Summary Judgment as to Plaintiff Vincenzo Allan*

12/10/2025



Motion Filed

*Defendant Cerence Inc. Motion for Summary Judgment as to Plaintiff Vincenzo Allan*

12/10/2025



Exhibits Filed

*Defendant Cerence Inc. Motion for Summary Judgment as to Plaintiff Vincenzo Allan - Exhibits 1-7*

12/10/2025　

Motion Filed

*Defendant Cerence Motion to Exclude Testimony of Plaintiffs Expert Carla A. Peak*

12/10/2025



Answer/Response/Reply

*Defendant Cerence Inc. Response in Opposition to Plaintiffs Motion and Memorandum of Law in Support of Class Certification*

12/10/2025



Exhibits Filed

*Defendant Cerence Inc. Response in Opposition to Plaintiffs Motion and Memorandum of Law in Support of Class Certifcation - Exhibits 1-17*

12/10/2025　

Notice Of Motion Filed

*Notice of Motion for Defendant Cerence Inc. Motion for Leave to File Under Seal*

12/10/2025　

Motion Filed

*Defendant Cerence Motion for Leave to File Under Seal*

11/25/2025    *CANCELED* **General Chancery Hearing**   (10:15 AM)   (Judicial Officer: Chupack, Joel)

> Resource: Location CH2601 Court Room 2601
> Resource: Location D1 Richard J Daley Center
> *Order of Court*

11/19/2025    🔴

Strike From The Call - Allowed -    (Judicial Officer: Chupack, Joel)
> Party:   Plaintiff Freshour, Randolph

11/19/2025    🔴

Taking Of Deposition - Allowed -    (Judicial Officer: Chupack, Joel)
> Party:   Defendant Cerence Inc.;
>      Plaintiff Freshour, Randolph

11/19/2025    🔴

Extend Time - Allowed -    (Judicial Officer: Chupack, Joel)
> Party:   Defendant Cerence Inc.;
>      Plaintiff Freshour, Randolph

11/19/2025    🔴

Strike Or Withdraw Motion Or Petition - Allowed -    (Judicial Officer: Chupack, Joel)
> Party:   Defendant Cerence Inc.

11/19/2025    🔴

Agreed Order Entered    (Judicial Officer: Chupack, Joel)
> Party:   Defendant Cerence Inc.;
>      Plaintiff Freshour, Randolph

11/17/2025

🔴

Notice Of Motion Filed
> *Notice of Motion for Defendant Cerence Motion to Compel Expert Discvoery and to Stay Briefing on Class Certification*
> Party:   Defendant Cerence Inc.
> *Notice of Motion for Defendant Cerence Motion to Compel Expert Discvoery and to Stay Briefing on Class Certification*

11/17/2025



Motion Filed

*Defendant Cerence Inc.'s Motion to Compel Expert Discovery and to Stay Briefing on Class Certification*
Party:   Defendant Cerence Inc.
*Defendant Cerence Inc.'s Motion to Compel Expert Discovery and to Stay Briefing on Class Certification*

11/12/2025   Filed Under Seal
*Plaintiffs' Sealed Motion for Class Certification*
Party:   Plaintiff Allan, Vincenzo
*Plaintiffs' Sealed Motion for Class Certification*

11/12/2025   Exhibits Filed
*Exhibit A Sealed*
Party:   Plaintiff Allan, Vincenzo
*Exhibit A Sealed*

11/12/2025   Exhibits Filed
*Exhibit B Sealed*
Party:   Plaintiff Allan, Vincenzo
*Exhibit B Sealed*

11/12/2025   Exhibits Filed
*Exhibit C Sealed*
Party:   Plaintiff Allan, Vincenzo
*Exhibit C Sealed*

11/12/2025   Exhibits Filed
*Exhibit D Sealed*
Party:   Plaintiff Allan, Vincenzo
*Exhibit D Sealed*

11/12/2025   Exhibits Filed
*Exhibit E Sealed*
Party:   Plaintiff Allan, Vincenzo
*Exhibit E Sealed*

11/12/2025   Exhibits Filed
*Exhibit F Sealed*
Party:   Plaintiff Allan, Vincenzo
*Exhibit F Sealed*

11/12/2025   Exhibits Filed
*Exhibit G Sealed*
Party:   Plaintiff Allan, Vincenzo
*Exhibit G Sealed*

| | | |
|---|---|---|
| 11/12/2025 | Exhibits Filed | |
| | *Exhibit H Sealed* | |
| | Party: Plaintiff Allan, Vincenzo | |
| | *Exhibit H Sealed* | |

11/12/2025 Exhibits Filed
*Exhibit I Sealed*
Party: Plaintiff Allan, Vincenzo
*Exhibit I Sealed*

11/12/2025 Exhibits Filed
*Exhibit J Sealed*
Party: Plaintiff Allan, Vincenzo
*Exhibit J Sealed*

11/12/2025 Exhibits Filed
*Exhibit K Sealed*
Party: Plaintiff Allan, Vincenzo
*Exhibit K Sealed*

11/12/2025 Exhibits Filed
*Exhibit N Sealed*
Party: Plaintiff Allan, Vincenzo
*Exhibit N Sealed*

11/12/2025 Exhibits Filed
*Exhibit P Sealed*
Party: Plaintiff Allan, Vincenzo
*Exhibit P Sealed*

10/30/2025
Order To Seal -Allowed     (Judicial Officer: Chupack, Joel)
Party: Plaintiff Allan, Vincenzo;
Plaintiff P, A;
Plaintiff Pena, Carlos

10/30/2025
Case Assigned to Zoom Hearing - Allowed

10/30/2025
Case Set On Status Call     (Judicial Officer: Chupack, Joel)
Party: Plaintiff Freshour, Randolph

10/30/2025
File Amendment Or Additional Or Amended Pleadings-Allowed     (Judicial Officer: Chupack, Joel)
Party: Plaintiff Allan, Vincenzo;
Plaintiff P, A;
Plaintiff Pena, Carlos

10/30/2025



File Amendment Or Additional Or Amended Pleadings-Allowed    (Judicial Officer: Chupack, Joel)
    Party:   Defendant Cerence Inc.


10/29/2025    **General Chancery Hearing**   (10:15 AM)   (Judicial Officer: Chupack, Joel)
                    Resource: Location CH2601 Court Room 2601
                    Resource: Location D1 Richard J Daley Center

10/24/2025

            Notice Filed
                *Notice Filed*
                Party:   Plaintiff Allan, Vincenzo
                *Notice Filed*

10/24/2025

            Motion Filed
                *Motion For Class Certification*
                Party:   Plaintiff Allan, Vincenzo
                *Motion For Class Certification*

10/24/2025

            Exhibits Filed
                *Exhibits Filed*
                Party:   Plaintiff Allan, Vincenzo
                *Exhibits Filed*

10/24/2025

            Exhibits Filed
                *Exhibits Filed*
                Party:   Plaintiff Allan, Vincenzo
                *Exhibits Filed*

10/24/2025

            Exhibits Filed
                *Exhibits Filed*
                Party:   Plaintiff Allan, Vincenzo
                *Exhibits Filed*

10/24/2025

            Exhibits Filed
                *Exhibits Filed*
                Party:   Plaintiff Allan, Vincenzo
                *Exhibits Filed*

10/24/2025

Exhibits Filed
*Exhibits Filed*
Party:   Plaintiff Allan, Vincenzo
*Exhibits Filed*

10/24/2025

Exhibits Filed
*Exhibits Filed*
Party:   Plaintiff Allan, Vincenzo
*Exhibits Filed*

10/24/2025

Exhibits Filed
*Exhibits Filed*
Party:   Plaintiff Allan, Vincenzo
*Exhibits Filed*

10/24/2025

Exhibits Filed
*Exhibits Filed*
Party:   Plaintiff Allan, Vincenzo
*Exhibits Filed*

10/24/2025

Exhibits Filed
*Exhibits Filed*
Party:   Plaintiff Allan, Vincenzo
*Exhibits Filed*

10/24/2025

Exhibits Filed
*Exhibits Filed*
Party:   Plaintiff Allan, Vincenzo
*Exhibits Filed*

10/24/2025

Exhibits Filed
*Exhibits Filed*
Party:   Plaintiff Allan, Vincenzo
*Exhibits Filed*

10/24/2025

Exhibits Filed
*Exhibits Filed*
Party:   Plaintiff Allan, Vincenzo
*Exhibits Filed*

10/24/2025

Exhibits Filed
*Exhibits Filed*
Party: Plaintiff Allan, Vincenzo
*Exhibits Filed*

10/24/2025

Exhibits Filed
*Exhibits Filed*
Party: Plaintiff Allan, Vincenzo
*Exhibits Filed*

10/24/2025

Exhibits Filed
*Exhibits Filed*
Party: Plaintiff Allan, Vincenzo
*Exhibits Filed*

10/24/2025

Exhibits Filed
*Exhibits Filed*
Party: Plaintiff Allan, Vincenzo
*Exhibits Filed*

10/24/2025

Exhibits Filed
*Exhibits Filed*
Party: Plaintiff Allan, Vincenzo
*Exhibits Filed*

10/24/2025

Exhibits Filed
*Exhibits Filed*
Party: Plaintiff Allan, Vincenzo
*Exhibits Filed*

10/24/2025

Motion Filed
*Unopposed Motion For Leave to File Under Seal*
Party: Plaintiff Allan, Vincenzo
*Unopposed Motion For Leave to File Under Seal*

10/23/2025

Notice Filed
*Notice Filed*
Party: Plaintiff Allan, Vincenzo
*Notice Filed*

10/23/2025

Motion Filed
*Motion Filed*
Party:   Plaintiff Allan, Vincenzo
*Motion Filed*

08/05/2025

Case Assigned to Zoom Hearing - Allowed
*930AM*

08/05/2025

Case Set On Status Call      (Judicial Officer: Chupack, Joel)
*930AM*
Party:   Defendant Cerence Inc.;
Plaintiff Allan, Vincenzo;
Plaintiff Freshour, Randolph;
Plaintiff P, A;
Plaintiff Pena, Carlos
Party 2:   Attorney Buscarini, Colin Primo;
Attorney Geske, Paul T.;
Attorney Wolfe, Matthew Charles
*930AM*

08/05/2025

Produce Exhibits OrOtherRecordsOrDocumentsOrPerson-Allowed      (Judicial Officer: Chupack, Joel)
*TO COURT {STATUS REPORT} BY 1/16/26*
Party:   Defendant Cerence Inc.;
Plaintiff Allan, Vincenzo;
Plaintiff Freshour, Randolph;
Plaintiff P, A;
Plaintiff Pena, Carlos
Party 2:   Attorney Buscarini, Colin Primo;
Attorney Geske, Paul T.;
Attorney Wolfe, Matthew Charles
*TO COURT {STATUS REPORT} BY 1/16/26*

08/05/2025

Extend Time - Allowed -      (Judicial Officer: Chupack, Joel)
*FACT DISCOVERY*
    Party:   Defendant Cerence Inc.;
           Plaintiff Allan, Vincenzo;
           Plaintiff Freshour, Randolph;
           Plaintiff P, A;
           Plaintiff Pena, Carlos
    Party 2:   Attorney Buscarini, Colin Primo;
           Attorney Geske, Paul T.;
           Attorney Wolfe, Matthew Charles
*FACT DISCOVERY*

08/05/2025   **Open Call**   (9:30 AM)   (Judicial Officer: Chupack, Joel)
    Resource: Location CH2601 Court Room 2601
    Resource: Location D1 Richard J Daley Center

03/11/2025

Case Set On Status Call      (Judicial Officer: Chupack, Joel)
*930AM*
    Party:   Defendant Cerence Inc.;
           Plaintiff Allan, Vincenzo;
           Plaintiff Freshour, Randolph;
           Plaintiff P, A;
           Plaintiff Pena, Carlos
    Party 2:   Attorney Buscarini, Colin Primo;
           Attorney Geske, Paul T.;
           Attorney Wolfe, Matthew Charles
*930AM*

03/11/2025

Protective Order - Allowed -      (Judicial Officer: Chupack, Joel)
    Party:   Defendant Cerence Inc.;
           Plaintiff Allan, Vincenzo;
           Plaintiff Freshour, Randolph;
           Plaintiff P, A;
           Plaintiff Pena, Carlos

03/11/2025

Case Assigned to Zoom Hearing - Allowed
*930AM*

03/11/2025

    Motion To - Allowed -    (Judicial Officer: Chupack, Joel)
      *PROTECTIVE ORDER*
      Party:   Defendant Cerence Inc.;
              Plaintiff Allan, Vincenzo;
              Plaintiff Freshour, Randolph;
              Plaintiff P, A;
              Plaintiff Pena, Carlos
      Party 2:   Attorney Buscarini, Colin Primo;
               Attorney Geske, Paul T.;
               Attorney Wolfe, Matthew Charles
      *PROTECTIVE ORDER*

03/11/2025

    Motion To - Denied -    (Judicial Officer: Chupack, Joel)
      *MEET AND CONFER ABOUT (ESI) WITHOUT PREJUDICE*
      Party:   Plaintiff Allan, Vincenzo;
               Plaintiff Freshour, Randolph;
               Plaintiff P, A;
               Plaintiff Pena, Carlos
      *MEET AND CONFER ABOUT (ESI) WITHOUT PREJUDICE*

03/11/2025

    Motion To - Denied -    (Judicial Officer: Chupack, Joel)
      *WITHOUT PREJUDICE (REQUEST TO LIFT DEADLINE)*
      Party:   Plaintiff Allan, Vincenzo;
               Plaintiff Freshour, Randolph;
               Plaintiff P, A;
               Plaintiff Pena, Carlos
      Party 2:   Attorney Buscarini, Colin Primo;
               Attorney Geske, Paul T.
      *WITHOUT PREJUDICE (REQUEST TO LIFT DEADLINE)*

03/11/2025

    Agreed Order Entered    (Judicial Officer: Chupack, Joel)
      Party:   Defendant Cerence Inc.;
               Plaintiff Allan, Vincenzo;
               Plaintiff Freshour, Randolph;
               Plaintiff P, A;
               Plaintiff Pena, Carlos
      Party 2:   Attorney Buscarini, Colin Primo;
               Attorney Geske, Paul T.;
               Attorney Wolfe, Matthew Charles

03/10/2025   **Open Call**   (9:30 AM)   (Judicial Officer: Chupack, Joel)
      Resource: Location CH2601 Court Room 2601
      Resource: Location D1 Richard J Daley Center

03/07/2025

Motion Filed
*JOINT MOTION FOR ENTRY OF CONFIDENTIALITY ORDER*

03/07/2025

Notice Of Motion Filed
*NOTICE OF MOTION RE: JOINT MOTION FOR ENTRY OF CONFIDENTIALITY ORDER*

02/26/2025

Proof Of Service Filed
*Proof of Service of Discovery*
Party: Defendant Cerence Inc.
*Proof of Service of Discovery*

02/13/2025

Case Set On Status Call      (Judicial Officer: Chupack, Joel)
*930AM*
Party: Defendant Cerence Inc.;
        Plaintiff Allan, Vincenzo;
        Plaintiff Freshour, Randolph
Party 2: Attorney Buscarini, Colin Primo;
        Attorney Wolfe, Matthew Charles
*930AM*

02/13/2025

Case Assigned to Zoom Hearing - Allowed
*930AM*

02/13/2025

Discovery - Allowed -      (Judicial Officer: Chupack, Joel)
*WRITTEN DISCOVERY*
Party: Defendant Cerence Inc.;
        Plaintiff Allan, Vincenzo;
        Plaintiff Freshour, Randolph
Party 2: Attorney Buscarini, Colin Primo;
        Attorney Wolfe, Matthew Charles
*WRITTEN DISCOVERY*

02/13/2025

Execute Or Perform - Allowed -      (Judicial Officer: Chupack, Joel)
*UPDATE COURT BY EMAIL*
Party: Defendant Cerence Inc.;
        Plaintiff Allan, Vincenzo;
        Plaintiff Freshour, Randolph
*UPDATE COURT BY EMAIL*

02/13/2025

Agreed Order Entered (Judicial Officer: Chupack, Joel)
  Party: Defendant Cerence Inc.;
       Plaintiff Allan, Vincenzo;
       Plaintiff Freshour, Randolph;
       Plaintiff P, A;
       Plaintiff Pena, Carlos
  Party 2: Attorney Buscarini, Colin Primo;
       Attorney Geske, Paul T.;
       Attorney Wolfe, Matthew Charles

01/31/2025

Proof Of Service Filed
  *Proof of Service of Discovery*
  Party: Defendant Cerence Inc.
  *Proof of Service of Discovery*

01/22/2025

Agreed Order Entered (Judicial Officer: Chupack, Joel)
  Party: Plaintiff Allan, Vincenzo;
       Plaintiff Freshour, Randolph

01/22/2025

Discovery - Continued - (Judicial Officer: Chupack, Joel)
  Party: Plaintiff Allan, Vincenzo;
       Plaintiff P, A

01/22/2025

Discovery - Allowed - (Judicial Officer: Chupack, Joel)
  Party: Defendant Cerence Inc.

01/22/2025

Case Assigned to Zoom Hearing - Allowed

01/22/2025

Discovery - Allowed - (Judicial Officer: Chupack, Joel)
  Party: Plaintiff Allan, Vincenzo;
       Plaintiff Freshour, Randolph

01/21/2025 **Open Call** (9:30 AM) (Judicial Officer: Chupack, Joel)
  Resource: Location CH2601 Court Room 2601
  Resource: Location D1 Richard J Daley Center

12/13/2024 📄

Case Set On Status Call (Judicial Officer: Chupack, Joel)
*930AM*
Party: Defendant Cerence Inc.;
Plaintiff Allan, Vincenzo;
Plaintiff Freshour, Randolph;
Plaintiff P, A;
Plaintiff Pena, Carlos
*930AM*

12/13/2024 📄

Motion To - Allowed - (Judicial Officer: Chupack, Joel)
*STRIKE AFFIRMATIVE DEFENSES*
Party: Plaintiff Allan, Vincenzo;
Plaintiff Freshour, Randolph
Party 2: Attorney Buscarini, Colin Primo
*STRIKE AFFIRMATIVE DEFENSES*

12/13/2024 📄

Case Assigned to Zoom Hearing - Allowed
*930AM*

12/13/2024 📄

Memorandum Of Opinion (Judicial Officer: Chupack, Joel)
Party: Defendant Cerence Inc.;
Plaintiff Allan, Vincenzo;
Plaintiff Freshour, Randolph;
Plaintiff P, A;
Plaintiff Pena, Carlos
Party 2: Attorney Buscarini, Colin Primo;
Attorney Geske, Paul T.;
Attorney Wolfe, Matthew Charles

10/17/2024 📄

Agreed Order Entered (Judicial Officer: Chupack, Joel)
Party: Attorney Buscarini, Colin Primo;
Attorney Geske, Paul T.;
Attorney Wolfe, Matthew Charles;
Defendant Cerence Inc.;
Plaintiff Allan, Vincenzo;
Plaintiff Freshour, Randolph;
Plaintiff P, A;
Plaintiff Pena, Carlos

10/17/2024 **Clerk Status Hearing** (10:00 AM) (Judicial Officer: Chupack, Joel)
Resource: Location CH2601 Court Room 2601
Resource: Location D1 Richard J Daley Center

10/15/2024

Answer/Response/Reply
    Party:   Plaintiff Freshour, Randolph

10/15/2024

Exhibits Filed
    Party:   Plaintiff Freshour, Randolph

10/07/2024

Clerk Status      (Judicial Officer: Chupack, Joel)
    *10AM*
    Party:   Plaintiff Allan, Vincenzo;
                Plaintiff Freshour, Randolph;
                Plaintiff P, A;
                Plaintiff Pena, Carlos
    Party 2:   Attorney Buscarini, Colin Primo;
                Attorney Geske, Paul T.
    *10AM*

10/07/2024

Extend Time - Allowed -      (Judicial Officer: Chupack, Joel)
    *UP TO*
    Party:   Plaintiff Allan, Vincenzo;
                Plaintiff Freshour, Randolph;
                Plaintiff P, A;
                Plaintiff Pena, Carlos
    Party 2:   Attorney Buscarini, Colin Primo;
                Attorney Geske, Paul T.
    *UP TO*

10/07/2024

Courtesy Copies Required - Allowed
    *PLAINTIFF*

10/07/2024

Agreed Order Entered      (Judicial Officer: Chupack, Joel)
    Party:   Defendant Cerence Inc.;
                Plaintiff Allan, Vincenzo;
                Plaintiff Freshour, Randolph;
                Plaintiff P, A;
                Plaintiff Pena, Carlos
    Party 2:   Attorney Buscarini, Colin Primo;
                Attorney Geske, Paul T.;
                Attorney Wolfe, Matthew Charles

09/24/2024



Answer/Response/Reply

*DEFENDANT CERENCE INC.S RESPONSE TO PLAINTIFFS MOTION TO STRIKE DEFENDANTS*
*AFFIRMATIVE DEFENSES PURSUANT TO 735 ILCS 5/2-615*

Party: Defendant Cerence Inc.

*DEFENDANT CERENCE INC.S RESPONSE TO PLAINTIFFS MOTION TO STRIKE DEFENDANTS*
*AFFIRMATIVE DEFENSES PURSUANT TO 735 ILCS 5/2-615*

08/27/2024

Execute Or Perform - Allowed - (Judicial Officer: Chupack, Joel)
*COURTESY COPIES ELECTRONICALLY*
Party: Plaintiff Allan, Vincenzo;
Plaintiff Freshour, Randolph;
Plaintiff P, A;
Plaintiff Pena, Carlos
Party 2: Attorney Buscarini, Colin Primo;
Attorney Geske, Paul T.
*COURTESY COPIES ELECTRONICALLY*

08/27/2024

Clerk Status (Judicial Officer: Chupack, Joel)
*10AM*
Party: Plaintiff Allan, Vincenzo;
Plaintiff Freshour, Randolph;
Plaintiff P, A;
Plaintiff Pena, Carlos
Party 2: Attorney Buscarini, Colin Primo;
Attorney Geske, Paul T.
*10AM*

08/27/2024

Answer/Reply/Response - Allowed
*ON OR BEFORE*
Party: Plaintiff Allan, Vincenzo;
Plaintiff Freshour, Randolph;
Plaintiff P, A;
Plaintiff Pena, Carlos
Party 2: Attorney Buscarini, Colin Primo;
Attorney Geske, Paul T.
*ON OR BEFORE*

08/27/2024

Case Assigned to Zoom Hearing - Allowed
*10AM*

08/27/2024 📄

Answer/Reply/Response - Allowed
*ON OR BEFORE*
Party: Defendant Cerence Inc.
Party 2: Attorney Wolfe, Matthew Charles
*ON OR BEFORE*

08/27/2024 📄

Agreed Order Entered    (Judicial Officer: Chupack, Joel)
Party: Defendant Cerence Inc.;
Plaintiff Allan, Vincenzo;
Plaintiff Freshour, Randolph;
Plaintiff P, A;
Plaintiff Pena, Carlos
Party 2: Attorney Buscarini, Colin Primo;
Attorney Geske, Paul T.;
Attorney Wolfe, Matthew Charles

08/27/2024 **Open Call**  (9:30 AM)  (Judicial Officer: Chupack, Joel)
Resource: Location CH2601 Court Room 2601
Resource: Location D1 Richard J Daley Center

08/26/2024 *CANCELED* **General Chancery Hearing**  (10:15 AM)  (Judicial Officer: Chupack, Joel)
Resource: Location CH2601 Court Room 2601
Resource: Location D1 Richard J Daley Center
*Stricken*

08/19/2024 📄

Advance Or Reset On Call    (Judicial Officer: Chupack, Joel)
*930AM*
Party: Defendant Cerence Inc.;
Plaintiff Allan, Vincenzo;
Plaintiff Freshour, Randolph;
Plaintiff P, A;
Plaintiff Pena, Carlos
Party 2: Attorney Buscarini, Colin Primo;
Attorney Geske, Paul T.;
Attorney Wolfe, Matthew Charles
*930AM*

08/19/2024

Strike From The Call - Allowed -    (Judicial Officer: Chupack, Joel)
   *8/26/24 STRICKEN*
   Party:   Defendant Cerence Inc.;
             Plaintiff Allan, Vincenzo;
             Plaintiff Freshour, Randolph;
             Plaintiff P, A;
             Plaintiff Pena, Carlos
   Party 2:   Attorney Buscarini, Colin Primo;
             Attorney Geske, Paul T.;
             Attorney Wolfe, Matthew Charles
   *8/26/24 STRICKEN*

08/19/2024

Agreed Order Entered    (Judicial Officer: Chupack, Joel)
   Party:   Defendant Cerence Inc.;
             Plaintiff Allan, Vincenzo;
             Plaintiff Freshour, Randolph;
             Plaintiff P, A;
             Plaintiff Pena, Carlos
   Party 2:   Attorney Buscarini, Colin Primo;
             Attorney Geske, Paul T.;
             Attorney Wolfe, Matthew Charles

08/15/2024

Notice Of Motion Filed
   Party:   Plaintiff Freshour, Randolph

08/15/2024

Motion Filed
   Party:   Plaintiff Freshour, Randolph

08/15/2024

Exhibits Filed
   Party:   Plaintiff Freshour, Randolph

08/15/2024

Exhibits Filed
   Party:   Plaintiff Freshour, Randolph

08/15/2024

Exhibits Filed
   Party:   Plaintiff Freshour, Randolph

08/07/2024

Extend Time - Allowed -     (Judicial Officer: Quish, Clare J)
   Party:   Plaintiff Allan, Vincenzo;
            Plaintiff Freshour, Randolph;
            Plaintiff P, A;
            Plaintiff Pena, Carlos

08/07/2024

Agreed Order Entered     (Judicial Officer: Quish, Clare J)
   Party:   Attorney Buscarini, Colin Primo;
            Attorney Geske, Paul T.;
            Attorney Wolfe, Matthew Charles;
            Defendant Cerence Inc.;
            Plaintiff Allan, Vincenzo;
            Plaintiff Freshour, Randolph;
            Plaintiff P, A;
            Plaintiff Pena, Carlos

07/18/2024



Answer To Amended Complaint Filed
   *Defendant Cerence Inc.s Answer and Affirmative Defenses to Plaintiffs Second Amended Class Action Complaint*
   Party:   Defendant Cerence Inc.
   *Defendant Cerence Inc.s Answer and Affirmative Defenses to Plaintiffs Second Amended Class Action Complaint*

06/20/2024   **Open Call**   (1:30 PM)   (Judicial Officer: Chupack, Joel)
            Resource: Location CH2601 Court Room 2601
            Resource: Location D1 Richard J Daley Center

06/20/2024

Amendment To Complaint Filed
   *Second Amended Class Action Complaint*
   Party:   Plaintiff Freshour, Randolph
   *Second Amended Class Action Complaint*

06/13/2024

Case Set On Status Call     (Judicial Officer: Chupack, Joel)
*930AM*
Party:   Defendant Cerence Inc.;
        Plaintiff Allan, Vincenzo;
        Plaintiff Freshour, Randolph;
        Plaintiff P, A;
        Plaintiff Pena, Carlos
Party 2:   Attorney Buscarini, Colin Primo;
        Attorney Geske, Paul T.;
        Attorney Wolfe, Matthew Charles
*930AM*

06/13/2024

Strike Or Withdraw Motion Or Petition - Allowed -     (Judicial Officer: Chupack, Joel)
*6/18/24 DEADLINE IN 5/23 ORDER*
Party:   Defendant Cerence Inc.
Party 2:   Attorney Wolfe, Matthew Charles
*6/18/24 DEADLINE IN 5/23 ORDER*

06/13/2024

Case Assigned to Zoom Hearing - Allowed
*930AM*

06/13/2024

Answer/Reply/Response - Allowed
*28 DAYS*
Party:   Defendant Cerence Inc.
Party 2:   Attorney Wolfe, Matthew Charles
*28 DAYS*

06/13/2024

Strike Or Withdraw Motion Or Petition - Allowed -     (Judicial Officer: Chupack, Joel)
*ALL PREVIOUS DATES & DEADLINES*
Party:   Defendant Cerence Inc.;
        Plaintiff Allan, Vincenzo;
        Plaintiff Freshour, Randolph;
        Plaintiff P, A;
        Plaintiff Pena, Carlos
*ALL PREVIOUS DATES & DEADLINES*

06/13/2024

Amend Complaint Or Petition - Allowed -     (Judicial Officer: Chupack, Joel)
*WITHIN 7 DAYS OF THIS ORDER*
Party:   Plaintiff Allan, Vincenzo;
          Plaintiff Freshour, Randolph;
          Plaintiff P, A;
          Plaintiff Pena, Carlos
*WITHIN 7 DAYS OF THIS ORDER*


06/13/2024

Order Plaintiff Leave To File Petition     (Judicial Officer: Chupack, Joel)
*WITHIN 7 DAYS*
Party:   Plaintiff Allan, Vincenzo;
          Plaintiff Freshour, Randolph;
          Plaintiff P, A;
          Plaintiff Pena, Carlos
Party 2:   Attorney Buscarini, Colin Primo;
            Attorney Geske, Paul T.
*WITHIN 7 DAYS*


06/13/2024

Agreed Order Entered     (Judicial Officer: Chupack, Joel)
Party:   Defendant Cerence Inc.;
          Plaintiff Allan, Vincenzo;
          Plaintiff Freshour, Randolph;
          Plaintiff P, A;
          Plaintiff Pena, Carlos
Party 2:   Attorney Buscarini, Colin Primo;
            Attorney Geske, Paul T.;
            Attorney Wolfe, Matthew Charles

06/13/2024

Strike Or Withdraw Motion Or Petition - Allowed -     (Judicial Officer: Chupack, Joel)
Party:   Defendant Cerence Inc.
Party 2:   Attorney Wolfe, Matthew Charles


05/23/2024

File Amendment Or Additional Or Amended Pleadings-Allowed     (Judicial Officer: Chupack, Joel)
Party:   Defendant Cerence Inc.

05/23/2024

Order Defendant Leave To File Petition    (Judicial Officer: Chupack, Joel)
    Party:   Defendant Cerence Inc.
    Party 2:   Attorney Wolfe, Matthew Charles

05/23/2024

Motion To - Allowed -    (Judicial Officer: Chupack, Joel)
    Party:   Plaintiff Allan, Vincenzo;
          Plaintiff Freshour, Randolph;
          Plaintiff P, A;
          Plaintiff Pena, Carlos
    Party 2:   Attorney Buscarini, Colin Primo;
          Attorney Geske, Paul T.

05/22/2024   **Open Call**  (1:30 PM)  (Judicial Officer: Chupack, Joel)
    Resource: Location CH2601 Court Room 2601
    Resource: Location D1 Richard J Daley Center

05/20/2024

Continuance - Allowed -    (Judicial Officer: Chupack, Joel)
    *130PM*
    Party:   Defendant Cerence Inc.;
          Plaintiff Allan, Vincenzo;
          Plaintiff Freshour, Randolph;
          Plaintiff P, A;
          Plaintiff Pena, Carlos
    Party 2:   Attorney Buscarini, Colin Primo;
          Attorney Geske, Paul T.;
          Attorney Wolfe, Matthew Charles
    *130PM*

05/20/2024

Agreed Order Entered    (Judicial Officer: Chupack, Joel)
    Party:   Defendant Cerence Inc.;
          Plaintiff Allan, Vincenzo;
          Plaintiff Freshour, Randolph;
          Plaintiff P, A;
          Plaintiff Pena, Carlos
    Party 2:   Attorney Buscarini, Colin Primo;
          Attorney Geske, Paul T.;
          Attorney Wolfe, Matthew Charles

05/20/2024

Case Assigned to Zoom Hearing - Allowed
    *130PM*

05/20/2024 **General Chancery Hearing** (10:15 AM) (Judicial Officer: Chupack, Joel)
      Resource: Location CH2601 Court Room 2601
      Resource: Location D1 Richard J Daley Center

05/20/2024 🗎

Memorandum Filed
   *Memorandum Filed*

05/07/2024 🗎

Notice Of Motion Filed
   Party: Plaintiff P, A

05/07/2024 🗎

Motion Filed
   Party: Plaintiff P, A

05/07/2024 🗎

Exhibits Filed
   Party: Plaintiff P, A

04/30/2024 *CANCELED* **Open Call** (9:30 AM) (Judicial Officer: Chupack, Joel)
      Resource: Location CH2601 Court Room 2601
      Resource: Location D1 Richard J Daley Center
      *Order of Court*

04/22/2024 🗎

Strike From The Call - Allowed - (Judicial Officer: Chupack, Joel)
   Party: Attorney Buscarini, Colin Primo;
        Attorney Geske, Paul T.;
        Attorney Wolfe, Matthew Charles;
        Defendant Cerence Inc.;
        Plaintiff Allan, Vincenzo;
        Plaintiff Freshour, Randolph;
        Plaintiff P, A;
        Plaintiff Pena, Carlos

04/22/2024 🗎

Stay Of Execution (Judicial Officer: Chupack, Joel)
   Party: Attorney Buscarini, Colin Primo;
        Attorney Geske, Paul T.;
        Attorney Wolfe, Matthew Charles;
        Defendant Cerence Inc.;
        Plaintiff Allan, Vincenzo;
        Plaintiff Freshour, Randolph;
        Plaintiff P, A;
        Plaintiff Pena, Carlos

04/22/2024

    Miscellaneous Motion - Continued -    (Judicial Officer: Chupack, Joel)
        Party:  Attorney Buscarini, Colin Primo;
                  Attorney Geske, Paul T.;
                  Attorney Wolfe, Matthew Charles;
                  Defendant Cerence Inc.;
                  Plaintiff Allan, Vincenzo;
                  Plaintiff Freshour, Randolph;
                  Plaintiff P, A;
                  Plaintiff Pena, Carlos

04/22/2024

    Courtesy Copies Required - Allowed

04/22/2024

    Set Briefing Schedule - Allowed -    (Judicial Officer: Chupack, Joel)
       Party:  Attorney Buscarini, Colin Primo;
                  Attorney Geske, Paul T.;
                  Attorney Wolfe, Matthew Charles;
                  Defendant Cerence Inc.

04/22/2024   **General Chancery Hearing**  (10:15 AM)  (Judicial Officer: Chupack, Joel)
        Resource: Location CH2601 Court Room 2601
        Resource: Location D1 Richard J Daley Center

04/17/2024



Notice Of Motion Filed

   *Notice of Motion re: Defendant Cerence Inc.s Motion to Certify the February 27, 2024 Order for Interlocutory Appeal*
   Party:   Defendant Cerence Inc.
   *Notice of Motion re: Defendant Cerence Inc.s Motion to Certify the February 27, 2024 Order for Interlocutory Appeal*

04/16/2024



Motion Filed

   *Defendant Cerence Inc.s Motion to Certify the February 27, 2024 Order for Interlocutory Appeal*
   Party:  Defendant Cerence Inc.
   *Defendant Cerence Inc.s Motion to Certify the February 27, 2024 Order for Interlocutory Appeal*

04/16/2024



Motion Filed

*Defendant Cerence Inc.s Motion to Stay Pending Briefing on Motion to Certify and Potential Subsequent Appeal*
Party:    Defendant Cerence Inc.
*Defendant Cerence Inc.s Motion to Stay Pending Briefing on Motion to Certify and Potential Subsequent Appeal*

04/16/2024



Notice Of Motion Filed

*Notice of Motion re: Defendant Cerence Inc.s Motion to Stay Pending Briefing on Motion to Certify and Potential Subsequent Appeal*
Party:    Defendant Cerence Inc.
*Notice of Motion re: Defendant Cerence Inc.s Motion to Stay Pending Briefing on Motion to Certify and Potential Subsequent Appeal*

04/16/2024



Answer To Amended Complaint Filed

*Defendant Cerence Inc.s Answer and Affirmative Defenses to Plaintiffs First Amended Class Action Complaint*
Party:    Defendant Cerence Inc.
*Defendant Cerence Inc.s Answer and Affirmative Defenses to Plaintiffs First Amended Class Action Complaint*

04/09/2024    *CANCELED* **Open Call**   (9:30 AM)   (Judicial Officer: Chupack, Joel)
           Resource: Location CH2601 Court Room 2601
           Resource: Location D1 Richard J Daley Center
           *Stricken*

03/27/2024    *CANCELED* **General Chancery Hearing**   (10:15 AM)   (Judicial Officer: Chupack, Joel)
           Resource: Location CH2601 Court Room 2601
           Resource: Location D1 Richard J Daley Center
           *Stricken*

03/25/2024

Advance Or Reset On Call     (Judicial Officer: Chupack, Joel)
   *930AM*
   Party:  Defendant Cerence Inc.;
         Plaintiff Allan, Vincenzo;
         Plaintiff Freshour, Randolph;
         Plaintiff P, A;
         Plaintiff Pena, Carlos
   Party 2:  Attorney Buscarini, Colin Primo;
         Attorney Geske, Paul T.;
         Attorney Wolfe, Matthew Charles
   *930AM*

03/25/2024

Strike From The Call - Allowed -     (Judicial Officer: Chupack, Joel)
   *4/9/24 STRICKEN*
   Party:  Defendant Cerence Inc.;
         Plaintiff Allan, Vincenzo;
         Plaintiff Freshour, Randolph;
         Plaintiff P, A;
         Plaintiff Pena, Carlos
   *4/9/24 STRICKEN*

03/25/2024

Strike From The Call - Allowed -     (Judicial Officer: Chupack, Joel)
   *3/27/24 STRICKEN*
   Party:  Defendant Cerence Inc.;
         Plaintiff Allan, Vincenzo;
         Plaintiff Freshour, Randolph;
         Plaintiff P, A;
         Plaintiff Pena, Carlos
   *3/27/24 STRICKEN*

03/25/2024

Extend Time - Allowed -     (Judicial Officer: Chupack, Joel)
   *ANSWER FIRST AMENDED COMPLAINT*
   Party:  Defendant Cerence Inc.
   Party 2:  Attorney Wolfe, Matthew Charles
   *ANSWER FIRST AMENDED COMPLAINT*

03/25/2024

        Agreed Order Entered     (Judicial Officer: Chupack, Joel)
           Party:   Defendant Cerence Inc.;
                   Plaintiff Allan, Vincenzo;
                   Plaintiff Freshour, Randolph;
                   Plaintiff P, A;
                   Plaintiff Pena, Carlos
          Party 2:   Attorney Buscarini, Colin Primo;
                   Attorney Geske, Paul T.;
                   Attorney Wolfe, Matthew Charles

03/25/2024

        Motion To - Allowed -    (Judicial Officer: Chupack, Joel)
           Party:   Defendant Cerence Inc.
           Party 2:   Attorney Wolfe, Matthew Charles

03/22/2024



Motion Filed
   *DEFENDANT CERENCE INC.S UNOPPOSED MOTION FOR EXTENSION OF TIME TO FILE*
   *ANSWER*
   Party:   Defendant Cerence Inc.
   *DEFENDANT CERENCE INC.S UNOPPOSED MOTION FOR EXTENSION OF TIME TO FILE*
   *ANSWER*

03/22/2024



Notice Of Motion Filed
   *NOTICE OF MOTION RE DEFENDANT CERENCE INC.S UNOPPOSED MOTION FOR*
   *EXTENSION OF TIME TO FILE ANSWER*
   Party:   Defendant Cerence Inc.
   *NOTICE OF MOTION RE DEFENDANT CERENCE INC.S UNOPPOSED MOTION FOR*
   *EXTENSION OF TIME TO FILE ANSWER*

02/27/2024

Case Set On Status Call     (Judicial Officer: Chupack, Joel)
>    *930AM*
>    Party:   Defendant Cerence Inc.;
>               Plaintiff Allan, Vincenzo;
>               Plaintiff Freshour, Randolph;
>               Plaintiff P, A;
>               Plaintiff Pena, Carlos
>    Party 2:   Attorney Buscarini, Colin Primo;
>               Attorney Geske, Paul T.;
>               Attorney Wolfe, Matthew Charles
>    *930AM*

02/27/2024

Case Assigned to Zoom Hearing - Allowed
>    *930AM*

02/27/2024

Motion To - Denied -     (Judicial Officer: Chupack, Joel)
>    Party:   Defendant Cerence Inc.
>    Party 2:   Attorney Wolfe, Matthew Charles

02/27/2024

Answer/Reply/Response - Allowed
>    Party:   Defendant Cerence Inc.
>    Party 2:   Attorney Wolfe, Matthew Charles

02/27/2024

Memorandum Of Opinion     (Judicial Officer: Chupack, Joel)
>    Party:   Defendant Cerence Inc.;
>               Plaintiff Allan, Vincenzo;
>               Plaintiff Freshour, Randolph;
>               Plaintiff P, A;
>               Plaintiff Pena, Carlos
>    Party 2:   Attorney Buscarini, Colin Primo;
>               Attorney Geske, Paul T.;
>               Attorney Wolfe, Matthew Charles

01/25/2024

Answer/Response/Reply
>    *Answer/Response/Reply*
>    Party:   Plaintiff P, A
>    *Answer/Response/Reply*

01/22/2024

        Continuance - Allowed -     (Judicial Officer: Chupack, Joel)
           *RULING DATE*
           Party:   Defendant Cerence Inc.;
                    Plaintiff Allan, Vincenzo;
                    Plaintiff Freshour, Randolph;
                    Plaintiff P, A;
                    Plaintiff Pena, Carlos
           Party 2:   Attorney Buscarini, Colin Primo;
                    Attorney Geske, Paul T.;
                    Attorney Wolfe, Matthew Charles
           *RULING DATE*

01/22/2024

File Appearance Or Jury Demand, Answer Or Plead - Allowed -    (Judicial Officer: Chupack, Joel)
   *ON OR BEFORE 1/29/24*
     Party:   Plaintiff Allan, Vincenzo;
              Plaintiff Freshour, Randolph;
               Plaintiff P, A;
               Plaintiff Pena, Carlos
    Party 2:   Attorney Buscarini, Colin Primo;
              Attorney Geske, Paul T.
   *ON OR BEFORE 1/29/24*

01/22/2024

        Motion To - Allowed -     (Judicial Officer: Chupack, Joel)
           *2nd MOTION FOR LEAVE*
           Party:   Defendant Cerence Inc.
           Party 2:   Attorney Wolfe, Matthew Charles
           *2nd MOTION FOR LEAVE*

01/22/2024

        Motion To - Allowed -     (Judicial Officer: Chupack, Joel)
           Party:   Defendant Cerence Inc.
           Party 2:   Attorney Wolfe, Matthew Charles

01/22/2024

Courts Motion This Case Is Taken Under Advisement    (Judicial Officer: Chupack, Joel)
    Party:   Defendant Cerence Inc.;
              Plaintiff Allan, Vincenzo;
               Plaintiff Freshour, Randolph;
               Plaintiff P, A;
               Plaintiff Pena, Carlos

01/22/2024

> Agreed Order Entered    (Judicial Officer: Chupack, Joel)
>> Party:  Defendant Cerence Inc.;
>>          Plaintiff Allan, Vincenzo;
>>          Plaintiff Freshour, Randolph;
>>          Plaintiff P, A;
>>          Plaintiff Pena, Carlos
>> Party 2:  Attorney Buscarini, Colin Primo;
>>            Attorney Geske, Paul T.;
>>            Attorney Wolfe, Matthew Charles

01/22/2024 **General Chancery Hearing**  (10:15 AM)  (Judicial Officer: Chupack, Joel)
> Resource: Location CH2601 Court Room 2601
> Resource: Location D1 Richard J Daley Center

01/16/2024



Motion Filed

> *DEFENDANT CERENCE INC.S MOTION FOR LEAVE TO FILE SUPPLEMENTAL AUTHORITY CASTELAZ V. THE ESTE LAUDER COMPANIES, INC.*
> Party:  Defendant Cerence Inc.
> *DEFENDANT CERENCE INC.S MOTION FOR LEAVE TO FILE SUPPLEMENTAL AUTHORITY CASTELAZ V. THE ESTE LAUDER COMPANIES, INC.*

01/16/2024



Notice Of Motion Filed

> *NOTICE OF MOTION RE DEFENDANT CERENCE INC.S MOTION FOR LEAVE TO FILE SUPPLEMENTAL AUTHORITY CASTELAZ V. THE ESTE LAUDER COMPANIES, INC.*
> Party:  Defendant Cerence Inc.
> *NOTICE OF MOTION RE DEFENDANT CERENCE INC.S MOTION FOR LEAVE TO FILE SUPPLEMENTAL AUTHORITY CASTELAZ V. THE ESTE LAUDER COMPANIES, INC.*

01/16/2024



Answer/Response/Reply

> *PLAINTIFFS??? RESPONSE TO DEFENDANT CERENCE INC.???S MOTION FOR LEAVE TO FILE SUPPLEMENTAL AUTHORITY*
> Party:  Plaintiff P, A
> *PLAINTIFFS??? RESPONSE TO DEFENDANT CERENCE INC.???S MOTION FOR LEAVE TO FILE SUPPLEMENTAL AUTHORITY*

01/09/2024



Produce Exhibits OrOtherRecordsOrDocumentsOrPerson-Allowed      (Judicial Officer: Chupack, Joel)
 *ORDERS ENTERED IN DAICHENDT V. CVS PHARMACY INC.*
 Party: Defendant Cerence Inc.
 Party 2: Attorney Wolfe, Matthew Charles
 *ORDERS ENTERED IN DAICHENDT V. CVS PHARMACY INC.*


01/09/2024 

 Agreed Order Entered (Judicial Officer: Chupack, Joel)
  Party: Defendant Cerence Inc.;
    Plaintiff Allan, Vincenzo;
    Plaintiff Freshour, Randolph;
    Plaintiff P, A;
    Plaintiff Pena, Carlos
  Party 2: Attorney Buscarini, Colin Primo;
    Attorney Geske, Paul T.;
    Attorney Wolfe, Matthew Charles

01/09/2024 

 Execute Or Perform - Allowed - (Judicial Officer: Chupack, Joel)
  *FILE RESPONSE ON OR BEFORE 1/16/24*
  Party: Plaintiff Allan, Vincenzo;
    Plaintiff Freshour, Randolph;
    Plaintiff P, A;
    Plaintiff Pena, Carlos
  Party 2: Attorney Buscarini, Colin Primo;
    Attorney Geske, Paul T.
  *FILE RESPONSE ON OR BEFORE 1/16/24*

01/09/2024 **General Chancery Hearing** (10:15 AM) (Judicial Officer: Chupack, Joel)
  Resource: Location CH2601 Court Room 2601
  Resource: Location D1 Richard J Daley Center


01/02/2024



Motion Filed
 *DEFENDANT CERENCE INC.S MOTION FOR LEAVE TO FILE SUPPLEMENTAL AUTHORITY*
 Party: Defendant Cerence Inc.
 *DEFENDANT CERENCE INC.S MOTION FOR LEAVE TO FILE SUPPLEMENTAL AUTHORITY*

01/02/2024



Notice Of Motion Filed

*NOTICE OF MOTION RE: DEFENDANT CERENCE INC.S MOTION FOR LEAVE TO FILE SUPPLEMENTAL AUTHORITY*

Party: Defendant Cerence Inc.

*NOTICE OF MOTION RE: DEFENDANT CERENCE INC.S MOTION FOR LEAVE TO FILE SUPPLEMENTAL AUTHORITY*

12/07/2023

Continuance - Allowed - (Judicial Officer: Chupack, Joel)

*WRITTEN RULING TO BE ISSUED 2/2 24*

Party: Defendant Cerence Inc.;
Plaintiff Allan, Vincenzo;
Plaintiff Freshour, Randolph;
Plaintiff P, A;
Plaintiff Pena, Carlos

*WRITTEN RULING TO BE ISSUED 2/2 24*

12/07/2023

Agreed Order Entered (Judicial Officer: Chupack, Joel)

Party: Defendant Cerence Inc.;
Plaintiff Allan, Vincenzo;
Plaintiff Freshour, Randolph;
Plaintiff P, A;
Plaintiff Pena, Carlos

Party 2: Attorney Buscarini, Colin Primo;
Attorney Geske, Paul T.;
Attorney Wolfe, Matthew Charles

12/07/2023 **Continued Hearing** (10:00 AM) (Judicial Officer: Chupack, Joel)
Resource: Location CH2601 Court Room 2601
Resource: Location D1 Richard J Daley Center

12/04/2023



Answer/Response/Reply

*DEFENDANT CERENCE INC.S REPLY IN SUPPORT OF ITS SECTIONS 5/2-615 AND 619 MOTION TO DISMISS PLAINTIFFS FIRST AMENDED CLASS ACTION COMPLAINT*

Party: Defendant Cerence Inc.

*DEFENDANT CERENCE INC.S REPLY IN SUPPORT OF ITS SECTIONS 5/2-615 AND 619 MOTION TO DISMISS PLAINTIFFS FIRST AMENDED CLASS ACTION COMPLAINT*

11/30/2023     *CANCELED* **Open Call**   (10:00 AM)   (Judicial Officer: Chupack, Joel)
         Resource: Location CH2601 Court Room 2601
         Resource: Location D1 Richard J Daley Center
         *Stricken*

11/13/2023



Memorandum Of Law Filed
    *Plaintiffs??? Response in Opposition to Defendant Cerence Inc.???s Sections 5/2-615 and 619*
    *Motion to Dismiss Plaintiffs??? First Amended Class Action Complaint*
    Party:   Plaintiff P, A
    *Plaintiffs??? Response in Opposition to Defendant Cerence Inc.???s Sections 5/2-615 and 619*
    *Motion to Dismiss Plaintiffs??? First Amended Class Action Complaint*

11/13/2023    
         Exhibits Filed
           *Exhibit A*
           Party:   Plaintiff P, A
           *Exhibit A*

11/13/2023    
         Exhibits Filed
           *Exhibit B*
           Party:   Plaintiff P, A
           *Exhibit B*

11/13/2023    
         Exhibits Filed
           *Exhibit C*
           Party:   Plaintiff P, A
           *Exhibit C*

11/13/2023    
         Exhibits Filed
           *Exhibit D*
           Party:   Plaintiff P, A
           *Exhibit D*

11/13/2023    
         Exhibits Filed
           *Exhibit E*
           Party:   Plaintiff P, A
           *Exhibit E*

11/13/2023   📄

Exhibits Filed
  *Exhibit F*
  Party:   Plaintiff P, A
  *Exhibit F*

11/13/2023   📄

Exhibits Filed
  *Exhibit G*
  Party:   Plaintiff P, A
  *Exhibit G*

11/09/2023   **Open Call**  (10:00 AM)  (Judicial Officer: Chupack, Joel)
  Resource: Location CH2601 Court Room 2601
  Resource: Location D1 Richard J Daley Center

10/23/2023   📄

Advance Or Reset On Call    (Judicial Officer: Chupack, Joel)
  *10AM*
  Party:   Defendant Cerence Inc.;
    *Plaintiff Allan, Vincenzo;*
    *Plaintiff Freshour, Randolph;*
    *Plaintiff P, A;*
    *Plaintiff Pena, Carlos*
  Party 2:   Attorney Buscarini, Colin Primo;
    *Attorney Geske, Paul T.;*
    *Attorney Wolfe, Matthew Charles*
  *10AM*

10/23/2023   📄

Strike From The Call - Allowed -   (Judicial Officer: Chupack, Joel)
  *11/30 STRICKEN*
  Party:   Defendant Cerence Inc.;
    *Plaintiff Allan, Vincenzo;*
    *Plaintiff Freshour, Randolph;*
    *Plaintiff P, A;*
    *Plaintiff Pena, Carlos*
  *11/30 STRICKEN*

10/23/2023   📄

Case Assigned to Zoom Hearing - Allowed
  *10AM*

10/23/2023

File Appearance Or Jury Demand, Answer Or Plead - Allowed -    (Judicial Officer: Chupack, Joel)
*ON OR BEFORE 12/4*
Party:   Defendant Cerence Inc.;
Plaintiff Allan, Vincenzo;
Plaintiff Freshour, Randolph;
Plaintiff P, A;
Plaintiff Pena, Carlos
Party 2:   Attorney Buscarini, Colin Primo;
Attorney Geske, Paul T.;
Attorney Wolfe, Matthew Charles
*ON OR BEFORE 12/4*

10/23/2023

Set Briefing Schedule - Allowed -    (Judicial Officer: Chupack, Joel)
*MODIFIED*
Party:   Defendant Cerence Inc.;
Plaintiff Allan, Vincenzo;
Plaintiff Freshour, Randolph;
Plaintiff P, A;
Plaintiff Pena, Carlos
Party 2:   Attorney Buscarini, Colin Primo;
Attorney Geske, Paul T.;
Attorney Wolfe, Matthew Charles
*MODIFIED*

10/23/2023

File Appearance Or Jury Demand, Answer Or Plead - Allowed -    (Judicial Officer: Chupack, Joel)
*ON OR BEFORE 11/13*
Party:   Plaintiff Allan, Vincenzo;
Plaintiff P, A;
Plaintiff Pena, Carlos
*ON OR BEFORE 11/13*

10/23/2023

> Agreed Order Entered    (Judicial Officer: Chupack, Joel)
> Party:    Defendant Cerence Inc.;
>         Plaintiff Allan, Vincenzo;
>         Plaintiff Freshour, Randolph;
>         Plaintiff P, A;
>         Plaintiff Pena, Carlos
> Party 2:    Attorney Buscarini, Colin Primo;
>         Attorney Geske, Paul T.;
>         Attorney Wolfe, Matthew Charles

09/26/2023



Motion To Dismiss Filed

> *DEFENDANT CERENCE INC.S SECTIONS 5/2-615 AND 619 MOTION TO DISMISS PLAINTIFFS FIRST AMENDED CLASS ACTION COMPLAINT*
> Party:    Defendant Cerence Inc.
> *DEFENDANT CERENCE INC.S SECTIONS 5/2-615 AND 619 MOTION TO DISMISS PLAINTIFFS FIRST AMENDED CLASS ACTION COMPLAINT*

09/26/2023



Exhibits Filed

> *EXHIBIT 1 RE: DEFENDANT CERENCE INC.S SECTIONS 5/2-615 AND 619 MOTION TO DISMISS PLAINTIFFS FIRST AMENDED CLASS ACTION COMPLAINT*
> Party:    Defendant Cerence Inc.
> *EXHIBIT 1 RE: DEFENDANT CERENCE INC.S SECTIONS 5/2-615 AND 619 MOTION TO DISMISS PLAINTIFFS FIRST AMENDED CLASS ACTION COMPLAINT*

09/26/2023



Exhibits Filed

> *EXHIBIT 2 RE: DEFENDANT CERENCE INC.S SECTIONS 5/2-615 AND 619 MOTION TO DISMISS PLAINTIFFS FIRST AMENDED CLASS ACTION COMPLAINT*
> Party:    Defendant Cerence Inc.
> *EXHIBIT 2 RE: DEFENDANT CERENCE INC.S SECTIONS 5/2-615 AND 619 MOTION TO DISMISS PLAINTIFFS FIRST AMENDED CLASS ACTION COMPLAINT*

09/26/2023



Exhibits Filed

*EXHIBIT 3 RE: DEFENDANT CERENCE INC.S SECTIONS 5/2-615 AND 619 MOTION TO DISMISS PLAINTIFFS FIRST AMENDED CLASS ACTION COMPLAINT*

Party: Defendant Cerence Inc.

*EXHIBIT 3 RE: DEFENDANT CERENCE INC.S SECTIONS 5/2-615 AND 619 MOTION TO DISMISS PLAINTIFFS FIRST AMENDED CLASS ACTION COMPLAINT*

08/30/2023



File Amendment Or Additional Or Amended Pleadings-Allowed    (Judicial Officer: Chupack, Joel)

*ON OR BEFORE 9/26*

Party: Defendant Cerence Inc.

*ON OR BEFORE 9/26*

08/30/2023

Clerk Status    (Judicial Officer: Chupack, Joel)

*10AM*

Party: Defendant Cerence Inc.;

Plaintiff Allan, Vincenzo;

Plaintiff Freshour, Randolph;

Plaintiff P, A;

Plaintiff Pena, Carlos

Party 2: Attorney Buscarini, Colin Primo;

Attorney Geske, Paul T.;

Attorney Wolfe, Matthew Charles

*10AM*

08/30/2023

Courtesy Copies Required - Allowed

*DEFENDANT*

08/30/2023



File Appearance Or Jury Demand, Answer Or Plead - Allowed -    (Judicial Officer: Chupack, Joel)

*ON OR BEFORE 11/16/23*

Party: Defendant Cerence Inc.

*ON OR BEFORE 11/16/23*

08/30/2023

Case Assigned to Zoom Hearing - Allowed

*10AM*

08/30/2023

File Appearance Or Jury Demand, Answer Or Plead - Allowed -   (Judicial Officer: Chupack, Joel)
   Party:  Plaintiff Allan, Vincenzo;
          Plaintiff Freshour, Randolph;
          Plaintiff P, A;
          Plaintiff Pena, Carlos

08/30/2023

Set Briefing Schedule - Allowed -   (Judicial Officer: Chupack, Joel)
*IF MOTION TO DISMISS IS FILED*
   Party:  Defendant Cerence Inc.;
          Plaintiff Allan, Vincenzo;
          Plaintiff Freshour, Randolph;
          Plaintiff P, A;
          Plaintiff Pena, Carlos
   Party 2:  Attorney Buscarini, Colin Primo;
          Attorney Geske, Paul T.;
          Attorney Wolfe, Matthew Charles
*IF MOTION TO DISMISS IS FILED*

08/30/2023

File Appearance Or Jury Demand, Answer Or Plead - Allowed -   (Judicial Officer: Chupack, Joel)
*TO PLAINTIFF'S 1ST AMENDED ON OR BEFORE 9/26*
   Party:  Defendant Cerence Inc.
   Party 2:  Attorney Wolfe, Matthew Charles
*TO PLAINTIFF'S 1ST AMENDED ON OR BEFORE 9/26*

08/30/2023

Extend Time - Allowed -   (Judicial Officer: Chupack, Joel)
*21 DAY*
   Party:  Defendant Cerence Inc.
*21 DAY*

08/30/2023

Motion To - Allowed -   (Judicial Officer: Chupack, Joel)
*21 DAY ENTENSION*
   Party:  Defendant Cerence Inc.
   Party 2:  Attorney Wolfe, Matthew Charles
*21 DAY ENTENSION*

08/30/2023

Motion To - Denied - (Judicial Officer: Chupack, Joel)
*TO STAY PROCEEDINGS*
Party: Defendant Cerence Inc.
Party 2: Attorney Wolfe, Matthew Charles
*TO STAY PROCEEDINGS*

08/30/2023

Agreed Order Entered (Judicial Officer: Chupack, Joel)
Party: Defendant Cerence Inc.;
Plaintiff Allan, Vincenzo;
Plaintiff Freshour, Randolph;
Plaintiff P, A;
Plaintiff Pena, Carlos
Party 2: Attorney Buscarini, Colin Primo;
Attorney Geske, Paul T.;
Attorney Wolfe, Matthew Charles

08/30/2023 **General Chancery Hearing** (10:15 AM) (Judicial Officer: Chupack, Joel)
Resource: Location CH2601 Court Room 2601
Resource: Location D1 Richard J Daley Center

08/29/2023

Answer/Response/Reply
Party: Plaintiff P, A

08/29/2023

Exhibits Filed
Party: Plaintiff P, A

08/23/2023



Motion Filed
*DEFENDANT CERENCE INC.S MOTION TO STAY PROCEEDINGS PENDING PARALLEL
FEDERAL COURT PROCEEDINGS*
Party: Defendant Cerence Inc.
*DEFENDANT CERENCE INC.S MOTION TO STAY PROCEEDINGS PENDING PARALLEL
FEDERAL COURT PROCEEDINGS*

08/23/2023

Notice Of Motion Filed
*NOTICE OF MOTION RE: DEFENDANT CERENCE INC.S MOTION TO STAY PROCEEDINGS
PENDING PARALLEL FEDERAL COURT PROCEEDINGS*
Party: Defendant Cerence Inc.
*NOTICE OF MOTION RE: DEFENDANT CERENCE INC.S MOTION TO STAY PROCEEDINGS
PENDING PARALLEL FEDERAL COURT PROCEEDINGS*

08/04/2023   📄

    Amendment To Complaint Filed
      *Amendment To Complaint Filed*
      Party:   Plaintiff Allan, Vincenzo
      Party 2:   Attorney Buscarini, Colin Primo
      *Amendment To Complaint Filed*

07/28/2023   📄

    Clerk Status     (Judicial Officer: Chupack, Joel)
      *10AM*
      Party:   Defendant Cerence Inc.;
            Plaintiff P, A;
            Plaintiff Pena, Carlos
      Party 2:   Attorney Geske, Paul T.;
            Attorney Wolfe, Matthew Charles
      *10AM*

07/28/2023   📄

    Courtesy Copies Required - Allowed
      *DEFENDANT*

07/28/2023

📄

File Appearance Or Jury Demand, Answer Or Plead - Allowed -    (Judicial Officer: Chupack, Joel)
  *ON OR BEFORE 10/26*
  Party:   Defendant Cerence Inc.
  Party 2:   Attorney Wolfe, Matthew Charles
  *ON OR BEFORE 10/26*

07/28/2023   📄

    Case Assigned to Zoom Hearing - Allowed
      *10AM*

07/28/2023   📄

    Set Briefing Schedule - Allowed -    (Judicial Officer: Chupack, Joel)
      Party:   Defendant Cerence Inc.;
            Plaintiff P, A;
            Plaintiff Pena, Carlos

07/28/2023

📄

File Appearance Or Jury Demand, Answer Or Plead - Allowed -    (Judicial Officer: Chupack, Joel)
  *ON OR BEFORE 10/5*
  Party:   Plaintiff P, A;
         Plaintiff Pena, Carlos
  *ON OR BEFORE 10/5*

07/28/2023

File Appearance Or Jury Demand, Answer Or Plead - Allowed -     (Judicial Officer: Chupack, Joel)
   *ON OR BEFORE 9/5*
   Party:   Defendant Cerence Inc.
   Party 2:   Attorney Wolfe, Matthew Charles
   *ON OR BEFORE 9/5*

07/28/2023

   Order Plaintiff Leave To File Petition     (Judicial Officer: Chupack, Joel)
      Party:   Plaintiff P, A;
           Plaintiff Pena, Carlos
      Party 2:   Attorney Geske, Paul T.

07/28/2023

   Amend Complaint Or Petition - Allowed -     (Judicial Officer: Chupack, Joel)
      Party:   Plaintiff P, A;
           Plaintiff Pena, Carlos

07/28/2023

   Agreed Order Entered     (Judicial Officer: Chupack, Joel)
      Party:   Defendant Cerence Inc.;
           Plaintiff P, A;
           Plaintiff Pena, Carlos
      Party 2:   Attorney Geske, Paul T.;
           Attorney Wolfe, Matthew Charles

07/28/2023

   Motion To - Allowed -     (Judicial Officer: Chupack, Joel)
      Party:   Plaintiff P, A;
           Plaintiff Pena, Carlos
      Party 2:   Attorney Geske, Paul T.

07/27/2023   **Case Management**  (10:00 AM)  (Judicial Officer: Chupack, Joel)
      Resource: Location CH2601 Court Room 2601
      Resource: Location D1 Richard J Daley Center

07/27/2023  
Appearance Filed - Fee Paid - (Jury Demand)  
*Appearance and Jury Demand on behalf of Defendant Cerence, Inc.*  
Party:   Defendant Cerence Inc.  
Party 2:   Attorney Cho, Amy Y  
*Appearance and Jury Demand on behalf of Defendant Cerence, Inc.*

06/16/2023  
Electronic Notice Sent  
Party:   Defendant Cerence Inc.  
Party 2:   Attorney Wolfe, Matthew Charles

06/16/2023  
Electronic Notice Sent  
Party:   Plaintiff P, A  
Party 2:   Attorney Geske, Paul T.

06/16/2023  
Electronic Notice Sent  
Party:   Plaintiff Pena, Carlos  
Party 2:   Attorney Geske, Paul T.

04/28/2023  
Notice Of Filing Notice Of Removal  
*Notice of Filing Notice of Removal*  
Party:   Defendant Cerence Inc.  
Party 2:   Attorney Wolfe, Matthew Charles  
*Notice of Filing Notice of Removal*

03/24/2023   New Case Filing

03/24/2023  
Class Action Complaint Filed (Jury Demand)  
Party:   Plaintiff P, A  
Party 2:   Attorney Geske, Paul T.

03/24/2023  
Exhibits Filed  
Party:   Plaintiff P, A  
Party 2:   Attorney Geske, Paul T.

03/24/2023  
Summons Issued And Returnable  
Party:   Plaintiff P, A  
Party 2:   Attorney Geske, Paul T.

03/24/2023

Exhibits Filed
    Party:   Plaintiff P, A
    Party 2:   Attorney Geske, Paul T.

03/24/2023

Notice Of Filing Filed
    Party:   Plaintiff P, A
    Party 2:   Attorney Geske, Paul T.

# EXHIBIT 3

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


RANDOLPH FRESHOUR and VINCENZO       )   No. 23 C 2667
ALLAN, each individually and on      )
behalf of similarly situated         )
individuals,                         )
                                     )
                Plaintiffs,          )
                                     )
            vs.                      )
                                     )
CERENCE, INC., a Delaware            )
corporation,                         )   Chicago, Illinois
                                     )   August 13, 2025
                Defendant.           )   11:13 a.m.


                    TRANSCRIPT OF PROCEEDINGS
     BEFORE THE HONORABLE M. DAVID WEISMAN, MAGISTRATE JUDGE


APPEARANCES:

for the Plaintiffs:    MCGUIRE LAW, P.C.
                       BY:  MR. PAUL T. GESKE
                            MR. DAVID L. GERBIE
                       55 West Wacker Drive, 9th Floor,
                       Chicago, Illinois  60601


for the Defendant:     SHOOK, HARDY & BACON, LLP
                       BY:  MS. MEHGAN E. H. KEELEY
                       111 South Wacker Drive, Suite 4700,
                       Chicago, Illinois  60606



                       PATRICK J. MULLEN
                  Retired Official Court Reporter
                  United States District Court
                    219 South Dearborn Street
                   Chicago, Illinois  60604
                       (708) 935-1931

                       *   *   *   *   *

     TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

APPEARANCES:   (Continued.)

For Subpoena
Respondent MBUSA:        LEWIS, BRISBOIS, BISGAARD & SMITH LLP
                         BY:  MR. DANIEL W. MYERSON
                         550 West Adams Street, Suite 300,
                         Chicago, Illinois   60661

For Subpoena
Respondent Nuance:       JENNER & BLOCK LLP
                         BY:  MR. DAVID C. LAYDEN
                         353 North Clark Street,
                         Chicago, Illinois   60654

3

(Proceedings in open court.)

THE CLERK:  23 CV 2667, Pena versus Cerence, Incorporated.

THE COURT:  All right.  Good morning.  For plaintiffs?

MR. GERBIE:  Good morning, Your Honor.  David Gerbie on behalf of plaintiffs.

MR. GESKE:  Good morning, Your Honor.  Paul Geske for plaintiffs.

THE COURT:  Good morning to both of you.

For defendant?

MS. KEELEY:  Mehgan Keeley for defendant.

THE COURT:  Good morning, Ms. Keeley.

And for MBUSA?

MR. MYERSON:  Good morning, Your Honor.  Daniel Myerson for Mercedes-Benz USA.

THE COURT:  Good morning.

MR. LAYDEN:  And good morning, Your Honor.  David Layden for Nuance.

THE COURT:  Good morning.  All right.  Give me one second.  So I looked at the status report, and I want to discuss the MBUSA issue.  Give me a minute.

(Pause.)

THE COURT:  All right.  I'm a little bit confused, to be candid.

So, Mr. Gerbie, it sounds like you tried to set up an

agreement with MBUSA to get a declaration as opposed to the need to conduct a 30(b)(6) deposition, correct?

MR. GERBIE: Yes, Your Honor. It was something we discussed at the last hearing in our trying to be flexible. Their position was that they're a neutral third party and that this is burdensome, so we -- as mentioned at the hearing. They reached out to us after the hearing, and we said: Great. We're happy to do that, but we have two conditions.

And as you saw from the attached correspondence, we were not able to reach agreement.

THE COURT: And so one of the conditions was a confirmation that -- and I'm reading from your version:

"Plaintiffs asked MBUSA to confirm whether it has a joint defense agreement or similar arrangement with Cerence."

And then the limited confidentiality:

"Plaintiffs requested that communications about draft declarations and the drafts themselves remain confidential to protect plaintiffs' work product and litigation strategy."

Putting aside the joint defense agreement or similar arrangement, I'm confused on the limited confidentiality issue. So you wanted MBUSA to agree, and I envisioned this through email, but it could be through phone calls, too, I suppose, where you're talking with Mr. Myerson and saying: Hey, here are the questions we're interested in. This is the information we're interested in, and this is what we're looking for.

Then you did not want Mr. Myerson -- you wanted Mr. Myerson to agree that he would not share that exchange with Ms. Keeley or her colleagues on behalf of Cerence.

MR. GERBIE: Yes, Your Honor.

THE COURT: Okay. So I can understand that thought process, certainly, if you and Mr. Geske were saying what about this and we should be asking about that, how that's comfortably within work product. So your emails back and forth within the firm about the declaration, I would and I think most people would acknowledge that as work product. It informs your strategy as to the deposition or the declaration, however you go about getting the information.

Your thought was that if you shared that with Mr. Myerson, you wanted him to keep it confidential as well.

MR. GERBIE: Yes, Your Honor.

THE COURT: Okay. So tell me this. When Ms. Keeley sends the subpoena to Mr. Myerson and says she wants the emails between you and him, why wouldn't he have to produce those, because the only way I think that works is if you have an agreement, a signed agreement, which happens where you have joint defense or joint prosecution agreements with Mr. Myerson. Whether it's written or oral, that's what you'd be saying you'd want.

MR. GERBIE: Well, Your Honor --

THE COURT: Hold on. Because that would be the only

way that Ms. Keeley -- Mr. Myerson could come in here and say: Judge, I'm not producing these.

MR. GERBIE: I appreciate that, Your Honor. Again, we were seeking to reach an agreement with that.

THE COURT: But do you understand, if you appreciate that, that's the same thing you're all bent out of shape over with Mr. Myerson and Ms. Keeley?

MR. GERBIE: Your Honor, if the communications regarding --

THE COURT: Well, wait. What am I missing?

MR. GERBIE: What I'm saying is that we would like to -- our perspective is we want to take a deposition. We've noticed topics that are well within the scope of what we believe is permissible and discoverable information. We sought that deposition four months ago. We're here now, having done numerous meet-and-confers on the topics, and we're trying to be flexible in agreeing to entirely eliminate the need for a deposition and instead, you know, replace that with sworn testimony through a declaration. So, you know --

THE COURT: Right. So we can have a hard stop there and say that didn't happen. We couldn't get there.

MR. GERBIE: Well, we haven't gotten there yet.

THE COURT: Okay. But you're -- that part I'm fine with. So we need to have the deposition. I'm completely perplexed by your position that somehow MBUSA has done

something sanctionable, that they've done something wrong, because honestly what I just walked through with you is exactly why what they're doing is totally fine. Because if you set that deal up and Mr. Myerson had, I would say, probably the bad judgment to accept it, Ms. Keeley, when she sends the subpoena over, is going to get those communications.

MR. GERBIE: Your Honor, again, that may be discoverable.

THE COURT: But that's what you're complaining about that they've done.

MR. GERBIE: Your Honor, if the parties are able to reach a declaration or were able to reach a declaration --

THE COURT: They're not parties. It's not parties.

MR. GERBIE: I'm sorry. I apologize, Your Honor. If plaintiffs and MBUSA were able to reach a declaration, we wouldn't have a problem, even without conferring with co-counsel, with the substance of the communications being discoverable information.

THE COURT: Substance? The communications.

MR. GERBIE: That's what I'm -- yes, Your Honor.

THE COURT: Yes.

MR. GESKE: So we're only --

THE COURT: But you're complaining because they wouldn't agree to it. You're telling me: Oh, we would be okay with that.

But you spend four pages in the status report telling me: They wouldn't agree to this, and look how unreasonable they are.

MR. GERBIE: Your Honor, our perspective is that the information ultimately coming into Cerence's possession is different than it happening while the parties are preparing to conduct finally a 30(b)(6) deposition of Cerence, you know, a week before that or two weeks before that, a deposition of MBUSA, and potentially a deposition of Nuance.

THE COURT: Is that anywhere in your status report, by the way?

MR. GERBIE: Well, I think, I think we're colorably explaining why we believe that we want our work product protected. So, you know --

THE COURT: But, look, you're going to get your deposition. You have the uncanny ability to find issues that simply don't exist and make no sense. You are literally asking MBUSA to do the exact same thing you find so offensive that they may be doing for good reason, I might add, with Cerence. You know this. Across corporate America, companies that do business together, their attorneys often get on the phone and talk to each other.

MR. GERBIE: Yes, Your Honor.

THE COURT: That is not sanctionable. That's not unethical. There's nothing about that that is wrong.

MR. GERBIE: And you're right. You're right. That's totally fine, and that's why our position --

THE COURT: I'm glad because it's happening. It's probably happening right now somewhere.

MR. GERBIE: Well, that's why our position is if that's the case, we just want to know and that's fine. So then we don't want to have in-depth, you know, litigation strategy conversations with you if that is the state of affairs. So if it's -- to the extent it's not --

THE COURT: Then why didn't you just write that? Why didn't you just say: We tried to talk through this, and practically it's really not going to work so we need to do the deposition.

MR. GERBIE: I apologize if Your Honor feels that I overstepped in using the language in the status report, but that is our position. We believe that there's been a representation that MBUSA has been a completely neutral third party, and this has been going on for a number of months. So if there's a joint defense agreement at issue --

THE COURT: I don't even know where -- I have to respectfully disagree with that. I don't know where it even came from that they're a neutral third party. They are certainly not a party to this litigation, but I've got to be -- maybe they said that.

Did you? Did you that say, Mr. Myerson, that you're a

neutral third party?

MR. MYERSON:  Not to my knowledge, ever.

THE COURT:  Okay.  Maybe they have and he doesn't remember.  I don't remember, but I have to tell you it shocks me to think that two companies that have built a car together -- and I know that Ms. Keeley's client has played a smaller role in that part, but they have an ongoing or did have an ongoing business relationship.  They worked together to design a product that people spend a lot of money for.  So they are -- they have a business relationship.  They still may have a business relationship.

I didn't think that they were neutral in that regard, and because of that I certainly didn't think it would be odd for Mr. Myerson to call up Ms. Keeley and say "can you tell me what you're thinking about this because I'm confused about that" when they were talking.

MR. GERBIE:  That's a totally fair position, and ultimately that's why we said we don't think this is workable.

THE COURT:  That's good.

MR. GERBIE:  If you can't agree, we don't think it's workable.  So we'll proceed with the deposition.

THE COURT:  I don't know.

MR. GERBIE:  And that's where we are.

THE COURT:  I mean, I read three pages, including the proposed path forward and potential sanctions, and I'm

confused. You know, like I don't understand this. There is so much conflict in our world today, and when you have an attorney who has come in and said we're trying to work through this or you're trying to work through this and it didn't work out, fine.

MR. GERBIE: Understood, Your Honor.

THE COURT: And the things that didn't work out are not things that shocked me. It's shocking to me that you find them shocking. That's shocking to me. But the fact that they're not going to say whether or not they have a joint defense agreement, they may or they may not. They may have some other kind of agreement. That's all fine. It happens every day.

MR. GERBIE: I understand. Your Honor, again, you know, we wanted testimony through a deposition. We were trying to be flexible in this. You know, due to their request, they preferred to have a declaration, and we said: Okay. If you prefer to have a declaration, we can do that. We just don't want to share with you, you know, our specific list of questions.

And, you know, I've been in a situation before where you enter into negotiations and drafts are exchanged and ultimately there is no execution of that, and that can be shared. We believe that's work product, and it shouldn't be shared, particularly with a party. I think Your Honor

understands that.  So I apologize for the suggestion.

THE COURT:  But, Mr. Gerbie, when you share your work product with someone else, it's no longer privileged by definition.

MR. GERBIE:  Well, absent an agreement.

THE COURT:  Absent an agreement, which is exactly what you think MBUSA and Cerence have done, and you think that's wrong.

MR. GERBIE:  I don't think that's wrong.  I just want to know if that's the case --

THE COURT:  That's fair.

MR. GERBIE:  -- before I share my work product with them.

THE COURT:  That's fair.  That's fair.

MR. GERBIE:  It's not wrong.  Of course, that happens all the time.

THE COURT:  Yes, and that is fair.

MR. GERBIE:  Thank you, Your Honor.

THE COURT:  Anyway, you're going to get your deposition, but it's going to be after Cerence's.

Ms. Keeley, where does the Cerence deposition stand?

MS. KEELEY:  Location?  Is that "where"?

THE COURT:  And when.

MS. KEELEY:  Oh, when.  I'm sorry.  August 20th in Chicago.

THE COURT: Okay. Then, Mr. Myerson, you're going to need to have someone teed up soon thereafter. Where are we on the 30(b)(6) issues, the notice and the issues?

MR. MYERSON: So what Your Honor had said last time is that after Cerence's 30(b)(6) is completed, then plaintiffs will give us a copy --

THE COURT: That's right.

MR. MYERSON: -- and we'll figure out what else is needed, and we may possibly bifurcate the class certification issues from the substantive issues as well.

THE COURT: Okay.

MR. MYERSON: But all that was to be decided after the Cerence deposition.

I will say, you know, just as one last, you know, thing to try to see if this declaration can be done, we had actually made an offer back to plaintiffs just to say very specifically: If you want to give us a list of questions, we actually would agree to consider that as your work product.

Then if Cerence wants to come and subpoena or request it, we won't voluntarily give it unless you, Your Honor, says it has to be produced. That was the offer we made to them, you know, in an attempt to try to get this done. So we did make that offer. You know, if that's something that, you know, Your Honor thinks is reasonable to try to finish this with a declaration instead of a deposition, that is our preference

14

because a 30(b)(6) is very burdensome.  But that's where we were.

THE COURT:  So here is where I am on that issue.  If Mr. Gerbie or Mr. Geske sends over questions and Ms. Keeley subpoenas the email with the questions, I would be, like, I don't know why she couldn't get that email as I understand things now.  There may be something that I don't know or something that has happened, you know, since or whatever that may say, oh, she shouldn't get it.  An agreement might be a way to do that if it's an agreement that would cover that.

That said, on a practical level, I don't understand the issue about the questions, because if I'm understanding this Mr. Gerbie would say here are the questions and then the declaration would be saying information that responds to the questions.  So are the questions important?  I guess, but the answers are really the important thing.  So I don't --

MR. GERBIE:  That's exactly right, Your Honor.

THE COURT:  I don't understand why Ms. Keeley getting the questions would matter much at all.  What I did understand -- and maybe I'm misreading the status report -- was the back-and-forth in getting to the questions because that may be or I think I could imagine Mr. Gerbie saying:  Well, this issue is important.  We need to have someone explain this part, and this is why it matters.

That's all his thought process which, you know, we

call work product, and that's the -- you know, that type of email, I could see why Ms. Keeley would be interested in it. Unless there's an agreement, I don't know why it wouldn't be that you wouldn't have to produce it. But that goes back to if MBUSA has that kind of agreement with Cerence. No one -- I mean, that's how the world works here. It's not sanctionable. It's not inappropriate. It's just how things get done or don't get done, I suppose.

All right. So let's set a date after the deposition. It's the 20th, so we should --

(Discussion off the record.)

THE COURT: I want to get you all in here soon thereafter, so I'm looking at -- before I get down this rabbit hole, I'm looking at the week of the 25th. Is everyone here?

MS. KEELEY: Yes.

THE CLERK: Do you know how long it's going?

THE COURT: Probably a half-hour.

MR. MYERSON: Yes, Your Honor.

THE COURT: Mr. Gerbie?

MR. GERBIE: I'm unavailable Friday.

THE COURT: On the 29th.

MR. GERBIE: Correct.

MS. KEELEY: Judge, I'm in town. I have a deposition on the 28th --

THE COURT: Okay.

MS. KEELEY:  -- so I will be unavailable that day.

THE COURT:  Ms. Owens is throwing out the 26th at 10:00 o'clock.  Yes, I could do that.

MS. KEELEY:  That works for defendant.

MR. GERBIE:  That works for plaintiff, Your Honor.

MR. MYERSON:  That works for MBUSA.  Thank you.

THE COURT:  All right.  And is it Mr. Layden?

MR. LAYDEN:  Your Honor, yes.  I wasn't sure you were including me in this.  I'm actually going to be out of town that week, so I'm sorry about that.

THE COURT:  Okay.  Do you have someone who can cover for you?  Do you want to be at the --

MR. LAYDEN:  Well, I suppose it will depend, but it might be better to do it, if it's possible, the week after.

THE COURT:  Can you appear by phone that day?

MR. LAYDEN:  I can, Your Honor, yes.

THE COURT:  Are you on a family vacation or what?

MR. LAYDEN:  I am on a vacation, but I'll be working. So I'm happy to appear by phone, not a problem.

THE COURT:  Okay.  We'll have you appear by phone.

MR. LAYDEN:  Okay.  Thank you, Your Honor.

THE COURT:  Is there anything you wanted to add?  I have not engaged you on any of this yet.

MR. LAYDEN:  No, Your Honor.  I'm happy to address it, but I showed up, frankly, because I was invited in your last

minute order. I'm happy to address any questions the Court has. I think plaintiffs' counsel has laid out where we are in terms of our discussions, and I think it also will depend upon, you know, what questions are asked at the Cerence deposition and what answers are given in terms of the scope there.

You know, we're continuing to talk about the one issue, which is MBSL, which is I think the only area where I think we have any unique knowledge. I'm not sure of the relevance of that, frankly, because I think my understanding is that the facts are showing that that's only on vehicle tech. So it's never going to be in the possession of Cerence, but that's not something that I just understand from reading the docket, certainly my client's understanding of it.

But I haven't been part of this case, so I certainly don't want to start arguing about the scope of discovery. I don't know what Your Honor has said about that in the past, but that's I think the only thing that is potentially uniquely in the possession of Nuance and what I've been discussing with Mr. Geske.

THE COURT: We'll see how this one plays out, and then you can -- we'll see where things are on the 26th. Then I just want to make sure, Mr. Myerson, because we are dealing with dates that may or may not -- that I can't change on my own, I can tell you that. So I just want to make sure you are getting someone teed up for a 30(b)(6) deposition. I'm not saying it

will happen or it won't happen, but what I don't want is for you to tell me you need two weeks to find people.

MR. MYERSON: Understood, Your Honor.

THE COURT: So please engage with Mr. Gerbie and Mr. Geske as to topics. I mean, you've got the topics. I presume you'd need to cover all of that, and then hopefully -- I'm not saying "hopefully," but, you know, it may get whittled down. I'm just giving you a forewarning that I'm not going to look kindly on you saying: I need two weeks to find someone and another two weeks to prepare someone.

MR. MYERSON: Yeah. Then just, you know, as a note on that front about the topics, Your Honor --

THE CLERK: Can you get near the microphone?

MR. MYERSON: Oh, I'm sorry.

THE COURT: Thank you, Alyssia.

MR. MYERSON: Yeah, a note about the topics. When we last appeared, that was the issue that we were going back and forth on, and that didn't actually get decided. The idea was to come back after. We will make sure that we have somebody. We understand in broad strokes what's really the key stuff. The specific language of the topics is not settled, but I just wanted to remind Your Honor about that.

THE COURT: Yes, I do remember that, and I think the whole point of getting the Cerence deposition done first was to see whether or not either side needs all of the topics. I

don't know until we see what Cerence is saying or what the 30(b)(6) deposition produces.

All right. Anything further from plaintiff?

MR. GERBIE: No, Your Honor.

MR. GESKE: Your Honor, very briefly, a housekeeping matter. Obviously Your Honor is taking a close look at the schedule and the deadlines as extended by the district court judge. When we sought that extension, candidly I think we had a motion to compel already pending as to MBUSA. So I think we would have sought a little bit more time if we thought it was going to be entered and continued for another effectively six weeks beyond that. So we might go back to Judge Kendall if we think that we need some more time, but we're hoping to get everything, you know, ironed out shortly after the 26th, take the deposition hopefully in the next two weeks thereafter, and then be in good shape for our current deadlines.

THE COURT: Yes, I appreciate that situation. You know, Judge Kendall, she does manage her docket very tightly. I think she will see what's going on, you know.

MR. GESKE: Yes, Your Honor.

THE COURT: If you want to file something sooner rather than later so we know if we have wiggle room, I'm not offended in the least. If we find out we don't have any, you know, that will help inform me on dates, certainly. So do what you need to do. I know that you -- I know you're in -- when I

was in your situation, I knew it's challenging, right?  You're dealing with one judge who's doing the work and another judge who's setting the dates, so that's not ideal sometimes.  So whatever you think is appropriate, it will not offend me in the least --

MR. GESKE:  Yes, Your Honor.  Thank you.

THE COURT:  -- to take those steps.

Okay.  Anything else?

MR. GESKE:  Not from plaintiff, Your Honor.

THE COURT:  Great.

Anything, Ms. Keeley?

MS. KEELEY:  No.  That's all, Judge.

THE COURT:  All right.  Thank you all very much.

MR. GESKE:  Thank you, Your Honor.

THE COURT:  We'll see will you in a couple weeks.

MS. KEELEY:  Thank you.

MR. MYERSON:  Thank you, Your Honor.

(Proceedings concluded at 11:33 a.m.)

C E R T I F I C A T E

I certify that the foregoing is an accurate transcript produced from an audio recording of the proceedings in the above-entitled matter.

*/s/Patrick J. Mullen*                    *January 16, 2026*

Patrick J. Mullen
Retired Official Court Reporter

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RANDOLPH FRESHOUR, *et al*.,                )    Case No. 23  C 02667
                                            )
          Plaintiffs,                       )
                                            )
     v.                                     )
                                            )
CERENCE, INC.,                              )    Chicago, Illinois
                                            )    June 5, 2025
          Defendant.                        )    2:48 p.m.

TRANSCRIPT OF PROCEEDINGS - STATUS/MOTION
BEFORE THE HONORABLE M. DAVID WEISMAN, MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiffs:        McGUIRE LAW PC
                           BY:   MR. DAVID L. GERBIE
                           55 W. Wacker Drive, 9th Floor
                           Chicago, Illinois 60601


For the Defendant:         SHOOK HARDY & BACON LLP
                           BY:   MS. MEHGAN KEELEY
                           111 S. Wacker Drive, Suite 4700
                           Chicago, Illinois 60606


          FAILURE TO SPEAK DIRECTLY INTO MICROPHONE
          RESULTS IN INAUDIBLE PROCEEDINGS AS NOTED.

Transcriber:               KRISTEN J. CARANNANTE, RPR, RMR, FCRR
                           Court Reporter
                           10 Montgomery Place, #1D
                           Brooklyn, New York 11215
                           848.459.3124
                           kjcarannante@gmail.com

                    * * * * *
PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court:)

THE DEPUTY CLERK:   23CV2663 Peña v. Cerence, Incorporated.

MR. GERBIE:   Good afternoon, your Honor.  David Gerbie, on behalf of plaintiffs.

THE COURT:   Good afternoon.

MS. KEELEY:   Mehgan Keeley, for defendant, Cerence.

THE COURT:   Good afternoon.  Okay.  So thank you for your status report, and we still have the motion to deal with.

Where is defendant on these additional deponents?

MS. KEELEY:   On the deponents?

THE COURT:   Yes.

MS. KEELEY:   So we —— and I'm sorry, Judge, the deponent on --

THE COURT:   You said --

MS. KEELEY:   -- from Cerence's side?

THE COURT:   Yes.  I think it says there were three that are coming over, and you were going to know more about these other five I thought was what I read.

MS. KEELEY:   Yes.

So we have provided dates that we have confirmed the three witnesses listed in the status report are available.  We are waiting for plaintiffs to confirm if that works on their end or to notice those.

THE COURT:   Yes.

MS. KEELEY: For the remaining five, our client is talking to those people. We are still --

THE COURT: Oh.

MS. KEELEY: We are hoping to get an answer to plaintiffs about what information those people know, what their availability would be like and what our final, you know, positions would be on all of them.

THE COURT: So you -- okay.

MS. KEELEY: Yes, we are still tracking that information on them.

THE COURT: So, Mr. Gerbie, the part in the status report when counsel said they -- finding out if they know stuff, I am just wondering, at this later stage of the case, you -- where did you come up with these five people where they're not sure know --

MR. GERBIE: Your Honor, our perspective is these people very obviously know stuff. And while I don't want to jump too far ahead of the game, where I expect we will be in a week or two weeks is us making argument that they are selectively bringing over the witnesses that they believe are the most beneficial to their case and refusing to produce the ones that we believe will probably have the most relevant information to proving our case.

So, put simply, they are identified as relevant parties on documents that are very clearly substantively

4

related to the claims at issue in this case which, as a general matter, revolve around the voiceprints captured through their software in vehicles.

THE COURT:    Yes.  So, again, because this case is kind of new to me, I have looked through the complaint.  I understand the general issue.  I am trying to understand what in these depositions you are hoping to find out as it relates to the BIPA claims that are remaining here.

MR. GERBIE:    So it relates to sort of what happens with the information upon its collection, how it is collected within vehicles, and where it goes and where it is stored, at base.

So defendant produces software that is deployed in a variety of makes and models of vehicles.  So the people we are looking to depose have in-depth technical knowledge as to how the software is actually designed, how it is actually installed in software packages, and then how those are deployed within the vehicles and the specific head units within those vehicles, as well.  So that's high level how it works.

THE COURT:    That's fine.

And the five people that are in dispute, so to speak, from the discovery you have received, you think they know those kinds of things as they relate to the BIPA claim.

MR. GERBIE:    Yes, your Honor.

THE COURT:    Are there any issues with people having

5

signed consents or --

MR. GERBIE:   Well --

THE COURT:   -- any of the carveouts that the statute provides?

MR. GERBIE:   I guess I can let defendant speak to its position on that.  I expect they will make some arguments with respect to some terms and conditions bearing on some software.

Our position is that those aren't actually reviewed or even necessarily presented to the person to the extent that they exist at all or apply to the specific vehicles at issue in the class that we ultimately seek to certify.

So what we expect, candidly, is that the witnesses they want to bring over are going to talk all about how there is so much consent; and we do everything in compliance with everyone ever; you know, this is extremely robust from a data protection standpoint; and all the people who actually do the hard coding of where the information goes, what's done with it, what it is, that it is a voiceprint, that it is a biometric tech under the statute, those people we couldn't possibly produce in the United States.

THE COURT:   I am thinking defendant has a different view.  Tell me what you are thinking about that.

MS. KEELEY:   Yes, Judge, a few things.  I would like to just start with clarifying a few facts that were presented by counsel.

6

Just as an initial matter, we are not -- right now, we are not disputing these five people.  We have tried --

THE COURT:   Yes, I know.  I --

MS. KEELEY:    -- to confer about it, and we also asked to kind of try to understand what information they are looking for that the other three that we want to start with don't have, and they weren't willing to have that conversation with us.

The first three people we proposed to them first because they —— we have done a lot of digging through the whole life of this case on who knows about what the —— how the product works, where it goes, the customer that has bought it——which is Mercedes——and the majority of all the documents we have produced are by those three people, and that's because they are the ones with the knowledge.  I understand that, you know, they have a different position on that and they are learning about it through discovery.

But another thing I would like to add is that counsel's suggested that the other five people that are maybe on a few documents they believe obviously have technical knowledge about how the product was designed.  We have actually provided many rounds of discovery responses and explained to them our client didn't design the product.  They purchased a license for it from Nuance, which is one of the entities that plaintiff's subpoenaed.

So I don't think that that is —— I'm not sure where

the basis for that is, but that is —— you know, there are people at our company who understand how it works and whatnot. But the reason that we have mentioned Nuance in some of our responses, and I understand why they are in the case, is because they are the ones that developed it and they have more technical documents about how it really works.

Some of these witnesses, including at least one of them, Mr. Hamerich, used to work for Nuance, so that's why we felt he would be a helpful witness.

THE COURT: And can I ask you a question on that? So, to me, the design -- maybe you are using this interchangeably. To me, the design isn't nearly as important as the functionality of it. So however it got to where it got to —— and I don't know if that's what you are getting at, Mr. Gerbie, but however it was designed to achieve its functionality doesn't seem to me to be relevant. Maybe it is and I am missing that. The functionality of it to be covered by the statute, I understand that. But ——

MR. GERBIE: That's right from our perspective, your Honor. We care about what happens to the information that we believe is subject to the statute within the vehicles.

THE COURT: Okay.

MR. GERBIE: Not that we are indifferent to the design, but certainly the people who design the product may have some relevant testimony. And to the extent, you know,

the defendant is wanting to point towards Nuance, there is a little bit of an entity shell game going on. Cerence used to be a part of Nuance. There has been a spin-off. Some employees went to one, some went to another. And then Cerence, I guess, is now licensing the software that they are saying, We didn't develop it, we don't know, we are just a licenser. But it is a little more nuanced——no pun intended——than that.

THE COURT: Yes. The first time confused me, but I got you.

I'm sorry, Ms. Keeley, I interrupted you, but do you agree that the functionality is really what's at play here and not necessarily how the design was achieved?

MS. KEELEY: I mean, I think both can be relevant --

THE COURT: Okay.

MS. KEELEY: -- and we produced documents about both.

THE COURT: Okay.

MS. KEELEY: And I think —— but I think the second fact that we have explained in discovery responses, and verified in our interrogatory answers, is that we also don't have any access to the information that could conceivably be collected by the software once it's in a car. It is actually not even —— one of the reasons design is important is because another key fact is that it wasn't designed to have any ability to connect to Cerence's cloud, and it never has had a connection to Cerence's cloud.

And again, we have produced documents explaining that it's embedded in vehicles, but that's, I understand, another reason why another -- a few entities that are subpoenaed in this case are Mercedes, because —— and, you know, we don't take a position on their role —— their positions on the subpoenas and the meet-and-confers with plaintiffs. But my point is that we don't have access either to any of the information that once it's in a car, and we didn't design or develop it.

So we produced plenty of technical documents that we could find and that we do have, and we are producing three witnesses that can talk about those things. We are just -- because the extra five witnesses are not really key players in the issues in this lawsuit, it is taking a little bit more time, a few days' turnaround for our clients to figure out who they are and what they know and just —— you know, for example, one of them is completely irrelevant and doesn't know anything about this stuff, but was copied on an e-mail. That might be someone we would, you know, take a position about. But we are just trying to track that information down.

THE COURT: Okay.

MS. KEELEY: And I would also add, we understand that plaintiffs -- they mentioned at that status hearing last week for the first time about a 30(b)(6) notice that they might be issuing. We don't know yet what the topics will be. We think that also would be a really efficient way to kind of

understand, like, what the main issues at play in the depositions are and could also achieve a bit more of a targeted deposition approach. So ——

THE COURT: Of the three people who are going to come to Boston for the deposition, and I was curious they were coming to Boston and not here. Is there a reason for that?

MS. KEELEY: Yes, Judge. So the client is located in Boston.

THE COURT: Oh, okay.

MS. KEELEY: One of the witnesses actually does live in Boston. Two of them are coming from Germany and Boston. We gave them the option, and they all prefer to be where their headquarters to their client is, so that's --

THE COURT: That's a --

MS. KEELEY: -- where we are producing them.

THE COURT: -- good reason.

So is there a possibility that, of those three, they would be -- one of those or more of those would be 30(b)(6) witnesses? Is there an efficiency to be gained there or ——

MS. KEELEY: I think it is possible. I think that's why we are looking forward to seeing what the topics are.

THE COURT: Okay.

MS. KEELEY: I think that because those three are the ones with the most knowledge about the issues in this case, it is likely.

THE COURT:    All right.  So let's -- so as far as the depositions, it sounds like three are squared away, five are still at play.  I will —— I want to get that figured out, and if it is —— you know, if there is a dispute that the Court can resolve, I would like to get that resolved sooner rather than later.  And I say, "if the Court can resolve" because if these are people who are in Germany and they don't want to come here, I don't know -- we would have to explore what the Court could do about that.

So I appreciate your client being willing to fly some of these witnesses over.  That helps.  And I would prefer that whatever —— if there are additional deponents necessary, we do the same.  But I think we've got to take this one step at a time, unless you see it differently.

MS. KEELEY:    No.  I think that's sounds productive.

And just to be clear, we aren't and have never taken the position that we are not —— we are refusing to fly anyone else out --

THE COURT:    Okay.

MS. KEELEY:    -- from Germany.  I think it's just --

THE COURT:    Yes, I haven't heard that.

MS. KEELEY:    -- we are trying to figure out what's proportional to the needs --

THE COURT:    Yes.

MS. KEELEY:    -- of the case.

THE COURT: All right. So we will deal with that in our next status hearing.

The third-party discovery, Mr. Gerbie, talk me through that because I want to get that taken care of.

MR. GERBIE: So we have got some what we believe are deficient subpoena responses. We are in the process of meeting and conferring with at least two of the entities on that. And then the third one, in addition to that, we believe we will want a deposition. That is —— we are in the process of meeting and conferring with them on that, as well.

So these relate to the vehicle manufacturer and distributor. Those are two of them and the third one is Nuance, which, again, has a preexisting and long-term relationship with defendant. So we are in the process of meeting and conferring with all those parties, and to the extent your Honor would like, we can provide a more fulsome report in the next couple of weeks if we are not able to iron anything out.

THE COURT: Yes. I would like it get a date in place if we need to do any motions to compel.

Between Mercedes-Benz USA, LLC, and Mercedes-Benz Research & Development North America, LLC, are you dealing with the same attorneys are or are they a different set of attorneys or don't you know?

MR. GERBIE: I'm not sure off the top of my head,

your Honor.

THE COURT:   Okay.

MR. GERBIE:   I believe it is different attorneys, but I don't want to get too ahead of my skis on that.

THE COURT:   That's fine.  I will give you a few weeks to get it figured out or file a motion.  I know you have been dealing with scheduling issues on your side.

June 27, is that enough time?  So that would be three weeks and a day.

MR. GERBIE:   That should be fine, your Honor.

THE COURT:   And you can tell them, you know, there is a cranky judge who is making you move this thing along.  So June 27, any motions to compel.

MR. GERBIE:   And that's for third parties?

THE COURT:   Yes.

And then I am just going through the status report.

The next issue is the ESI.  I will tell you my take on that.  There wasn't an agreed ESI protocol, which is fine. Some cases have it, some case don't.  Defendant sent over their proposal.  It sounds like there wasn't a timely response. Defendants started reasonably producing documents because they hadn't gotten a timely response.  I am not bothered by any of that.  So I think if you don't have an agreement, you don't have an agreement.  Then the defendant's treating their ESI production pursuant to the rule.  They are making a reasonable

inquiry.

From plaintiffs' perspective, I know that there is a suggestion that they were, what is -- you used some language that I thought was a little bit odd. But, in any event, it feels like -- you feel like you have been left out. But the ESI protocols, those are creatures of attorneys getting together and saying, We want to have an agreement and here is our agreement. If the parties don't reach an agreement, there is no requirement under the rule to have one. So then I turn to the rule, and it's got to be a reasonable effort to —— a reasonable search to respond to discovery.

I assume that's what you think you are doing. Correct, Ms. Keeley?

MS. KEELEY:   Yes, Judge.

THE COURT:   And Mr. Gerbie, from your perspective, I don't see any suggestion that the production you have received is somehow deficient. So it seems like a procedural disagreement in the sense, like, the process didn't work the way you wanted it to? I don't have to resolve that because the rule doesn't have a process requirement.

MR. GERBIE:   I appreciate that, your Honor. I would just like to lay a little bit more of a timeline out from our perspective, that we —— we have been working cooperatively with defendant with respect to discovery. We served significant discovery and -- going back to November. Defendant asked for

an extension from December to January. And in us saying, Yes, sure, take another month, we also said, We would like your proposed search terms and connectors so that we can meet and confer on that. They never got back to us about that.

Subsequently, they responded, and then we responded in February saying we —— here is a draft ESI, can we meet and confer on this? Only subsequent to that, a month later, had I'll call it the lion's share of the documents been produced. So that's what I am trying to flag before the Court is -- and to the extent the state court ruled the issue wasn't ripe, it is because we didn't have any opportunity to view a material amount of documents yet, as far as -- again, your Honor, over 75 percent of the documents have been produced since March 7, which we understand we'd need any of them for responsiveness prior to March 7.

So to the extent the state court already ruled on that issue, we would say where it wasn't ripe at that time, it is ripe now. And having reviewed some of them, we believe there are significant search terms——and more importantly, custodians——that do relate specifically to the claims at issue that were excluded.

So I can go through a couple of those just to give an example if it would be helpful to your Honor, but your Honor's comments are also well taken as far as procedure and requirement under the rule.

THE COURT: Yes. So I am looking at Exhibit B to the status report. This is a letter from defense counsel to your —— I don't think you actually got this, but to your colleagues at your firm. And on page 6 it says, "At the December 18, 2024 meet-and-confer, you asked us to send you the list of search terms applied to Cerence's documents. On December 20, 2024, we e-mailed you the list of search terms. You did not respond to that e-mail."

So it sounds like your colleagues were made aware of the search terms that they were using. It doesn't say "custodians" in here. I don't know if there is —— and that is -- a reasonable search is required, right? So if defendant, for whatever reason, has chosen to leave out a key custodian, that's an issue I can look at and why you think that key custodian should have been included. But to say, well, we just started getting documents in March; you know, this all happened right around the holidays; after the first of the year, they start pulling documents, and then they are going to review the documents for privilege and relevance; I don't know if they are doing —— if defendant is doing both the relevance review, they probably should be since there is no ESI protocol; and then the privilege review; and then they are producing documents starting in March, that sounds pretty good to me.

So I am trying to understand. I don't see, from last hearing and today, I don't see that there is an unfairness or

anything like that in the way defendants attempted to proceed.

MR. GERBIE: Your Honor, if I may --

THE COURT: Yes.

MR. GERBIE: —— briefly.

There are some specific search terms that are terms of art within the biometric and voiceprint industry specifically that should have been, in our opinion, rather obviously been included, which we wouldn't have known until we received the documents. And so to the extent that your Honor would permit us the extension, we can issue new specific discovery requests to that effect including those terms.

We think that the most efficient way of doing it would be to meet and confer on it and come to an agreement. And I am not saying that they haven't produced relevant documents, just that we would like a few custodians and probably four or five additional search terms or searches done.

THE COURT: I'm not tracking —— I hear what you are saying. I am not tracking what you mean when you say there are some technical search terms that are unique to this area that should have been used and weren't, I guess. Are you saying they were not used?

MR. GERBIE: Yes, your Honor.

THE COURT: Okay. But they sent those over in December and no one said, hey, what about these terms? And then you said, we didn't know that they weren't used until

later. That is what is confusing to me.

MS. KEELEY: Judge, if I may add, we still don't know what search terms they want. Like, they still haven't communicated that to us.

MR. GERBIE: Your Honor, to be clear, I -- immediately before the hearing, I said, are you wanting to meet and confer on anything additional? We have made that offer now twice in February, in March, today before the hearing. So this claim that we are not willing to confer with them, it's quite the opposite. We are —— and that's what --

THE COURT: Well, she didn't say that. She said, I still don't know what the search terms are. So that's not saying you are not willing to do that. So we are not going to have a hypothetical argument here.

MR. GERBIE: Sure. So I am happy to provide some of them. And just to give you a little bit more flavor of exactly what it is, so some of the terms would be "user acoustic profile." That's an example of a term. It's a term of art. It's contained in some of the contracts that we didn't get until after March 7. So we wouldn't have known that that is how Mercedes or Cerence refers to a specific piece of information absent their production of documents, which we do believe have been ——

THE COURT: Okay. Just for the record, I now understand what you are saying.

MR. GERBIE:   Okay.

THE COURT:   I misunderstood what you were saying.

Okay.  So "user acoustic profile" is a unique term of art for this —— either for Mercedes or for Cerence's software.

MR. GERBIE:   For voice biometric information generally.  And there are a couple of other ones that are sort of right in that category, if I may.

Another one would be speech signal, spectral features, i-vectors; and those, combined with other words that we would have proposed, like "recognition"; and then there are a couple other ones, as well, which are acronyms, MFCC——Mel-Frequency Cepstral Coefficient——you know, getting into the more technical details of what exactly a voiceprint is, how it is processed, what pieces of information from that are analyzed, and really how the information is identified within the software.  So those are terms that are used in the product, that are used in the code in the product, that are used in documents that we only just received from our perspective.

So we appreciate —— and, again, we don't think it is an endless ask to ask for these terms of art that were not included to be run for relevant documents.  You know, we are talking about four or five.  And then we would ask defendant to tell us which custodians were searched, because I don't believe we have that information, so that we can see if we can maybe add the ones I have identified in addition to one or two

more against the custodians that have already been run and then confirming that there are no others we need.

THE COURT: Ms. Keeley, in your correspondence, did you identify search terms and custodians or just search terms?

MS. KEELEY: I believe we just identified search terms and the time period. That was the information the plaintiffs asked for.

THE COURT: Okay.

MS. KEELEY: I would also like to add that -- I think just two, again, factual corrections here. To the extent plaintiffs derive these new search term ideas from contracts, those were one of our earliest productions, not in the March production with --

THE COURT: Okay.

MS. KEELEY: -- the bulk of the documents.

We made seven productions in this case. The one on March 7 was the biggest. But we have made several. So they have had those since December, and it might have been the January one, but they did receive those right around the time of the state court status hearing.

Also, the majority of the terms counsel just mentioned were actually removed —— his firm removed from the complaint when they filed an amended complaint. The parties reached an agreement where two plaintiffs were taken out because we narrowed it down to certain products. The products that were

removed at that time include speech signal enhancement, one of the terms that he mentioned, and also the speech recognition software, because neither of those have biometric capabilities, and his firm agreed to remove those from the complaint.

So I think we are still a little confused about what the basis for this is and why they are coming up this late when we tried to engage on this many times.

THE COURT: Yes. To me, I don't —— Mr. Gerbie, you said something along the lines of the search being endless. I don't hear your position to be that it is endless. I think what you are saying is it is not timely; we have tried to engage, and we gave them our ideas. We never heard back.

MS. KEELEY: Yes, and I would also add that the search terms we sent were really broad. I mean, a lot of them didn't end up being responsive just because our client is a voice technology company. One of those products is biometric capabilities. So it captured a lot of stuff. And I understand that's, again, a subjective view if they are narrow or broad. But even the search terms that we gave them a long time ago that we tried to engage with them about and they waited too long, even those are broad.

And also, I mean, to the extent they are arguing that they shouldn't have had —— I don't know, that they didn't need to engage with us about it between December and March, we also didn't hear a peep about it since March. And when the state

court declined to order us to confer with them about it, he did say it is denied without prejudice. If they can articulate a reason or what they have an issue with or what they think we did wrong, it can be revisited.

And we heard about ESI again for the first time with you last week. So I think that there is almost two rounds of delay here, and our client has spent a lot of money and spent a lot of time going through all of these. And I think at this stage, especially when at least of the current fact cutoff schedule is next month, we are ready to start depositions, it just would be really unfair and prejudicial to our client, especially when we weren't opposing any, you know, willingness to work together on this when it came up the first time.

THE COURT: I think those are all good arguments to be considered.

Tell me, you said you don't know which custodians. Do you know the number of custodians?

MS. KEELEY: Yes. So we focused on four key custodians. Three of them are the three witnesses that we have dates for in July. The fourth one has some tangential relevant information. We just thought he might capture some technical info that the others didn't, so he produced a smaller number of documents. But we also produced document that were just in the client's files generally, that's where all of our contracts with Mercedes and Nuance came from.

And where search terms caught documents from other people that were collected kind of through go-get search, we don't necessarily work on the relevant product or with Mercedes or anything, there are a few documents produced from those folks, too.

So more than four custodians produced documents, but we ran a full collections of files and focused searches and review and everything on those four who have different pieces of knowledge to the puzzle in this case basically.

THE COURT: Okay. I am inclined —— I am inclined to give you more time to get the depositions done. But as I said last time we were together, if I give you more time for that and you use it for ESI, then you are really asking for two more extensions, which I am not inclined to do.

MR. GERBIE: I understand, your Honor. May I be heard very briefly?

THE COURT: Yes.

MR. GERBIE: Defendant is telling us that they have sought to meet and confer. Our perspective is that they have said, these are the search terms that we ran. Here are the documents. Actually we need several more months to produce them. Just hang tight. And then they produced them.

We sought to meet and confer with them prior to the production, six weeks prior to the production, on two occasions. So if defendant can point me towards any time, in

writing or verbally, where they said, we would like to meet and confer on the search terms and/or custodians, I would love to be proven wrong and that would be well-taken.

THE COURT: Well, it sounds like they said, here are the search terms, let us know what you think.

MS. KEELEY: Yes, Judge. That's what happened.

MR. GERBIE: Your Honor, we said, we would like to meet and confer on search terms. They said, here are the search terms. And then I'm not going to dispute that there was a four-week or five-week period over the holidays where we didn't respond, but we did respond a month before their, you know, very, very large production.

THE COURT: I think you responded in early February like, February 8.

MR. GERBIE: Yes, your Honor.

THE COURT: And you were talking about the holidays. I was thinking, well, that's Valentine's Day. That's the holiday then. That's not -- I mean, we are way past the holidays. I mean, I just think this case has kind of languished, and now people are starting to pay attention.

So we don't have an ESI protocol, so there is nothing to enforce. There is no court-adopted, by me or Judge Kendall or Judge Maldonado, where the Court said, this is the protocol, this is what you will use. Rule 26 says "reasonableness."

If there is a custodian that you —— I will get some

dates so that defendant tells you what custodians they used, and if you think there is a custodian that is obviously not being used and should have been used, fine, we can talk about that. I am hearing from counsel that they did go get discovery as well, so they went and got particular documents. That all sounds part of reasonableness under Rule 26. They are not saying, we just used these search terms, these four custodians, and that's what we did. So that sounds like it is appropriate.

The other thing I am not hearing is that, especially in these kinds of cases -- first of all, you have depositions to do, and my experience with these kinds of cases is that the ESI, other than the go-get type documents, which I haven't heard anyone really talking about, we are talking about custodians and search terms, which is all e-mail communication, really, or internal communication, whether it is e-mail or Slack or whatever, but this kind of case is not informed usually by that.

My strong suspicion is that neither the people in Boston nor the people in Germany were talking about Illinois' BIPA statute. They were talking about design issues, what the product can or cannot do. That you are going to be able to get through go-get discovery, and if you think that's inadequate, you should be having those conversations separate from ESI or through depositions and 30(b)(6).

So I don't see the prejudice to your client. If this

were, you know, a fraud case or contractual breaching case where, you know, there are particular issues at hand and you were somehow handcuffed because you weren't told certain things, I would have a different view. But my experience with discovery needs of this kind of case with this issue, ESI is not all that important. I'm not saying you shouldn't do it, it's not reasonable to do, I'm not saying that, but this is not one of these kinds of cases where the ESI is going to have -- at least no one's telling me this to prove my experience wrong, that ESI is not going to be a rich source of either discoverable evidence or discoverable information that would lead to discoverable evidence.

So it sounds to me like we are talking more about a process that people don't like. I think plaintiffs kind of sat on their hands a bit and now they are trying to regroup and that --

MR. GERBIE: Your comments are well-taken, your Honor. But to the extent that you would permit or ask that the defendant provide us with the custodians and potentially permit us to ask that -- you know, again, we believe those —— if those custodians are the same ones that defendants identified for depositions, we have our suspicions that there is a reason that the others who we have asked about —— just to be clear, we asked about these individuals for many weeks now. It's not a new request. So there is a little bit of delay from our

perspective on defendant's side about who are we going to produce and when and, no, we are going —— plenty of time before the deadline, but we still don't know who we are going to produce even though we have identified them.

So to the extent that we may be able to get some additional custodians, even with the terms that they already ran, that would likely satisfy plaintiffs, your Honor.

THE COURT: All right. Let's do this. I am going to set some dates and probably have you in either next week or the week after. I just want to get this thing going.

MR. GERBIE: If I may request the week after, your Honor. Again, my partner is still out of the country. I am still technically on paternity leave.

THE COURT: Oh, I thought you were off.

MR. GERBIE: No, your Honor. I'm coming in just for you.

THE COURT: Okay.

Ms. Keeley, what is Wednesday the 18th looking like for you?

MS. KEELEY: We are actually deposing one of the plaintiffs in this case that day.

THE COURT: What about the 17th?

MS. KEELEY: I think we could make an afternoon status work.

THE COURT: Okay.

MS. KEELEY:   We have a lengthy hearing in the morning, so if there is another day that week that would work, that would be great.

THE COURT:   So the 19th is a federal holiday.  The 20th we are not sitting.

(Clerk and Court confer)

THE COURT:   What about the 16th at like 2:30?

MS. KEELEY:   We could do that.

THE COURT:   Mr. Gerbie?

MR. GERBIE:   That works for plaintiffs, your Honor.

THE COURT:   Okay.  And then file a status report on Friday, the 13th.  And if you are superstitious, you can do it on the 12th.  I want to close out this deposition issue.  Tell me where you are on that.

Mr. Gerbie, I already gave you dates to file the motions to compel for the third party.  I am going to order the parties——I'm not going to give you all dates; I will just trust you to get this done timely——to exchange the search terms used and the custodians.  If you want to have a meet-and-confer on that, that's fine, but I will tell you, Mr. Gerbie, I encourage you to have a meet-and-confer.  You are going to be hard-pressed to get me to move much on search terms unless the search terms are just way off.

MR. GERBIE:   Yes, your Honor.

THE COURT:   If there is a custodian that you think is

particularly important, I think that may be a better avenue. I am not saying that there is one that they haven't done.

And I certainly will hear from defendant if they say, look, we did not search this particular custodian, but we did a bunch of documents from his or her electronic account, so we don't have the e-mails, but we have a bunch of other documents from this custodian, because I do think, based primarily on burden, defendant has been timely with their efforts, and staying silent isn't a form of --

MR. GERBIE: Efficacy?

THE COURT: Yes, it's not. You know, it's not -- right, someone's moving ahead, no one's responding. I don't think that's a fair burden on the diligent party. So I may be open to a custodian or something like that. I mean, you can lay out your positions, but we are going to argue whatever they are on the date. So just be prepared to discuss that.

And then the status report, if you want to include hit reports. So, from defendant's perspective, if that custodian is producing 10,000 documents, that may cut both ways, Ms. Keeley, you understand that, right?

MS. KEELEY: Sure, your Honor.

THE COURT: If there is a custodian with the search terms you have used and there are 10,000 documents that are coming from that custodian, then I might be saying, are these deduped? If you have all these original documents from that

custodian that are relevant terms you thought of and you didn't use that custodian, that may favor Mr. Gerbie's position.

MS. KEELEY:   I understand --

THE COURT:   Okay.

MS. KEELEY:   -- and I can explain how we came to ——

THE COURT:   Yes, so I kind of get in the weeds on that stuff.  So if you want to include hit reports, it's fine.

MR. GERBIE:   And, your Honor, can we provide defendant with our list of custodians for the hit reports?

THE COURT:   You can do any of that stuff.  If they don't want to do it, that's fine.  I am telling you the search terms themselves, that's a big lift to go back and read ——

MR. GERBIE:   I understand, your Honor.

THE COURT:   Yes.

MR. GERBIE:   I understand.

THE COURT:   But we will see.  I am generally not inclined to do much, if anything, on the ESI, but I do want to hear out since it appears you didn't know who the custodians were.

Okay.  So we've got the deps, we've got the third parties, we've got ESI.

MS. KEELEY:   Judge, can I ask just a clarifying --

THE COURT:   Yes.

MS. KEELEY:   If you would be willing to make -- it sounds like there is going to a forthcoming meet-and-confer on

this. Just to make it a little more productive, based on how slow things have been moving, would you —— I guess we would request if your Honor could ask plaintiffs to maybe provide the reasons first, if they are going to give us a long list of custodians for hit reports and whatnot, if maybe they could provide the rationale for why they are interested in those people, I think that could maybe make it a little more efficient --

THE COURT: Yes.

MS. KEELEY: -- since we are going to be back in a couple of weeks.

THE COURT: Yes. So do you want me to give you all dates to do all this stuff? I feel it may be helpful. I just hate doing that because I feel like, you know ——

MR. GERBIE: Your Honor, I am not conceptually —— in fact, I am conceptually supportive of that. But just in light of, you know, my ongoing half absence and my partner still being out of the country, I would want to push those dates out a few weeks just to allow him to return, which is in a week from Monday, I believe, and get his feet under him with respect to what is -- I will get on the same page with respect to those dates.

So I am okay with dates. I ask that they be pushed out just a few weeks. And again, this, your Honor, is why we did seek a 90-day extension to sort of wrap up all these

issues. But your Honor entering and continuing that motion to see where we are week-by-week is more than okay with us, as well.

THE COURT: So this is what is confusing me. So if your partner is coming back June 16——is that what you are telling me——and we are meeting June 16 --

MR. GERBIE: Yes, your Honor.

THE COURT: I know I am infringing on your paternity leave, and I apologize about that.

MR. GERBIE: No, that's okay. So we are more than able to get them a list of the custodians we want. I would say that, to the extent that defendant is asking for exactly what we believe their relevance is to the case, you know, we are happy to articulate something broad, but we are reluctant to reveal litigation strategy when we believe that we have identified these people as having relevant documents and their names are on relevant documents. So, you know ——

THE COURT: Well, I think what I am envisioning is if you say Steve Smith, lead engineer on --

MR. GERBIE: Yes.

THE COURT: —— whatever the program is called that is at issue, that is a ——

MR. GERBIE: We are happy to do that.

THE COURT: Ms. Keeley, would that satisfy you and your client's needs to say, that is a lead engineer, I see why

they think he would be a ——

MS. KEELEY: Yes, I think we are just looking for something more, other than they are copied on an e-mail.

THE COURT: Yes.

MS. KEELEY: Just articulate -- or maybe if that's the case, explaining why that e-mail seems relevant.

THE COURT: Even that, though, if they were shown on one e-mail --

MS. KEELEY: Yes.

THE COURT: -- unless it is super key to the case, it's hard to figure out how that works.

So I think in the meet-and-confer, the more detail you can give, I will order plaintiffs to explain each custodian, why they believe that custodian meets Rule 26 standards.

MR. GERBIE: Sure.

THE COURT: And then if there are particular search terms, same exercise. But the search terms, I'm going to be really reluctant to do because that is just a huge lift to go —— if I say five more search terms, that requires defendant to go back and do the custodians it does. I don't know if it's three or four, but it sounds like it's a manageable number, but then you are rereviewing documents. They could dedupe.

Are you using an ESI vendor?

MS. KEELEY: We are, yes.

THE COURT: So --

MS. KEELEY:   After we applied all the search terms, there are around 100,000 documents, that's what went through with all this stuff.

THE COURT:   Yes.

MS. KEELEY:   So it wasn't narrow.

THE COURT:   Okay.

MS. KEELEY:   And I ——

THE COURT:   Your vendor should be able to dedupe, though.  So --

MS. KEELEY:   Yes, we have been --

THE COURT:   Okay.

MS. KEELEY:   -- applying that technology.

THE COURT:   So I think an explanation is appropriate, so the order will reflect that.  And then I will order defendants to provide a hit report in a reasonable time to allow the status report to be meaningful, you know.

MS. KEELEY:   Okay.  And that's for all of the custodians they identify or is that based on the ones --

THE COURT:   All additional --

MS. KEELEY:   -- that are relevant?

THE COURT:   -- custodians that they have identified in search terms -- that they have proposed in these search terms --

MS. KEELEY:   Okay.

THE COURT:   -- you know, across all custodians, both

the proposed and the ones you used.

MS. KEELEY:   Okay.

THE COURT:   Do you understand what I am saying?

MS. KEELEY:   I do.  I just —— some of the names that -- at least, for example, like, the names that they have mentioned for depositions are not —— we didn't collect all their files.

THE COURT:   Right.

MS. KEELEY:   They are not custodians, so there might not be hit reports for some of them, but --

THE COURT:   Okay.

MS. KEELEY:   I just wanted to make sure I was explaining that properly.

THE COURT:   Yes.  So you are saying there are some that you don't —— when you did your litigation hold, you —— maybe let me ask it this way.  Your vendor did not download all the e-mail accounts.  You just had them download particular custodians, is that right?

MS. KEELEY:   Right.  So we issued a litigation hold to a bunch --

THE COURT:   Right.

MS. KEELEY:   —— of people.  And then, based on the folks who were actually relevant to the products like we explained and everything, I won't go into the details again, those few people, the vendor download —— collected all of their

documents, and then for, I don't know, somewhere between probably, like, five -- it's been a long time, five and ten more, were the people we got go-get documents from.

THE COURT: Okay.

MS. KEELEY: But some of the names I'm not sure will necessarily be people that, you know, we did that with. If, for example, they were on a speech signal enhancement e-mail, that's a product that was taken out of the case, so we might not have collected someone who only works on that product's files because it's not at issue here.

THE COURT: Okay.

MS. KEELEY: Just as an example. I don't know for sure if that's one of them, but ——

THE COURT: Okay. So --

MS. KEELEY: And I think just, also, if I can add, just because -- I mean, they have never asked us about custodians either, so we weren't withholding it. That wasn't asked for.

THE COURT: I don't think you were withholding anything.

MS. KEELEY: So, and I think that's why some of this information I don't have off the top of my head, because we didn't know until, I don't know, either in the past week or right now that they wanted —— you know, who they want to add. We still don't know who they want to add. So that's just why

we don't have all this information off the top of our head. It's been also a really long time because discovery's been open so long since we dug into custodians, so -- but we are willing to provide that information next.

THE COURT: Yes. Please provide to Mr. Gerbie and his colleagues the custodians that you downloaded their e-mails, and then -- just the names of them, and then the ones you did go-gets for.

And, Mr. Gerbie, if there are people, when you see that list, you're like, oh, that's good enough, or what about this person, explain why you want that person. I am really reluctant to kind of undo —— have defendant redo all of this stuff. And it does —— it gets very complicated and expensive.

MR. GERBIE: I hear your Honor. We haven't known who the custodians were. They produced a bunch of --

THE COURT: Did you ask?

MR. GERBIE: Candidly, I was not on this correspondence——the vast majority of it, if any of it——so I can't speak to whether we have or have not. But what I was going to say is, I know that we have identified these people as relevant individuals from whom we want testimony --

THE COURT: Yes.

MR. GERBIE: -- you know, long ago. So these are not new people from our or defendant's perspective. And it sounds like they may have pulled the documents already for some of

them. Even if they haven't run the search terms, they put a litigation hold on it, so they presumably knew that they would have relevant information.

So we are happy to provide a list of custodians and hopefully we are able to get something in terms of having those even run just against the terms they already drafted. Maybe we will get one more in there, maybe not.

THE COURT: Ms. Keeley, when do you think you can provide the custodians and search terms to Mr. Gerbie?

MS. KEELEY: Let me just see real quick.

Okay. So we have the status report due next Friday. Okay. Can we do the 11th?

THE COURT: Sure. 11th by noon.

MS. KEELEY: Okay. And, I'm sorry, that's resending the search terms and sending the custodians ——

THE COURT: And then the custodians, yes. And it sounds to me, as I am hearing you, but I will leave it to your professional discretion, it sounds to me like there are actual custodians in the traditional sense of ESI you dumped and ran the search terms through, and then there is a hybrid form of custodians where you did go-gets for some of their files or records.

MS. KEELEY: Right. That's correct.

THE COURT: And so if Mr. Gerbie and his colleagues can know, like, okay, we do have —— they have done a reasonable

search of these custodians' records, although not their e-mails, that would be important, at least for me, to understand.

MS. KEELEY:   Okay.  We can do that.

THE COURT:   Again, Mr. Gerbie, I am leaning into this notion to my experience that BIPA cases themselves, ESI is not a huge source of useful information and/or evidence.  It usually comes from other sources——go-get documents, for example, and technical information.  And trust me, we have litigated a few of these here, and I have never heard someone say they found a smoking gun in the e-mails.

MR. GERBIE:   Well, your Honor, allow me to be the first to tell you I have absolutely found smoking guns in e-mails --

THE COURT:   Okay.

MR. GERBIE:   -- that do relate specifically to BIPA using that language, and I will leave it at that.

THE COURT:   From a German company?

MR. GERBIE:   I don't know about from a German company.

THE COURT:   Okay.

MR. GERBIE:   So -- and I'm not saying that that would be the case here, but, you know, if I may, your Honor, that's also why I am not sure that defendant including "BIPA" and "Biometric Information Privacy Act" in its search terms is that helpful of a search term from our perspective.  And so, you

know, I'm not saying, oh, we included 15 search terms and, you know, some of them, they don't use the term of art that's used by the technology provider, but they do use very specific legal terms, I'm not sure how useful that is from our perspective. But we don't need to ——

THE COURT: BIPA might go to willful and wanton conduct, right, if they knew they were violating it.

MR. GERBIE: Yes, your Honor.

MS. KEELEY: I won't belabor the point, but our terms were more precise than that, and we will provide them in our status report so you can read them, but ——

THE COURT: I wouldn't be surprised in BIPA was a big one you leaned into when searching around, but maybe --

MS. KEELEY: It wasn't a search term, but so were the actual technological terms.

THE COURT: Those were used.

MS. KEELEY: Yes.

MR. GERBIE: Well, not the ones I have articulated today, your Honor.

THE COURT: Well, that's different.

MR. GERBIE: Yes.

THE COURT: Again, December 18 or 22, whenever you had those, that was a good time to raise that.

MR. GERBIE: Yes, your Honor.

THE COURT: Okay. So we will see you on the 16th,

status report on the 13th, you have got other dates, and then we will keep this thing moving along.

MR. GERBIE: And just so we're —— just to run through everything real quick, just to make sure I have it, so for the status report, we will hopefully have an update from defendant on those potential deponents, whether they are going to bring them here.

THE COURT: The five more, correct.

MR. GERBIE: That's right. We will have provided to them a list of custodians and their titles, I guess, or description of their relevance, and they will hopefully have been able to generate hit reports for those.

Is that, high-level, the substance of --

THE COURT: Yes.

MR. GERBIE: -- the status report?

THE COURT: Yes.

MR. GERBIE: Okay.

THE COURT: And if it turns out, Ms. Keeley, you can't provide the hit reports for the status report on the 13th but they run them over the weekend or something, you can just bring them in on the 16th, too.

MS. KEELEY: Okay.

THE COURT: Okay?

MS. KEELEY: I will try to get them in for the 13th.

THE COURT: I know sometime --

MS. KEELEY: Thank you.

THE COURT: Yes. All right. Thanks a lot. Have a good weekend.

MR. GERBIE: Thank you, your Honor.

MS. KEELEY: Thank you, your Honor.

THE COURT: Thanks.

(Concluded at 3:39 p.m.)

* * * * *

I certify that the foregoing is a correct transcript of the digital recording of proceedings in the above-entitled matter to the best of my ability, given the limitations of using a digital recording system.

*/s/ Kristen J. Carannante*
*June 9, 2025*
Kristen J. Carannante, RPR, RMR, FCRR
Court Reporter/Transcriber

# EXHIBIT 5

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RANDOLPH FRESHOUR and VINCENZO      )   No. 23 C 2667
ALLAN, each individually and on     )
behalf of similarly situated        )
individuals,                        )
                                    )
                 Plaintiffs,        )
                                    )
            vs.                     )
                                    )
CERENCE, INC., a Delaware           )
corporation,                        )   Chicago, Illinois
                                    )   June 16, 2025
                 Defendant.         )   2:47 p.m.

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE M. DAVID WEISMAN, MAGISTRATE JUDGE

APPEARANCES:


for the Plaintiffs:    MCGUIRE LAW, P.C.
                       BY:  MR. PAUL T. GESKE
                            MR. DAVID L. GERBIE
                       55 West Wacker Drive, 9th Floor,
                       Chicago, Illinois  60601


For the Defendant:     SHOOK, HARDY & BACON, LLP
                       BY:  MS. MEHGAN E. H. KEELEY
                       111 South Wacker Drive, Suite 4700,
                       Chicago, Illinois 60606




                       PATRICK J. MULLEN
                  Retired Official Court Reporter
                 United States District Courthouse
                   219 South Dearborn Street
                   Chicago, Illinois  60604


                    *   *   *   *   *

TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings in open court.)

THE CLERK:  23 CV 2667, Pena versus Cerence, Incorporated.

MR. GERBIE:  Good morning -- or good afternoon, Your Honor.  David Gerbie on behalf of the plaintiffs.

THE COURT:  Good afternoon.

MR. GESKE:  Good afternoon, Your Honor.  Paul Geske for plaintiffs.

THE COURT:  Good afternoon.

For defendant?

MS. KEELEY:  Mehgan Keeley for defendant.

THE COURT:  Good afternoon.

Thank you for your status report.  I've got a couple of questions I want to talk to you all about.  Let's start with the depositions.  So from defendant's standpoint, I hear what you're saying about this.  In addition to Mr. Cashman, Mr. Hamerich, and Mr. Tropp, all of whom you will be bringing here to the States, there's a 30(b)(6) deposition referenced. Would that deposition occur here or in Germany?

MS. KEELEY:  We think it would be productive to try to do it in line with the depositions that are already scheduled. We're just waiting.  It's hard to form our position without knowing what the topics will be like and which witnesses will testify to them.

THE COURT:  Yes, and we'll get to the timing of that.

So I'm talking at a little bit higher level. Then there's a series of additional people, Mr. Steiger, Mr. Tsuboyama, Mr. Haiber -- I think that's a mister -- Mr. Kwast, and Mr. Hardegger, all individuals that plaintiff wants or plaintiffs want to depose, but your client is saying: We don't think we need to bring them over here, and at best we would like to let these other depositions go forward and then see on these others.

Is that correct?

MS. KEELEY: High level, but I'll make a -- there's a few distinctions between them.

THE COURT: Tell me.

MS. KEELEY: Three of them live in Germany, so for those three, yeah, we did some digging into them. We aren't agreeing right now to fly them all the way over here until we go through some of the depositions that we already are flying people here for that we think will be better sources of knowledge --

THE COURT: Okay.

MS. KEELEY: -- objectively. I'll also add that I think plaintiffs kind of mischaracterized our position in their status report. We're not downright refusing to produce them at this time. They're welcome to go through the procedures required to depose those people if they want to. I just don't think that that issue is even ripe yet because they haven't

4

initiated any of those procedures. These are just based on emails. So if they choose to do that, we would probably still need to evaluate if we would seek a protective order or something like that, but that's our position as to those three.

Mr. Tsuboyama lives in Canada. Our position as to him, I don't know as extensively what the procedures are that plaintiffs would need to research for deposing a witness in Canada. But I interviewed him personally last week and talked to him about what he does, what he knows about the issues in the case. He knows absolutely nothing about the voice biometric product, which is why we didn't connect with him in the first place.

Again, if plaintiffs want to take the deposition anyway so he can tell them that, you know, they're welcome to. They just haven't done any of the procedures. At that time, again, we would need to evaluate if we would pursue a protective -- a motion for a protective order. But for that reason, too, that's also why for now we suggest they start with the three depositions and the 30(b)(6) that go directly to the issues that we understand from their written discovery requests they're looking for.

Mr. Haiber, I'm not -- I don't really understand the legal basis of plaintiffs' comment that we refused them after our communications last week because we explained that he's a former employee so we don't have any control over him. We're

not in contact with him, so we don't have the ability to require him to sit for a deposition.

THE COURT:  I think you're misspeaking.  I think it's Mr. Kwast who's a former employee.

MR. GERBIE:  That was our understanding as well, Your Honor.

THE COURT:  I'm just looking at page 3 of the status report.  It says:

"Mr. Haiber is not willing to fly" -- I'm sorry -- "Cerence is not willing to fly Mr. Haiber from Germany and does not think it's appropriate to set a date at this time for Mr. Kwast, who's at number 4.  Cerence does not plan to produce Mr. Kwast.  Mr. Kwast is a former employee."

MS. KEELEY:  That's correct.  I just switched the names.

THE COURT:  That's fine.

MS. KEELEY:  I misspoke, yeah.

THE COURT:  Yes, yes, I just want to make sure.

All right.  So you're speaking at the level I want to to kind of get this stuff sorted out at.  So I did not -- I agree with you I did not understand your status report to say you were refusing to produce these people.  So I think you're in agreement with that.  You're not taking that position now, correct?

MS. KEELEY:  Correct.

THE COURT: Then the next question I have is this. If plaintiffs' counsel flew to Germany to do the depositions, would you be -- would you require them to go through the procedures they need to, letters rogatory, et cetera, to do those depositions, or are you just saying: We're not going to fly our people here. If you want to do the depositions, you can go to Germany and do them there. You know, we'll meet you there and do them, but we're not going to fly our people here.

MS. KEELEY: So it's correct that we're at this time not willing to fly them here. I'm not sure, but just from my high level research, I think they might be required to go through special procedures even if they go to Germany. I think Germany is particularly strict.

THE COURT: Okay.

MS. KEELEY: I think that until the depositions in July happen, I don't think the issue is ripe enough for us to take a position on where -- I mean, again, we've been saying since the beginning of these hearings with you that we're willing to revisit all of these issues after those go forward. It's just -- I think we're just concerned that these are just efforts to slow things down without any articulations of why they're needed.

THE COURT: Yes, I guess what -- I think that things are on the slow roll since it's been in front of me, and it's not -- I don't like that. I think we have a date and we should

be working towards it, and I think, you know, I think perhaps now for both sides to find compromise, they're saying they're not -- you are saying: We're not deciding now. Let's do these depositions and see what they look like.

This is okay, but that seems to me to invite a further slow roll of the resolution of the issue, which is should there be more time to do any of this, because I don't see how you get any of this done. Like if you needed -- if plaintiffs needed to issue letters rogatory or follow whatever procedure German law requires, I don't think you'd be able to get that done unless -- I know the Germans are known for efficiency, but I can't imagine that they're going to get this done in 45 days.

MR. GERBIE: May I be heard?

THE COURT: Yes, tell me what you're thinking about that.

MR. GERBIE: Well, Your Honor, we have flagged this issue well in advance of today's hearing, and candidly defendant is presenting a bit of a moving target as to whether or not they are cooperating or not. Originally their position was: We're not going to bring anyone to the United States. Go to the Hague for all of them.

They've walked that back and now they're producing two people and saying: Well, we'll decide later based on whether we believe that you've uncovered enough relevant testimony or documents as to whether or not we will further cooperate.

Even sitting here today, defendant is again refusing to say one way or the other if they will cooperate and produce these people or if we need to go to the Hague immediately. We are at the point where we think it is ripe but, again, our perspective is shared with what I sort of understood the Court's comments were, which is, you know, we still don't know if the defendant is going to cooperate or is not going to cooperate.

We can get into the custodial issues as well which relate to some of these individuals and the timeline, but as a general matter, you know, these people are relevant, we're allowed to take depositions, and they're only agreeing to produce three witnesses in a complex biometrics case.

THE COURT: You keep saying that, Mr. Gerbie, and that's not what they're saying. They're saying: We're willing to bring -- we're willing on our tab to fly over three or possibly four or more individuals to do discovery here. We're going to fly them over. We're going to put them up at maybe not nice hotels, maybe Motel 6 or something like that.

I don't know what they're going to do, but they're saying: We are willing to do all of that.

Now, as people familiar with the litigation process, we all might say, well, there's a benefit to Cerence to do it that way. They've got to have their defense counsel prepare their witnesses. There's lots of logistical benefits to doing

it that way.

MR. GERBIE: But we --

THE COURT: What's happened here is discovery has been ignored effectively. Cerence has, you know, has proceeded with discovery. They've asked, and they have not heard back. Then here they come and they're like: We're near the end of the date of a date that the chief district judge in the court said don't expect extensions, that you're getting a healthy discovery time.

And like all judges who say that, you know, Judge Kendall doesn't mean that in stone. So if you were looking for 30 days to do more stuff, fine, but that's not where -- the flavor of this since it's been before me is you saying that they're not willing to cooperate. They're actually doing a lot of cooperation, and instead of just saying you dropped the ball on discovery, which if you don't want to say it you don't want to say it, but that's what it looks like.

So here we are. I agree with you on one point. We need clarity on the issue of depositions. Unless there's some rule or case that I'm not familiar with, if they're saying "you want to depose our people in Germany, have at it, go through the proper procedure," I don't know why that's not within their rights. Is there something the matter with that approach?

MR. GERBIE: Well, we can get into whether or not --

THE COURT: No, we are going to now. That's why I'm

asking.

MR. GERBIE: Oh, I understand. Our perspective as to that issue specifically is that they're demonstrating that they have control over these people. First they weren't going to produce anybody in the United States, and now they've decided to produce two. I'm sure you're not surprised to hear that they're selecting the two that will be the most beneficial to their case and potentially the least beneficial to our case.

THE COURT: I actually disagree with that because what counsel has done effectively has said: Here are the people you wanted to depose, and we've done searches and there aren't a lot of documents.

MR. GERBIE: Well, if we can talk about that, they've only --

THE COURT: No, we're talking about the depositions. So are you telling me that since these people are in their control, they have to fly them here?

MR. GERBIE: No, not necessarily --

THE COURT: Okay.

MR. GERBIE: -- to that extent, but there may be some caselaw that supports that. So if we're at the point of needing to brief a motion to compel on --

THE COURT: There's no motion to compel. I'm telling you that you aren't getting more time for depositions. So you can do what you want to do and see what you get done, but this

has got to -- this facade that they have done something wrong or that they have not cooperated has got to end.  That's not what's happened, and they continue to -- you continue to say they're saying they won't when they're saying they might, and I, quite frankly, am saying I don't care if they might or might not because if they -- I think we all know this.  If they say "we might," I think your point is well-taken.  It then lies on defendant to decide whether or not they're going to cooperate and bring someone over.  And if they decide not to, then you're going to come back and yell foul and say:  We waited.  Ms. Keeley lulled me into waiting.

I don't think she's done anything of the sort because I think it's been very clear if you've been in the hearings that this is not a done deal.  So I don't want that to happen. Start doing what you need to do to take depositions in Germany.

MR. GERBIE:  Understood, Your Honor.  Thank you.

THE COURT:  Okay.

MR. GERBIE:  And that was our perspective.

THE COURT:  Or Canada.  Just so I'm clear, or Canada, and I don't know where Mr. Kwast lives.

MR. GERBIE:  Tsuboyama.

MS. KEELEY:  Mr. Kwast, we understand, is likely in Belgium.

THE COURT:  Okay.

MS. KEELEY:  Since he's a former employee, that's what

we've pieced together.

THE COURT: Okay. So I have no idea what Belgium law requires. Mr. Tsuboyama is in Canada. I have had some touches with that, but do whatever you need to do.

MR. GERBIE: And, Your Honor, may I be heard a little bit --

THE COURT: Yes.

MR. GERBIE: -- a little bit more on this issue? So, you know, the reason we brought the motion for extension was in order that we may complete oral discovery and so that we weren't before Your Honor a month from now saying: Well, here we are. We've taken these three, and we need more time to complete these four. We think that they are required.

Then defendant says: There's been plenty of time to work this out.

And our perspective is yes, they've been slow rolling this issue for several weeks or months now.

THE COURT: Mr. Gerbie, just on the point of slow rolling and why you shouldn't be saying that, in this status report you say: We'll file a motion to compel in a couple of weeks.

That's what you wrote. It's June 16th. Discovery ends July 29th. You file a motion. Just so we're all clear, this is on page 4 of the status report. This is a paragraph dealing with plaintiffs' position:

"Plaintiffs will draft and file in the coming weeks, as necessary, to the extent that additional good faith efforts fail to resolve these disputes."

That's slow rolling a case, so stop using "slow rolling."

MR. GERBIE:  Yes, Your Honor.

THE COURT:  They've been clear on their position. This case has languished on the plaintiffs' side.  That's where we're at.

So anyway, on the deposition point, do what you need to do.  The idea as to the number of depositions, you're not near the limit so the rule is not at play on that.  You know, Rule 26 does talk about other factors, but do what you need to do.

MR. GERBIE:  Understood, Your Honor.

THE COURT:  I'm unlikely to get in the way of you going to Germany to take depositions unless defendant has a really, really good reason to say that there's nothing you could possibly get from it.  If it's a little bit duplicative, so be it.  You know, if you have a good faith reason and you can explain it to me, I'm not going to get in the way of doing that.

MR. GERBIE:  Understood, Your Honor.  As to one individual in particular, Mr. Steiger, defendant identified this person specifically in their Rule 26 disclosures as

somebody who has relevant knowledge, but they're not willing to produce him in the United States for testimony.

THE COURT: Is there a rule that says they have to? You brought this suit. Is there? I have not done enough international --

MR. GERBIE: Your point is well-taken, Your Honor.

THE COURT: Okay. They are -- in their sense of cooperation, they're saying: We're not paying. We're not footing the bill.

MR. GERBIE: Well, but they're also not saying if we fly there they will produce them subject to U.S. law.

THE COURT: Well, I don't know that they have to, either.

MR. GERBIE: Understood, Your Honor.

THE COURT: Again, those are two areas that I'm flagging for you. If I've got them wrong, I'm happy to look and tell you I have them wrong.

MR. GERBIE: Yes, Your Honor.

THE COURT: I certainly don't think the first one I have wrong, and the second one I'm not as clear on.

MR. GERBIE: Understood, Your Honor. I do want to apologize to the Court to the extent it appears as though we are slow rolling this. As we identified in our motion, I've been out on paternity leave for a length of time. My co-counsel has been out on his honeymoon for the last three

weeks.

THE COURT: Which is why if you were asking for 30 days I'd be like no problem.

MR. GERBIE: Understood, Your Honor.

THE COURT: I'd be telling Ms. Keeley: You know, does that really have -- do you want to conduct yourself there?

But she's not done that. She's been like: We're probably okay with you, you know.

But you're saying: I've had these life events which are joyous and things we should do as people.

I agree. Then you're saying: But I want ESI. I want them to fly people over to Germany.

You're creating all these things, but really what you're saying is: We've had these good things happening in our lives. We're a little bit behind. Can we get 30 days more?

You'd have 30 days more, probably 45, without the bat of an eyelash from me.

MR. GERBIE: Understood, Your Honor.

THE COURT: But that's not what's happening. So we've got to get past that. It's not being slow rolled.

MR. GERBIE: Understood. Understood, Your Honor.

THE COURT: Okay. That's where we are on the depositions, except the 30(b)(6). I know there's other things you want to talk about. I don't want to lose track of the 30(b)(6) deposition. When are you going to get that notice

out?

MR. GERBIE:  This week, Your Honor.

THE COURT:  Okay.  I like that idea.  The 30(b)(6) notice has to be sent out by June 20th.

Ms. Keeley, what does next week look like for you?

MS. KEELEY:  Judge, do you mind if I grab my phone back there?

THE COURT:  Go ahead.

MS. KEELEY:  Sorry about that.

(Brief pause.)

MS. KEELEY:  Are you looking for a hearing or for a response?

THE COURT:  A response.

MS. KEELEY:  Okay.

THE COURT:  I just want to get this set up --

MS. KEELEY:  Sure.

THE COURT:  -- so it can get done in July.

MS. KEELEY:  If we can have a week to respond.

THE COURT:  Okay, June 27th, any objections to the scope and notice of the 30(b)(6).  Then I want all meet-and-confers to be done -- and so the July 4th holiday weekend is there -- by close of business July 8th.  Then file a -- we'll have a status report probably July 9th-ish.  We'll see, but we'll just get a status report with any of the lingering discovery issues.  So right now all meet-and-confers

on the 30(b)(6) have to be done by the 8th.

MS. KEELEY: Judge, if it's -- and I'm open to talking through this, you know, with opposing counsel, too. Their deposition of John Cashman, who's one of our witnesses who could possibly be a 30(b)(6), is on the 9th.

THE COURT: Oh.

MS. KEELEY: So if it's feasible for anyone -- and, you know, speak up, too -- if we could maybe try to wrap up meet-and-confers sooner, it could be productive for us to try to prepare him if he ends up being a witness, you know, for both at the same time.

THE COURT: That would be great.

Mr. Gerbie, Ms. Keeley has till June 27th, and you get your notice out the 20th. Can you get your notice out sooner than the 20th?

MR. GERBIE: Your Honor, I'm not sure that we can this week.

THE COURT: That's fine.

MR. GERBIE: That's the end of the week. We've got a holiday between now and then, and counsel is still getting back up to speed.

THE COURT: That's fine. Okay. So the 20th, the 27th. Can we get meet-and-confers finished by noon on July 3rd?

MS. KEELEY: I think that could work for us.

MR. GERBIE: Yes, Your Honor.

THE COURT: Okay.

MS. KEELEY: And if we can, depending on the number of topics and stuff, you know, we'll try to be diligent. If we can get a response out sooner, too, we'll try to do that.

THE COURT: Okay. Then you said that deposition that might work well is the 9th, is that right?

MS. KEELEY: Yeah. Well, I'm not -- so the three folks that are scheduled right now of the Cerence witnesses are the 9th, the 15th, and the 17th.

THE COURT: Okay.

MS. KEELEY: Then any combination of those three, you know, depending on what the topics are, could potentially be 30(b)(6) witnesses. But the 9th is just the first one that's up. He's a -- I'm blanking on his formal title, but he's the director of privacy of sorts at Cerence. So he's the first one that's up, so I think -- I was just thinking in the event that we could figure it out by then, it might be more productive for all of us.

THE COURT: Okay. Yes, I'm not going to -- I'm going to put those dates in place. I was going to have you do a status report on whether that's been worked out or not. But if you can get it done, great. I am going to get a status report and have you back before me, but I'm not going to try to sync all that up.

MS. KEELEY: Okay.

THE COURT: I'll get it definitely -- I'll definitely have you all back here before the 15th and 17th. So we'll somehow get that figured out.

MS. KEELEY: Okay. That is the week of the Boston witnesses.

THE COURT: Okay.

MS. KEELEY: So a status hearing on -- we'll be in Boston the 14th through the 17th with those witnesses.

THE COURT: Okay. I think Ms. Owens is telling me the 7th is probably going to be when we're going to get back together.

(Discussion off the record.)

THE COURT: Okay. Sorry. We have a couple --

(Discussion off the record.)

THE COURT: Put July 7th at 9:15 for our next status hearing here. All right. So depositions in general we're good on. The 30(b)(6) notice, the meet-and-confer on that we're good on.

Then, Mr. Gerbie, I think you were going to talk about ESI, which is the next thing I have on my list. But if you were going to talk about something else, tell me that.

MR. GERBIE: Yes, that is where we were going to go.

THE COURT: Okay. So tell me what you're thinking about that, and tell me if I'm right or wrong because I'm

looking at plaintiffs' position after defendant's summary. I'd give you a page number, but it's not numbered.

MR. GERBIE: Page 9.

THE COURT: Page 9, yes. Is that where you're at, or are you on their work, on defendant's?

MR. GERBIE: Well, six of one, half-dozen of the other.

THE COURT: Tell me where you want to go.

MR. GERBIE: So, I mean, I guess we can start with defendant's, you know, custodians and hit reports. Our perspective is that we've identified individuals that clearly should have been included as full file custodians for the search terms that they did run, and candidly they only ran four individuals as full file custodians in a case like this where candidly the product has clearly been worked on by many, many individuals.

We can prevent -- present those witnesses or those individuals to Your Honor along with an explanation of why they should have been included as full file custodians even just against the search terms that defendant has run, and then in accordance with Your Honor's wishes, we really did put our heads together and try and present as narrow of additional search terms as we could to supplement defendant's search which the Court spoke to last week.

THE COURT: All right. So let's start with this

notion that ESI is even -- renewed ESI or supplemental ESI is even justified.  I'm looking at page 8 of the status report where Ms. Keeley and her colleagues have put together a custodian and hit report for Cashman, Tropp, Hamerich, and Steiger.

I haven't done the math, but if you use the most cold and reviewed amount of data that defendants identify -- and this is the third column over -- "documents remaining left for review after email threading, removal of junk files, running unique search term hits, applying date ranges, and keeping families together," for Mr. Cashman, it's 17,000-plus, for Mr. Tropp 20,000-plus, for Mr. Hamerich 46,000-plus, for Mr. Steiger 23,000-plus.

They then conduct a manual review.  As I understand that, Ms. Keeley, you use real people to look at the documents and it's supervised.  Whether you use contract attorneys to do it, it's supervised by someone in your firm, correct?

MS. KEELEY:  Yes.  We have a team of contract attorneys that did the first round of review one at a time, and then myself and another team member personally did a quality check review of each document.

THE COURT:  Okay.  So from those 17,000 with Mr. Cashman, we get 38 relevant documents.  From Mr. Tropp's 20,000, we get 132 relevant documents.  Mr. Hamerich's 46,000, we get 574 relevant documents.  Mr. Steiger's 23,000, we get

25.

So that confirms my suspicion which I had last time and I think I put on the record, which is, I don't think this is an ESI-heavy case because I don't think that German companies are talking a lot about BIPA in their back-and-forth. You know, quite frankly, Illinois law on BIPA, to say it's an outlier is probably not doing justice to outlying statutes, but it's not something that most people are out there worrying about because it's not data privacy as we understand it or something like that. It's a very specific statute, and it does not surprise me in the least that it's not -- you're not getting a lot of ESI documents.

Why would we be talking about doing more ESI when Rule 26 tells me I have to look at the proportional needs of the case?

MR. GERBIE: Your Honor, the needs of this case relate to specific products that are developed and deployed by defendant. So the documents we're looking for are from individuals who were intimately involved in the design and deployment of those products with defendant's customers.

There are certain people -- and I can go through them -- you know, directors of software engineering, product managers, vice-president of research and development, all which relate to this product, and none of their files were searched. Certain ones had "go get" documents produced. Mr. Hardegger

had four produced. You know, he's the one, but he's someone along with at least a few others who candidly should have just been included in defendant's own, as Your Honor put it, reasonable search for records on these products.

So we're not, we're not on a fishing expedition looking for questions about, you know, necessarily documents that say "BIPA" or "BIPA liability," but documents which describe voice biometrics, where the samples that are taken from the vehicles go, how they're stored, where they're stored. You know, the people that are responsible for designing and deploying those products have relevant testimony, and their files should have been searched. So we believe this is very, you know --

THE COURT: You're still not answering the question I have, which is that Rule 26 tells me that discovery needs to be proportional, and for proportionality, you know, when I'm forcing another side -- go ahead.

MR. GERBIE: Go ahead.

MR. GESKE: Sorry, Your Honor. So I understand the point about proportionality. On a number of these individuals, we're not necessarily saying you need to conduct a full ESI search and then go through the same process that you did for these first four. For some of them, we're saying let's just see a hit report so that then we can determine is this somebody that warrants further attention or is this somebody where a

manual review would even be required.

But on a number of these, like, for example, the individuals who we included as people -- I'm sorry -- individuals that Cerence included as individuals who were asked to provide "go get" documents, we said: Okay. Well, what would -- can you provide a hit report for them if you applied those same set of terms?

And if the hit report comes back and, you know, there's very little, then we can say: All right. Let's rule that person out.

Or, you know, are there so many documents that a manual review would be extremely burdensome, such that it's, you know, it's too late to address that at this point. But for some of these, all we've asked is let's see what a hit report would look like.

Then on the additional terms that we've provided, you know, we were very conservative with these. We just provided five terms. They're largely in line with Cerence's own terms, but they're designed to address several holes or gaps that were left by how they drafted their terms. But, you know, again, these specifically incorporate some of the terminology and the product names that Cerence uses.

And to Your Honor's question about, well, is this really an ESI-heavy case, you know, oftentimes what we've seen in reviewing the documents is that, you know, these employees

are -- among themselves and with Mercedes, they're very candid in how they describe the technology, what it is and what it does. Whereas, you know, a lawyer might say: Well, that's not really a voiceprint or that's not really biometrics within the meaning of BIPA.

And then, you know, you'll have an email from an employee that says: Oh, yeah, this is the voiceprint. This technology uses voiceprints.

Then, you know, when we try to get to the bottom of that, you know, we hear: Well, there's actually a more specific biometric product, you know, and that "voiceprint" doesn't really mean "voiceprint" as it's used in BIPA.

You know, it's much easier if we're just looking at trying to get to the bottom of how the technology works, what it does factually, what data is collected and then stored in the cloud or obtained by Cerence, it's much easier to do that if we actually have the words from the employees themselves rather than just, you know, some lawyer's interpretation of those words.

THE COURT: But that's what depositions are for, right?

MR. GESKE: Right, and, you know, this was proposed in conjunction with some of the individuals who we intend to depose.

THE COURT: Yes, but it was proposed to you in

December of 2024.

MR. GESKE: Yes, that's a fair point. I believe we approached Cerence about running an ESI protocol in February. I recognize there was two months of time between December and February and, you know, it should have been done sooner. But, you know, I think realistically if you look at the timeline of Cerence's productions, we got very substantial productions in February and March. I think during that period we got more documents than we had gotten during the entire previous lifespan of this case. So we got a huge document --

THE COURT: But do you know why that is?

MR. GESKE: Well, I can speculate, but we got a huge --

THE COURT: Well, I can tell you why it is. In December, they sent you their custodians and their search terms and they said: Let me know if this is going to work.

Then someone was probably hearing The First Noel in the background and then New Year's Eve celebrations, and then after that people got back to work, but nothing, and then it was just crickets. No more Christmas carols, it was just crickets and crickets and crickets.

Then in February I guess there's some contact. Then March is when -- I thought it's in March. Is that when you first end up in state court on this issue?

MR. GESKE: We were in state court, I believe, earlier

in February.

THE COURT: Okay.

MS. KEELEY: Yes, this was the first time on that issue, yeah.

THE COURT: Okay. So that's why you got a lot of stuff. It's because while the Christmas carols were playing and you weren't calling them, they started working. Then they started producing stuff and then, yes, you got stuff because you never said anything.

As we just heard from Ms. Keeley, she and her firm and her client paid a lot of money to have contract attorneys review stuff. That takes time, and then to do quality control the right way you need to -- you can't kind of just do it. You've got to do it and make sure you're doing it right, and that takes some time. Then they start producing.

In my experience -- and I don't know if this is the experience in this case -- you start to get a production that starts to looks like this and speeds up, because once they get things going then they start sending stuff out. So I don't disagree with any of that. That's not defendant's fault.

MR. GESKE: Right, and I'm not saying it is defendant's fault. I'm not --

THE COURT: It would be their money. It would be their time. It would be all of that.

MR. GESKE: Right, and I'm not trying to put blame on

anybody. I'm just saying that this is -- this is the timeline of when we received the documents, and then shortly after we received the documents in February and March we said: Here's a list of people we'd like to depose.

You know, after weeks of going back and forth on that, you know, we got to the point where we were told, well, go to Germany and, you know, that's the point at which we said --

THE COURT: They didn't say that. They said --

MR. GESKE: Well, with the exception of two people.

THE COURT: Well, three -- no, three plus a 30(b)(6).

MR. GESKE: I think it's just two.

MR. GERBIE: One of them is already in the United States, Your Honor.

THE COURT: Okay.

MR. GESKE: Yeah, Mr. Cashman is U.S.-based.

THE COURT: Okay.

MR. GESKE: So they're saying: With the exception of these two who we've chosen, the rest you can go to Germany.

So at that point we said: Okay. Let's --

THE COURT: They're saying maybe.

MR. GESKE: Well --

THE COURT: They're still saying -- I'm the one who's saying forget it. I'm saying forget "maybe" and pretend you're going to have to go to Germany because I don't want you to be saying: While Ms. Keeley was being gracious, she lulled us

into thinking we didn't need to do anything.

I'm done with this.

MR. GESKE:  No, that's not what I'm saying.  I'm just trying to provide context here.

THE COURT:  I have a ton of context.

MR. GESKE:  Sure.

THE COURT:  You don't have to do any of that.  I'm really up on this case.

MR. GESKE:  Okay.  Fair enough.

THE COURT:  So that's not going to work.  What I would like context on is the inference I'm drawing from the numbers that Ms. Keeley has provided is not suggestive of a case that ESI is really all that important.  When you were using your example of a voiceprint, I thought before you finished what happened, what people are saying, which is:  Well, when we say voiceprint, it's not what the Illinois Biometric Information Privacy Act means.  It's just voiceprint.  That's just our short -- you know, our in-the-know language that we use.

When you were telling that story, I was like they're going to say that's not what -- we're not talking about an Illinois BIPA voiceprint.  We're just talking about voiceprint.  That's what we talk about.

So that further tells me that using search terms and having defendant incur additional costs doesn't make a whole lot of sense.  What am I missing?

MR. GESKE: Well, I think when we're seeing individuals use the term "voiceprint," they're talking about identifying a person based on the unique characteristics of their voice, which our position is that that is -- that falls squarely within BIPA. But BIPA doesn't define the term "voiceprint," so it's something that is ultimately open to argument. If there's going to be an argument from defendant that this isn't really a voiceprint within the meaning of BIPA then, you know, that's undeniably relevant to us making the counterargument that it is within the meaning of BIPA.

THE COURT: Tell me what the emails -- how that would change any of this.

MR. GESKE: Well, there is, you know, a reckless versus negligent component which speaks to mindset. So defendant's understanding of its own product is something that, you know, I'm sure defendant would argue we have to prove that the information that they were collecting, they were collecting it in a knowing manner, not necessarily knowing that it was violating BIPA, but knowing that it was being collected and what the information was.

THE COURT: Well, I think Ms. Keeley has said they don't even collect it.

Isn't that your client's view?

MS. KEELEY: Yeah, our client's cloud servers don't have any connection to the product.

THE COURT: Okay.

MS. KEELEY: May I just add something as well?

THE COURT: In a second.

But explain to me, though, why the emails are necessary. I understand what you're interested in. Why do you need emails to ask people about that concept?

MR. GESKE: Well, in part potentially to impeach them to the extent that they are saying that's untrue:

I notice, you know, Mr. Hardegger, that you described this as a voiceprint in your email. What did you mean by that? Okay. Let's talk about it. What is that? Do you mean that in a way that it -- is it used to identify a person? Okay. How is that done? Is it done by taking that sample, storing it in XYZ way, taking data points from that sample, and then later comparing that to future samples? Okay. Tell me about that process.

Then we can take that testimony in accordance with the documents, with whatever other documents we have, provide it to an expert, and say: Okay. Is it a biometric, or is it not? Is it subject to the statute, or is it not?

We believe that it is, and the way that engineers describe the product is very relevant to their testimony and their credibility as witnesses. So we think it's extremely relevant.

THE COURT: Well, that wasn't -- I didn't ask about

relevance. I asked why do you need the emails, and you told me you needed it for a particular reason which I'm still not tracking. Do you remember the reason you said you needed it?

MR. GERBIE: The way that engineers discuss the product and its deployment is, I think as my colleague said, often more suggestive of how the product actually functions than necessarily the technical documentation. So the way in which they describe the product is relevant. Oftentimes, as we've seen with the emails that they have produced, they are talking about how the product works and its capabilities candidly with each other.

So we think that, you know, search terms aside, certain of these individuals, which we didn't know they had relevant documents until we received productions in March, would have relevant documents for production here.

THE COURT: But you received their relevant documents in March.

MR. GESKE: No, we received relevant documents from these four individuals who they've identified as custodians in March. Upon review of those documents the last couple of months, we've identified that there are other individuals who we're not -- who we don't have hit reports for and who we don't -- who they didn't pull files for even on their own search terms that are likely to have relevant documents.

THE COURT: Yes, I'm still -- you said you needed the

emails for impeachment.  That doesn't make sense to me much.

MR. GERBIE:  We don't know if we need them for impeachment.

THE COURT:  Well, that's what you said.  That's not what I offered.

MR. GERBIE:  It was a hypothetical, Your Honor.  I apologize.

THE COURT:  Well, I asked you what you needed them for, why you couldn't ask these questions in a deposition without the emails.  These are things you're trying to find out:

When you say voiceprint, what does that mean?  Here's a colleague of yours discussing a voiceprint of a voice.  What does that mean to you all within your team?

This is what it means.

What do you do with it?

Whatever it is, you've got emails to prompt you to understand what to ask.  I understand, of course, it's always better to have the emails of people you're deposing, but again when the Christmas carols were playing in December, if someone had reached out to Ms. Keeley and said:  I don't like these custodians, and we'd like these custodians as well --

MR. GERBIE:  I'm not sure if we were provided with the custodians in December.

THE COURT:  That's -- I think you are right about

that, actually.

MR. GERBIE: And that was the issue. Your Honor's comments last week were well taken that, you know, bringing additional search terms this late in the ballgame is likely not to be, you know, looked upon kindly and asked that we -- that custodians is a different matter. So we really have endeavored to identify those additional custodians that we wouldn't have had any reason to know about until these late productions in March.

THE COURT: Yes, I forgot about that. That's a fair point.

Go ahead, Ms. Keeley.

MS. KEELEY: Thanks, Judge. Just starting at the top and kind of redirecting, I just wanted to clarify because I know depositions came up again. Is that issue still open? Do I need to respond to that?

THE COURT: No.

MS. KEELEY: Okay. There were two -- on the ESI issue, there were two open issues that you asked us to come here with at the last hearing. The first is our reporting about our procedures, the hit reports we ran of the custodians to plaintiffs and to you, and the second was for plaintiffs to articulate good cause and particular reasons why a certain person was particularly important, why not getting their ESI is prejudicial to their clients, and so far the only reason

they've had in terms of either custodians -- well, I'll start with search terms, that there's certain emails about engineers talking about biometrics. I don't know if they haven't reviewed all of them yet, but we've produced a lot of emails saying exactly what they're looking for.

Directing you to page 8 of the report, our search terms have a lot of different synonyms for "voice" that we pulled from technical documents, the exact words that are used in them. So I'm not really following the argument that they aren't receiving the documents that they think are relevant, one, because they do have them and they might just not have reviewed them yet and, two, because -- because these terms include all the different kinds of variations of words that they're looking for. And the terms proposed, even if they were timely, for example, we've produced documents explaining that the Gen20 -- I'm on page 10.

THE COURT: Yes.

MS. KEELEY: The last one, Gen20-X, that's a head unit in certain Mercedes vehicles. We've produced many documents explaining that Mercedes did not purchase the voice biometric products to use in that head unit. The same thing for the cloud, we've produced documents explaining -- like I mentioned with Mr. Tsuboyama who was identified for a deposition, we've produced documents explaining that the voice biometric product is incapable of connecting to the cloud. So I think this is

not only untimely but far from good cause.

THE COURT: So what do you make of the idea that you didn't provide custodians in December? I don't know that that would have changed anything, but on page 9 it reads:

"To this end, plaintiffs have requested that defendant run all search terms for the custodial files of Khaled Anani, Christophe" -- and I think that should be Christopher -- "Couvreur, Jochen Hardegger, and hit reports for the following custodians: Mike Chachich" -- I may be butchering that -- "Jorge Tsuboyama" -- who we've talked about -- "Udo Haiber, and Holger Kwast."

So, Mr. Gerbie, when you said that plaintiffs have also requested hit reports for the following custodians, what is the difference between those four and the three right above them?

MR. GERBIE: The three right above them we believe or we're quite confident have -- relevant documents have been produced. You know, certain "go get" documents were produced for them. So we think there's at least some acknowledgment that they may have relevant documents, and we're asking that defendant pull the full files and run a custodial search. Then for the subsequent ones --

THE COURT: Oh, okay.

MR. GERBIE: Go ahead, Paul.

MR. GESKE: So the difference, Your Honor, is that the

top three were ones for which Cerence did the "go get" production. The bottom three were not included as custodians either for the full search terms or for the "go get" process.

THE COURT: Okay. So you would expect Cerence to go -- for Anani, Couvreur, and Hardegger, you would expect them to go through the same process they did for the four who are covered on page 8, right?

MR. GESKE: Well, I think to start with it would be helpful to get a hit report for them.

THE COURT: But that's what I'm wondering. It doesn't say that.

MR. GESKE: Well, I think we asked that they run the search terms.

THE COURT: That's why I was asking you the difference between those two --

MR. GESKE: Yeah.

THE COURT: -- and I thought what you just told me was you think with those three, they should do what they have done. I thought you were saying you don't want hit reports. You want them to go run the search terms on those three custodians.

MR. GESKE: So the difference between the two lists, the top list are individuals who Cerence included in their "go get" production. The bottom three were not included.

THE COURT: I get that. The relief, what is the relief you're asking for?

MR. GESKE: So, I mean, to start with, I think it would be helpful to have a hit report for all six of these individuals.

THE COURT: All seven.

MR. GERBIE: Yeah, there's one more.

MR. GESKE: Oh, I'm sorry. Yeah, there's one on the last page. So it would be helpful to have a hit report for them, and then we can discuss, you know, whether there --

THE COURT: We're not doing that.

MR. GERBIE: May I be heard briefly, please?

THE COURT: Sure.

MR. GERBIE: So just by way of example, if Your Honor may, I've got a copy of a document I'd like to provide to the Court and counsel.

THE COURT: Sure.

(Brief pause.)

THE COURT: Thanks.

MR. GERBIE: So as Your Honor can see from the first page, which is Bates 74 --

THE COURT: I don't mean to interrupt. It's just marked "attorneys' eyes only," so I'm just reminding all of us, if we're going to talk about it, we've got to be mindful that it's marked "attorneys' eyes only."

MS. KEELEY: Thank you.

THE COURT: Go ahead, Mr. Gerbie.

MR. GERBIE: Yes, Your Honor. Your Honor can note the author of the document is one of the individuals we've identified here as somebody who should have been a full file custodian, and this document describes rather explicitly the sorts of technology at issue. If you look at page 76, within the box there's a couple of things, and I'm mindful of the protective -- I'm trying to be mindful of the protective order.

THE COURT: Yes.

MR. GERBIE: You know, I can pass up a highlighted copy if that would be a little bit easier for Your Honor. But certainly 76, 77, and then I'd also direct Your Honor specifically to 83, the fourth dash at the bottom of 83 -- sorry -- the fourth dash from the first bullet in 83. So this individual who wrote this is the principal product manager for one of the products at issue in this case.

THE COURT: Okay.

MR. GERBIE: So this is an individual who -- based on this document, we believe he very obviously has knowledge about the facts at issue in this case. That's why we're looking to depose him and to get the search terms defendant has already run against the others run against his file as well.

So, you know, we're happy to provide the Court with these sorts of documents for other individuals as well, but I did just want to put some additional color -- excuse me -- on the types of documents that are at issue in this case that go

beyond emails.

THE COURT: Yes, okay. So I appreciate that. That doesn't change what I think is the most appropriate way to resolve this issue, and that is to have defendant do a "go get" for --

As long as I'm tracking this, if I'm wrong, tell me, Ms. Keeley. Mr. Anani, Mr. Couvreur, and Mr. Hardegger you have done "go gets" on, is that correct?

MS. KEELEY: Correct.

THE COURT: If based on any of the proposed search terms that are appearing on page 10 of the joint status report you think further review for "go get" documents for those three people, understanding your obligation under Rule 26 to do a reasonable search, that there are additional documents, I'd order you or I'm ordering you to supplement that based on what you are seeing from plaintiffs' sense of what may be relevant here, and then I'm going to order you to do a "go get" review for the four individuals who are on pages 9 and 10.

I'm not asking you to do a full ESI dump and search. So you can go into their files and see if they have them. I know one of these individuals is no longer with the company. So I am not going to order a full ESI download and search. This is way too late in the game.

I think, Mr. Gerbie, I see your point on -- well, I think it's 83 where the terms "biometry" and "biometrics" is

included.  I understand why that's of interest to you, but that still reinforces my view, which is, considering the amount of time and money that went into going through hundreds of thousands of documents to get to a few hundred, we need to look at proportionality.  You have a document right here for this individual with a nice bullet point that you've identified that you can ask him all sorts of questions about.

MR. GERBIE:  Well, Your Honor --

THE COURT:  Way back when, before there were emails and Slack and whatever the next generation is going to produce, attorneys just asked questions.  They didn't have the emails for supposed impeachment.  They didn't spend hundreds of thousands of dollars looking at what people send back and forth about where they're going for lunch and all the other things that come from all of this.  You know what you're looking for. You've got documents.

Defendant gave you an opportunity in December, January, and finally in February someone woke up, and they've started their production.  I don't see -- and you have not come to me and said:  Here's obvious things we're missing.

These are all things you think might be out there.  I am convinced based on the numbers that have been presented that this is not an ESI-driven case.  Unlike others where sometimes there is a reason ESI has to be front and center, that does not seem to be this case.

Additionally, Ms. Keeley has repeatedly said that she does not think her client is involved in the maintaining of biometric information to begin with, that they're a software designer and their cloud doesn't even store the information. I have yet to hear you tell me that that's wrong.

And as anyone who works in the area of BIPA knows, unrestrained, plaintiff's attorneys can come up with lots of different theories as to why things may or may not be relevant, but I have yet to hear plaintiff say: We don't think that's true. Here's good reason why we think our case is different from the way Ms. Keeley is describing it.

So I do not see under Rule 26 proportionality based on the needs of the case cause that full ESI discovery is appropriate, but I will order defendants to supplement any "go get" discovery for the three identified people on page 9 and to do "go get" discovery on the four that are identified on pages 9 and 10.

MR. GERBIE: Is Your Honor willing to order defendant to produce a hit report?

THE COURT: No.

MR. GERBIE: Thank you, Your Honor.

THE COURT: No, and the reason I'm not ordering a hit report is because it's too late in the game. So if Ms. Keeley produced another hit report similar to the one we just saw for the others, where would that lead us -- leave us?

MR. GERBIE: Well, Your Honor, in that case, if they were to produce a hit report, again, this is a -- you know, we're trying to be very targeted with the specific individual who was the principal product manager of the product that we believe is at issue in the case. This is not somebody who's tangentially worked on the product at some point. This is somebody who we believe should have been included and who we didn't know wasn't included, again, until we got these documents in March and started reviewing them.

You know, we've been before Your Honor for a couple of weeks now. We've been trying to meet and confer. I hear Your Honor telling us that we can go get testimony, but it sounds like we might be having to go to Germany to get testimony from them, which we'll do and which is fine. We'll have to do that. But Your Honor's order last week did ask us to tell them which additional custodians you'd want to get hit reports for and potentially full file custodians and ordered defendant to identify to us --

THE COURT: That's --

MR. GERBIE: So this is the first time, you know, and we are trying to --

THE COURT: That's fair. That's fair.

So, Ms. Keeley, I did think I was going to get hit reports, so tell me what happened there.

MS. KEELEY: So you're referring to the "go get"

custodians, right?

THE COURT: Yes.

MS. KEELEY: Yeah. So our client doesn't have the capability to run search terms on like files in their internal system. So to run search terms and to run a hit report, that's what we -- how the full file collect worked. We did like a PST collection through our client's IT department. They have to send it to our e-discovery vendor. We do a full upload, which I understand that you understand is very expensive storage costs and uploading costs, and we pay vendors hourly to go through them and then we run the search terms on everything.

So in order to do a hit report on anyone that we haven't done a full file collection from would require another initiation of an e-discovery process, and that's why when we realized that these "go get" people only had a few documents that they sent us and said we think these sound relevant to how their in-house counsel described the case and found the ones from that that were responsive, that's why, again, proportionality didn't seem -- or we concluded it wouldn't have been productive, especially with the full file collect custodians we had, as you explained, the small percentage that even ended up being responsive.

THE COURT: Okay. Well, that does explain why it didn't happen. You know, I didn't know that when I ordered it for certain. I think that kind of relief that I was ordering

back then, though I presumed incorrectly, was just a matter of a vendor doing a couple runs and not -- I didn't realize what the collection protocol looked like, that it was more limited. That does make sense because you have to pay for all that stuff to be stored.

So you have the answer to that, Mr. Gerbie, and it's a fair question to be asking. Hearing that answer, though, I don't think you're entitled to further relief. Nothing has changed. I guess the better way to say it is nothing has changed in the way I'm seeing this.

MR. GERBIE: We understand, Your Honor, but our perspective is that even if we had had a disagreement or raised the search terms question on December 21st, 2024, that wouldn't have changed that the defendant's selected from our perspective, you know, convenient individuals for a search. We weren't able to identify these people until today -- until relatively recently, and we believe we're bringing those individuals to the Court promptly.

MS. KEELEY: Judge, we understand this isn't a game. We're not picking and choosing. This keeps coming up that they weren't given custodians in December. They didn't ask for them until they were here before you. I think this is just getting a little out of control.

THE COURT: I mean, I am confident if on December 21st, again, with Christmas carols playing in the background,

you had called Ms. Keeley and said, "look, we don't even know who these custodians -- what custodians you are talking about," we would have a whole different background here.

MR. GERBIE:  Understood, Your Honor.

THE COURT:  And I don't think it would -- you know, we wouldn't be here.  You know, if Ms. Keeley or her colleagues were like "we're not going to tell you the custodians," they would have been laughed out of the court, whether here or down at the Daley Center, you know.

MR. GERBIE:  Understood, Your Honor.  Candidly, this is -- you know, we are complying with -- we had this discussion last week.

THE COURT:  Yes, you're right.

MR. GERBIE:  And Your Honor asked us -- thought it was a reasonable perspective to say we didn't know who the custodians were until -- we still didn't.  As of last week, we didn't know who the custodians were.  So that was provided to us in response to --

THE COURT:  Did you not ask?

MS. KEELEY:  Not until we were before Your Honor, no, they didn't.

THE COURT:  I mean --

MR. GERBIE:  Your Honor, I can't speak to what happened before I appeared before Your Honor.  We handled this at least in some detail last week, and Your Honor knew that we

did not know who the custodians were even last week.

THE COURT: You are 100 percent right that I didn't. What I did not know is in December the custodians weren't identified. I don't know when I -- I don't know if I knew. Maybe it's in the transcript, and I'll stand corrected. I don't know when I knew that you didn't know the custodians until very recently. But again, did someone ask and Ms. Keeley say: I'm not telling you, it's my secret?

MR. GESKE: Well, Your Honor, in February when we provided them with a proposed ESI protocol, it had here's how many search terms we would be limited to and here's how many custodians we would be limited to.

Then the response that we got from them was: We're not even going to talk to you about an ESI protocol because we already did our own search.

THE COURT: Yes.

MR. GESKE: So that was the response that we got at that time.

THE COURT: Right.

MS. KEELEY: And that does not identify custodians, either. I remember there being a vague number in the ESI -- this boilerplate protocol that they drafted of custodians they would like. But even at that time, no, they did not ask for names and they did not give us names that they wanted to be custodians.

THE COURT: Yes, I remember looking at that earlier when I first got the case because it was -- and I don't mean this in a negative way -- it was a general boilerplate ESI protocol, correct?

MR. GESKE: Well, it was a --

THE COURT: It wasn't -- let me put it this way. I know the answer, but sometimes I'll see ESI protocols where the hit reports have been exchanged, custodians, search terms, and it says: These are the custodians, these are the search terms, and this is what we're going to produce.

Then I sign those because both sides are saying this will satisfy our Rule 26 obligation from a producing party's standpoint, and the discovery-requesting party is saying we believe that meets our obligation to diligently pursue our case, or vice versa, depending on how you're looking at it. But the one I looked at didn't have that. It was more like here's how ESI is going to work.

MR. GESKE: Yeah, I think that's correct. It didn't -- the ESI protocol itself did not list who the custodians were or what the search terms would be. I think it was prepared based on a template from the Northern District of Illinois. But again, the response that we got was: We're not going to discuss this with you. We're not going to meet and confer about it. We think that what we did on our own is all that we needed to do.

THE COURT: Right, and you understood. Like there is a difference when the court order says that this is the ESI protocol versus a party saying: I'm meeting my Rule 26 obligations, and this is how I have done it.

MR. GESKE: Yes.

THE COURT: Okay. So it is not uncommon in my experience for a party to say: We're not entering an agreement, and we don't want you to sign an order, Judge, saying that this meets Rule 26. We're just going to do it, and we can duke it out on the fringes, which is what's happened here, whether by default or by design, I don't know.

MR. GESKE: Right, and I think that that's similar to what we've endeavored to do here. These very limited custodians and these very limited search terms are, as Your Honor said, the fringes of the --

THE COURT: And that's why you're getting the relief that you're getting, which is that I'm ordering the defendant to do "go get" searches for those individuals and supplement the three that already were "go getted." Excuse the verbiage.

I mean, you have a date at the end of July. You're trying to get depositions done, and now you're asking them to spend I don't know how much time going through potential ESI searches. It's not happening, and that is for all the reasons I've said. On top of which the stuff that has been produced, the numbers absolutely confirm my belief, which is that this is

not an ESI-heavy case. It's a lot of money and time going into looking through emails to produce very few, and there's a way that people for years, decades, hundreds of years, conducted depositions without having emails. I trust that you're able to do that.

MR. GESKE: Yes. I don't know if hundreds of years ago they had biometric technology but, yes, we can do our best.

THE COURT: No, but they had -- if someone built a Ford motor car that didn't work right, someone figured out what questions to ask to prove that true.

All right. So I've covered the ESI. I've covered the 30(b)(6). I've covered the depositions. I am going to set a status date, but before I get there, anything else from plaintiffs that you want to talk about?

(Discussion off the record.)

MR. GERBIE: Yes, Your Honor. We'd like a short accommodation to the deadline to move to compel all third party compliance with our issued subpoenas, a seven-or-14-day extension, if Your Honor will permit it, from I believe the 27th to a week or two beyond that.

THE COURT: Do you know where on the docket we have that date?

MR. GERBIE: I think it was last week's order.

MS. KEELEY: Yeah, that's what I'm seeing, 96.

THE COURT: 96? Give me a second.

(Discussion off the record.)

THE COURT: And, Mr. Gerbie, you're asking for, you said, two weeks?

MR. GERBIE: Yes, Your Honor.

THE COURT: So July 13th.

(Discussion off the record.)

THE COURT: Oh, sorry. I'm looking at June. Sorry. July 11th. Any objection, Ms. Keeley?

MS. KEELEY: No.

THE COURT: That motion will be granted.

MR. GERBIE: Thank you, Your Honor.

THE COURT: Anything else like that or other things, I should say, in general?

MR. GERBIE: No, Your Honor. I just -- we're going to go about going to the Hague, so we'll keep you posted.

THE COURT: Yes. I don't --

MR. GERBIE: Understood, Your Honor.

THE COURT: If you need -- I know sometimes you need stuff from here. We're happy to do that, and we'll get that turned around. Okay. You're good?

MR. GERBIE: Yes, sir.

THE COURT: Okay. From defendant?

MS. KEELEY: Nothing further.

THE COURT: All right. So we've got July 7th for our status.

(Discussion off the record.)

THE COURT: Okay. Can you do 10:00 o'clock on the 7th? I've got a settlement conference at 10:00, but otherwise -- or 10:30, but otherwise you're going to be sitting through a 9:15 call, which isn't going to be good for you.

MS. KEELEY: Thank you. 10:00 o'clock works for me if it works for plaintiffs.

(Discussion off the record.)

MR. GERBIE: Yes, Your Honor.

THE COURT: It does work for you?

MR. GERBIE: July 7th at 10:15 or 10:00?

THE COURT: 10:00.

MR. GERBIE: Yes, Your Honor.

THE COURT: Okay. And then please file a status report by noon on --

(Discussion off the record.)

THE COURT: You can just -- if you want to file a status report the morning of the 7th, you can do that or you can tell me where things are. I don't want to ruin your weekend, so I'm not going to make you do something on the 3rd, you know.

MR. GERBIE: Thank you, Your Honor.

(Discussion off the record.)

THE COURT: Yes, you do need to do the meet-and-confer and have all that done by the 3rd.

MR. GERBIE:  Understood, Your Honor.

THE COURT:  But you can -- even if you file something real short saying these are some points you'd like to cover on the 7th, great.  Otherwise, I can do it on the fly.

All right.  Thank you all very much.

MR. GERBIE:  Thank you, Your Honor.

MS. KEELEY:  Thank you, Judge.

THE COURT:  Thanks.  Mr. Gerbie, don't forget this.

MR. GERBIE:  Yes, Your Honor.

THE COURT:  Thanks a lot.

(Proceedings concluded at 3:54 p.m.)

C E R T I F I C A T E

I certify that the foregoing is an accurate transcript produced from an audio recording of the proceedings in the above-entitled matter.

*/s/Patrick J. Mullen*          *June 20, 2025*

Patrick J. Mullen
Retired Official Court Reporter

# EXHIBIT 6

1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


RANDOLPH FRESHOUR and ) Case No. 23 CV 2667
VINCENZO ALLAN, each )
individually and on behalf )
of similarly situated )
individuals, )
)
             Plaintiffs, )
)
      v. )
)
CERENCE, INC., a Delaware ) Chicago, Illinois
corporation, ) October 15, 2025
) 1:45:55 p.m.
           Defendant. )

TRANSCRIPT OF PROCEEDINGS - Motion Hearing
BEFORE THE HONORABLE M. DAVID WEISMAN, Magistrate Judge

APPEARANCES:
For the Plaintiffs:     McGUIRE LAW PC
                  BY: MR. PAUL T. GESKE
                    MR. DAVID L. GERBIE
                  55 W. Wacker Street, 9th Floor
                  Chicago, Illinois 60601

For the Defendant:     SHOOK HARDY & BACON LLP
                  BY: MS. MEHGAN E.H. KEELEY
                    MR. MATTHEW C. WOLFE
                  111 S. Wacker Drive, Suite 4700
                  Chicago, Illinois 60606

FAILURE TO SPEAK DIRECTLY INTO MICROPHONE
RESULTS IN INAUDIBLE PROCEEDINGS AS NOTED

Transcriber:     Laura LaCien, CSR, RMR, F/CRR
              Official Court Reporter
              219 S. Dearborn Street, Room 2304A
              Chicago, Illinois 60604
              Telephone: 312-408-5032
              laura_lacien@ilnd.uscourts.gov

* * * * *
PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court:)

COURTROOM DEPUTY:  This court resumes in session. Please be seated and come to order.  23 CV 2667, Pena versus Cerence, Incorporated.

MR. GESKE:  Good afternoon, your Honor.  Paul Geske for plaintiffs.

MR. GERBIE:  Good afternoon, your Honor.  David Gerbie also on behalf of plaintiffs.

THE COURT:  Good afternoon to both of you.

MS. KEELEY:  Good afternoon, your Honor.  Meghan Keeley for Cerence.

THE COURT:  Good afternoon, Ms. Keeley.

MR. WOLFE:  Matt Wolfe also for Cerence.

THE COURT:  Good afternoon, Mr. Wolfe.

All right.  So we've got plaintiffs' motion to compel and the response.  Let me start with the fundamental question. I don't understand how this is -- any of this is related to class certification at this point.

UNIDENTIFIED SPEAKER:  That -- that's largely correct, your Honor.  This is -- this is --

THE COURT:  All right.

UNIDENTIFIED SPEAKER:  This was --

THE COURT:  Then I don't think we need to decide this. This -- I mean, we are -- we have managed discovery for class certification purposes.  I think we've made that clear.  I

don't -- I've got a bunch of other questions but I'm -- you know, a judge told me before I became a judge "only decide what you need to decide" so I don't under -- your brief was eloquent. It was a beautiful merits brief on something that may happen later; but as I read through it, it was like ships crossing in the night because you were talking about substance and BIPA and the merits of all of that -- which, again, there is a time and place for it -- and Ms. Keeley's brief was one grounded in discovery. And I'm not saying one's better than the other but I'm managing discovery on class certification so I don't think we need to get this resolved to move forward with the class certification.

MR. GESKE: Well, so, your Honor, the reason why we brought this now, partly it's because there was a merits fact discovery cutoff and we were directed to file this within seven days after we last appeared before your Honor. Another reason is we have deadlines coming up next month for expert disclosures --

THE COURT: Oh, that's right. Okay.

MR. GESKE: -- and so we think that experts -- our experts are going to be opining on merits issues and so we want them to have the information that they need before those disclosures are due.

THE COURT: And you haven't gone back to Judge Kendall to ask her to change any of this?

MR. GESKE: We did ask for an extension to the expert discovery deadlines previously which she gave us. We haven't asked her for another subsequent extension beyond that.

THE COURT: Okay. All right. So let's go to the issue on the -- on the discovery front. So reading defendants' response, I'm -- as I understand it -- and, Ms. Keeley, tell me if I'm misunderstanding. I'm looking at Exhibit D of your brief which is this agreement that there was an agreement as to what would be produced responsive to the requests for production, the second set of requests for production. And as I read the email chain, there's -- you know, it's instructive to me, quite candidly, as a Judge. When you set dates, it sometimes creates this pressure among the parties. But as I read it, there's this back and forth about what Cerence could do or would agree to do in response to these second set of requests. And then -- again, I'm at Exhibit D and it's a long email chain, you got to read backwards, but "Wednesday, September 10th at 10:10 a.m." -- this is to you, Mr. Geske, from Mr. Wolfe, it says -- "Hi, Paul, I just received an update from Cerence on this. The sample voice data has been requested. I'm hoping to have another update for you this week." That's -- and that's from Mr. Wolfe. And then, Mr. Geske, you respond to Mr. Wolfe "Hi, Matt. We first discussed this nearly two weeks ago. Given the tight deadlines in this matter, we'll need the actual supplemented responses

and production this week, not merely another update." And then Mr. Wolfe responds "Professionally, I understand. I've been contending with some people being out of the office. I will be in touch this week."

So defendant says -- unless I have this wrong, Ms. Keeley -- is we had an agreement and we're going to produce a sample and that's what we did.

MS. KEELEY: Yes, Judge.

THE COURT: And so that's what they did. I understand that certain fields said "dummy" in there and, you know, other things that were explained in their -- in Cerence's response, but it seems to me you negotiated a sample and that's what they gave you. I know the one word "cancel" you said is insufficient. They -- they disagree with that. And moreover, there's nothing in here that says "one word sample would cut it." So tell me why under a local rule and, you know, you -- you bargained for and get the benefit of your bargain that that doesn't cover the agreement you reached?

MR. GESKE: Yeah. I'd be happy to address that, your Honor.

THE COURT: Yeah.

MR. GESKE: So, first of all, there wasn't an agreement. If you look at the email from me to Mr. Wolfe on August 29th where -- this is the day that we had our -- our telephone call pursuant to Local Rule 37.2, I'm summarizing the

call, and I say "we conferred pursuant to Local Rule 37.2 regarding Requests 43 through 51 and plaintiffs' second set of requests for production so I'm identifying multiple requests that we talked about there. And although we -- we specifically asked that their production include a sample or an example of data, we weren't limited to that. There was no agreement that we would accept that in lieu of everything else that we were asking for.

And if you look at the email from Ms. Keeley to me on September 12th, she says "To follow up on your meet and confers with Matt" -- meaning Mr. Wolfe -- "please see the attached supplemental responses to Requests 43 through 44 and 46 through 50. We did not find any additional information to supplement the responses to RFPs 45 and 51."

So she's acknowledging in her email that our discussions were far broader than just one single sample or one single example of the data. There never was an agreement either in writing or orally to limit Cerence's production to that one piece of information.

Now as far as whether the example that they personally handpicked and produced to us, we don't think that the one they chose is a representative sample or example because Cerence's own 30(b)(6) witness said Cerence gets ███████████████

██████████████████████████████████████████

████████████████████████     ████████████████

████████████████████████████████████████████

█████████████████████████ █████████████████

███████████████████████████████████

██████████████████████████████████

███████████████████████████ so we don't feel that this is the one that they chose is particularly representative as a sample and that's why what we've proposed in our motion is that they give us several examples of at least four to six seconds in length so that we can see what occurs when it's -- when the voice recognition technology is actually analyzing a typical request that a person would make.

THE COURT:  Ms. Keeley?

MS. KEELEY:  Thanks, Judge.  I guess I'll start with the -- your question about the meet-and-confer agreement. Counsel is mischaracterizing the entire course of events, including the email chain that you just read.  The course of meeting and conferring under 37.2 is about resolving disputes and oftentimes in most cases as it has in the past in this case -- we thought it did most recently in this case -- the parties make agreements to resolve disputes in give and take. That's exactly what happened.

We did reach an agreement both on the phone, which my co-counsel here handled that phone call and can speak to it if that would be helpful, and in the email chains that we've attached that we were resolving the disputes in those requests

with the production of an audio sample and the associated metadata. We had that agreement that it would resolve the disputes and now that it doesn't have the information plaintiffs hoped it would, they're backing out of that agreement. That's not a proper thing to do and it undermines the meet-and-confer process so I just wanted to clarify the course of events that were mischaracterized.

Concerning plaintiffs' arguments about the sample not being what they think it should be or what they thought it could be --

THE COURT: Can I interrupt you on that?

MS. KEELEY: Sure.

THE COURT: I don't want to lose your flow but I do think it's more efficient to go through this point by point. So I'm again looking at Exhibit D on defendant Cerence's response to the motion to compel. On September 5th, Mr. Wolfe says "We agree to investigate the feasibility of pulling a sample of the voice data transmitted through the MB Cloud to Cerence's cloud, including the associated metadata. Assuming the data is reasonably accessible to be pulled and produced to you, we agreed to provide a sample as discussed." And then "I will try to get you an update on this by Tuesday." The email after that is from Mr. Geske to Mr. Wolfe.

Where do they accept that as the agreement? I do think my read of this is that they accept that principle but I

don't know that they agree to one sample. And I guess one of the things I'm wondering is if the agreement was to do several samples -- so I'm reading in part the email that Mr. Geske sent to Mr. Wolfe -- "Cerence must commit to supplementing its responses to Requests 43 through 51 and supplementing its production to" -- that's probably a typo -- "and supplementing its production to with examples or samples of all types, forms, and categories of Mercedes-Benz end-user voice data stored, processed, or transmitted with to its research grid and run-time environment."

So it sounds like they're looking for more than one sample. What am I missing there?

MR. WOLFE: Your Honor, if you don't mind, I'll address this.

THE COURT: Yeah.

MR. WOLFE: So when I spoke to Mr. Geske, there are three issues raised with regards to Requests 43 to 51. One was Mr. Geske said to me "we want audio samples." The other two were follow-up questions about other documents they were producing. We investigated those and you see those referred to in the email chain.

There were two samples produced. One is from the research grid and one is from the run-time environment, which is a live environment. It's a representative sample. There was no discussion about I need to four to six seconds in

length, I need multiple representative samples from each system.  And if you look later in the chain, he says "make sure we get one from the run-time environment and one from the research grid," which is what we did.  It's effectively the same file but there are two samples, one of each.  There was never any discussion about length.  There was never any discussion about content.  We did not consider length or content because we don't think it's pertinent.  We just said get us a sample to the client.  The client got us a sample.  We produced it --

THE COURT:  So --

MR. WOLFE:  -- and all this comes up later.

THE COURT:  Yeah.  So let me ask you this or you all decide who you want to respond to this but if -- if you could get one sample and putting aside all the other, I think, peripheral issues that I don't -- are not really -- I don't think really move the needle, what would be the added burden of getting, let's say, two more samples of each, the run-time and the -- what's the other one -- research grid of five to six seconds in length?

I'm just trying to understand burden here now that Mr. Geske is reminding me that we are in -- you know, we've kind of blended these for a variety of reasons.  They may be necessary for their expert to look at.  I'm trying to think what Rule 26 factor would tell me you shouldn't have to do

this. I agree that -- I agree that there was an agreement to produce samples and maybe not -- I don't -- I haven't looked at the actual request, but I think there was an agreement to produce samples and that would satisfy and I don't think anyone did anyone untoward by using "cancel" as a sample, but if they're saying we need a longer sample four or five seconds, what in Rule 26 would tell me they shouldn't get that?

UNIDENTIFIED SPEAKER: Your Honor, in the -- in the scope of your previous rulings about what's discoverable, I don't think this is about an additional burden so we would go and get those additional samples --

THE COURT: Correct.

UNIDENTIFIED SPEAKER: -- recognizing that you already ruled the way you did in the 30(b)(6) issues and things like that and said they're about to explore what's happening in the cloud. But I believe it should resolve Requests 43 through 51 including the source code request which is a whole --

THE COURT: Well, source code --

UNIDENTIFIED SPEAKER: -- another level of burden and problem.

THE COURT: Yeah. The source code is -- I don't see that but I do think that you have an agreement to have some samples and if your expert is saying, you know, one word sample isn't going to work, who am I to disagree with your expert but having a couple samples of each seem to me to be sufficient.

Source code is -- I don't even know where we would start with that given the posture of the case.

UNIDENTIFIED SPEAKER: Well -- excuse me. So when it comes to the length of the examples and the type of examples, it's not just our expert is saying this would be helpful to us, let us see it. It's Cerence's own 30(b)(6) witness which we quoted from the transcript in Page 9 of our brief, he says

And he says that

This is what their witness testified to. So it's not just our expert. It's their own witness who is saying longer

THE COURT: What does their expert say about whether or not that is -- those examples or samples are associated with a person?

UNIDENTIFIED SPEAKER: So I think, you know, Cerence's witness has -- their position was consistent with what their lawyers have taken as their legal position.

UNIDENTIFIED SPEAKER: I don't believe we have an expert disclosure from them specifically if that's answering your question.

THE COURT: Mr. Geske, this is -- I have many BIPA cases and plaintiffs' counsel for reasons I still don't understand will say everyone is lying on the other side.

MR. GESKE: No --

THE COURT: That's what you're suggesting is that their witnesses are parroting back whatever their attorneys are arguing. It may be that Cerence's attorneys are parroting what their own witnesses are telling them but the question I'm asking is different.

MR. GESKE: I understand, your Honor; and I didn't mean to imply that anybody is lying. What I'm saying is because this is -- this is a voiceprint case and the term "voiceprint" is not defined in BIPA, that is one of the areas of dispute among the parties. Ultimately, it's a legal question and --

THE COURT: It is.

MR. GESKE: Right. So --

THE COURT: I asked -- what was the question I asked that got you off on your tangent, do you remember?

MR. GESKE: You asked what their witness was saying about whether the samples contain biometric information?

THE COURT: I don't think I used "biometric information." But yeah, does the sample, does it connect to an individual?

MR. GESKE: So the -- their witness said that --

obviously that it does not contain biometric information but their -- Cerence has a contract with Mercedes, and this was attached as Exhibit 5 to our motion, and the contract says that ██████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ █████████████████████████████ ████████████████ ████████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████████████████████

████ And so if we're asking for let us know what the code is of that software that's distorting this to remove the voiceprints, that's highly, highly relevant to the merits. And that's encompassed in these requests and it's encompassed in what we were asking for.

THE COURT: How -- well, this is something Judge Kendall is going to have to figure out. That does not -- whether or not something resulted in a voiceprint being obscured or modified to an algorithm does not tell -- that's part of the picture but not the whole picture because if it's not related to anyone, it's not biometric information.

If Cerence took my voice from -- they were listening in and they loaded it into their cloud and they used it for

whatever purpose they wanted but they never connected it to me, I don't understand how BIPA comes into play.

MR. GESKE: So --

THE COURT: If Cerence -- who is the guy who does the Lincoln ads, that famous actor who does the Lincoln ads? If they used his --

UNIDENTIFIED SPEAKER: Matthew McConaughey.

THE COURT: Yeah. If they used McConaughey's voice and loaded it up into their cloud but never connected it to McConaughey, how is there a BIPA violation?

UNIDENTIFIED SPEAKER: So it's still -- it's still violative of the statute. It is still capable of identifying a person, so.

THE COURT: If they don't do that, though, that --

UNIDENTIFIED SPEAKER: If they don't do that, the information is still subject to the law because in a subsequent example -- let's say someone is talking on the phone and their voiceprint is captured in that circumstance and say oh, well, if we only had another sample that we could compare this against. And so this is a known sample, the first one is an unknown sample and we think the unknown sample did something, whatever it is -- let's imagine in a criminal justice context -- then you can match it based on the identified subsequent sample and then you're able to identify the first sample so it is still biometric information.

THE COURT: If it's related to someone.

UNIDENTIFIED SPEAKER: Yes. But, I mean, definitionally at least -- I mean, this is the problem again that my co-counsel has addressed is we're arguing over, you know, what does that mean, what should it mean. But from a business perspective at least, Cerence did find it important enough of a term or rather --

THE COURT: Mercedes.

UNIDENTIFIED SPEAKER: Mercedes did to ensure that the samples taken from its vehicle had an algorithm applied to remove whatever it -- whatever the two businesses have determined are a voiceprint which may be the same as BIPA's non-defined term or they may not be.

THE COURT: How does that relate to the source code? So you think you need to get to source code that obscures the voice?

UNIDENTIFIED SPEAKER: Yes, your Honor, because I think the source code probably says -- I'm quite sure it has an algorithm that says something along the lines of identify voiceprint, obscure and delete or, you know, add filter to remove and I'm oversimplifying it and we'll have an expert who is able to better testify to, you know, exactly what the source code does or the method in which it removes the -- or attempts to remove the data, the biometric data specifically.

THE COURT: Have you done any discovery on the source

code, the use of source code by Cerence?  Do you have any reason to think they didn't do that?

UNIDENTIFIED SPEAKER:  They didn't apply --

THE COURT:  The algorithm that obscures a voice?

UNIDENTIFIED SPEAKER:  Oh, we don't have reason to believe that they didn't apply the algorithm, but we also don't have reason to know that the algorithm was effective.  So, you know, that's one of the things that we'd like to know and I think perhaps your Honor's point in seeking the other samples, the lengthier samples will be -- because -- and opposing counsel suggests that the two samples were produced but I just want to clarify a point that, you know, from a chain-of-custody perspective, there are two samples that were produced but of the same spoken words at different points in the, excuse me, processing process.  So -- okay, here's audio sample, algorithms applied, and here's the second sample so that we have two.

So what we -- what I imagine we'll do assuming that we're able to get some longer samples is have our experts say okay, well, can we connect the first sample and the second sample and can we identify them as being the same person because if we can, well, then it would show whatever the algorithm was wasn't effective, the algorithm that was supposed to be applied, meaning that there is still biometric information that remains --

THE COURT: And whose -- whose voice would that be?

UNIDENTIFIED SPEAKER: The driver of the vehicle.

THE COURT: Who is that?

UNIDENTIFIED SPEAKER: I'm not sure I understand your Honor's question.

THE COURT: Does Cerence know who the driver of the vehicle is? Does Cerence have that information? I know Mercedes does because it's Mercedes' car. Does Cerence know?

UNIDENTIFIED SPEAKER: They -- they may not know.

THE COURT: So that -- that brings me back to how is this covered by BIPA?

UNIDENTIFIED SPEAKER: Well, it brings me back to what I -- what I've already addressed which is that the collection of biometric information can, per se, lead to, you know, serious privacy risks down the road if the information is subsequently leaked.

So, for example, in the OPM data breach of two-and-a-half million government workers' fingerprints in 2016, even if none of that information was associated with the person's name, that doesn't mean that it's not still damaging to their privacy and potentially later linked to them were there to be a subsequent collection and identification of that person.

THE COURT: Do you agree that facial recognition is covered by BIPA?

UNIDENTIFIED SPEAKER:  Broadly speaking, yes.

THE COURT:  And pictures of us if those were stored by a corporation, those are potentially BIPA, right?

UNIDENTIFIED SPEAKER:  Well, not simply as photos.  I mean, at least there's a few rulings to that effect.  You know, Judge Chang's *Google versus Rivera* case which is going a ways back now, at least took that position.  So not necessarily absent algorithmic application of it but we think that may have happened here which is why we're looking for the source code of these other filters to see, okay, well, what happens to this raw voice data first and what do we end up with and maybe it is creating that voiceprint.  I mean, it certainly must identify it in order to remove it, at least that's what the contract between Mercedes and Cerence says.

THE COURT:  But you agree that that really doesn't answer the question at all, the contract?

UNIDENTIFIED SPEAKER:  Well, the contract doesn't answer the truth of what is happening but it addresses Cerence's and Mercedes' intentions with respect to data privacy or privacy of those samples so I agree that the contract doesn't control what actually happened.

THE COURT:  And it doesn't -- well, I was getting at a different point.  It doesn't mean that either Mercedes or Cerence followed BIPA or did not follow BIPA, right?

UNIDENTIFIED SPEAKER:  Correct.

THE COURT: So I'm not sure the relevance of the contract and what that has to do with what we're trying to get done here which is decide whether or not BIPA was violated.

UNIDENTIFIED SPEAKER: Well, clearly -- I mean, it identifies that there's -- information that's relevant to the claims at issue in the case and whether or not they -- the words they use in the contract are the same as the definition that's ultimately decided by the court as applying to BIPA doesn't mean that it's not --

THE COURT: If Mercedes says you don't have to do anything to obscure the voice and Cerence said we followed our contract with Mercedes, you wouldn't say that answers the question, right?

UNIDENTIFIED SPEAKER: Correct.

THE COURT: Okay.

UNIDENTIFIED SPEAKER: So -- and just to be clear, your Honor, the point of our motion -- you know, this is not a summary judgment merits motion.

THE COURT: It's written a lot like it.

UNIDENTIFIED SPEAKER: That's right.

UNIDENTIFIED SPEAKER: We are -- we're not here today to decide whether Cerence violated BIPA or not. What we're trying to show is that the information that we're seeking is relevant to that ultimate merits question. Obviously Cerence says the voice data that we get doesn't -- there's -- we don't

use it for -- to create biometric information and what we get is not biometric data. The contract says that when they do get the data, they need to mask the voiceprint so obviously we think that that's -- that shows that this data is relevant.

We recognize obviously Cerence is going to deny that that is subject to BIPA, deny that it violates BIPA; but the point is that that's ultimately the heart of the parties' dispute. And I -- I wanted to go back to your Honor's analogy of the photographs because I think this is helpful because there are -- there are companies, for example, that all they do is just store photos but then there are also companies that they take the photos and they analyze it and collect the facial geometry from the photograph. And then once -- once they start doing that, that's what potentially implicates BIPA.

And so the situation that we have in this case is more like the latter example where a company is going in and analyzing it because Cerence is not just getting just recordings of voices. They're -- they are -- there's speech recognition and voice recognition technology that is applied to the voice utterances. It's processed data. It's not merely just a photograph to use the analogy. This is -- there are -- there is software, there are algorithms, there are voice recognition models that are being applied to these recordings that get sent to their cloud. And so that's why we're asking for code and that's why we're -- we want to know what is your

code doing with these voices, what vocal features is it extracting from the recordings in order to carry out its functions. And the logs that they provided, all it does is it shows that the data gets sent to their servers but it doesn't show what their software is actually doing with it. We tried asking their 30(b)(6) deponent about this. He couldn't even identify the names of the software models that they've used. And, you know, I went through the transcript after the deposition and I -- I counted every single time the witness either said "I don't know" or "I would have to speculate." It was more than 75 times, your Honor. He was totally unprepared to actually talk about how the software works.

And so that's why we came back to Cerence after the deposition and we said, hey, we sent you these requests back in June, we're asking for these things, we tried to get it through the deposition, the deponent didn't have the information, let's revisit this topic and let's get a production in response to these requests for this information that we've been asking for -- that the Court has already said is relevant when it resolved the 30(b)(6) topics.

And so, you know, we -- we really bent over backwards to meet and confer for weeks about this and we've been trying to get it for weeks. And it's -- it's -- it's not something --

THE COURT: So -- okay. You're going to get a couple more samples because I don't hear a big burden. I understand

why these one words may -- you know, I'm relying on your representation of what your expert is saying, that he or she needs something more.  So you'll get a couple more samples. We're on to, you know, a different issue which is the algorithm in the source code for whatever algorithm is applied.  That is a big deal to Cerence.  Why should you get that in a case like this?  Why -- tell me why your expert needs that source code.

UNIDENTIFIED SPEAKER:  For the same reason I think -- circling back to your Honor's question about the photos and my co-counsel's point which is we think this is more like a case where it's not just that samples are received and nothing is done to them but samples are received and algorithms are applied and it's actually biometric information is collected and if -- we might be wrong on the merits.  We fully accept that.  If we review the source code and there's nothing there, it sounds like defendants are going to have an easy motion for summary judgment against us down the road, but we think it's certainly relevant to the merits of our case and whether or not they actually do collect biometrics or, you know, identify and store and then delete the biometrics using an algorithm but something is done in order to remove the voiceprint as identified by the contract or the contract is not being complied with.

THE COURT:  So I started by asking do you have any reason to think they weren't doing that and you're saying no,

you don't have any reason to think that they didn't apply --
and the algorithm to obscure the voice.

UNIDENTIFIED SPEAKER: Well, again, you know, part of the issue, your Honor, is we did seek a lot of this through testimony and unfortunately the 30(b)(6) witness wasn't prepared to answer questions that were well within the agreed upon and heavily litigated scope of the topics. So if perhaps we received more information from the 30(b)(6) witness that said, for example, we use X, Y, Z, open source algorithm, it's been used for decades for this purpose or, you know, five years for this purpose or we used, you know, this other model, then perhaps our expert would be able to address that, you know, from a merits perspective substantively. But when we don't receive responsive information from the person who is supposed to provide it, we're sort of left with no other choice but to seek, you know, further relief from the Court.

THE COURT: Yeah. I don't know why you didn't bring a motion on the 30(b)(6) witness not answering those key questions. Does your complaint even animate this theory of liability under BIPA?

UNIDENTIFIED SPEAKER: Are you asking -- you're asking about what the complaints pleads?

THE COURT: Yeah.

UNIDENTIFIED SPEAKER: Yes. The complaint referenced --

THE COURT: Because Ms. Keeley says you've pivoted on your theory of liability so I want to understand that.

UNIDENTIFIED SPEAKER: No. The complaint references requests being sent to the cloud. Some of the citations in the factual background section of our motion come straight from the complaint. We haven't pivoted on anything.

The -- the way that Cerence has chose to defend this case is it's -- it's chosen to focus on a particular component of the technology that lives solely in the vehicle and Cerence would love for this case to be only about that component because that's the one that it feels the best about defending and that's the one that it says doesn't send any data to the cloud so Cerence has tried to make this case about that component. From our perspective, this case has never been limited to or focused particularly on that. It's always been about the data that's leaving the vehicle.

THE COURT: All right. So, Ms. Keeley, I'm inclined to give them -- plaintiffs more samples. I'm not inclined to give a whole lot more samples. Tell me about the algorithm and the issues that that would pose for your client.

MS. KEELEY: Yes. Thanks, Judge. If I can just start by responding to the last point about plaintiffs' complaint, I think they used the phrase "we chose to defend a certain technology." They actually chose to amend their complaint to focus on that technology as well and it's not an ambiguous

technology. It's the voice biometric product because this is a BIPA case and that was the -- what their operative complaint was focusing on, the technology that people can use to unlock settings in their car with their voice. This is a new theory that they've pivoted to and it's as, you know, you've ordered, it's within the scope. You know, certain speech recognition discovery has been within the scope of discovery. But I do -- all of the theories that they've put forward in their motion a few minutes ago for the source code and the algorithmic information, none of it is supported by the record and several witnesses have testified proving much of it wrong. It's not stuff lawyers are saying. To the extent plaintiffs' counsel are refusing to listen to that testimony, that's not a basis for them to mischaracterize it and demand information about theories that have no basis in the record especially after discovery has been open for more than two years and they've had more than enough opportunities to ask questions about it or discover it.

To the extent that I -- the argument about the Mercedes-Benz contract, I under -- I think that was already flushed out, the contract term doesn't represent something that was actually put into an algorithm. It's a contract executed before technology was deployed. It has nothing to do with what a company is actually doing that's governed by BIPA. And as they've said, they used that as an exhibit at the deposition.

They had opportunities to ask the witness about what was actually put into code and the witness testified throughout the entire deposition that the speech recognition software has zero capability or ability or actual execution of any identification component. It wasn't just testimony that it's, quote, not biometric or not under BIPA. He thoroughly explained that, as did many other witnesses in this case.

So to the extent they're arguing he said "I don't know, I don't know," they're referring to a lengthy -- basically it was a pop quiz of hypertechnical terms and very minute details about the technology that were very, very specific and very broad for any one person to have an encyclopedia of knowledge about. They also -- as you mentioned, they didn't return to those issues later. And again, to the extent that they think the Mercedes-Benz contract is a basis for anything, they had an opportunity to ask about that and they didn't.

THE COURT: Do any of the requests actually ask for the source code on this algorithm or is that something you're interpreting as necessary to respond to the request?

MS. KEELEY: I think that one of the requests that we agreed to resolve with the audio file production asked for source code so -- but that was one that we responded it's not responsive because it's specifically asking for source code for this speech recognizance software which multiple witnesses and

documents have explained and proved doesn't do anything identification related.

THE COURT: Okay.

MS. KEELEY: The only other piece of evidence I understand plaintiffs to be pointing to in support is this testimony about training internal software and models which has nothing to do with identifying people. It has -- it doesn't even have anything to do with real people. A company's training of its own software has nothing to do with BIPA, plain and simple. It governs companies that collect and possess data that falls under biometric identifiers or biometric information.

Regardless of either side's interpretation of what a voiceprint is, his testimony about ▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ has nothing to do with any of it. That's the only piece of evidence to this entire section in the motion that they cite and it doesn't have anything to do with it.

So this -- these requests are just beyond disproportionate to the needs of the case especially at this stage and given the highly proprietary nature of source code -- you know, we understand courts need to take an extra close look at that and it's been beyond proven that the software they're looking for source code for has nothing to do with what would actually be governed under BIPA.

THE COURT: So the samples, I'll give you time to work through something definitive so we can get -- put that to rest but I'm still not -- the source code issue is --

UNIDENTIFIED SPEAKER: May I address that briefly --

THE COURT: Yeah --

UNIDENTIFIED SPEAKER: -- your Honor?

THE COURT: -- because I'm not tracking that.

UNIDENTIFIED SPEAKER: Your question to opposing counsel was tell me about the burden of the source code, of producing the source code. There was no response to that at all. And to answer another question, we did request a source code in document request number 47 specifically and it's also included at least in an umbrella fashion through several other discovery requests.

MS. KEELEY: Judge, if I just may note that I responded that the source code is highly proprietary and that's exactly what the burden is to a company.

UNIDENTIFIED SPEAKER: We're happy to enter into an agreed-upon protective order that protects their proprietary technology. Of course.

THE COURT: But -- yeah. To what end, though? You're telling me your expert would want to look at it to see if it sufficiently obscures the voice?

UNIDENTIFIED SPEAKER: Or if it obscures it at all or --

THE COURT: Right.

UNIDENTIFIED SPEAKER: -- if it doesn't do anything --

THE COURT: Right.

UNIDENTIFIED SPEAKER: -- then that term in the contract, maybe to your Honor's point, it didn't mean anything or it wasn't implemented but we'll know that only after looking at the source code.

THE COURT: I don't understand how that is relevant to the claims you have in your complaint. If you were representing Mercedes and saying Cerence didn't do what they promised to do in a contract, that's different. But I'm still not -- I'm not persuaded or, quite frankly, I don't understand the relevance of whatever they did or did not do with their agreement with Mercedes.

UNIDENTIFIED SPEAKER: Well, so I just want to clarify something, your Honor, because there -- there are two different servers. There's one that's called a run-time server and that's like essentially the production environment where people sitting in their Mercedes making requests, that's where they go. Cerence has a separate server -- it's called the research grid -- that it uses -- it uses the data in the research grid to train its voice recognition models. The data that enters the research grid comes in part from the run-time environment so these are -- they're pulling from actual requests by actual drivers. So the -- the distortion process that we've been

talking about, that occurs for certain requests in the research server. As far as we're aware, at least under this contract, it doesn't say anything about them applying the distortion to requests in the run-time environment, the production environment. So, you know, whether they're doing this or not, we agree, that doesn't matter. But what it -- the fact that they're contractually required to do shows that when they're taking requests and moving them over from one environment to the other, they're distorting it to remove the voiceprint or to mask the voiceprint. They wouldn't have to do that if what they got didn't contain a voiceprint. And the fact that not only are they doing that but Mercedes is contractually obligating them to do it to protect their customer's privacy, we think is important to -- we think it's relevant to understanding the nature of the data that they actually do get so that's -- that's the distortion algorithm.

There's also other algorithms that power the actual voice recognition technology in the run-time environment. So these are the algorithms involved in understanding the commands. We asked the witness can you at least tell us the name, you don't necessarily have to tell us how they work at a technical level but what are they called; he couldn't do it.

THE COURT: When you say "they called," what is "they"? What are they --

UNIDENTIFIED SPEAKER: The models, the algorithms.

There are some that are publicly available. There are some that are proprietary and to the extent there was an open source publicly available model our expert could address that and opine on it potentially but we don't know if it's proprietary or not or if it is an open source model or not at least for those specific ones that counsel -- co-counsel is referring to.

All right. So when we looked at the transcript with our expert, they said --

THE COURT: Let me -- the run-time environment data, that -- as I understand, Cerence is saying that's Mercedes, we don't get that.

UNIDENTIFIED SPEAKER: No. These are both Cerence servers.

THE COURT: Okay.

UNIDENTIFIED SPEAKER: These are Cerence cloud servers.

THE COURT: And so the data that stays within the Mercedes environment does not include run-time environment. Research grid I understood to go to Cerence but you're saying the run-time also goes to Cerence?

UNIDENTIFIED SPEAKER: Yes. It's a cloud environment run by Cerence.

UNIDENTIFIED SPEAKER: Yes.

THE COURT: Do you agree with that?

MS. KEELEY: Yes. We -- Cerence has a run-time

environment and it has a grid and those are the two locations that we produced audio files from.

THE COURT: And you used "cancel" twice in two different settings --

UNIDENTIFIED SPEAKER: Correct.

THE COURT: -- is that right?

UNIDENTIFIED SPEAKER: Those are the two files we produced.

UNIDENTIFIED SPEAKER: It's from one ultimate source, one driver and one vehicle, saying "cancel." And then from those two environments, they're -- there are two representations, I guess, one before an algorithm and one after an algorithm is applied.

UNIDENTIFIED SPEAKER: But if I'm understanding Mr. Geske's theory correctly, the expert can just compare these two files and see how they're different and there's no need for the source code.

THE COURT: That's what I'm still not tracking why you need the source code.

UNIDENTIFIED SPEAKER: Well, what the -- the expert -- well, so, first of all, we're just talking about -- again, this is the distortion algorithm. We're not talking about the other algorithms which we tried to ask the witness about and he couldn't even tell us their names. But as far as the distortion algorithm, we -- we may be able to compare and we've

endeavored to do that with the one word sample that --

THE COURT: With "cancel."

UNIDENTIFIED SPEAKER: -- we have.

THE COURT: Right. But you're saying you need longer samples. You're going to get that, but go ahead.

UNIDENTIFIED SPEAKER: So the thing that's helpful about the algorithm is that it gives us insight into what the software is actually doing to the voice -- so what features of the voice is it masking or distorting -- and are they the types of features that are unique to an individual such that it's relevant to whether this is a voiceprint or not.

THE COURT: And, Ms. Keeley, have you indicated whether it's proprietary -- they're talking about publicly available. Those would not be proprietary in my mind. Have you indicated whether or not the -- any algorithm that's applied is proprietary?

UNIDENTIFIED SPEAKER: My understanding is that they are.

THE COURT: All right. Has that been responded to in some form, either discovery, written requests, interrogatories?

UNIDENTIFIED SPEAKER: We have -- I believe we have objections to that effect, yes.

THE COURT: But -- well, maybe I'm not asking my question well. Have you said we object because it's proprietary or have you said we object because we're not

answering and we're not telling you whether it's proprietary or not?

UNIDENTIFIED SPEAKER: We object because proprietary.

THE COURT: All right. I'm still not persuaded that you need the source code.

UNIDENTIFIED SPEAKER: Your Honor, I mean, if ultimately a question on this case is determined whether or not biometrics are collected, in almost every -- I'll tell you every BIPA case I've been a plaintiffs' lawyer in -- there's a lot at this point -- there's an algorithm that collects and identifies and stores biometrics or there's not.

THE COURT: That's not what you're asking for, though. You're asking for the algorithm that obscures a voice.

UNIDENTIFIED SPEAKER: But the way that it obscures the voice -- the object of the algorithm as described in the contract is that of removing voiceprints and removing the information that could be used to identify an individual.

THE COURT: If they have the identifying information of the individual to begin with.

UNIDENTIFIED SPEAKER: Well, your Honor, fingerprint -- you know, a latent fingerprint is a biometric under the statute irrespective of whether it's paired to an individual or not.

UNIDENTIFIED SPEAKER: I don't agree with that.

THE COURT: I don't think so either. That's -- that's

the whole -- pictures, all of this stuff, those are not -- unless they're linked to someone, those are not biometric --

UNIDENTIFIED SPEAKER:  I understand that the linking and -- but these -- this is I think -- maybe you won't agree, but a driver who is registered with a software in a vehicle that's identified by Mercedes and has a user profile with a lot of identifying information, voice samples sent from their vehicle to a cloud environment, there's certainly a lot more information there.  And if there weren't, it would be a nonsensical contractual term for Mercedes to obligate Cerence to.

Now maybe they -- maybe they include nonsensical terms all the time and certainly I've seen those, but it does at least indicate that there's extremely relevant information contained with any -- whatever algorithm is applied.

THE COURT:  From Cerence's standpoint, can you identify the algorithm without providing the source code? That's what I was asking with the proprietary information.  If it's a -- if it's an algorithm that has a name, I don't operate in this world.  So like I think of Windows in Outlook and you might say, oh, it's Outlook but we've tweaked Outlook but it's based on Outlook but for a company we've modified it, is it -- is the algorithm so unique that it's truly source code that Cerence has created or is it some publicly available

source code you have to pay for maybe but then you've -- you've tweaked it for some reason or another within the world of Cerence?

UNIDENTIFIED SPEAKER: Your Honor, we can look into that but we're two-plus years in and this is a theory that came up this month and I need some real specific guidance from either counsel or you on what are we asking to identify because what I don't want to do -- and this is burdensome -- is to go down that path and say identify this obfuscation algorithm and then it's "oh, no, we wanted this one too; oh, no, we wanted this one too" when they don't like the answer because that's why we're here.

THE COURT: I get your sense of whack-a-mole that --

UNIDENTIFIED SPEAKER: We can make this pretty clear as far as what we're looking for to the extent --

THE COURT: Yeah. Don't worry. You're going to make it clear but you're not going to do it here because I got another case to deal with --

UNIDENTIFIED SPEAKER: Understood, your honor.

THE COURT: -- or two more. Have you talked to your expert about how many samples she or he may need?

UNIDENTIFIED SPEAKER: Yes, your Honor.

THE COURT: How many?

UNIDENTIFIED SPEAKER: Three to five.

THE COURT: Three --

UNIDENTIFIED SPEAKER:  But of longer --

UNIDENTIFIED SPEAKER:  Yes.

UNIDENTIFIED SPEAKER:  -- four to five seconds.

THE COURT:  Okay.

UNIDENTIFIED SPEAKER:  Four to six seconds (unintelligible).

THE COURT:  And do you need three to five for the two different --

UNIDENTIFIED SPEAKER:  Three to five samples which we understand will include two audio files effectively from -- so a sample -- you know, you speak in the car, it goes into this environment, there's one audio file.  An algorithm is applied.  There's a second audio file.  So we'd like to call that one sample because it represents sort of one event, one chain of custody.  So what we'd like is three to five of those; and I'm gesticulating wildly here.

THE COURT:  Yeah; no.  Three to five linear samples --

UNIDENTIFIED SPEAKER:  Yes, your Honor.  Thank you.

THE COURT:  -- that have been processed.  Okay.  Of four to six seconds?

UNIDENTIFIED SPEAKER:  Yes, your Honor.

THE COURT:  Okay.  And then --

UNIDENTIFIED SPEAKER:  Well, I should -- I should be clear because I don't want to be back here in a few weeks on the same issue --

UNIDENTIFIED SPEAKER: Yes.

UNIDENTIFIED SPEAKER: -- complete audio requests. So if it's a sample that is a trigger word followed by five seconds of silence, we would not find that in the spirit of, you know, valuable audio sample.

THE COURT: Okay.

UNIDENTIFIED SPEAKER: Right. So if --

THE COURT: Four to six seconds of voice --

UNIDENTIFIED SPEAKER: Yes.

THE COURT: -- command.

UNIDENTIFIED SPEAKER: So the command, the command itself would be four to six seconds in length.

THE COURT: Okay. Again, I don't own a Mercedes but using -- four to six seconds is a long voice command in a car. I think you're going to end up with -- it's not Google. What do you all call it?

UNIDENTIFIED SPEAKER: It's actually pretty typical when you think "hey, Mercedes, tell me where the nearest gas station is." It's very typical.

THE COURT: Yeah. I don't think that's six seconds.

UNIDENTIFIED SPEAKER: If defendant comes back and says we can't identify it, then I'll -- four to six seconds, we can identify -- we've got three of four to five seconds, I think we'll probably be able to reach an agreement if they're complete audio requests.

THE COURT: Yeah. Okay. All right. You're all are going to put together an agreed order on this so it's -- I know it's over your objection, Cerence, so you don't -- it's not agreed that way but I need an order because I am not going to have you back again.

The algorithm issue, though, I want to under -- I do want Cerence to say -- if you say it's completely our intellectual property and our -- you know, our source code and it's -- again, I don't work in this area so what I'm saying may make no sense to your client. But if they are -- if they are -- if they're saying these are publicly available, we paid for them but we tweak them, then I want you to tell them here is the format we started with although we've modified it. That will at least give -- and that maybe all you get. I am really disinclined to give the source code. So if they have modified something they paid for to make it work for their system, I don't see the need to have that done given the fact that your expert would -- will still look at and say this was sufficiently modified or obscured or it wasn't.

The fact that they -- that Cerence may have used a publicly available algorithm and paid for it and done nothing with it, no tweaking and used it and your expert says this still doesn't modify it enough, so be it, I don't -- I don't know why you need the source code.

UNIDENTIFIED SPEAKER: Well, if it's publicly

available, we certainly won't or I can't imagine that we would.

THE COURT: It doesn't even matter because it's -- the source code doesn't matter. Your expert's opinion as to whether or not it's been sufficiently obscured is what matters under your theory.

UNIDENTIFIED SPEAKER: There are also --

THE COURT: Well, wait a minute. Maybe I'm wrong. Are you saying if they've used a publicly available software that obscures a voice and if they've used one that's been deemed reasonable and you'll end the case because they've used a publicly available software.

UNIDENTIFIED SPEAKER: No, your Honor.

THE COURT: Okay. So that answered my question. So it doesn't matter what the source code is. The end result is what your expert says about it unless I'm missing something.

UNIDENTIFIED SPEAKER: Well, are we talking about publicly available?

THE COURT: It doesn't matter. What if it's -- what if it's publicly available, they used it, they didn't change anything about it and your expert says they still --

UNIDENTIFIED SPEAKER: I think your Honor has cut to the chase in a unique way.

THE COURT: -- they still haven't -- they still hasn't sufficiently obscured the voice.

UNIDENTIFIED SPEAKER: So I think if they could tell

us there are certain types of voice and speech recognition technology that, although the source code is not public, the types of models and algorithms that the software uses are well known and the names of them are well known.  So I think it would be helpful to have some indication since the witness was not able to answer questions on this here's what models we apply when we do the ASR, here's what models we apply when we do natural language understanding, here's the models that we -- that our software utilizes when we do the obscure process and that -- that's helpful to the expert because --

THE COURT:  Wait.  Why does anything but the obscure process matter?

UNIDENTIFIED SPEAKER:  Because the -- we're talking about things that go on in the run-time environment.  If these software or these algorithms are extracting features from the person's voice that are unique to the individual, that's relevant to the witness's opinion on it being a voiceprint and on Cerence extracting a voiceprint from the utterance.

THE COURT:  Isn't the issue whether or not the voice has been sufficiently obscured?

UNIDENTIFIED SPEAKER:  That is.

THE COURT:  And if you're telling me -- look, we can end this right now.  If you're telling me if they're using a well founded, well-established software and that's all you need to know if they obscure it using that, then the case is over,

right?

UNIDENTIFIED SPEAKER: Your Honor, we are -- we are looking for -- maybe. We're looking for the algorithms as identified in Document Request 47 that are applied to the audio sample. That includes -- there are multiple steps to that, including natural language understanding and automatic speech recognition and this, what I'll call, an obfuscation step for algorithms.

THE COURT: But like natural language understanding, that doesn't obscure the voice, does it? That's an algorithm that's used to understand what's being said.

UNIDENTIFIED SPEAKER: Yes, your Honor, but based -- but -- and this is something that we're relying on experts for as well is that may require to build a model of the individual user's voice in order to operate effectively.

THE COURT: Okay. Work on the -- I am not persuaded that you're going to get their source code. I am persuaded that if there's an algorithm that's being used if it's all in-house created source code that has no name other than Cerence -- this is what our engineers created and this is what we use and you may have, you know, some internal name for it, I don't think that's protected, but the source code itself is, you need to provide that to them.

UNIDENTIFIED SPEAKER: Thank you, your Honor.

UNIDENTIFIED SPEAKER: Your Honor, is this as -- only

as to obscuring the voice, correct?

THE COURT: Yes.

UNIDENTIFIED SPEAKER: Okay. Because in their motion, they say "plaintiffs' expert needs to have an opportunity to review the software source code for defendants' voice and speech recognition technology." That's everything.

THE COURT: Yes, that --

UNIDENTIFIED SPEAKER: That's the whole company. This is all we do.

THE COURT: -- that is the point I just made.

UNIDENTIFIED SPEAKER: Understood, your Honor.

THE COURT: This "natural language understanding," that is not obscuring anything. That is how their technology works.

UNIDENTIFIED SPEAKER: Understood, your Honor.

THE COURT: Your issue is biometric information privacy.

UNIDENTIFIED SPEAKER: Yes, your Honor.

THE COURT: And apparently I can tell you if you -- your theory of what happens is what matters, artificial intelligence, you'll become billionaires. It is just an absurd application of the statute but you have a right to try it.

UNIDENTIFIED SPEAKER: Yes, your Honor.

THE COURT: So it is just the -- I don't know what your client use -- so I don't know if you know right now what

your client uses to obscure the voice identification.

UNIDENTIFIED SPEAKER: I don't know the answer because the request was so broad I haven't gotten to that.

THE COURT: I'm not faulting you, but you need to provide that type of information. And if your answer is "it's all in-house, that's what we designed and we have our own source code," that's -- that's going to be what they're stuck with and their expert is going to be able to say this sufficiently does it or it doesn't do it. I don't -- you know, well beyond my wheelhouse.

UNIDENTIFIED SPEAKER: So we will work with counsel on the agreed order that says we will identify the nature of the technology that obscures the voice, if any, as described in that Mercedes contract.

THE COURT: Correct. And the linear sample as we -- you know --

UNIDENTIFIED SPEAKER: Yes.

THE COURT: -- as Ms. -- okay. We're talking about the samples, how they --

UNIDENTIFIED SPEAKER: Yes.

THE COURT: -- get modified, if at all.

UNIDENTIFIED SPEAKER: Got it.

THE COURT: How much -- I'll give you all until Friday to send in a proposed order.

UNIDENTIFIED SPEAKER: You know -- I'm sorry. I'm

not sure I -- I'm not sure I followed the last thing. We're providing the samples?

THE COURT: Yes.

UNIDENTIFIED SPEAKER: Okay.

THE COURT: Three to five linear samples.

UNIDENTIFIED SPEAKER: Three to five linear samples and identify the nature of the technology used for obscuring, if any, as described in the Mercedes contract?

THE COURT: Correct.

UNIDENTIFIED SPEAKER: Those are the two things.

THE COURT: And those three to five samples have to be, I don't know, about four to six seconds. I think that is going to be a lot.

UNIDENTIFIED SPEAKER: We can -- we can rip that out.

THE COURT: Okay.

UNIDENTIFIED SPEAKER: I actually think we can rip that out.

THE COURT: Okay. Anything else on your motion?

UNIDENTIFIED SPEAKER: No.

(Pause.)

UNIDENTIFIED SPEAKER: Your Honor, I -- I don't see it being burdensome or difficult for Cerence to at least identify the models involved in the ASR and NLU technologies. I understand your Honor --

THE COURT: No, no. This has gone far enough. This

is their -- that's what they do.  They take saying "cancel, take me to the nearest gas station, where is a Starbucks," all the other things people in a Mercedes do, that's what they provide to Mercedes.  You want to get that source code? That's giving -- that's like Pepsi Cola giving you the Pepsi formula.

UNIDENTIFIED SPEAKER:  No, no, no.  We're not talking about source code.  I'm just saying the names of the models.

THE COURT:  What models --

UNIDENTIFIED SPEAKER:  Your Honor, a lot of these might be --

THE COURT:  -- for voice recognition?

UNIDENTIFIED SPEAKER:  Yeah.  It might be publicly available and a lot -- you know, in the fingerprint context to your Honor's points --

THE COURT:  No.

UNIDENTIFIED SPEAKER:  -- were based on this algorithm, maybe there's some modification.

THE COURT:  No.  Your issue is voice goes into Mercedes car, Mercedes car somehow shares that information with Cerence, Cerence uses it for two purposes, one of which is training, and they promised Mercedes they'd obscure the voices.

UNIDENTIFIED SPEAKER:  Right, but -- I don't want to get too technical but a computer can't hear a voice the way a human ear can.  So what computers do the way that voice and

speech recognition technology works --

THE COURT:  No.  I'm done.  Sorry.  That's what you're getting.  This has --

UNIDENTIFIED SPEAKER:  Understood.

THE COURT:  -- honestly gone on long enough.

UNIDENTIFIED SPEAKER:  Thank you, your Honor.

THE COURT:  You're welcome.  Set a status for next week to make sure we get an order in place; and then in your order, tell me when you want to get back here if at all -- hopefully not -- but I don't know where you are in discovery.

UNIDENTIFIED SPEAKER:  Yes, your Honor.

THE COURT:  Anything else from Cerence?

MR. WOLFE:  No, your Honor.

MS. KEELEY:  No.

THE COURT:  Thank you.

(Concluded at 2:48:52 p.m.)

* * * * *

I certify that the foregoing is a correct transcript of the digital proceedings in the above-entitled matter to the best of my ability, given the limitations of using digital-recording system.

*/s/Laura LaCien* _____          October 16, 2025
Laura LaCien, CSR, RMR, CRR                    Date
Official Court Reporter/Transcriber